# United States Tax Court

T.C. Memo. 2024-3

WILLIAM E. FRAZIER AND MARY A. FRAZIER, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos. 8427-14, 8548-14,     Filed January 8, 2024.
18494-15, 18521-15,
18721-15, 18745-15,
18797-15, 18799-15.

————————

*Jaye A. Calhoun* and *Ray C. Mayo, Jr.*, for petitioners.

*Edwin B. Cleverdon*, for respondent.

## CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ...................... 9

FINDINGS OF FACT ........................................................................... 15

I.     Petitioners: the Fraziers and their wholly-owned C corporation, LHDC ...................................................................... 15

II.     LHDC administered Section 8 housing programs for certain public housing agencies in Louisiana. ........................... 16

---

[1] Cases of the following petitioners are consolidated herewith: Louisiana Housing Development Corp., Docket Nos. 8548-14, 18721-15, and 18799-15; William E. Frazier, Docket No. 18494-15; Mary A. Frazier, Docket No. 18521-15; and William E. Frazier and Mary A. Frazier, Docket Nos. 8427-14, 18745-15, and 18797-15. Cases with docket numbers 18725-15 and 18726-15, regarding deficiencies for tax years 2013, were also consolidated with these cases, but were settled before trial.

**[*2]**

III. Louisiana Assisted administered Section 8 housing programs for certain other public housing agencies in Louisiana. ................................................................ 16

IV. LHDC agreed to make payments to Gary Lala.......................... 17

V. Hurricane Katrina affected LHDC operations............................ 17

VI. LHDC began administering Disaster Housing Assistance Program payments for Jefferson Parish PHA........................... 17

VII. In 2006, LHDC and Lala replaced their 2003 contract with a new contract. ........................................................................ 17

VIII. Louisiana Assisted began administering DHAP payments for Mississippi Gulf Coast; Bobbie sold 50% of her share of Louisiana Assisted to LHDC in exchange for LHDC's assistance in doing so. ................................................................. 19

IX. Business operations of LHDC and Louisiana Assisted during the years at issue.............................................................. 19

X. During the years at issue, Louisiana Assisted made cash distributions to LHDC and reimbursed LHDC for certain expenses. ................................................................................ 21

    A. During the years at issue, Trombetta's accounting firm prepared income statements for LHDC. .............................. 21

    B. During the years at issue, Louisiana Assisted paid cash distributions to LHDC. .......................................................... 23

    C. During the years at issue, Louisiana Assisted made reimbursements payments to LHDC. ................................... 24

XI. In 2012, LHDC sold of its 50% membership interest in Louisiana Assisted to Bobbie.................................................... 24

XII. In 2012, the Fraziers sold securities from the Merrill Lynch brokerage account. .................................................................... 25

XIII. In 2012, the Fraziers sold securities from the Franklin Growth Fund, receiving $40,867 of proceeds. ........................... 48

**[*3]**
XIV. In 2012, the Fraziers' received $1,417 from "Columbia Seligman Comm. And Info.".................................................. 48

XV. In 2012, the Fraziers received taxable wages, interest, dividends, IRA distributions, pension distributions, social security benefits, and Schedule E income and had federal income tax withholding. ............................................. 48

XVI. In 2012, the Fraziers paid state and local income taxes and real estate taxes. ........................................................ 48

XVII. Tax reporting: Louisiana Assisted's Forms 1065, the Fraziers' Forms 1040 and 2012 Form 1099-B, and LHDC's Forms 1120 .................................................................... 48

    A. Louisiana Assisted ................................................ 49

        1. Overview of Louisiana Assisted's tax reporting: Forms 1065 .................................................... 49

        2. Louisiana Assisted's tax reporting by year ............... 51

            a. 2009 ................................................. 51

            b. 2010 ................................................. 54

            c. 2011 ................................................. 57

            d. 2012 ................................................. 59

    B. The Fraziers ....................................................... 62

        1. The Fraziers' tax reporting for 2009 ......................... 62

        2. The Fraziers' tax reporting for 2010 ......................... 65

        3. The Fraziers' tax reporting for 2011 ......................... 68

        4. The Fraziers' 2012 tax year ...................................... 72

    C. LHDC ................................................................. 72

        1. LHDC's tax reporting for 2009 ................................. 72

        2. LHDC's tax reporting for 2010 ................................. 76

4

**[\*4]**      3.  LHDC's tax reporting for 2011 ................................... 79

                 4.  LHDC's tax reporting for 2012 ................................... 83

XVIII. Notices of deficiency ...................................................... 87

    A.  The Fraziers .................................................................. 87

                 1.  2009 tax year ............................................... 87

                 2.  2010 tax year ............................................... 90

                 3.  2011 tax year ............................................... 92

                 4.  2012 tax year ............................................... 93

    B.  LHDC .......................................................................... 97

                 1.  2009 tax year ............................................... 97

                 2.  2010 tax year ............................................... 99

                 3.  2011 tax year ............................................. 100

OPINION ............................................................................... 102

I.    LHDC was the other member of Louisiana Assisted. .............. 106

    A.  Under Louisiana law, the other membership interest in
        Louisiana Assisted was owned by LHDC. .......................... 106

    B.  Under federal tax law, the other membership interest
        in Louisiana Assisted was owned by LHDC. ....................... 113

    C.  The IRS's Danielson argument is inapposite because
        petitioners are not attempting to disavow the terms of
        the 2007 oral agreement. ...................................... 114

II.   The tax consequences to LHDC and the Fraziers of LHDC
      being the other member of Louisiana Assisted ...................... 115

    A.  Legal Concepts ................................................................ 115

                 1.  Tax Court jurisdiction ........................................ 115

                 2.  Taxation of entities treated as partnerships ............ 116

5

[*5]    B. Analysis ................................................................ 117

      1. 2009 tax year ................................................ 117

          a. The Fraziers .................................................. 118

          b. LHDC .......................................................... 118

      2. 2010 tax year ................................................ 120

          a. The Fraziers .................................................. 121

          b. LHDC .......................................................... 121

      3. 2011 tax year ................................................ 122

          a. The Fraziers .................................................. 123

          b. LHDC .......................................................... 124

      4. 2012 tax year ................................................ 124

          a. The Fraziers .................................................. 126

          b. LHDC .......................................................... 126

III.   We do not sustain the IRS's adjustments to LHDC's 2010 and 2011 salary-and-wage deductions and to LHDC's 2011 professional-fee deductions. ...................................................... 127

     A. The entire amounts of disallowed salaries and wages and professional fees were paid. .......................................... 131

     B. The IRS is not permitted to rely on the new theory raised on brief .................................................................. 132

IV.   The Fraziers had $3,856 short-term capital gain and $2,283 in long-term capital gain for 2012 from the sales of capital assets from the Merrill Lynch brokerage account. ....... 135

     A. The law .......................................................................... 135

     B. Analysis of the Fraziers' sales of securities from the Merrill Lynch brokerage account ........................................ 136

        1. Cost basis ................................................................ 136

**[\*6]**

    a. The Fraziers had basis of $30,642 in the 2,332 shares of Columbia Tax Exempt Fund A that they acquired on June 8, 2011, and sold on March 15, 2012.................. 137

    b. The Fraziers had basis of (a) $13.14 in the 1 share of Columbia Tax Exempt Fund A that they acquired on January 26, 2012, and sold on March 15, 2012; and (b) $4.06 in the 0.309 of a share of Columbia Tax Exempt Fund A that they acquired on January 26, 2012, and sold on March 27, 2012. .............................................. 137

    c. The Fraziers had basis of (a) $19,003 in the 1,829 shares of Blackrock Municipal I that they acquired on June 8, 1994, and sold on March 15, 2012; and (b) $26,214 in the (separately listed on the Form 1099-B) 2,523 shares of Blackrock Municipal I that they acquired on June 8, 1994, and sold on March 15, 2012. ............................................ 138

2. The securities sold from the Merrill Lynch brokerage account in 2012 were capital assets........ 138

3. Holding periods for the five sales of securities for which the Form 1099-B states the cost basis are "N/A" ....................................................................... 139

4. The Fraziers' long-term capital gain is computed without the $5.62 loss disallowed by the wash-sale. ................................................................... 139

5. The Fraziers' short-term and long-term capital gains from the sales of securities from the Merrill Lynch brokerage account assuming that the total proceeds from the sales were $307,261 (the total of the amounts stated in the Form 1099-B) ............. 140

6. The Fraziers' short-term and long-term capital gains from the sales of securities from the Merrill Lynch brokerage account after accounting for the $665 discrepancy between the total proceeds in

7

[*7]     the Form 1099-B and the total proceeds in the
         stipulation................................................................. 141

V.    The Fraziers had $40,867 in short-term capital gain from
      the sale of securities from the Franklin Growth Fund. ........... 143

VI.   For 2012, the Fraziers had $1,417 in short-term capital
      gain from "Columbia Seligman Comm. And Info." .................. 143

VII.  The Fraziers received $957,397 in Schedule E income,
      $1,545 in ordinary dividends, and $4,636 in qualified
      dividends for 2012. ............................................................. 145

VIII. For 2012, the Fraziers are entitled to the standard
      deduction of $14,200.......................................................... 146

IX.   The Fraziers' income for 2012 is computed with two
      personal exemptions for a total of $7,600................................ 147

X.    The Fraziers' liability for section 6662 accuracy-related
      penalties............................................................................ 148

      A. For 2009, the Fraziers are not liable for the accuracy-
         related penalty under section 6662(a)................................ 150

      B. For 2010, the Fraziers are not liable for the accuracy-
         related penalty under section 6662(a) because the
         understatement is not substantial, a point that will be
         confirmed by Rule 155 computations. ................................ 151

      C. For 2011, the Fraziers are not liable for the accuracy-
         related penalty under section 6662(a) because the
         understatement is not substantial, a point that will be
         confirmed by Rule 155 computations. ................................ 152

XI.   The Fraziers' liability for section 6651(a)(1) additions to tax
      ......................................................................................... 153

      A. The law ......................................................................... 153

      B. Analysis ........................................................................ 156

         1. For 2009, the Fraziers are liable for the section
            6651(a)(1) addition to tax........................................... 156

8

[*8]  2. For 2010, the Fraziers are liable for the section 6651(a)(1) addition to tax.......................................... 157

3. For 2011, the Fraziers are liable for the section 6651(a)(1) addition to tax.......................................... 158

4. For 2012, the Fraziers are not liable for the section 6651(a)(1) addition to tax. ........................... 159

XII.  The Fraziers' liability for the section 6651(a)(2) addition to tax ................................................................... 160

A. Petitioners waived the argument that (1) the IRS did not prepare a valid substitute for return under section 6020(b) and (2) the IRS has not produced evidence that it prepared such a return..................................... 162

B. For 2012, should the Rule 155 computations show a positive amount as the correct amount of tax, the Fraziers are liable for the section 6651(a)(2) addition to tax. ..................................................................... 163

XIII.  LHDC's liability for section 6662 accuracy-related penalties............................................................. 164

A. For 2009, if Rule 155 computations show a substantial understatement, LHDC is liable for the section 6662(a) penalty for the entire underpayment. ................................ 166

B. For 2010, LHDC is not liable for the accuracy-related penalty under 6662(a)....................................... 168

C. For 2011, LHDC is not liable for the accuracy-related penalty under 6662(a)....................................... 169

XIV.  LHDC's liability for section 6651(a)(1) additions to tax .......... 170

A. For 2009, LHDC is liable for the section 6651(a)(1) addition to tax. ................................................................ 171

B. For 2010, LHDC is liable for the section 6651(a)(1) addition to tax. ................................................................ 172

[*9]    MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, *Judge*: During the 2009, 2010, 2011, and 2012 tax years (years at issue), William and Mary Frazier were the sole shareholders of Louisiana Housing Development Corporation (LHDC), a subchapter C corporation. The Fraziers are a married couple who filed joint income tax returns for 2009, 2010, and 2011, but they did not file a return for 2012. Respondent, or the IRS, issued notices of deficiency to the Fraziers and LHDC (collectively, petitioners) determining income tax deficiencies, accuracy-related penalties, and additions to tax. In these consolidated cases, the Fraziers and LHDC seek judicial review of these determinations:

| Docket number | Petitioner(s) | Year | Deficiency | § 6662 penalty | § 6651(a)(1) addition to tax | § 6651(a)(2) addition to tax |
|---|---|---|---|---|---|---|
| 8427-14 | William & Mary Frazier | 2009 | $1,051,988 | $210,398 | $261,807 | $ — |
| 8548-14 | LHDC | 2009 | 313,155 | 62,631 | 77,7933 | — |
| 18745-15 | William & Mary Frazier | 2010 | 211,420 | 42,284 | 52,855 | — |
| 18721-15 | LHDC | 2010 | 9,270 | 20,299 | 15,224 | — |
| 18797-15 | William & Mary Frazier | 2011 | 167,051 | 33,410 | 41,763 | — |
| 18799-15 | LHDC | 2011 | 177,759 | 36,152 | — | — |
| 18521-15 | Mary Frazier | 2012 | 267,458 | — | 60,178 | 29,420 |
| 18494-15 | William Frazier | 2012 | 268,506 | — | 60,414 | 29,536 |

The Fraziers and LHDC filed timely Petitions under section 6213(a). The Fraziers were residents of Louisiana when they filed their Petitions. LHDC's principal place of business was in Louisiana when it filed its petitions. We have jurisdiction to resolve these cases under section 6213(a).[2]

---

[2] Unless otherwise indicated, references to sections are to the Internal Revenue Code of 1986, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*10] We use short names for certain persons and entities:

| Short name of person or entity | Full name | Description |
|---|---|---|
| William | William Frazier | A petitioner, married to Mary |
| Mary | Mary Frazier | A petitioner, married to William |
| The Fraziers | William & Mary Frazier | Collective name for William and Mary Frazier |
| LHDC | Louisiana Housing Development Corporation | A C corporation owned 75% by Mary and 25% by William |
| Louisiana Assisted | Louisiana Assisted Housing Company, LLC | A limited liability company that, from 2007 to 2012, was owned 50% by Bobbie Robinson and 50% by LHDC. |
| Tracy | Tracy Robinson | Daughter of William and Mary |
| Bobbie | Bobbie Robinson | Chief operating officer of LHDC and from 2007 to 2012, the 50% owner of Louisiana Assisted; Bobbie is not related to either Tracy or Robert |
| Robert | Robert Robinson | Husband of Tracy, unrelated to Bobbie |
| Trombetta | Mark Trombetta | The accountant for LHDC and the Fraziers |

The parties have resolved some issues through concessions. The remaining issues are resolved as follows:

1. It is undisputed that Louisiana Assisted Housing Company, LLC (Louisiana Assisted) was treated as a partnership for federal income tax purposes from 2009 through 2012 and was not subject to TEFRA proceedings for those years. *See* sec. 6221. The Fraziers and LHDC contend that in 2007 Bobbie sold half her 100% membership interest in Louisiana Assisted to LHDC and repurchased the interest in 2012. The IRS contends that in 2007 Bobbie sold half her 100% membership interest in Louisiana Assisted to William and repurchased the interest in 2012. We agree with the Fraziers and LHDC. Therefore, LHDC was the owner of the 50% membership interest opposite Bobbie from 2009 through 2012.

**[\*11]**

2.  The tax consequences of LHDC being a 50% member of Louisiana Assisted are as follows:

    a.  For 2009, the Fraziers' income does not include the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and the $3,156 distributive share of Louisiana Assisted's separately stated interest income (because William was not a member of Louisiana Assisted). We disallow the $2,987,744 deduction that the Fraziers reported to cancel the effect of their reporting the $2,987,744 distributive share of nonseparately stated income in their income (dummy deduction). LHDC's income includes its $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and its $3,156 distributive share of Louisiana Assisted's separately stated interest income. LHDC's income does not include its $2,165,000 cash distribution from Louisiana Assisted that it reported as its income. LHDC's outside basis is increased by $2,990,900 total distributive share of income from Louisiana Assisted and decreased by the $2,165,000 distribution of cash from Louisiana Assisted.

    b.  For 2010, the Fraziers' income does not include the $643,165 distributive share of Louisiana Assisted's nonseparately stated income and the $3,392 distributive share of Louisiana Assisted's separately stated interest income (because William was not a member of Louisiana Assisted). We disallow the $643,165 dummy deduction that the Fraziers reported to cancel the effect of their reporting the $643,165 distributive share of nonseparately stated income in their income. LHDC's income includes its $643,165 distributive share of Louisiana Assisted's nonseparately stated income and its $3,392 distributive share of Louisiana Assisted's separately stated interest income. LHDC's income does not include its $765,000 cash distribution from Louisiana Assisted that it reported as its income. LHDC's outside basis is increased by the $646,557 total distributive share of income from Louisiana Assisted and decreased by the $765,000 distribution of cash from Louisiana Assisted.

[*12]  c.   For 2011, the Fraziers' income does not include the $7,586 distributive share of Louisiana Assisted's nonseparately stated loss and the $1,839 distributive share of Louisiana Assisted's separately stated interest income (because William was not a member of Louisiana Assisted). The Fraziers' income does not include the $450,000 cash distribution from Louisiana Assisted to LHDC that the Fraziers reported as their income. We disallow the $450,000 dummy deduction that the Fraziers reported to cancel the effect of their reporting the $450,000 cash distribution in their income. LHDC's income includes its $7,586 distributive share of Louisiana Assisted's nonseparately stated loss and its $1,839 distributive share of Louisiana Assisted's separately stated interest income. LHDC's income does not include its $450,000 cash distribution from Louisiana Assisted that it reported in its income. LHDC's outside basis is decreased by the $5,747 net distributive share of loss from Louisiana Assisted and further decreased by the $450,000 distribution of cash from Louisiana Assisted.

d.   For 2012, William's income does not include the $932,972 distributive share of Louisiana Assisted's income (because William was not a member of Louisiana Assisted). William is not entitled to a $932,972 deduction the purpose of which would be to cancel the effect of including in William's income the $932,972 distributive share.[3]

3.   In OPINION Part III, we hold that the IRS erred in disallowing $424,935 of the $2,770,775 deduction claimed by LHDC for salaries and wages for 2010, in disallowing $358,922 of the $2,326,404 deduction claimed by LHDC for salaries and wages for

---

[3] The Fraziers did not file a tax return for 2012. Trombetta, the Fraziers' and LHDC's accountant, sent the IRS an unfiled Form 1040, U.S. Individual Income Tax Return, for 2012, which includes a Schedule C and Schedule E. The parties stipulate that "[t]he Fraziers reported Schedule E income . . . from [Louisiana Assisted] . . . during . . . 2012 in the amount[] of . . . $932,972.00" and that "[t]he Fraziers claimed Schedule C deductions related to alleged payments to LHDC for taxable year[] . . . 2012 in the amount[] of . . . $932,972.00 . . . which respondent disallowed for lack of substantiation and for lack of business purpose." While the $932,972 dummy deduction was not disallowed or even addressed in either William's or Mary's 2012 notices of deficiency, we hold that the parties tried the deductibility of this $932,972 dummy deduction by consent under Rule 41(b)(1).

**[*13]** 2011, and in disallowing $158,993 of the $1,818,542 deduction claimed by LHDC for professional fees for 2011.

4.  In OPINION Part IV, we address capital gains from the sale of the securities from the Fraziers' Merrill Lynch brokerage account. In 2012, the Fraziers sold a group of securities from their Merrill Lynch brokerage account which are the subject of the Form 1099-B, Proceeds from Broker and Barter Exchange Transactions, provided to the Fraziers and the IRS by Merrill Lynch.[4] The only issues in dispute involving the securities sold from the Merrill Lynch brokerage account are the amounts of basis of: (1) the 2,332 shares of Columbia Tax Exempt Fund A that were acquired on June 8, 2011, and sold on March 15, 2012; (2) the one share of Columbia Tax Exempt Fund A that was acquired on January 26, 2012, and sold on March 15, 2012; (3) the 0.309 of a share of Columbia Tax Exempt Fund A that was acquired on January 26, 2012, and sold on March 27, 2012; (4) the 1,829 shares of Blackrock Municipal I that were acquired on June 8, 1994, and sold on March 15, 2012; and (5) the 2,523 shares of Blackrock Municipal I that were acquired on June 8, 1994, and sold on March 15, 2012. We resolve these issues as follows:

    a.  The Fraziers had a basis of $30,642 in the 2,332 shares of Columbia Tax Exempt Fund A that were acquired on June 8, 2011, and sold on March 15, 2012. We hold that the disposition of these securities resulted in short-term capital gain.

    b.  The Fraziers had a basis of $13.14 in the one share of Columbia Tax Exempt Fund A that was acquired on January 26, 2012, and sold on March 15, 2012. We hold that the disposition of this share resulted in short-term capital gain.

    c.  The Fraziers had a basis of $4.06 in the 0.309 of a share of Columbia Tax Exempt Fund A that was acquired on January 26, 2012, and sold on March 27, 2012. We hold

---

[4] We observe that there is a $665 discrepancy between the stipulated amount of proceeds of $306,596 and the $307,261 of proceeds stated by the Form 1099-B, which the Fraziers actually received. We hold the parties to their stipulation under Rule 91(e). The $665 discrepancy must be accounted for by reducing proceeds from the 2012 sales of securities from the Merrill Lynch brokerage account that the Fraziers held for more than one year.

**[\*14]**   that the disposition of this fraction of a share resulted in short-term capital gain.

    d.   The Fraziers had a basis of $19,003 in the 1,829 shares of Blackrock Municipal I that were acquired on June 8, 1994, and sold on March 15, 2012. We hold that the disposition of these securities resulted in long-term capital gain.

    e.   The Fraziers had a basis of $26,214 in the 2,523 shares of Blackrock Municipal I that were acquired on June 8, 1994, and sold on March 15, 2012. We hold that the disposition of these securities resulted in long-term capital gain.

5.   In OPINION Part V, we address capital gains from the sale of the securities from the Fraziers' Franklin Growth Fund. In 2012, the Fraziers sold a group of securities from their Franklin Growth Fund. We hold that the Fraziers' basis in the securities was $0 and we hold that the disposition of these securities resulted in a short-term capital gain of $40,867 to the Fraziers.

6.   In OPINION Part VI, we address capital gains from an amount of $1,417 received by the Fraziers from "Columbia Seligman Comm. And Info." In 2012, the Fraziers received an amount of $1,417 from "Columbia Seligman Comm. And Info." We hold that the Fraziers' basis was $0 and that the Fraziers received $1,417 in a short-term capital gain from "Columbia Seligman Comm. And Info."

7.   In OPINION Part VII, we hold that the Fraziers received $957,397 in Schedule E income, $1,545 in ordinary dividends, and $4,636 in qualified dividends in 2012.

8.   In OPINION Part VIII, we hold that the Fraziers are entitled to the standard deduction of $14,200 for 2012.

9.   In OPINION Part IX, we hold that the Fraziers' income for 2012 is computed with two personal exemptions for a total of $7,600.

10.   In OPINION Part X, we address the Fraziers' liability for section 6662 penalties. The Fraziers are not liable for the section 6662(a) penalty for 2009 because they do not have an underpayment of tax for 2009. The Fraziers are not liable for section 6662(a) penalties for 2010 and 2011 because the understatements are not

[*15] substantial, a point that will be confirmed by computations under Rule 155.

11. In OPINION Part XI, we address the Fraziers' liability for section 6651(a)(1) additions to tax. The Fraziers are liable for section 6651(a)(1) additions to tax for 2009, 2010, and 2011. The Fraziers are not liable for the section 6651(a)(1) addition to tax for 2012.

12. In OPINION Part XII, we address the Fraziers' liability for the section 6651(a)(2) additions to tax for 2012. The Fraziers are liable for the section 6651(a)(2) addition to tax for 2012 should the Rule 155 computations show a positive amount as the correct amount of tax.

13. In OPINION Part XIII, we address LHDC's liability for section 6662 penalties. LHDC is liable for the section 6662(a) penalty for 2009 if Rule 155 calculations show the existence of a substantial understatement of tax. LHDC is not liable for section 6662(a) penalties for 2010 and 2011 because it does not have underpayments of tax for 2010 and 2011.

14. In OPINION Part XIV, we address LHDC's liability for 6651(a)(1) additions to tax. LHDC is liable for section 6651(a)(1) additions to tax for 2009 and 2010.

FINDINGS OF FACT

The parties stipulated some facts. Unless otherwise stated, we agree with the facts to which the parties have stipulated.

I. *Petitioners: the Fraziers and their wholly-owned C corporation, LHDC*

William and Mary founded LHDC in 1971. During the tax years at issue, 2009–2012, Mary held 75% of LHDC's shares, and William held 25% of its shares. William was the president of LHDC. Mary's exact role in the company is not revealed by the record, but was insignificant compared to her husband's. LHDC used the cash basis for accounting during all years at issue. William and Mary were over 65 years old at the end of 2012.

**[\*16]** II.     *LHDC administered Section 8 housing programs for certain public housing agencies in Louisiana.*

LHDC was engaged in the business of administering the Section 8 housing program for public housing agencies (PHAs) in Louisiana.

In the early 1970s, the PHA of the City of Shreveport, Louisiana,[5] engaged LHDC to administer the Section 8 housing program on its behalf. A few years later, during the late 1970s, LHDC received a second contract to administer Section 8 funds on behalf of the PHA of Jefferson Parish, Louisiana.[6]

III.     *Louisiana Assisted administered Section 8 housing programs for certain other public housing agencies in Louisiana.*

In 2000, Bobbie formed Louisiana Assisted to administer the Section 8 housing program for Plaquemines Parish PHA. (Initially, Plaquemines Parish did not have a PHA, and Bobbie helped the Parish create one.) Bobbie was LHDC's chief operating officer and its program administrator for Jefferson Parish. William knew about Louisiana Assisted and gave Bobbie his full consent for her to operate it. Louisiana Assisted expanded its administration of the Section 8 housing program from Plaquemines Parish to other PHAs that were too small to be profitable for LHDC. Bobbie was Louisiana Assisted's sole member until 2007.[7] During all years at issue, Louisiana Assisted used the cash basis of accounting for federal income tax purposes. During all years at issue, Louisiana Assisted was a Louisiana limited liability company operating out of Gretna, Louisiana with a mailing address in Metairie, Louisiana. Both Gretna and Metairie are in Jefferson Parish Louisiana.

---

[5] Shreveport is located in Caddo Parish in the northern part of Louisiana.

[6] In Louisiana, parishes are the sub-state governmental units analogous to counties in other states. Where the city and parish governments are consolidated, the consolidated city-parish is the sub-state governmental unit corresponding to consolidated city-county units in other states. *Cities 101 – Consolidations*, National League of Cities, https://www.nlc.org/resource/cities-101-consolidations/ (last visited Sept. 9, 2021).

[7] It is unclear how Louisiana Assisted was treated for federal income tax purposes when Bobbie was its sole member. Louisiana Assisted was a single-member LLC. For federal income tax purposes, it would have been treated either as (1) a disregarded entity (and sole proprietorship of Bobbie) or (2) a corporation. *See* Treas. Reg. § 301.7701-3(a), (b)(1)(ii).

[*17] IV.  *LHDC agreed to make payments to Gary Lala.*

In 2003, LHDC's contract with the Jefferson Parish PHA was up for renewal. A former vice chairman of the Jefferson Parish PHA, Gary Lala (Lala), contacted William. Lala suggested that he would attempt to secure the contract for himself unless LHDC entered into a business arrangement with him. Lala's best friend was the chairman of the board of the Jefferson Parish PHA, Barry Bordelon. Not wanting LHDC to lose the Jefferson Parish Section 8 housing program contract, William agreed that Lala could receive payments from LHDC. Lala and LHDC drew up a contract in 2003. That contract is not in the record.

V.  *Hurricane Katrina affected LHDC operations.*

Hurricane Katrina, which hit the Gulf Coast in August 2005, destroyed LHDC's Jefferson Parish office and disrupted LHDC's operations. To help LHDC recover, William and Mary's daughter Tracy and her husband Robert moved from Austin, Texas to work for LHDC. Tracy was a lawyer with a solo practice in Austin, Texas. Before that she had worked as an in-house tax lawyer for Exxon Mobil and BP. After the post-Katrina move to Louisiana, Tracy began to perform regulatory compliance work for LHDC. Robert had been working as an information-technology professional in Austin. After the post-Katrina move to Louisiana, he began working for LHDC without a specific title. In 2014, he became its president.

VI.  *LHDC began administering Disaster Housing Assistance Program payments for Jefferson Parish PHA.*

Katrina displaced many people living in Jefferson Parish and other parts of the U.S. Gulf Coast. The Federal Emergency Management Agency partnered with HUD to develop the Disaster Housing Assistance Program (DHAP), whose purpose was to provide disaster-relief housing for victims displaced by Katrina. LHDC received a contract with Jefferson Parish PHA to administer its DHAP payments.

VII.  *In 2006, LHDC and Lala replaced their 2003 contract with a new contract.*

The 2003 contract between LHDC and Lala was replaced with a new contract each time LHDC renewed its contract with the Jefferson Parish PHA. In 2006, the 2003 LHDC-Lala contract was replaced by a new contract.

**[\*18]** The 2006 contract, which was signed by William Frazier as LHDC's "duly authorized President," provided that Lala would be employed as the vice president of LHDC. Under the contract, LHDC was required to pay Lala a base fee of $400,080 per year. In addition to this base fee, Lala was to be paid a fee calculated by reference to increased fees received by LHDC for administering Section 8 payments:

An additional monthly fee of 33% of the net increase in the Base Administrative Fee received by LHDC above the sum received for the same month in the previous calendar year. Should the gross unit administrative fee[8] that LHDC receives from the Authority fall below the Base Administrative Fee for the same month in the previous calendar year, 33% of the reduction shall be offset against future or current payments.[9]

"Base Administrative Fee" was defined as the fee that LHDC received each month for providing Section 8-related administrative services to PHAs.

Furthermore, the contract required LHDC to pay Lala 50% of fees that LHDC earned from new programs:

Additional compensation: Fees for any new programs such as Disaster Voucher Program (DVP) one time placement fees, affordable housing, homeownership and consulting grants, all shall be paid at a rate of one-half (50%)

The contract also provided that Lala was entitled to reimbursement for business-related meals, entertainment, travel, and telephone expenses of $4,000 per month.

Except for exercising his influence with the Jefferson Parish PHA, Lala seems to have performed little work for LHDC. He did not

---

[8] The contract does not define "gross unit administrative fee." There is nothing else in the record that allows us to discern what the "gross unit administrative fee" is. We need not make a finding as to what constitutes the "gross unit administrative fee" because the specific terms of Lala's compensation under his contract with LHDC has no bearing on the outcome of the issues under dispute.

[9] The contract does not elaborate on what payments the 33% reductions are offset against. Like the "gross unit administrative fee," *see supra* note 8, we need not make a finding as to what payments the 33% reductions are being offset against because the specific terms of Lala's compensation under his contract with LHDC has no bearing on the outcome of the issues in dispute.

**[\*19]** have an office at the LHDC headquarters. He went into LHDC's headquarters infrequently, if ever. Other LHDC workers considered him a political "leech."

VIII. *Louisiana Assisted began administering DHAP payments for Mississippi Gulf Coast; Bobbie sold 50% of her share of Louisiana Assisted to LHDC in exchange for LHDC's assistance in doing so.*

Around 2007, HUD awarded Louisiana Assisted a contract to administer DHAP payments for portions of the Mississippi Gulf Coast.[10] These payments were apparently handled without the involvement of a PHA. Bobbie, who was the sole owner of Louisiana Assisted, was concerned that Louisiana Assisted lacked the necessary personnel, office space, and information technology, for such an undertaking. Bobbie orally agreed with William that Louisiana Assisted could use LHDC's personnel, office space, and information technology to administer the DHAP payments to residents of the Mississippi Gulf Coast in exchange for LHDC receiving a 50% membership interest in Louisiana Assisted. We refer to this agreement as the 2007 oral agreement.

William and Bobbie were concerned that Lala would take the view that he was entitled to a portion of the Louisiana Assisted fees for the Mississippi Gulf Coast under his 2006 agreement with LHDC. Therefore, they attempted to conceal that LHDC had received a 50% membership interest in Louisiana Assisted. As described later, the tax returns of Louisiana Assisted, the Fraziers, and LHDC, were prepared in such a way as to hide LHDC's ownership interest in Louisiana Assisted and report that William was the owner.

IX. *Business operations of LHDC and Louisiana Assisted during the years at issue*

During the years at issue, 2009–2012, LHDC and Louisiana Assisted were administering the following housing programs:

---

[10] The Mississippi Gulf Coast refers to the area of the State of Mississippi that is along the Gulf of Mexico.

| [*20] | *LHDC* | *Louisiana Assisted* |
|---|---|---|
| *Section 8* | City of Shreveport PHA<br><br>Jefferson Parish PHA<br><br>Other PHAs | Plaquemines Parish PHA<br><br>Other PHAs |
| *DHAP* | Jefferson Parish PHA | Areas of Mississippi Gulf Coast (no PHAs involved) |

Pursuant to the 2007 oral agreement, LHDC provided Louisiana Assisted services (through its workers, both workers treated as employees and workers treated as independent contractors), office space, and information systems, to assist Louisiana Assisted in administering the Mississippi Gulf Coast DHAP program. LHDC also administered its own contracts.

LHDC and Louisiana Assisted each had their own workers and their own payment system for making wage and non-wage payments to the workers. LHDC paid its workers (and paid non-wage payroll expenses) through the use of Creative Payroll Solutions, a professional employer organization.

Creative Payroll Solutions performed LHDC's payroll function, which includes paying those workers that LHDC treated as employees, and performing payroll services related to payroll compliance, workers' compensation, health insurance, retirement, 401(k), dental plans, and company benefit plans.[11] Creative Payroll Solutions also paid professional fees to workers who were not treated as employees.

The people who worked for LHDC, and who were treated as employees by LHDC, were paid by Creative Payroll Solutions, which in turn received payment from LHDC. The wage for each such worker was determined by LHDC. LHDC would pay Creative Payroll Solutions amounts equal to (1) wages for all such workers, (2) payroll expenses that were not related to wages, and (3) a fee for Creative Payroll

---

[11] Trombetta ran Creative Payroll Solutions. Trombetta was also the Fraziers' and LHDC's long-time accountant. He began working for them in the mid-1980s. He was a certified public accountant and was licensed with the State of Louisiana to practice accounting. Trombetta prepared the Fraziers' Forms 1040, U.S. Individual Income Tax Return; LHDC's Forms 1120, U.S. Corporation Income Tax Return; and LHDC's annual income statement. Another accounting firm prepared the Forms 1065, U.S. Return of Partnership Income, for Louisiana Assisted.

[*21] Solutions. Every two weeks Creative Payroll Solutions would pay these workers their wages.

LHDC paid Creative Payroll Solutions $2,770,775.28 in 2010, which is the same amount that LHDC reported as a deduction for salaries and wages on its 2010 tax return. LHDC paid Creative Payroll Solutions $2,326,406.19 in 2011, which is the same amount that LHDC reported as a deduction for salaries and wages on its 2011 tax return. Our reasoning for the findings in this paragraph is discussed *infra*, OPINION Part III.B.1.

Creative Payroll Solutions also wrote checks on behalf of LHDC to various payees for professional fees. Creative Payroll Solutions had a facsimile of William's signature that it used to sign the checks to these payees.

LHDC paid professional fees in the amount of $1,818,542 in 2011, which is the same amount that LHDC reported as a deduction for professional fees on its 2011 tax return. Our reasoning for this finding is discussed *infra*, OPINION Part III.B.2.

X. *During the years at issue, Louisiana Assisted made cash distributions to LHDC and reimbursed LHDC for certain expenses.*

During the years at issue, Louisiana Assisted made two types of transfers of funds to LHDC for two reasons. First, Louisiana Assisted made cash distributions to LHDC, and second, Louisiana Assisted reimbursed LHDC for certain expenses paid for work performed on behalf of Louisiana Assisted. LHDC's income statements and Trombetta's testimony help us trace the movements of cash from Louisiana Assisted to LHDC.

A. *During the years at issue, Trombetta's accounting firm prepared income statements for LHDC.*

For the years at issue, Trombetta's accounting firm prepared an income statement for LHDC. These income statements show LHDC's revenue and expenditures for the calendar years of 2009, 2010, 2011, and 2012. Although they were not filed with the IRS as part of LHDC's tax returns, Trombetta used them in preparing LHDC's tax returns.

Three line items in LHDC's income statements represent cash received from Louisiana Assisted:

**[*22]** (1) "Fees – LA Assisted Housing, LLC," which is in LHDC's 2009 and 2010 income statements, but not in LHDC's 2011 and 2012 income statements;

(2) "Fees Reimbursed LA Assisted Housing," which is in LHDC's income statements for all four years (2009–2012); and

(3) "Other Income," which is only in LHDC's 2012 income statement.

The following table shows the amounts recorded for these three categories (i.e., "Fees – LA Assisted Housing, LLC," "Fees Reimbursed LA Assisted Housing," and "Other Income") along with amounts recorded for "Total Sales" (for reference) in LHDC's income statements for every tax year at issue:

| Income Statement Year | Fees – LA Assisted Housing, LLC | Fees Reimbursed LA Assisted Housing | Other Income | Total Sales |
|---|---|---|---|---|
| 2009 | $2,165,000 | $17,560 | N/A | $9,239,547 |
| 2010 | 765,000 | 17,460 | N/A | 5,528,510 |
| 2011 | N/A | 477,114 | N/A | 4,830,470 |
| 2012 | N/A | 926,434 | 165,000 | 4,731,274 |

We now address some aspects of LHDC's income statements that are not explained by the statements but by other parts of the record.

First, for 2009 and 2010, Trombetta intended for "Fees – LA Assisted Housing, LLC" to show cash distributions from Louisiana Assisted and "Fees Reimbursed LA Assisted Housing" to show reimbursements for costs that LHDC paid for work performed on behalf of Louisiana Assisted.

Second, the 2011 income statement does not have the "Fees – LA Assisted Housing, LLC." Instead, Trombetta recorded the total $477,114 of cash that LHDC received from Louisiana Assisted (consisting of the $450,000 cash distribution and $27,114 of reimbursements) in "Fees Reimbursed LA Assisted Housing" for 2011. The $450,000 cash distribution component in "Fees Reimbursed LA Assisted Housing" in LHDC's 2011 income statement matches the $450,000 reported in the

[*23] "Distributions" box in Louisiana Assisted's 2011 Schedule K–1 issued to William.[12]

Third, the information in the record is inconsistent as to the total amount of money that LHDC received from Louisiana Assisted in 2012. Louisiana Assisted reported a $942,271 distribution on the Schedule K–1 issued to William. LHDC's 2012 income statement did not have a "Fees – LA Assisted Housing, LLC" line item. We might expect that the "Fees Reimbursed LA Assisted Housing" line item contained the combined amount of money that LHDC received from Louisiana Assisted for the cash distribution and reimbursements—since that was the case in 2011. However, the "Fees Reimbursed LA Assisted Housing" line item for 2012 shows $926,434, which is less than the $942,271 reported as a distribution on the Schedule K–1.

We make no finding as to whether $942,271, $926,434, or another amount was the actual amount of combined cash that LHDC received from Louisiana Assisted in 2012 for the cash distribution and reimbursements.

Lastly, the $165,000 of "Other Income" on LHDC's 2012 income statement refers to the proceeds from the sale of the 50% Louisiana Assisted membership interest pursuant to the 2012 agreement.

B.    *During the years at issue, Louisiana Assisted paid cash distributions to LHDC.*

In the early phase of Louisiana Assisted and LHDC's collaboration, Bobbie would write checks for cash distributions from Louisiana Assisted to herself and to LHDC. For the checks she made out to LHDC, she would mail them directly to Trombetta's office, a member of which would then deposit each check into LHDC's account.

But recall *supra* FINDINGS OF FACT Part IV, that, in 2003, LHDC and Lala had entered into a contract in which LHDC had agreed to hire Lala as vice-president of LHDC and agreed to compensate him in part based on certain types of fees earned by LHDC. Lala had already attempted to collect compensation from LHDC (to which the Fraziers believed he was not entitled under the terms of the contract) based on his broad interpretation of the new programs clause. Although, the fees to which Lala was entitled under the contract arguably did not include

---

[12] Louisiana Assisted issued Schedules K–1 to Bobbie and William for 2009, 2010, 2011, and 2012. *See infra* FINDINGS OF FACT Part XVII.A.1.

[*24] cash distributions from Louisiana Assisted, the Fraziers were concerned that if Lala discovered that LHDC was an owner of Louisiana Assisted, he would attempt to claim a portion of LHDC's cash distributions from Louisiana Assisted as part of his compensation. Therefore, William asked Bobbie to make the distribution checks out to him, instead of LHDC, in order to conceal the revenue from Lala. Bobbie made the checks out to William and sent them to Trombetta who deposited them directly into LHDC's account.

The cash distributions continued to be paid to LHDC despite the checks being written out to William. William never received any cash distributions from Louisiana Assisted.

Louisiana Assisted paid cash distributions to LHDC of $2,165,000 in 2009, $765,000 in 2010, $450,000 in 2011, and an undetermined amount, in 2012.

C.   *During the years at issue, Louisiana Assisted made reimbursements payments to LHDC.*

Louisiana Assisted made reimbursement payments to LHDC of $17,560 in 2009, $17,460 in 2010, $27,114 in 2011, and an indeterminate amount in 2012.

Both LHDC and Louisiana Assisted paid expenses for salary and wages of their respective workers. Workers performing duties for LHDC were expected to perform the same work for Louisiana Assisted on DHAP contracts if needed. There were no intercompany payments for these services other than the understanding that part of the consideration that LHDC provided in exchange for its 50% interest in Louisiana Assisted was to allow Louisiana Assisted to use LHDC's personnel to administer Louisiana Assisted's DHAP contracts.

XI.   *In 2012, LHDC sold of its 50% membership interest in Louisiana Assisted to Bobbie.*

In 2012, LHDC sold its 50% membership interest in Louisiana Assisted back to Bobbie for $165,000. She sent the check directly to Trombetta, who deposited the money in LHDC's account.

**[\*25]** XII.  *In 2012, the Fraziers sold securities from the Merrill Lynch brokerage account.*

During 2012, the Fraziers made 1,030 sales of securities from their Merrill Lynch brokerage account. Each of these 1,030 sales was reported on a Form 1099-B, Proceeds from Broker and Barter Exchange Transactions, that was sent by Merrill Lynch to the Fraziers. We admitted the Form 1099-B into evidence. The IRS suggests that the information in the Form 1099-B sent to the Fraziers is different from the information on the Form 1099-B Merrill Lynch sent to the IRS. However, the Form 1099-B Merrill Lynch sent to the IRS is not in evidence. Therefore, we cannot determine if the information on the Form 1099-B sent to the Fraziers is different from the information on the Form 1099-B sent to the IRS.

The 1,030 sales reported on the Form 1099-B sent by Merrill Lynch to the Fraziers involved the following eight securities:

| Full Name | CUSIP | Abbreviation Used in Form 1099-B |
|---|---|---|
| Columbia Tax Exempt Fund A | 19765L850 | Col. Tax Ex. Fd. A |
| Nuveen Louisiana Municipal Bond A | 67065P881 | Nuveen LA Muni A |
| Blackrock National Municipal I | 09253C876 | Blackrock Nat I |
| Orange County FL A Sales | 684515PY9 | Orange Cty FL A |
| New York N Y Subser | 64966JD78 | NY Subser |
| Michigan Municipal BD Auth. Rev. | 59455TZN5 | MI Muni Auth Rev |
| Nuveen Quality Income Municipal | 670977107 | Nuveen Qlty Muni |
| BlackRock MuniHoldings Fund II | 09253P109 | Blackrock MH II |

Replicated below is the information found in the Form 1099-B sent by Merrill Lynch to the Fraziers:

| [*26] Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Col. Tax Ex. Fd. A | 1/31/2012 | 3/15/2012 | 17.000 | $235.46 | $238.16 | 0.00 | −$2.70 |
| Col. Tax Ex. Fd. A | 2/29/2012 | 3/15/2012 | 1.000 | 13.85 | 13.99 | 0.00 | −0.14 |
| Col. Tax Ex. Fd. A | 2/29/2012 | 3/15/2012 | 15.000 | 207.76 | 209.85 | 0.00 | −2.09 |
| Col. Tax Ex. Fd. A | 2/29/2012 | 3/27/2012 | 0.132 | 1.83 | 1.85 | 0.00 | −0.02 |
| Col. Tax Ex. Fd. A | 4/30/2012 | 5/22/2012 | 0.488 | 6.89 | 6.77 | 0.00 | 0.12 |
| Col. Tax Ex. Fd. A | 5/31/2012 | 6/26/2012 | 0.001 | 0.01 | 0.01 | 0.00 | 0.00 |
| Col. Tax Ex. Fd. A | 3/30/2012 | 7/23/2012 | 6.000 | 85.62 | 83.28 | 0.00 | 2.34 |
| Col. Tax Ex. Fd. A | 7/31/2012 | 8/21/2012 | 0.004 | 0.06 | 0.05 | 0.00 | 0.01 |
| Nuveen LA Muni A | 1/31/2012 | 3/15/2012 | 1.000 | 11.21 | 11.13 | 0.00 | 0.08 |
| Nuveen LA Muni A | 1/31/2012 | 3/15/2012 | 13.000 | 145.74 | 147.03 | 0.00 | −1.29 |
| Nuveen LA Muni A | 2/29/2012 | 3/15/2012 | 1.000 | 11.21 | 11.32 | 0.00 | −0.11 |
| Nuveen LA Muni A | 2/29/2012 | 3/15/2012 | 13.000 | 145.75 | 147.16 | 0.00 | −1.41 |
| Nuveen LA Muni A | 2/29/2012 | 3/27/2012 | 0.040 | 0.45 | 0.45 | 0.00 | 0.00 |
| Nuveen LA Muni A | 4/30/2012 | 5/22/2012 | 0.913 | 10.39 | 10.23 | 0.00 | 0.16 |
| Nuveen LA Muni A | 6/1/2012 | 6/26/2012 | 0.002 | 0.02 | 0.02 | 0.00 | 0.00 |
| Nuveen LA Muni A | 3/30/2012 | 7/23/2012 | 5.000 | 57.55 | 56.05 | 0.00 | 1.50 |
| Nuveen LA Muni A | 7/31/2012 | 8/21/2012 | 0.003 | 0.03 | 0.03 | 0.00 | 0.00 |
| Blackrock Nat I | 1/31/2012 | 3/15/2012 | 18.000 | 193.33 | 194.94 | 0.00 | −1.61 |
| Blackrock Nat I | 2/29/2012 | 3/15/2012 | 1.000 | 10.74 | 10.67 | 0.00 | 0.07 |
| Blackrock Nat I | 2/29/2012 | 3/15/2012 | 17.000 | 182.6 | 183.94 | 0.00 | −1.34 |
| Blackrock Nat I | 2/29/2012 | 3/23/2012 | 0.365 | 3.91 | 3.95 | 0.00 | −0.04 |
| Blackrock Nat I | 4/30/2012 | 5/18/2012 | 0.550 | 6.02 | 5.9 | 0.00 | 0.12 |
| Blackrock Nat I | 5/31/2012 | 6/22/2012 | 0.001 | 0.01 | 0.01 | 0.00 | 0.00 |
| Blackrock Nat I | 3/30/2012 | 7/23/2012 | 6.000 | 66.54 | 64.44 | 0.00 | 2.10 |
| Blackrock Nat I | 7/31/2012 | 8/17/2012 | 0.0030 | 0.03 | 0.03 | 0.00 | 0.00 |
| Orange Cty FL A | 4/5/2012 | 12/11/2012 | 10,000.000 | 12,248.80 | 11,361.59 | 0.00 | 887.21 |
| NY Subser | 4/11/2012 | 12/7/2012 | 10,000.000 | 12,700.00 | 12,137.27 | 0.00 | 562.73 |
| MI Muni Auth Rev | 3/21/2012 | 4/13/2012 | 10,000.000 | 11,886.10 | 11,437.06 | 0.00 | 449.04 |
| Col. Tax Ex. Fd. A | 3/31/2011 | 3/15/2012 | 17.000 | 235.45 | 214.84 | 0.00 | 20.61 |
| Col. Tax Ex. Fd. A | 4/29/2011 | 3/15/2012 | 16.000 | 221.60 | 205.41 | 0.00 | 16.19 |
| Col. Tax Ex. Fd. A | 4/29/2011 | 3/15/2012 | 1.000 | 13.84 | 12.65 | 0.00 | 1.19 |
| Col. Tax Ex. Fd. A | 5/31/2011 | 3/15/2012 | 1.000 | 13.85 | 13.00 | 0.00 | 0.85 |
| Col. Tax Ex. Fd. A | 5/31/2011 | 3/15/2012 | 19.000 | 263.15 | 248.02 | 0.00 | 15.13 |
| Col. Tax Ex. Fd. A | 6/30/2011 | 3/15/2012 | 16.000 | 221.60 | 209.92 | 0.00 | 11.68 |
| Col. Tax Ex. Fd. A | 6/30/2011 | 3/15/2012 | 1.000 | 13.85 | 13.08 | 0.00 | 0.77 |
| Col. Tax Ex. Fd. A | 7/29/2011 | 3/15/2012 | 18.000 | 249.30 | 237.95 | 0.00 | 11.35 |
| Col. Tax Ex. Fd. A | 7/29/2011 | 3/15/2012 | 1.000 | 13.85 | 13.17 | 0.00 | 0.68 |
| Col. Tax Ex. Fd. A | 8/31/2011 | 3/15/2012 | 17.000 | 235.45 | 226.77 | 0.00 | 8.68 |
| Col. Tax Ex. Fd. A | 9/30/2011 | 3/15/2012 | 17.000 | 235.45 | 229.50 | 0.00 | 5.95 |
| Col. Tax Ex. Fd. A | 10/31/2011 | 3/15/2012 | 17.000 | 235.45 | 227.62 | 0.00 | 7.83 |
| Col. Tax Ex. Fd. A | 10/31/2011 | 3/15/2012 | 1.000 | 13.85 | 13.42 | 0.00 | 0.43 |
| Col. Tax Ex. Fd. A | 11/30/2011 | 3/15/2012 | 16.000 | 221.60 | 214.88 | 0.00 | 6.72 |
| Col. Tax Ex. Fd. A | 11/30/2011 | 3/15/2012 | 1.000 | 13.85 | 13.41 | 0.00 | 0.44 |
| Col. Tax Ex. Fd. A | 12/30/2011 | 3/15/2012 | 16.000 | 221.60 | 218.39 | 0.00 | 3.21 |
| Nuveen LA Muni A | 3/31/2011 | 3/15/2012 | 14.000 | 156.95 | 142.37 | 0.00 | 14.58 |
| Nuveen LA Muni A | 3/31/2011 | 3/15/2012 | 1.000 | 11.21 | 10.21 | 0.00 | 1.00 |
| Nuveen LA Muni A | 4/29/2011 | 3/15/2012 | 14.000 | 156.95 | 144.75 | 0.00 | 12.20 |

| [*27]<br><br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 4/29/2011 | 3/15/2012 | 1.000 | 11.21 | 10.24 | 0.00 | 0.97 |
| Nuveen LA Muni A | 5/31/2011 | 3/15/2012 | 14.000 | 156.95 | 147.70 | 0.00 | 9.25 |
| Nuveen LA Muni A | 6/30/2011 | 3/15/2012 | 14.000 | 156.95 | 148.68 | 0.00 | 8.27 |
| Nuveen LA Muni A | 6/30/2011 | 3/15/2012 | 1.000 | 11.21 | 10.48 | 0.00 | 0.73 |
| Nuveen LA Muni A | 7/29/2011 | 3/15/2012 | 14.000 | 156.95 | 149.93 | 0.00 | 7.02 |
| Nuveen LA Muni A | 8/31/2011 | 3/15/2012 | 14.000 | 156.95 | 151.33 | 0.00 | 5.62 |
| Nuveen LA Muni A | 9/30/2011 | 3/15/2012 | 14.000 | 156.95 | 153.16 | 0.00 | 3.79 |
| Nuveen LA Muni A | 10/31/2011 | 3/15/2012 | 14.000 | 156.95 | 152.17 | 0.00 | 4.78 |
| Nuveen LA Muni A | 10/31/2011 | 3/15/2012 | 1.000 | 11.21 | 10.75 | 0.00 | 0.46 |
| Nuveen LA Muni A | 11/30/2011 | 3/15/2012 | 14.000 | 156.95 | 152.74 | 0.00 | 4.21 |
| Nuveen LA Muni A | 12/30/2011 | 3/15/2012 | 14.000 | 156.95 | 155.12 | 0.00 | 1.83 |
| Blackrock Nat I | 3/31/2011 | 3/15/2012 | 21.000 | 225.55 | 204.11 | 0.00 | 21.44 |
| Blackrock Nat I | 4/29/2011 | 3/15/2012 | 20.000 | 214.81 | 197.40 | 0.00 | 17.41 |
| Blackrock Nat I | 4/29/2011 | 3/15/2012 | 1.000 | 10.74 | 9.79 | 0.00 | 0.95 |
| Blackrock Nat I | 5/31/2011 | 3/15/2012 | 20.000 | 214.81 | 200.60 | 0.00 | 14.21 |
| Blackrock Nat I | 5/31/2011 | 3/15/2012 | 1.000 | 10.74 | 9.92 | 0.00 | 0.82 |
| Blackrock Nat I | 6/30/2011 | 3/15/2012 | 20.000 | 214.81 | 200.99 | 0.00 | 13.82 |
| Blackrock Nat I | 7/29/2011 | 3/15/2012 | 20.000 | 214.81 | 202.19 | 0.00 | 12.62 |
| Blackrock Nat I | 7/29/2011 | 3/15/2012 | 1.000 | 10.74 | 10.05 | 0.00 | 0.69 |
| Blackrock Nat I | 8/31/2011 | 3/15/2012 | 19.000 | 204.07 | 194.56 | 0.00 | 9.51 |
| Blackrock Nat I | 9/30/2011 | 3/15/2012 | 18.000 | 193.32 | 187.38 | 0.00 | 5.94 |
| Blackrock Nat I | 9/30/2011 | 3/15/2012 | 1.000 | 10.74 | 10.35 | 0.00 | 0.39 |
| Blackrock Nat I | 10/31/2011 | 3/15/2012 | 18.000 | 193.33 | 186.12 | 0.00 | 7.21 |
| Blackrock Nat I | 11/30/2011 | 3/15/2012 | 18.000 | 193.33 | 185.75 | 0.00 | 7.58 |
| Blackrock Nat I | 11/30/2011 | 3/15/2012 | 1.000 | 10.74 | 10.34 | 0.00 | 0.40 |
| Blackrock Nat I | 12/30/2011 | 3/15/2012 | 18.000 | 193.33 | 188.81 | 0.00 | 4.52 |
| Blackrock Nat I | 12/30/2011 | 3/15/2012 | 1.000 | 10.74 | 10.36 | 0.00 | 0.38 |
| Col. Tax Ex. Fd. A | 5/4/1991 | 4/26/2012 | 8.000 | 112.08 | 115.62 | 0.00 | −3.54 |
| Nuveen LA Muni A | 9/18/1993 | 4/26/2012 | 4.000 | 45.16 | 45.00 | 0.00 | 0.16 |
| Nuveen LA Muni A | 10/20/1993 | 4/26/2012 | 2.000 | 22.58 | 22.64 | 0.00 | −0.06 |
| Blackrock Nat I | 8/10/1999 | 4/26/2012 | 5.000 | 54.25 | 54.35 | 0.00 | −0.10 |
| Nuveen Qlty Muni | 6/26/1991 | 3/15/2012 | 1,000.000 | 14,586.74 | 15,000.00 | 0.00 | −413.26 |
| Blackrock MH II | 2/24/1998 | 3/15/2012 | 1,400.000 | 22,123.80 | 21,000.00 | 0.00 | 1,123.80 |
| Col. Tax Ex. Fd. A | 3/19/1991 | 3/15/2012 | 10.000 | 138.49 | 136.96 | 0.00 | 1.53 |
| Col. Tax Ex. Fd. A | 4/19/1991 | 3/15/2012 | 8.000 | 110.79 | 115.37 | 4.58 | 0.00 |
| Col. Tax Ex. Fd. A | 4/19/1991 | 3/15/2012 | 4.000 | 55.40 | 57.68 | 0.00 | −2.28 |
| Col. Tax Ex. Fd. A | 5/23/1991 | 3/15/2012 | 13.000 | 180.04 | 187.07 | 0.00 | −7.03 |
| Col. Tax Ex. Fd. A | 6/19/1991 | 3/15/2012 | 11.000 | 152.34 | 150.28 | 0.00 | 2.06 |
| Col. Tax Ex. Fd. A | 7/19/1991 | 3/15/2012 | 12.000 | 166.20 | 172.70 | 0.00 | −6.50 |
| Col. Tax Ex. Fd. A | 8/20/1991 | 3/15/2012 | 12.000 | 166.19 | 174.54 | 0.00 | −8.35 |
| Col. Tax Ex. Fd. A | 9/20/1991 | 3/15/2012 | 12.000 | 166.20 | 168.14 | 0.00 | −1.94 |
| Col. Tax Ex. Fd. A | 10/22/1991 | 3/15/2012 | 11.000 | 152.35 | 162.54 | 0.00 | −10.19 |
| Col. Tax Ex. Fd. A | 11/25/1991 | 3/15/2012 | 12.000 | 166.19 | 176.71 | 0.00 | −10.52 |
| Col. Tax Ex. Fd. A | 12/24/1991 | 3/15/2012 | 12.000 | 166.19 | 168.49 | 0.00 | −2.30 |
| Col. Tax Ex. Fd. A | 1/21/1992 | 3/15/2012 | 12.000 | 166.20 | 177.78 | 0.00 | −11.58 |
| Col. Tax Ex. Fd. A | 2/20/1992 | 3/15/2012 | 12.000 | 166.19 | 168.05 | 0.00 | −1.86 |
| Col. Tax Ex. Fd. A | 3/19/1992 | 3/15/2012 | 11.000 | 152.34 | 160.56 | 0.00 | −8.22 |

| [*28]<br>Security | Date of<br>acquisition | Date of sale<br>or exchange | Quantity | Amount | Cost basis | Wash sale<br>loss<br>disallowed | Gain or<br>loss |
|---|---|---|---|---|---|---|---|
| Col. Tax Ex. Fd. A | 4/21/1992 | 3/15/2012 | 13.000 | 180.05 | 190.40 | 0.00 | −10.35 |
| Col. Tax Ex. Fd. A | 5/20/1992 | 3/15/2012 | 12.000 | 166.19 | 169.08 | 0.00 | −2.89 |
| Col. Tax Ex. Fd. A | 6/19/1992 | 3/15/2012 | 12.000 | 166.20 | 178.32 | 0.00 | −12.12 |
| Col. Tax Ex. Fd. A | 7/22/1992 | 3/15/2012 | 12.000 | 166.19 | 182.52 | 0.00 | −16.33 |
| Col. Tax Ex. Fd. A | 8/19/1992 | 3/15/2012 | 11.000 | 152.35 | 167.69 | 0.00 | −15.34 |
| Col. Tax Ex. Fd. A | 9/22/1992 | 3/15/2012 | 13.000 | 180.04 | 196.44 | 0.00 | −16.40 |
| Col. Tax Ex. Fd. A | 10/20/1992 | 3/15/2012 | 12.000 | 166.20 | 179.50 | 0.00 | −13.30 |
| Col. Tax Ex. Fd. A | 11/20/1992 | 3/15/2012 | 43.000 | 595.55 | 624.96 | 0.00 | −29.41 |
| Col. Tax Ex. Fd. A | 12/22/1992 | 3/15/2012 | 11.000 | 152.35 | 163.93 | 0.00 | −11.58 |
| Col. Tax Ex. Fd. A | 1/22/1993 | 3/15/2012 | 12.000 | 166.20 | 179.28 | 0.00 | −13.08 |
| Col. Tax Ex. Fd. A | 2/23/1993 | 3/15/2012 | 13.000 | 180.04 | 197.00 | 0.00 | −16.96 |
| Col. Tax Ex. Fd. A | 3/22/1993 | 3/15/2012 | 10.000 | 138.50 | 146.04 | 0.00 | −7.54 |
| Col. Tax Ex. Fd. A | 4/22/1993 | 3/15/2012 | 12.000 | 166.19 | 184.46 | 0.00 | −18.27 |
| Col. Tax Ex. Fd. A | 5/20/1993 | 3/15/2012 | 12.000 | 166.20 | 176.12 | 0.00 | −9.92 |
| Col. Tax Ex. Fd. A | 6/23/1993 | 3/15/2012 | 12.000 | 166.20 | 185.02 | 0.00 | −18.82 |
| Col. Tax Ex. Fd. A | 7/21/1993 | 3/15/2012 | 11.000 | 152.35 | 171.85 | 0.00 | −19.50 |
| Col. Tax Ex. Fd. A | 8/20/1993 | 3/15/2012 | 12.000 | 166.20 | 179.58 | 0.00 | −13.38 |
| Col. Tax Ex. Fd. A | 9/22/1993 | 3/15/2012 | 12.000 | 166.20 | 189.41 | 0.00 | −23.21 |
| Col. Tax Ex. Fd. A | 10/20/1993 | 3/15/2012 | 10.000 | 138.50 | 152.21 | 0.00 | −13.71 |
| Col. Tax Ex. Fd. A | 11/22/1993 | 3/15/2012 | 38.000 | 526.30 | 576.90 | 0.00 | −50.60 |
| Col. Tax Ex. Fd. A | 12/22/1993 | 3/15/2012 | 12.000 | 166.20 | 186.40 | 0.00 | −20.20 |
| Col. Tax Ex. Fd. A | 1/21/1994 | 3/15/2012 | 12.000 | 166.20 | 178.92 | 0.00 | −12.72 |
| Col. Tax Ex. Fd. A | 2/25/1994 | 3/15/2012 | 12.000 | 166.20 | 185.56 | 0.00 | −19.36 |
| Col. Tax Ex. Fd. A | 3/22/1994 | 3/15/2012 | 11.000 | 152.35 | 157.82 | 0.00 | −5.47 |
| Col. Tax Ex. Fd. A | 4/21/1994 | 3/15/2012 | 13.000 | 180.05 | 189.10 | 0.00 | −9.05 |
| Col. Tax Ex. Fd. A | 5/19/1994 | 3/15/2012 | 13.000 | 180.05 | 189.08 | 0.00 | −9.03 |
| Col. Tax Ex. Fd. A | 6/21/1994 | 3/15/2012 | 14.000 | 193.90 | 204.23 | 0.00 | −10.33 |
| Col. Tax Ex. Fd. A | 7/19/1994 | 3/15/2012 | 11.000 | 152.34 | 160.36 | 0.00 | −8.02 |
| Col. Tax Ex. Fd. A | 8/23/1994 | 3/15/2012 | 13.000 | 180.05 | 189.40 | 0.00 | −9.35 |
| Col. Tax Ex. Fd. A | 9/21/1994 | 3/15/2012 | 13.000 | 180.05 | 186.25 | 0.00 | −6.20 |
| Col. Tax Ex. Fd. A | 10/19/1994 | 3/15/2012 | 13.000 | 180.05 | 184.91 | 0.00 | −4.86 |
| Col. Tax Ex. Fd. A | 11/18/1994 | 3/15/2012 | 55.000 | 761.75 | 702.70 | 0.00 | 59.05 |
| Col. Tax Ex. Fd. A | 11/21/1994 | 3/15/2012 | 15.000 | 207.75 | 195.37 | 0.00 | 12.38 |
| Col. Tax Ex. Fd. A | 12/20/1994 | 3/15/2012 | 14.000 | 193.90 | 188.98 | 0.00 | 4.92 |
| Col. Tax Ex. Fd. A | 1/19/1995 | 3/15/2012 | 13.000 | 180.05 | 179.27 | 0.00 | 0.78 |
| Col. Tax Ex. Fd. A | 2/23/1995 | 3/15/2012 | 15.000 | 207.75 | 210.87 | 0.00 | −3.12 |
| Col. Tax Ex. Fd. A | 3/21/1995 | 3/15/2012 | 11.000 | 152.35 | 158.18 | 0.00 | −5.83 |
| Col. Tax Ex. Fd. A | 4/19/1995 | 3/15/2012 | 13.000 | 180.05 | 187.64 | 0.00 | −7.59 |
| Col. Tax Ex. Fd. A | 5/19/1995 | 3/15/2012 | 13.000 | 180.05 | 189.53 | 0.00 | −9.48 |
| Col. Tax Ex. Fd. A | 6/21/1995 | 3/15/2012 | 14.000 | 193.90 | 202.23 | 0.00 | −8.33 |
| Col. Tax Ex. Fd. A | 7/20/1995 | 3/15/2012 | 12.000 | 166.20 | 174.98 | 0.00 | −8.78 |
| Col. Tax Ex. Fd. A | 8/21/1995 | 3/15/2012 | 14.000 | 193.90 | 198.98 | 0.00 | −5.08 |
| Col. Tax Ex. Fd. A | 9/19/1995 | 3/15/2012 | 13.000 | 180.05 | 191.15 | 0.00 | −11.10 |
| Col. Tax Ex. Fd. A | 10/23/1995 | 3/15/2012 | 13.000 | 180.05 | 191.92 | 0.00 | −11.87 |
| Col. Tax Ex. Fd. A | 11/21/1995 | 3/15/2012 | 14.000 | 193.90 | 205.48 | 0.00 | −11.58 |
| Col. Tax Ex. Fd. A | 11/21/1995 | 3/15/2012 | 24.000 | 332.40 | 346.57 | 0.00 | −14.17 |
| Col. Tax Ex. Fd. A | 12/19/1995 | 3/15/2012 | 12.000 | 166.20 | 178.84 | 0.00 | −12.64 |

| [*29]<br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Col. Tax Ex. Fd. A | 1/19/1996 | 3/15/2012 | 13.000 | 180.05 | 194.16 | 0.00 | −14.11 |
| Col. Tax Ex. Fd. A | 2/21/1996 | 3/15/2012 | 14.000 | 193.90 | 210.73 | 0.00 | −16.83 |
| Col. Tax Ex. Fd. A | 3/19/1996 | 3/15/2012 | 12.000 | 166.20 | 174.11 | 0.00 | −7.91 |
| Col. Tax Ex. Fd. A | 4/19/1996 | 3/15/2012 | 14.000 | 193.90 | 202.23 | 0.00 | −8.33 |
| Col. Tax Ex. Fd. A | 5/21/1996 | 3/15/2012 | 15.000 | 207.75 | 216.85 | 0.00 | −9.10 |
| Col. Tax Ex. Fd. A | 6/19/1996 | 3/15/2012 | 13.000 | 180.05 | 185.73 | 0.00 | −5.68 |
| Col. Tax Ex. Fd. A | 7/19/1996 | 3/15/2012 | 13.000 | 180.05 | 187.18 | 0.00 | −7.13 |
| Col. Tax Ex. Fd. A | 8/20/1996 | 3/15/2012 | 14.000 | 193.90 | 204.73 | 0.00 | −10.83 |
| Col. Tax Ex. Fd. A | 9/19/1996 | 3/15/2012 | 14.000 | 193.90 | 203.47 | 0.00 | −9.57 |
| Col. Tax Ex. Fd. A | 10/21/1996 | 3/15/2012 | 14.000 | 193.90 | 204.23 | 0.00 | −10.33 |
| Col. Tax Ex. Fd. A | 11/19/1996 | 3/15/2012 | 43.000 | 595.55 | 615.97 | 0.00 | −20.42 |
| Col. Tax Ex. Fd. A | 11/19/1996 | 3/15/2012 | 14.000 | 193.90 | 203.23 | 0.00 | −9.33 |
| Col. Tax Ex. Fd. A | 12/27/1996 | 3/15/2012 | 14.000 | 193.90 | 201.98 | 0.00 | −8.08 |
| Col. Tax Ex. Fd. A | 1/21/1997 | 3/15/2012 | 15.000 | 207.75 | 215.21 | 0.00 | −7.46 |
| Col. Tax Ex. Fd. A | 2/21/1997 | 3/15/2012 | 14.000 | 193.90 | 204.77 | 0.00 | −10.87 |
| Col. Tax Ex. Fd. A | 3/21/1997 | 3/15/2012 | 13.000 | 180.05 | 188.07 | 0.00 | −8.02 |
| Col. Tax Ex. Fd. A | 4/21/1997 | 3/15/2012 | 15.000 | 207.75 | 213.87 | 0.00 | −6.12 |
| Col. Tax Ex. Fd. A | 5/21/1997 | 3/15/2012 | 14.000 | 193.90 | 202.65 | 0.00 | −8.75 |
| Col. Tax Ex. Fd. A | 6/19/1997 | 3/15/2012 | 14.000 | 193.90 | 205.48 | 0.00 | −11.58 |
| Col. Tax Ex. Fd. A | 7/21/1997 | 3/15/2012 | 14.000 | 193.90 | 207.48 | 0.00 | −13.58 |
| Col. Tax Ex. Fd. A | 8/19/1997 | 3/15/2012 | 15.000 | 207.75 | 220.10 | 0.00 | −12.35 |
| Col. Tax Ex. Fd. A | 9/19/1997 | 3/15/2012 | 14.000 | 193.90 | 207.23 | 0.00 | −13.33 |
| Col. Tax Ex. Fd. A | 10/21/1997 | 3/15/2012 | 15.000 | 207.75 | 219.74 | 0.00 | −11.99 |
| Col. Tax Ex. Fd. A | 11/19/1997 | 3/15/2012 | 4.000 | 55.39 | 56.70 | 0.00 | −1.31 |
| Col. Tax Ex. Fd. A | 11/19/1997 | 3/15/2012 | 14.000 | 193.90 | 206.73 | 0.00 | −12.83 |
| Col. Tax Ex. Fd. A | 11/19/1997 | 3/15/2012 | 2.000 | 27.69 | 28.71 | 0.00 | −1.02 |
| Col. Tax Ex. Fd. A | 12/19/1997 | 3/15/2012 | 14.000 | 193.90 | 208.48 | 0.00 | −14.58 |
| Col. Tax Ex. Fd. A | 1/21/1998 | 3/15/2012 | 15.000 | 207.75 | 225.89 | 0.00 | −18.14 |
| Col. Tax Ex. Fd. A | 2/20/1998 | 3/15/2012 | 14.000 | 193.90 | 210.59 | 0.00 | −16.69 |
| Col. Tax Ex. Fd. A | 3/19/1998 | 3/15/2012 | 13.000 | 180.05 | 194.39 | 0.00 | −14.34 |
| Col. Tax Ex. Fd. A | 4/21/1998 | 3/15/2012 | 16.000 | 221.60 | 237.56 | 0.00 | −15.96 |
| Col. Tax Ex. Fd. A | 5/19/1998 | 3/15/2012 | 13.000 | 180.05 | 193.46 | 0.00 | −13.41 |
| Col. Tax Ex. Fd. A | 6/22/1998 | 3/15/2012 | 15.000 | 207.75 | 223.51 | 0.00 | −15.76 |
| Col. Tax Ex. Fd. A | 7/21/1998 | 3/15/2012 | 15.000 | 207.75 | 222.95 | 0.00 | −15.20 |
| Col. Tax Ex. Fd. A | 8/19/1998 | 3/15/2012 | 13.000 | 180.05 | 194.85 | 0.00 | −14.80 |
| Col. Tax Ex. Fd. A | 9/21/1998 | 3/15/2012 | 15.000 | 207.75 | 225.84 | 0.00 | −18.09 |
| Col. Tax Ex. Fd. A | 10/27/1998 | 3/15/2012 | 15.000 | 207.75 | 226.99 | 0.00 | −19.24 |
| Col. Tax Ex. Fd. A | 11/19/1998 | 3/15/2012 | 49.000 | 678.65 | 716.97 | 0.00 | −38.32 |
| Col. Tax Ex. Fd. A | 11/20/1998 | 3/15/2012 | 14.000 | 193.90 | 208.23 | 0.00 | −14.33 |
| Col. Tax Ex. Fd. A | 12/21/1998 | 3/15/2012 | 14.000 | 193.90 | 209.23 | 0.00 | −15.33 |
| Col. Tax Ex. Fd. A | 1/20/1999 | 3/15/2012 | 15.000 | 207.75 | 222.68 | 0.00 | −14.93 |
| Col. Tax Ex. Fd. A | 2/22/1999 | 3/15/2012 | 15.000 | 207.75 | 222.87 | 0.00 | −15.12 |
| Col. Tax Ex. Fd. A | 3/19/1999 | 3/15/2012 | 13.000 | 180.05 | 192.99 | 0.00 | −12.94 |
| Col. Tax Ex. Fd. A | 4/20/1999 | 3/15/2012 | 15.000 | 207.75 | 221.61 | 0.00 | −13.86 |
| Col. Tax Ex. Fd. A | 5/19/1999 | 3/15/2012 | 15.000 | 207.75 | 219.50 | 0.00 | −11.75 |
| Col. Tax Ex. Fd. A | 6/21/1999 | 3/15/2012 | 15.000 | 207.75 | 215.74 | 0.00 | −7.99 |
| Col. Tax Ex. Fd. A | 7/20/1999 | 3/15/2012 | 16.000 | 221.60 | 229.69 | 0.00 | −8.09 |

| [*30] Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Col. Tax Ex. Fd. A | 8/19/1999 | 3/15/2012 | 16.000 | 221.60 | 223.19 | 0.00 | −1.59 |
| Col. Tax Ex. Fd. A | 9/21/1999 | 3/15/2012 | 17.000 | 235.45 | 236.07 | 0.00 | −0.62 |
| Col. Tax Ex. Fd. A | 10/19/1999 | 3/15/2012 | 15.000 | 207.75 | 205.06 | 0.00 | 2.69 |
| Col. Tax Ex. Fd. A | 11/19/1999 | 3/15/2012 | 24.000 | 332.40 | 324.11 | 0.00 | 8.29 |
| Col. Tax Ex. Fd. A | 11/19/1999 | 3/15/2012 | 17.000 | 235.45 | 231.99 | 0.00 | 3.46 |
| Col. Tax Ex. Fd. A | 12/21/1999 | 3/15/2012 | 17.000 | 235.45 | 227.64 | 0.00 | 7.81 |
| Col. Tax Ex. Fd. A | 1/20/2000 | 3/15/2012 | 17.000 | 235.45 | 226.13 | 0.00 | 9.32 |
| Col. Tax Ex. Fd. A | 2/22/2000 | 3/15/2012 | 17.000 | 235.45 | 226.13 | 0.00 | 9.32 |
| Col. Tax Ex. Fd. A | 3/21/2000 | 3/15/2012 | 17.000 | 235.45 | 229.89 | 0.00 | 5.56 |
| Col. Tax Ex. Fd. A | 4/19/2000 | 3/15/2012 | 16.000 | 221.60 | 218.72 | 0.00 | 2.88 |
| Col. Tax Ex. Fd. A | 5/18/2000 | 3/15/2012 | 18.000 | 249.30 | 238.43 | 0.00 | 10.87 |
| Col. Tax Ex. Fd. A | 6/19/2000 | 3/15/2012 | 18.000 | 249.30 | 245.24 | 0.00 | 4.06 |
| Col. Tax Ex. Fd. A | 7/18/2000 | 3/15/2012 | 16.000 | 221.60 | 220.82 | 0.00 | 0.78 |
| Col. Tax Ex. Fd. A | 8/18/2000 | 3/15/2012 | 17.000 | 235.45 | 236.32 | 0.00 | −0.87 |
| Col. Tax Ex. Fd. A | 9/18/2000 | 3/15/2012 | 16.000 | 221.60 | 223.00 | 0.00 | −1.40 |
| Col. Tax Ex. Fd. A | 10/18/2000 | 3/15/2012 | 17.000 | 235.45 | 235.51 | 0.00 | −0.06 |
| Col. Tax Ex. Fd. A | 11/17/2000 | 3/15/2012 | 11.000 | 152.35 | 147.48 | 0.00 | 4.87 |
| Col. Tax Ex. Fd. A | 11/20/2000 | 3/15/2012 | 19.000 | 263.15 | 262.15 | 0.00 | 1.00 |
| Col. Tax Ex. Fd. A | 12/18/2000 | 3/15/2012 | 15.000 | 207.75 | 213.87 | 0.00 | −6.12 |
| Col. Tax Ex. Fd. A | 1/18/2001 | 3/15/2012 | 17.000 | 235.45 | 244.72 | 0.00 | −9.27 |
| Col. Tax Ex. Fd. A | 2/20/2001 | 3/15/2012 | 18.000 | 249.30 | 256.70 | 0.00 | −7.40 |
| Col. Tax Ex. Fd. A | 3/19/2001 | 3/15/2012 | 14.000 | 193.90 | 202.98 | 0.00 | −9.08 |
| Col. Tax Ex. Fd. A | 4/18/2001 | 3/15/2012 | 16.000 | 221.60 | 227.24 | 0.00 | −5.64 |
| Col. Tax Ex. Fd. A | 5/18/2001 | 3/15/2012 | 17.000 | 235.45 | 241.20 | 0.00 | −5.75 |
| Col. Tax Ex. Fd. A | 6/18/2001 | 3/15/2012 | 17.000 | 235.45 | 243.21 | 0.00 | −7.76 |
| Col. Tax Ex. Fd. A | 7/18/2001 | 3/15/2012 | 16.000 | 221.60 | 229.80 | 0.00 | −8.20 |
| Col. Tax Ex. Fd. A | 8/20/2001 | 3/15/2012 | 17.000 | 235.45 | 246.74 | 0.00 | −11.29 |
| Col. Tax Ex. Fd. A | 9/18/2001 | 3/15/2012 | 14.000 | 193.90 | 205.23 | 0.00 | −11.33 |
| Col. Tax Ex. Fd. A | 10/18/2001 | 3/15/2012 | 16.000 | 221.60 | 232.35 | 0.00 | −10.75 |
| Col. Tax Ex. Fd. A | 11/19/2001 | 3/15/2012 | 16.000 | 221.60 | 231.84 | 0.00 | −10.24 |
| Col. Tax Ex. Fd. A | 11/21/2001 | 3/15/2012 | 2.000 | 27.69 | 28.31 | 0.00 | −0.62 |
| Col. Tax Ex. Fd. A | 12/18/2001 | 3/15/2012 | 16.000 | 221.60 | 225.54 | 0.00 | −3.94 |
| Col. Tax Ex. Fd. A | 1/18/2002 | 3/15/2012 | 17.000 | 235.45 | 245.04 | 0.00 | −9.59 |
| Col. Tax Ex. Fd. A | 2/19/2002 | 3/15/2012 | 18.000 | 249.30 | 258.62 | 0.00 | −9.32 |
| Col. Tax Ex. Fd. A | 3/18/2002 | 3/15/2012 | 15.000 | 207.75 | 213.31 | 0.00 | −5.56 |
| Col. Tax Ex. Fd. A | 4/18/2002 | 3/15/2012 | 17.000 | 235.45 | 242.91 | 0.00 | −7.46 |
| Col. Tax Ex. Fd. A | 5/20/2002 | 3/15/2012 | 17.000 | 235.45 | 242.09 | 0.00 | −6.64 |
| Col. Tax Ex. Fd. A | 6/18/2002 | 3/15/2012 | 16.000 | 221.60 | 231.34 | 0.00 | −9.74 |
| Col. Tax Ex. Fd. A | 7/18/2002 | 3/15/2012 | 16.000 | 221.60 | 232.64 | 0.00 | −11.04 |
| Col. Tax Ex. Fd. A | 8/19/2002 | 3/15/2012 | 17.000 | 235.45 | 248.29 | 0.00 | −12.84 |
| Col. Tax Ex. Fd. A | 9/18/2002 | 3/15/2012 | 15.000 | 207.75 | 222.54 | 0.00 | −14.79 |
| Col. Tax Ex. Fd. A | 10/18/2002 | 3/15/2012 | 17.000 | 235.45 | 247.91 | 0.00 | −12.46 |
| Col. Tax Ex. Fd. A | 11/15/2002 | 3/15/2012 | 12.000 | 166.20 | 178.21 | 0.00 | −12.01 |
| Col. Tax Ex. Fd. A | 11/15/2002 | 3/15/2012 | 5.000 | 69.24 | 70.88 | 0.00 | −1.64 |
| Col. Tax Ex. Fd. A | 11/18/2002 | 3/15/2012 | 17.000 | 235.45 | 247.46 | 0.00 | −12.01 |
| Col. Tax Ex. Fd. A | 12/18/2002 | 3/15/2012 | 17.000 | 235.45 | 247.49 | 0.00 | −12.04 |
| Col. Tax Ex. Fd. A | 1/21/2003 | 3/15/2012 | 19.000 | 263.15 | 276.09 | 0.00 | −12.94 |

| [*31] Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Col. Tax Ex. Fd. A | 2/18/2003 | 3/15/2012 | 15.000 | 207.75 | 220.28 | 0.00 | −12.53 |
| Col. Tax Ex. Fd. A | 3/18/2003 | 3/15/2012 | 15.000 | 207.75 | 221.61 | 0.00 | −13.86 |
| Col. Tax Ex. Fd. A | 4/21/2003 | 3/15/2012 | 18.000 | 249.30 | 263.71 | 0.00 | −14.41 |
| Col. Tax Ex. Fd. A | 5/19/2003 | 3/15/2012 | 15.000 | 207.75 | 224.28 | 0.00 | −16.53 |
| Col. Tax Ex. Fd. A | 6/18/2003 | 3/15/2012 | 16.000 | 221.60 | 239.22 | 0.00 | −17.62 |
| Col. Tax Ex. Fd. A | 7/18/2003 | 3/15/2012 | 16.000 | 221.60 | 235.39 | 0.00 | −13.79 |
| Col. Tax Ex. Fd. A | 8/18/2003 | 3/15/2012 | 15.000 | 221.60 | 230.37 | 0.00 | −8.77 |
| Col. Tax Ex. Fd. A | 9/18/2003 | 3/15/2012 | 17.000 | 235.45 | 248.06 | 0.00 | −12.61 |
| Col. Tax Ex. Fd. A | 10/20/2003 | 3/15/2012 | 18.000 | 249.30 | 260.27 | 0.00 | −10.97 |
| Col. Tax Ex. Fd. A | 11/14/2003 | 3/15/2012 | 11.000 | 152.35 | 155.12 | 0.00 | −2.77 |
| Col. Tax Ex. Fd. A | 11/18/2003 | 3/15/2012 | 16.000 | 221.60 | 234.20 | 0.00 | −12.60 |
| Col. Tax Ex. Fd. A | 12/18/2003 | 3/15/2012 | 16.000 | 221.60 | 234.35 | 0.00 | −12.75 |
| Col. Tax Ex. Fd. A | 1/20/2004 | 3/15/2012 | 19.000 | 263.15 | 279.31 | 0.00 | −16.16 |
| Col. Tax Ex. Fd. A | 2/18/2004 | 3/15/2012 | 15.000 | 207.75 | 221.61 | 0.00 | −13.86 |
| Col. Tax Ex. Fd. A | 3/18/2004 | 3/15/2012 | 14.000 | 193.90 | 208.73 | 0.00 | −14.83 |
| Col. Tax Ex. Fd. A | 4/19/2004 | 3/15/2012 | 16.000 | 221.60 | 231.79 | 0.00 | −10.19 |
| Col. Tax Ex. Fd. A | 5/18/2004 | 3/15/2012 | 15.000 | 207.75 | 214.40 | 0.00 | −6.65 |
| Col. Tax Ex. Fd. A | 6/18/2004 | 3/15/2012 | 17.000 | 235.45 | 242.55 | 0.00 | −7.10 |
| Col. Tax Ex. Fd. A | 7/19/2004 | 3/15/2012 | 16.000 | 221.60 | 231.22 | 0.00 | −9.62 |
| Col. Tax Ex. Fd. A | 8/18/2004 | 3/15/2012 | 17.000 | 235.45 | 246.97 | 0.00 | −11.52 |
| Col. Tax Ex. Fd. A | 9/20/2004 | 3/15/2012 | 18.000 | 249.30 | 261.54 | 0.00 | −12.24 |
| Col. Tax Ex. Fd. A | 10/18/2004 | 3/15/2012 | 17.000 | 235.45 | 247.74 | 0.00 | −12.29 |
| Col. Tax Ex. Fd. A | 11/18/2004 | 3/15/2012 | 13.000 | 180.05 | 189.75 | 0.00 | −9.70 |
| Col. Tax Ex. Fd. A | 11/18/2004 | 3/15/2012 | 17.000 | 235.45 | 246.08 | 0.00 | −10.63 |
| Col. Tax Ex. Fd. A | 12/20/2004 | 3/15/2012 | 18.000 | 249.30 | 260.57 | 0.00 | −11.27 |
| Col. Tax Ex. Fd. A | 1/18/2005 | 3/15/2012 | 17.000 | 235.45 | 246.87 | 0.00 | −11.42 |
| Col. Tax Ex. Fd. A | 2/18/2005 | 3/15/2012 | 17.000 | 235.45 | 247.21 | 0.00 | −11.76 |
| Col. Tax Ex. Fd. A | 3/18/2005 | 3/15/2012 | 16.000 | 221.60 | 231.55 | 0.00 | −9.95 |
| Col. Tax Ex. Fd. A | 4/18/2005 | 3/15/2012 | 17.000 | 235.45 | 245.39 | 0.00 | −9.94 |
| Col. Tax Ex. Fd. A | 5/18/2005 | 3/15/2012 | 17.000 | 235.45 | 245.97 | 0.00 | −10.52 |
| Col. Tax Ex. Fd. A | 6/20/2005 | 3/15/2012 | 19.000 | 263.15 | 273.47 | 0.00 | −10.32 |
| Col. Tax Ex. Fd. A | 7/18/2005 | 3/15/2012 | 16.000 | 221.60 | 231.50 | 0.00 | −9.90 |
| Col. Tax Ex. Fd. A | 8/18/2005 | 3/15/2012 | 18.000 | 249.30 | 259.24 | 0.00 | −9.94 |
| Col. Tax Ex. Fd. A | 9/19/2005 | 3/15/2012 | 19.000 | 263.15 | 270.79 | 0.00 | −7.64 |
| Col. Tax Ex. Fd. A | 10/18/2005 | 3/15/2012 | 17.000 | 235.45 | 241.80 | 0.00 | −6.35 |
| Col. Tax Ex. Fd. A | 11/17/2005 | 3/15/2012 | 12.000 | 166.20 | 164.20 | 0.00 | 2.00 |
| Col. Tax Ex. Fd. A | 11/17/2005 | 3/15/2012 | 18.000 | 249.30 | 254.16 | 0.00 | −4.86 |
| Col. Tax Ex. Fd. A | 12/16/2005 | 3/15/2012 | 18.000 | 249.30 | 254.47 | 0.00 | −5.17 |
| Col. Tax Ex. Fd. A | 12/19/2005 | 3/15/2012 | 1.000 | 13.85 | 13.71 | 0.00 | 0.14 |
| Col. Tax Ex. Fd. A | 1/17/2006 | 3/15/2012 | 18.000 | 249.30 | 255.11 | 0.00 | −5.81 |
| Col. Tax Ex. Fd. A | 2/17/2006 | 3/15/2012 | 20.000 | 277.00 | 282.09 | 0.00 | −5.09 |
| Col. Tax Ex. Fd. A | 2/21/2006 | 3/15/2012 | 1.000 | 13.85 | 13.91 | 0.00 | −0.06 |
| Col. Tax Ex. Fd. A | 3/17/2006 | 3/15/2012 | 16.000 | 221.60 | 226.96 | 0.00 | −5.36 |
| Col. Tax Ex. Fd. A | 4/17/2006 | 3/15/2012 | 19.000 | 263.15 | 266.88 | 0.00 | −3.73 |
| Col. Tax Ex. Fd. A | 5/17/2006 | 3/15/2012 | 18.000 | 249.30 | 252.88 | 0.00 | −3.58 |
| Col. Tax Ex. Fd. A | 5/18/2006 | 3/15/2012 | 1.000 | 13.84 | 13.87 | 0.00 | −0.03 |
| Col. Tax Ex. Fd. A | 6/16/2006 | 3/15/2012 | 19.000 | 263.15 | 266.19 | 0.00 | −3.04 |

| [*32]<br>Security | Date of<br>acquisition | Date of sale<br>or exchange | Quantity | Amount | Cost basis | Wash sale<br>loss<br>disallowed | Gain or<br>loss |
|---|---|---|---|---|---|---|---|
| Col. Tax Ex. Fd. A | 7/17/2006 | 3/15/2012 | 18.000 | 249.30 | 252.43 | 0.00 | −3.13 |
| Col. Tax Ex. Fd. A | 7/18/2006 | 3/15/2012 | 1.000 | 13.84 | 13.80 | 0.00 | 0.04 |
| Col. Tax Ex. Fd. A | 8/17/2006 | 3/15/2012 | 19.000 | 263.15 | 267.10 | 0.00 | −3.95 |
| Col. Tax Ex. Fd. A | 9/15/2006 | 3/15/2012 | 19.000 | 263.15 | 267.43 | 0.00 | −4.28 |
| Col. Tax Ex. Fd. A | 10/17/2006 | 3/15/2012 | 19.000 | 263.15 | 267.10 | 0.00 | −3.95 |
| Col. Tax Ex. Fd. A | 10/18/2006 | 3/15/2012 | 1.000 | 13.84 | 13.95 | 0.00 | −0.11 |
| Col. Tax Ex. Fd. A | 11/17/2006 | 3/15/2012 | 12.000 | 166.20 | 163.49 | 0.00 | 2.71 |
| Col. Tax Ex. Fd. A | 11/17/2006 | 3/15/2012 | 20.000 | 277.00 | 279.98 | 0.00 | −2.98 |
| Col. Tax Ex. Fd. A | 11/20/2006 | 3/15/2012 | 1.000 | 13.84 | 13.61 | 0.00 | 0.23 |
| Col. Tax Ex. Fd. A | 12/15/2006 | 3/15/2012 | 16.000 | 221.60 | 225.25 | 0.00 | −3.65 |
| Col. Tax Ex. Fd. A | 12/18/2006 | 3/15/2012 | 1.000 | 13.85 | 13.76 | 0.00 | 0.09 |
| Col. Tax Ex. Fd. A | 1/17/2007 | 3/15/2012 | 18.000 | 249.30 | 251.68 | 0.00 | −2.38 |
| Col. Tax Ex. Fd. A | 2/16/2007 | 3/15/2012 | 20.000 | 277.00 | 279.16 | 0.00 | −2.16 |
| Col. Tax Ex. Fd. A | 2/20/2007 | 3/15/2012 | 1.000 | 13.85 | 13.76 | 0.00 | 0.09 |
| Col. Tax Ex. Fd. A | 3/16/2007 | 3/15/2012 | 16.000 | 221.60 | 224.68 | 0.00 | −3.08 |
| Col. Tax Ex. Fd. A | 4/17/2007 | 3/15/2012 | 13.000 | 180.05 | 183.95 | 0.00 | −3.90 |
| Col. Tax Ex. Fd. A | 5/17/2007 | 3/15/2012 | 14.000 | 193.90 | 197.25 | 0.00 | −3.35 |
| Col. Tax Ex. Fd. A | 6/15/2007 | 3/15/2012 | 14.000 | 193.90 | 195.73 | 0.00 | −1.83 |
| Col. Tax Ex. Fd. A | 7/17/2007 | 3/15/2012 | 14.000 | 193.90 | 195.99 | 0.00 | −2.09 |
| Col. Tax Ex. Fd. A | 8/17/2007 | 3/15/2012 | 14.000 | 193.90 | 194.98 | 0.00 | −1.08 |
| Col. Tax Ex. Fd. A | 9/17/2007 | 3/15/2012 | 13.000 | 180.05 | 183.01 | 0.00 | −2.96 |
| Col. Tax Ex. Fd. A | 10/17/2007 | 3/15/2012 | 14.000 | 193.90 | 196.16 | 0.00 | −2.26 |
| Col. Tax Ex. Fd. A | 11/16/2007 | 3/15/2012 | 17.000 | 235.45 | 235.25 | 0.00 | 0.20 |
| Col. Tax Ex. Fd. A | 11/16/2007 | 3/15/2012 | 14.000 | 193.90 | 194.98 | 0.00 | −1.08 |
| Col. Tax Ex. Fd. A | 12/17/2007 | 3/15/2012 | 12.000 | 166.20 | 168.51 | 0.00 | −2.31 |
| Col. Tax Ex. Fd. A | 12/18/2007 | 3/15/2012 | 1.000 | 13.85 | 13.57 | 0.00 | 0.28 |
| Col. Tax Ex. Fd. A | 1/17/2008 | 3/15/2012 | 19.000 | 263.15 | 265.08 | 0.00 | −1.93 |
| Col. Tax Ex. Fd. A | 2/15/2008 | 3/15/2012 | 19.000 | 263.15 | 261.50 | 0.00 | 1.65 |
| Col. Tax Ex. Fd. A | 3/17/2008 | 3/15/2012 | 17.000 | 235.45 | 231.68 | 0.00 | 3.77 |
| Col. Tax Ex. Fd. A | 4/17/2008 | 3/15/2012 | 18.000 | 249.30 | 246.51 | 0.00 | 2.79 |
| Col. Tax Ex. Fd. A | 4/18/2008 | 3/15/2012 | 1.000 | 13.85 | 13.61 | 0.00 | 0.24 |
| Col. Tax Ex. Fd. A | 5/16/2008 | 3/15/2012 | 18.000 | 249.30 | 247.15 | 0.00 | 2.15 |
| Col. Tax Ex. Fd. A | 5/19/2008 | 3/15/2012 | 1.000 | 13.85 | 13.31 | 0.00 | 0.54 |
| Col. Tax Ex. Fd. A | 6/17/2008 | 3/15/2012 | 18.000 | 249.30 | 243.96 | 0.00 | 5.34 |
| Col. Tax Ex. Fd. A | 7/17/2008 | 3/15/2012 | 16.000 | 221.60 | 218.35 | 0.00 | 3.25 |
| Col. Tax Ex. Fd. A | 8/15/2008 | 3/15/2012 | 15.000 | 207.75 | 205.04 | 0.00 | 2.71 |
| Col. Tax Ex. Fd. A | 8/18/2008 | 3/15/2012 | 1.000 | 13.85 | 13.58 | 0.00 | 0.27 |
| Col. Tax Ex. Fd. A | 9/17/2008 | 3/15/2012 | 17.000 | 235.45 | 228.54 | 0.00 | 6.91 |
| Col. Tax Ex. Fd. A | 10/17/2008 | 3/15/2012 | 22.000 | 304.70 | 270.14 | 0.00 | 34.56 |
| Col. Tax Ex. Fd. A | 10/20/2008 | 3/15/2012 | 1.000 | 13.85 | 12.08 | 0.00 | 1.77 |
| Col. Tax Ex. Fd. A | 11/17/2008 | 3/15/2012 | 81.000 | 1,121.85 | 1,025.69 | 0.00 | 96.16 |
| Col. Tax Ex. Fd. A | 11/17/2008 | 3/15/2012 | 18.000 | 249.30 | 230.04 | 0.00 | 19.26 |
| Col. Tax Ex. Fd. A | 12/17/2008 | 3/15/2012 | 19.000 | 263.15 | 231.00 | 0.00 | 32.15 |
| Col. Tax Ex. Fd. A | 1/16/2009 | 3/15/2012 | 19.000 | 263.15 | 248.41 | 0.00 | 14.74 |
| Col. Tax Ex. Fd. A | 2/17/2009 | 3/15/2012 | 16.000 | 221.60 | 210.15 | 0.00 | 11.45 |
| Col. Tax Ex. Fd. A | 2/18/2009 | 3/15/2012 | 1.000 | 13.85 | 12.91 | 0.00 | 0.94 |
| Col. Tax Ex. Fd. A | 3/17/2009 | 3/15/2012 | 15.000 | 207.75 | 193.31 | 0.00 | 14.44 |

| [*33]<br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Col. Tax Ex. Fd. A | 3/18/2009 | 3/15/2012 | 1.000 | 13.84 | 12.80 | 0.00 | 1.04 |
| Col. Tax Ex. Fd. A | 4/17/2009 | 3/15/2012 | 10.000 | 138.50 | 126.84 | 0.00 | 11.66 |
| Col. Tax Ex. Fd. A | 5/15/2009 | 3/15/2012 | 9.000 | 124.65 | 116.71 | 0.00 | 7.94 |
| Col. Tax Ex. Fd. A | 5/18/2009 | 3/15/2012 | 1.000 | 13.85 | 13.02 | 0.00 | 0.83 |
| Col. Tax Ex. Fd. A | 6/24/2009 | 3/15/2012 | 13.000 | 180.05 | 173.48 | 0.00 | 6.57 |
| Col. Tax Ex. Fd. A | 7/8/2009 | 3/15/2012 | 8.000 | 110.80 | 102.85 | 0.00 | 7.95 |
| Col. Tax Ex. Fd. A | 7/9/2009 | 3/15/2012 | 6.000 | 83.10 | 77.18 | 0.00 | 5.92 |
| Col. Tax Ex. Fd. A | 7/24/2009 | 3/15/2012 | 6.000 | 83.10 | 79.40 | 0.00 | 3.70 |
| Col. Tax Ex. Fd. A | 8/24/2009 | 3/15/2012 | 14.000 | 193.90 | 186.94 | 0.00 | 6.96 |
| Col. Tax Ex. Fd. A | 8/25/2009 | 3/15/2012 | 1.000 | 13.84 | 13.26 | 0.00 | 0.58 |
| Col. Tax Ex. Fd. A | 9/24/2009 | 3/15/2012 | 14.000 | 193.90 | 193.90 | 0.00 | 0.00 |
| Col. Tax Ex. Fd. A | 10/26/2009 | 3/15/2012 | 15.000 | 207.75 | 203.79 | 0.00 | 3.96 |
| Col. Tax Ex. Fd. A | 11/24/2009 | 3/15/2012 | 14.000 | 193.90 | 189.15 | 0.00 | 4.75 |
| Col. Tax Ex. Fd. A | 12/17/2009 | 3/15/2012 | 16.000 | 221.60 | 212.55 | 0.00 | 9.05 |
| Col. Tax Ex. Fd. A | 12/18/2009 | 3/15/2012 | 95.000 | 1,315.75 | 1,262.01 | 0.00 | 53.74 |
| Col. Tax Ex. Fd. A | 12/18/2009 | 3/15/2012 | 1.000 | 13.85 | 13.34 | 0.00 | 0.51 |
| Col. Tax Ex. Fd. A | 1/20/2010 | 3/15/2012 | 18.000 | 249.30 | 239.40 | 0.00 | 9.90 |
| Col. Tax Ex. Fd. A | 2/19/2010 | 3/15/2012 | 14.000 | 193.90 | 186.22 | 0.00 | 7.68 |
| Col. Tax Ex. Fd. A | 2/22/2010 | 3/15/2012 | 1.000 | 13.84 | 13.30 | 0.00 | 0.54 |
| Col. Tax Ex. Fd. A | 3/22/2010 | 3/15/2012 | 16.000 | 221.60 | 213.89 | 0.00 | 7.71 |
| Col. Tax Ex. Fd. A | 4/21/2010 | 3/15/2012 | 16.000 | 221.60 | 214.17 | 0.00 | 7.43 |
| Col. Tax Ex. Fd. A | 5/20/2010 | 3/15/2012 | 15.000 | 207.75 | 201.58 | 0.00 | 6.17 |
| Col. Tax Ex. Fd. A | 5/21/2010 | 3/15/2012 | 1.000 | 13.85 | 13.41 | 0.00 | 0.44 |
| Col. Tax Ex. Fd. A | 6/21/2010 | 3/15/2012 | 17.000 | 235.45 | 226.73 | 0.00 | 8.72 |
| Col. Tax Ex. Fd. A | 7/22/2010 | 3/15/2012 | 16.000 | 221.60 | 215.57 | 0.00 | 6.03 |
| Col. Tax Ex. Fd. A | 8/23/2010 | 3/15/2012 | 16.000 | 221.60 | 219.40 | 0.00 | 2.20 |
| Col. Tax Ex. Fd. A | 8/23/2010 | 3/15/2012 | 1.000 | 13.85 | 13.42 | 0.00 | 0.43 |
| Col. Tax Ex. Fd. A | 9/22/2010 | 3/15/2012 | 15.000 | 207.75 | 206.45 | 0.00 | 1.30 |
| Col. Tax Ex. Fd. A | 10/22/2010 | 3/15/2012 | 15.000 | 207.75 | 206.21 | 0.00 | 1.54 |
| Col. Tax Ex. Fd. A | 10/22/2010 | 3/15/2012 | 1.000 | 13.84 | 13.68 | 0.00 | 0.16 |
| Col. Tax Ex. Fd. A | 11/22/2010 | 3/15/2012 | 16.000 | 221.60 | 210.90 | 0.00 | 10.70 |
| Col. Tax Ex. Fd. A | 11/22/2010 | 3/15/2012 | 1.000 | 13.85 | 13.53 | 0.00 | 0.32 |
| Col. Tax Ex. Fd. A | 12/16/2010 | 3/15/2012 | 38.000 | 526.30 | 482.19 | 0.00 | 44.11 |
| Col. Tax Ex. Fd. A | 12/16/2010 | 3/15/2012 | 13.000 | 180.05 | 164.89 | 0.00 | 15.16 |
| Col. Tax Ex. Fd. A | 1/31/2011 | 3/15/2012 | 26.000 | 360.10 | 326.66 | 0.00 | 33.44 |
| Col. Tax Ex. Fd. A | 2/28/2011 | 3/15/2012 | 16.000 | 221.60 | 203.94 | 0.00 | 17.66 |
| Nuveen LA Muni A | 11/6/1992 | 3/15/2012 | 932.000 | 10,447.72 | 10,014.53 | 0.00 | 433.19 |
| Nuveen LA Muni A | 12/2/1992 | 3/15/2012 | 3.000 | 33.62 | 31.56 | 0.00 | 2.06 |
| Nuveen LA Muni A | 12/23/1992 | 3/15/2012 | 4.000 | 44.83 | 42.04 | 0.00 | 2.79 |
| Nuveen LA Muni A | 1/6/1993 | 3/15/2012 | 5.000 | 56.05 | 52.70 | 0.00 | 3.35 |
| Nuveen LA Muni A | 2/3/1993 | 3/15/2012 | 5.000 | 56.04 | 53.15 | 0.00 | 2.89 |
| Nuveen LA Muni A | 3/3/1993 | 3/15/2012 | 4.000 | 44.83 | 44.16 | 0.00 | 0.67 |
| Nuveen LA Muni A | 4/5/1993 | 3/15/2012 | 5.000 | 56.05 | 54.20 | 0.00 | 1.85 |
| Nuveen LA Muni A | 5/5/1993 | 3/15/2012 | 5.000 | 56.04 | 54.55 | 0.00 | 1.49 |
| Nuveen LA Muni A | 6/3/1993 | 3/15/2012 | 4.000 | 44.84 | 43.72 | 0.00 | 1.12 |
| Nuveen LA Muni A | 7/6/1993 | 3/15/2012 | 5.000 | 56.04 | 55.45 | 0.00 | 0.59 |
| Nuveen LA Muni A | 8/4/1993 | 3/15/2012 | 5.000 | 56.05 | 55.15 | 0.00 | 0.90 |

| [*34] Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 9/3/1993 | 3/15/2012 | 4.000 | 44.83 | 45.00 | 0.17 | 0.00 |
| Nuveen LA Muni A | 10/5/1993 | 3/15/2012 | 2.000 | 22.42 | 22.64 | 0.22 | 0.00 |
| Nuveen LA Muni A | 10/5/1993 | 3/15/2012 | 3.000 | 33.63 | 33.96 | 0.00 | −0.33 |
| Nuveen LA Muni A | 11/4/1993 | 3/15/2012 | 4.000 | 44.83 | 45.24 | 0.00 | −0.41 |
| Nuveen LA Muni A | 12/3/1993 | 3/15/2012 | 5.000 | 56.05 | 55.55 | 0.00 | 0.50 |
| Nuveen LA Muni A | 12/16/1993 | 3/15/2012 | 3.000 | 33.62 | 33.69 | 0.00 | −0.07 |
| Nuveen LA Muni A | 1/5/1994 | 3/15/2012 | 5.000 | 56.05 | 56.15 | 0.00 | −0.10 |
| Nuveen LA Muni A | 2/3/1994 | 3/15/2012 | 5.000 | 56.05 | 56.60 | 0.00 | −0.55 |
| Nuveen LA Muni A | 3/2/1994 | 3/15/2012 | 4.000 | 44.84 | 43.92 | 0.00 | 0.92 |
| Nuveen LA Muni A | 4/8/1994 | 3/15/2012 | 5.000 | 56.05 | 52.15 | 0.00 | 3.90 |
| Nuveen LA Muni A | 5/10/1994 | 3/15/2012 | 5.000 | 56.05 | 52.05 | 0.00 | 4.00 |
| Nuveen LA Muni A | 6/2/1994 | 3/15/2012 | 5.000 | 56.05 | 52.40 | 0.00 | 3.65 |
| Nuveen LA Muni A | 7/6/1994 | 3/15/2012 | 5.000 | 56.04 | 51.85 | 0.00 | 4.19 |
| Nuveen LA Muni A | 8/3/1994 | 3/15/2012 | 5.000 | 56.05 | 52.75 | 0.00 | 3.30 |
| Nuveen LA Muni A | 9/2/1994 | 3/15/2012 | 5.000 | 56.05 | 52.60 | 0.00 | 3.45 |
| Nuveen LA Muni A | 10/4/1994 | 3/15/2012 | 5.000 | 56.05 | 51.30 | 0.00 | 4.75 |
| Nuveen LA Muni A | 11/2/1994 | 3/15/2012 | 5.000 | 56.05 | 49.95 | 0.00 | 6.10 |
| Nuveen LA Muni A | 12/6/1994 | 3/15/2012 | 5.000 | 56.04 | 48.65 | 0.00 | 7.39 |
| Nuveen LA Muni A | 1/4/1995 | 3/15/2012 | 6.000 | 67.26 | 59.70 | 0.00 | 7.56 |
| Nuveen LA Muni A | 2/2/1995 | 3/15/2012 | 5.000 | 56.05 | 51.15 | 0.00 | 4.90 |
| Nuveen LA Muni A | 3/2/1995 | 3/15/2012 | 5.000 | 56.05 | 52.50 | 0.00 | 3.55 |
| Nuveen LA Muni A | 4/5/1995 | 3/15/2012 | 5.000 | 56.04 | 52.65 | 0.00 | 3.39 |
| Nuveen LA Muni A | 5/2/1995 | 3/15/2012 | 5.000 | 56.04 | 52.40 | 0.00 | 3.64 |
| Nuveen LA Muni A | 6/5/1995 | 3/15/2012 | 5.000 | 56.05 | 54.00 | 0.00 | 2.05 |
| Nuveen LA Muni A | 7/6/1995 | 3/15/2012 | 5.000 | 56.04 | 53.05 | 0.00 | 2.99 |
| Nuveen LA Muni A | 8/2/1995 | 3/15/2012 | 5.000 | 56.04 | 53.20 | 0.00 | 2.84 |
| Nuveen LA Muni A | 9/5/1995 | 3/15/2012 | 5.000 | 56.05 | 53.65 | 0.00 | 2.40 |
| Nuveen LA Muni A | 10/4/1995 | 3/15/2012 | 5.000 | 56.05 | 53.70 | 0.00 | 2.35 |
| Nuveen LA Muni A | 11/2/1995 | 3/15/2012 | 6.000 | 67.26 | 65.22 | 0.00 | 2.04 |
| Nuveen LA Muni A | 12/5/1995 | 3/15/2012 | 5.000 | 56.05 | 55.45 | 0.00 | 0.60 |
| Nuveen LA Muni A | 1/4/1996 | 3/15/2012 | 5.000 | 56.05 | 55.90 | 0.00 | 0.15 |
| Nuveen LA Muni A | 2/2/1996 | 3/15/2012 | 5.000 | 56.05 | 55.75 | 0.00 | 0.30 |
| Nuveen LA Muni A | 3/4/1996 | 3/15/2012 | 5.000 | 56.05 | 55.15 | 0.00 | 0.90 |
| Nuveen LA Muni A | 4/2/1996 | 3/15/2012 | 5.000 | 56.05 | 53.95 | 0.00 | 2.10 |
| Nuveen LA Muni A | 5/2/1996 | 3/15/2012 | 5.000 | 56.05 | 53.45 | 0.00 | 2.60 |
| Nuveen LA Muni A | 6/7/1996 | 3/15/2012 | 5.000 | 56.04 | 53.55 | 0.00 | 2.49 |
| Nuveen LA Muni A | 7/3/1996 | 3/15/2012 | 6.000 | 67.26 | 64.56 | 0.00 | 2.70 |
| Nuveen LA Muni A | 8/2/1996 | 3/15/2012 | 5.000 | 56.05 | 54.10 | 0.00 | 1.95 |
| Nuveen LA Muni A | 9/5/1996 | 3/15/2012 | 5.000 | 56.05 | 53.95 | 0.00 | 2.10 |
| Nuveen LA Muni A | 9/12/1996 | 3/15/2012 | 622.000 | 6,972.64 | 7,014.79 | 0.00 | −42.15 |
| Nuveen LA Muni A | 10/2/1996 | 3/15/2012 | 7.000 | 78.47 | 76.58 | 0.00 | 1.89 |
| Nuveen LA Muni A | 10/7/1996 | 3/15/2012 | 8.000 | 89.68 | 92.00 | 0.00 | −2.32 |
| Nuveen LA Muni A | 11/4/1996 | 3/15/2012 | 8.000 | 89.68 | 92.00 | 0.00 | −2.32 |
| Nuveen LA Muni A | 11/5/1996 | 3/15/2012 | 8.000 | 89.68 | 88.16 | 0.00 | 1.52 |
| Nuveen LA Muni A | 12/2/1996 | 3/15/2012 | 8.000 | 89.68 | 93.44 | 0.00 | −3.76 |
| Nuveen LA Muni A | 12/3/1996 | 3/15/2012 | 8.000 | 89.68 | 89.60 | 0.00 | 0.08 |
| Nuveen LA Muni A | 1/6/1997 | 3/15/2012 | 8.000 | 89.68 | 92.16 | 0.00 | −2.48 |

| [*35]<br><br>Security | Date of<br>acquisition | Date of sale<br>or exchange | Quantity | Amount | Cost basis | Wash sale<br>loss<br>disallowed | Gain or<br>loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 1/7/1997 | 3/15/2012 | 8.000 | 89.68 | 88.80 | 0.00 | 0.88 |
| Nuveen LA Muni A | 2/3/1997 | 3/15/2012 | 8.000 | 89.68 | 92.56 | 0.00 | −2.88 |
| Nuveen LA Muni A | 2/6/1997 | 3/15/2012 | 9.000 | 100.89 | 99.45 | 0.00 | 1.44 |
| Nuveen LA Muni A | 3/3/1997 | 3/15/2012 | 8.000 | 89.68 | 92.80 | 0.00 | −3.12 |
| Nuveen LA Muni A | 3/5/1997 | 3/15/2012 | 8.000 | 89.68 | 88.88 | 0.00 | 0.80 |
| Nuveen LA Muni A | 4/3/1997 | 3/15/2012 | 8.000 | 89.68 | 87.44 | 0.00 | 2.24 |
| Nuveen LA Muni A | 4/7/1997 | 3/15/2012 | 8.000 | 89.68 | 91.20 | 0.00 | −1.52 |
| Nuveen LA Muni A | 5/2/1997 | 3/15/2012 | 9.000 | 100.89 | 99.00 | 0.00 | 1.89 |
| Nuveen LA Muni A | 5/5/1997 | 3/15/2012 | 8.000 | 89.68 | 92.00 | 0.00 | −2.32 |
| Nuveen LA Muni A | 6/2/1997 | 3/15/2012 | 8.000 | 89.68 | 92.72 | 0.00 | −3.04 |
| Nuveen LA Muni A | 6/5/1997 | 3/15/2012 | 8.000 | 89.68 | 88.80 | 0.00 | 0.88 |
| Nuveen LA Muni A | 7/7/1997 | 3/15/2012 | 8.000 | 89.68 | 94.24 | 0.00 | −4.56 |
| Nuveen LA Muni A | 7/7/1997 | 3/15/2012 | 9.000 | 100.89 | 100.62 | 0.00 | 0.27 |
| Nuveen LA Muni A | 8/4/1997 | 3/15/2012 | 8.000 | 89.68 | 95.12 | 0.00 | −5.44 |
| Nuveen LA Muni A | 8/5/1997 | 3/15/2012 | 8.000 | 89.68 | 91.28 | 0.00 | −1.60 |
| Nuveen LA Muni A | 9/2/1997 | 3/15/2012 | 8.000 | 89.68 | 94.16 | 0.00 | −4.48 |
| Nuveen LA Muni A | 9/4/1997 | 3/15/2012 | 9.000 | 100.89 | 101.52 | 0.00 | −0.63 |
| Nuveen LA Muni A | 10/3/1997 | 3/15/2012 | 8.000 | 89.68 | 91.04 | 0.00 | −1.36 |
| Nuveen LA Muni A | 10/6/1997 | 3/15/2012 | 8.000 | 89.68 | 95.36 | 0.00 | −5.68 |
| Nuveen LA Muni A | 11/3/1997 | 3/15/2012 | 8.000 | 89.68 | 94.88 | 0.00 | −5.20 |
| Nuveen LA Muni A | 11/4/1997 | 3/15/2012 | 9.000 | 100.89 | 102.24 | 0.00 | −1.35 |
| Nuveen LA Muni A | 12/1/1997 | 3/15/2012 | 8.000 | 89.68 | 95.52 | 0.00 | −5.84 |
| Nuveen LA Muni A | 12/2/1997 | 3/15/2012 | 8.000 | 89.68 | 91.52 | 0.00 | −1.84 |
| Nuveen LA Muni A | 1/2/1998 | 3/15/2012 | 3.000 | 33.63 | 34.56 | 0.00 | −0.93 |
| Nuveen LA Muni A | 1/2/1998 | 3/15/2012 | 13.000 | 145.73 | 149.76 | 0.00 | −4.03 |
| Nuveen LA Muni A | 1/5/1998 | 3/15/2012 | 8.000 | 89.68 | 96.72 | 0.00 | −7.04 |
| Nuveen LA Muni A | 2/2/1998 | 3/15/2012 | 8.000 | 89.68 | 96.72 | 0.00 | −7.04 |
| Nuveen LA Muni A | 2/3/1998 | 3/15/2012 | 9.000 | 100.89 | 104.22 | 0.00 | −3.33 |
| Nuveen LA Muni A | 3/2/1998 | 3/15/2012 | 8.000 | 89.68 | 96.08 | 0.00 | −6.40 |
| Nuveen LA Muni A | 3/3/1998 | 3/15/2012 | 8.000 | 89.68 | 92.08 | 0.00 | −2.40 |
| Nuveen LA Muni A | 4/3/1998 | 3/15/2012 | 9.000 | 100.89 | 103.59 | 0.00 | −2.70 |
| Nuveen LA Muni A | 4/6/1998 | 3/15/2012 | 8.000 | 89.68 | 96.72 | 0.00 | −7.04 |
| Nuveen LA Muni A | 5/4/1998 | 3/15/2012 | 8.000 | 89.68 | 95.44 | 0.00 | −5.76 |
| Nuveen LA Muni A | 5/5/1998 | 3/15/2012 | 9.000 | 100.89 | 102.69 | 0.00 | −1.80 |
| Nuveen LA Muni A | 6/1/1998 | 3/15/2012 | 8.000 | 89.68 | 96.56 | 0.00 | −6.88 |
| Nuveen LA Muni A | 6/3/1998 | 3/15/2012 | 9.000 | 100.89 | 104.04 | 0.00 | −3.15 |
| Nuveen LA Muni A | 7/6/1998 | 3/15/2012 | 8.000 | 89.68 | 96.48 | 0.00 | −6.80 |
| Nuveen LA Muni A | 7/6/1998 | 3/15/2012 | 9.000 | 100.89 | 103.77 | 0.00 | −2.88 |
| Nuveen LA Muni A | 8/3/1998 | 3/15/2012 | 8.000 | 89.68 | 96.24 | 0.00 | −6.56 |
| Nuveen LA Muni A | 8/7/1998 | 3/15/2012 | 9.000 | 100.89 | 103.68 | 0.00 | −2.79 |
| Nuveen LA Muni A | 9/4/1998 | 3/15/2012 | 9.000 | 100.89 | 104.85 | 0.00 | −3.96 |
| Nuveen LA Muni A | 9/8/1998 | 3/15/2012 | 8.000 | 89.68 | 97.20 | 0.00 | −7.52 |
| Nuveen LA Muni A | 10/5/1998 | 3/15/2012 | 8.000 | 89.68 | 99.12 | 0.00 | −9.44 |
| Nuveen LA Muni A | 10/5/1998 | 3/15/2012 | 9.000 | 100.89 | 106.11 | 0.00 | −5.22 |
| Nuveen LA Muni A | 11/2/1998 | 3/15/2012 | 8.000 | 89.68 | 97.12 | 0.00 | −7.44 |
| Nuveen LA Muni A | 11/4/1998 | 3/15/2012 | 9.000 | 100.89 | 104.67 | 0.00 | −3.78 |
| Nuveen LA Muni A | 12/3/1998 | 3/15/2012 | 9.000 | 100.89 | 104.94 | 0.00 | −4.05 |

| [*36]<br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 12/7/1998 | 3/15/2012 | 8.000 | 89.68 | 97.20 | 0.00 | −7.52 |
| Nuveen LA Muni A | 12/8/1998 | 3/15/2012 | 7.000 | 78.47 | 81.48 | 0.00 | −3.01 |
| Nuveen LA Muni A | 12/23/1998 | 3/15/2012 | 10.000 | 112.10 | 115.70 | 0.00 | −3.60 |
| Nuveen LA Muni A | 1/4/1999 | 3/15/2012 | 8.000 | 89.68 | 96.80 | 0.00 | −7.12 |
| Nuveen LA Muni A | 2/1/1999 | 3/15/2012 | 8.000 | 89.68 | 97.12 | 0.00 | −7.44 |
| Nuveen LA Muni A | 2/3/1999 | 3/15/2012 | 9.000 | 100.89 | 104.67 | 0.00 | −3.78 |
| Nuveen LA Muni A | 3/1/1999 | 3/15/2012 | 8.000 | 89.68 | 96.00 | 0.00 | −6.32 |
| Nuveen LA Muni A | 3/2/1999 | 3/15/2012 | 9.000 | 100.89 | 103.50 | 0.00 | −2.61 |
| Nuveen LA Muni A | 4/5/1999 | 3/15/2012 | 8.000 | 89.68 | 96.00 | 0.00 | −6.32 |
| Nuveen LA Muni A | 4/5/1999 | 3/15/2012 | 10.000 | 112.10 | 115.00 | 0.00 | −2.90 |
| Nuveen LA Muni A | 5/3/1999 | 3/15/2012 | 8.000 | 89.68 | 95.92 | 0.00 | −6.24 |
| Nuveen LA Muni A | 5/4/1999 | 3/15/2012 | 9.000 | 100.89 | 103.41 | 0.00 | −2.52 |
| Nuveen LA Muni A | 6/1/1999 | 3/15/2012 | 8.000 | 89.68 | 94.64 | 0.00 | −4.96 |
| Nuveen LA Muni A | 6/2/1999 | 3/15/2012 | 9.000 | 100.89 | 101.97 | 0.00 | −1.08 |
| Nuveen LA Muni A | 7/2/1999 | 3/15/2012 | 10.000 | 112.10 | 111.30 | 0.00 | 0.80 |
| Nuveen LA Muni A | 7/6/1999 | 3/15/2012 | 8.000 | 89.68 | 92.96 | 0.00 | −3.28 |
| Nuveen LA Muni A | 8/2/1999 | 3/15/2012 | 8.000 | 89.68 | 92.56 | 0.00 | −2.88 |
| Nuveen LA Muni A | 8/3/1999 | 3/15/2012 | 10.000 | 112.10 | 110.80 | 0.00 | 1.30 |
| Nuveen LA Muni A | 9/2/1999 | 3/15/2012 | 10.000 | 112.10 | 108.40 | 0.00 | 3.70 |
| Nuveen LA Muni A | 9/7/1999 | 3/15/2012 | 8.000 | 89.68 | 90.32 | 0.00 | −0.64 |
| Nuveen LA Muni A | 10/4/1999 | 3/15/2012 | 8.000 | 89.68 | 89.28 | 0.00 | 0.40 |
| Nuveen LA Muni A | 10/4/1999 | 3/15/2012 | 10.000 | 112.10 | 106.90 | 0.00 | 5.20 |
| Nuveen LA Muni A | 11/1/1999 | 3/15/2012 | 9.000 | 100.89 | 98.19 | 0.00 | 2.70 |
| Nuveen LA Muni A | 11/2/1999 | 3/15/2012 | 11.000 | 123.31 | 114.95 | 0.00 | 8.36 |
| Nuveen LA Muni A | 12/2/1999 | 3/15/2012 | 11.000 | 123.31 | 115.61 | 0.00 | 7.70 |
| Nuveen LA Muni A | 12/6/1999 | 3/15/2012 | 9.000 | 100.89 | 98.73 | 0.00 | 2.16 |
| Nuveen LA Muni A | 12/21/1999 | 3/15/2012 | 11.000 | 123.31 | 113.74 | 0.00 | 9.57 |
| Nuveen LA Muni A | 1/3/2000 | 3/15/2012 | 9.000 | 100.89 | 96.75 | 0.00 | 4.14 |
| Nuveen LA Muni A | 2/2/2000 | 3/15/2012 | 12.000 | 134.52 | 122.04 | 0.00 | 12.48 |
| Nuveen LA Muni A | 2/7/2000 | 3/15/2012 | 9.000 | 100.89 | 96.12 | 0.00 | 4.77 |
| Nuveen LA Muni A | 3/2/2000 | 3/15/2012 | 11.000 | 123.31 | 113.52 | 0.00 | 9.79 |
| Nuveen LA Muni A | 3/6/2000 | 3/15/2012 | 9.000 | 100.89 | 97.20 | 0.00 | 3.69 |
| Nuveen LA Muni A | 4/3/2000 | 3/15/2012 | 9.000 | 100.89 | 98.91 | 0.00 | 1.98 |
| Nuveen LA Muni A | 4/4/2000 | 3/15/2012 | 11.000 | 123.31 | 115.83 | 0.00 | 7.48 |
| Nuveen LA Muni A | 5/1/2000 | 3/15/2012 | 9.000 | 100.89 | 97.74 | 0.00 | 3.15 |
| Nuveen LA Muni A | 5/2/2000 | 3/15/2012 | 11.000 | 123.31 | 114.40 | 0.00 | 8.91 |
| Nuveen LA Muni A | 6/2/2000 | 3/15/2012 | 11.000 | 123.31 | 113.30 | 0.00 | 10.01 |
| Nuveen LA Muni A | 6/5/2000 | 3/15/2012 | 9.000 | 100.89 | 97.20 | 0.00 | 3.69 |
| Nuveen LA Muni A | 7/3/2000 | 3/15/2012 | 9.000 | 100.89 | 98.73 | 0.00 | 2.16 |
| Nuveen LA Muni A | 7/5/2000 | 3/15/2012 | 11.000 | 123.31 | 115.61 | 0.00 | 7.70 |
| Nuveen LA Muni A | 8/2/2000 | 3/15/2012 | 11.000 | 123.31 | 117.04 | 0.00 | 6.27 |
| Nuveen LA Muni A | 8/7/2000 | 3/15/2012 | 8.000 | 89.68 | 89.28 | 0.00 | 0.40 |
| Nuveen LA Muni A | 9/5/2000 | 3/15/2012 | 8.000 | 89.68 | 90.24 | 0.00 | −0.56 |
| Nuveen LA Muni A | 9/5/2000 | 3/15/2012 | 12.000 | 134.52 | 129.60 | 0.00 | 4.92 |
| Nuveen LA Muni A | 10/2/2000 | 3/15/2012 | 8.000 | 89.68 | 89.20 | 0.00 | 0.48 |
| Nuveen LA Muni A | 10/3/2000 | 3/15/2012 | 11.000 | 123.31 | 117.48 | 0.00 | 5.83 |
| Nuveen LA Muni A | 11/2/2000 | 3/15/2012 | 11.000 | 123.31 | 118.14 | 0.00 | 5.17 |

| [*37] Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 11/6/2000 | 3/15/2012 | 8.000 | 89.68 | 89.60 | 0.00 | 0.08 |
| Nuveen LA Muni A | 12/4/2000 | 3/15/2012 | 8.000 | 89.68 | 90.16 | 0.00 | −0.48 |
| Nuveen LA Muni A | 12/4/2000 | 3/15/2012 | 11.000 | 123.31 | 118.80 | 0.00 | 4.51 |
| Nuveen LA Muni A | 12/27/2000 | 3/15/2012 | 11.000 | 123.31 | 121.66 | 0.00 | 1.65 |
| Nuveen LA Muni A | 1/2/2001 | 3/15/2012 | 8.000 | 89.68 | 92.88 | 0.00 | −3.20 |
| Nuveen LA Muni A | 2/2/2001 | 3/15/2012 | 12.000 | 134.52 | 133.68 | 0.00 | 0.84 |
| Nuveen LA Muni A | 2/5/2001 | 3/15/2012 | 8.000 | 89.68 | 93.20 | 0.00 | −3.52 |
| Nuveen LA Muni A | 3/2/2001 | 3/15/2012 | 11.000 | 123.31 | 122.43 | 0.00 | 0.88 |
| Nuveen LA Muni A | 3/5/2001 | 3/15/2012 | 8.000 | 89.68 | 93.04 | 0.00 | −3.36 |
| Nuveen LA Muni A | 4/2/2001 | 3/15/2012 | 8.000 | 89.68 | 93.20 | 0.00 | −3.52 |
| Nuveen LA Muni A | 4/3/2001 | 3/15/2012 | 11.000 | 123.31 | 122.76 | 0.00 | 0.55 |
| Nuveen LA Muni A | 5/2/2001 | 3/15/2012 | 11.000 | 123.31 | 120.78 | 0.00 | 2.53 |
| Nuveen LA Muni A | 5/7/2001 | 3/15/2012 | 8.000 | 89.68 | 92.16 | 0.00 | −2.48 |
| Nuveen LA Muni A | 6/4/2001 | 3/15/2012 | 8.000 | 89.68 | 92.64 | 0.00 | −2.96 |
| Nuveen LA Muni A | 6/4/2001 | 3/15/2012 | 12.000 | 134.52 | 132.96 | 0.00 | 1.56 |
| Nuveen LA Muni A | 7/2/2001 | 3/15/2012 | 8.000 | 89.68 | 92.80 | 0.00 | −3.12 |
| Nuveen LA Muni A | 7/3/2001 | 3/15/2012 | 11.000 | 123.31 | 122.21 | 0.00 | 1.10 |
| Nuveen LA Muni A | 8/2/2001 | 3/15/2012 | 11.000 | 123.31 | 123.86 | 0.00 | −0.55 |
| Nuveen LA Muni A | 8/6/2001 | 3/15/2012 | 8.000 | 89.68 | 94.08 | 0.00 | −4.40 |
| Nuveen LA Muni A | 9/4/2001 | 3/15/2012 | 8.000 | 89.68 | 95.04 | 0.00 | −5.36 |
| Nuveen LA Muni A | 9/5/2001 | 3/15/2012 | 12.000 | 134.52 | 136.56 | 0.00 | −2.04 |
| Nuveen LA Muni A | 10/1/2001 | 3/15/2012 | 8.000 | 89.68 | 94.40 | 0.00 | −4.72 |
| Nuveen LA Muni A | 10/2/2001 | 3/15/2012 | 11.000 | 123.31 | 124.30 | 0.00 | −0.99 |
| Nuveen LA Muni A | 11/2/2001 | 3/15/2012 | 11.000 | 123.31 | 125.73 | 0.00 | −2.42 |
| Nuveen LA Muni A | 11/5/2001 | 3/15/2012 | 8.000 | 89.68 | 95.36 | 0.00 | −5.68 |
| Nuveen LA Muni A | 12/3/2001 | 3/15/2012 | 8.000 | 89.68 | 93.76 | 0.00 | −4.08 |
| Nuveen LA Muni A | 12/4/2001 | 3/15/2012 | 12.000 | 134.52 | 134.76 | 0.00 | −0.24 |
| Nuveen LA Muni A | 12/27/2001 | 3/15/2012 | 12.000 | 134.52 | 132.36 | 0.00 | 2.16 |
| Nuveen LA Muni A | 1/7/2002 | 3/15/2012 | 8.000 | 89.68 | 92.56 | 0.00 | −2.88 |
| Nuveen LA Muni A | 2/4/2002 | 3/15/2012 | 8.000 | 89.68 | 93.76 | 0.00 | −4.08 |
| Nuveen LA Muni A | 2/4/2002 | 3/15/2012 | 12.000 | 134.52 | 134.52 | 0.00 | 0.00 |
| Nuveen LA Muni A | 3/4/2002 | 3/15/2012 | 8.000 | 89.68 | 93.92 | 0.00 | −4.24 |
| Nuveen LA Muni A | 3/4/2002 | 3/15/2012 | 12.000 | 134.52 | 135.24 | 0.00 | −0.72 |
| Nuveen LA Muni A | 4/1/2002 | 3/15/2012 | 8.000 | 89.68 | 91.84 | 0.00 | −2.16 |
| Nuveen LA Muni A | 4/2/2002 | 3/15/2012 | 12.000 | 134.52 | 132.00 | 0.00 | 2.52 |
| Nuveen LA Muni A | 5/2/2002 | 3/15/2012 | 12.000 | 134.52 | 133.56 | 0.00 | 0.96 |
| Nuveen LA Muni A | 5/6/2002 | 3/15/2012 | 8.000 | 89.68 | 93.12 | 0.00 | −3.44 |
| Nuveen LA Muni A | 6/3/2002 | 3/15/2012 | 8.000 | 89.68 | 93.20 | 0.00 | −3.52 |
| Nuveen LA Muni A | 6/4/2002 | 3/15/2012 | 12.000 | 134.52 | 133.92 | 0.00 | 0.60 |
| Nuveen LA Muni A | 7/1/2002 | 3/15/2012 | 8.000 | 89.68 | 93.44 | 0.00 | −3.76 |
| Nuveen LA Muni A | 7/2/2002 | 3/15/2012 | 13.000 | 145.73 | 145.47 | 0.00 | 0.26 |
| Nuveen LA Muni A | 8/2/2002 | 3/15/2012 | 12.000 | 134.52 | 136.08 | 0.00 | −1.56 |
| Nuveen LA Muni A | 8/5/2002 | 3/15/2012 | 8.000 | 89.68 | 95.04 | 0.00 | −5.36 |
| Nuveen LA Muni A | 9/3/2002 | 3/15/2012 | 8.000 | 89.68 | 95.68 | 0.00 | −6.00 |
| Nuveen LA Muni A | 9/4/2002 | 3/15/2012 | 12.000 | 134.52 | 137.52 | 0.00 | −3.00 |
| Nuveen LA Muni A | 10/2/2002 | 3/15/2012 | 12.000 | 134.52 | 139.80 | 0.00 | −5.28 |
| Nuveen LA Muni A | 10/7/2002 | 3/15/2012 | 8.000 | 89.68 | 97.36 | 0.00 | −7.68 |

| [*38]<br><br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 11/4/2002 | 3/15/2012 | 8.000 | 89.68 | 94.40 | 0.00 | −4.72 |
| Nuveen LA Muni A | 11/4/2002 | 3/15/2012 | 13.000 | 145.73 | 147.29 | 0.00 | −1.56 |
| Nuveen LA Muni A | 12/2/2002 | 3/15/2012 | 8.000 | 89.68 | 93.76 | 0.00 | −4.08 |
| Nuveen LA Muni A | 12/3/2002 | 3/15/2012 | 12.000 | 134.52 | 134.76 | 0.00 | −0.24 |
| Nuveen LA Muni A | 12/30/2002 | 3/15/2012 | 12.000 | 134.52 | 137.16 | 0.00 | −2.64 |
| Nuveen LA Muni A | 1/6/2003 | 3/15/2012 | 8.000 | 89.68 | 95.12 | 0.00 | −5.44 |
| Nuveen LA Muni A | 2/3/2003 | 3/15/2012 | 8.000 | 89.68 | 94.72 | 0.00 | −5.04 |
| Nuveen LA Muni A | 2/4/2003 | 3/15/2012 | 12.000 | 134.52 | 136.08 | 0.00 | −1.56 |
| Nuveen LA Muni A | 3/3/2003 | 3/15/2012 | 8.000 | 89.68 | 96.24 | 0.00 | −6.56 |
| Nuveen LA Muni A | 3/4/2003 | 3/15/2012 | 12.000 | 134.52 | 138.24 | 0.00 | −3.72 |
| Nuveen LA Muni A | 4/2/2003 | 3/15/2012 | 13.000 | 145.73 | 148.46 | 0.00 | −2.73 |
| Nuveen LA Muni A | 4/7/2003 | 3/15/2012 | 8.000 | 89.68 | 94.72 | 0.00 | −5.04 |
| Nuveen LA Muni A | 5/2/2003 | 3/15/2012 | 12.000 | 134.52 | 138.48 | 0.00 | −3.96 |
| Nuveen LA Muni A | 5/5/2003 | 3/15/2012 | 8.000 | 89.68 | 96.32 | 0.00 | −6.64 |
| Nuveen LA Muni A | 6/2/2003 | 3/15/2012 | 8.000 | 89.68 | 97.92 | 0.00 | −8.24 |
| Nuveen LA Muni A | 6/3/2003 | 3/15/2012 | 12.000 | 134.52 | 140.76 | 0.00 | −6.24 |
| Nuveen LA Muni A | 7/2/2003 | 3/15/2012 | 12.000 | 134.52 | 139.44 | 0.00 | −4.92 |
| Nuveen LA Muni A | 7/7/2003 | 3/15/2012 | 8.000 | 89.68 | 96.72 | 0.00 | −7.04 |
| Nuveen LA Muni A | 8/4/2003 | 3/15/2012 | 8.000 | 89.68 | 92.64 | 0.00 | −2.96 |
| Nuveen LA Muni A | 8/4/2003 | 3/15/2012 | 12.000 | 134.52 | 132.96 | 0.00 | 1.56 |
| Nuveen LA Muni A | 9/2/2003 | 3/15/2012 | 8.000 | 89.68 | 92.56 | 0.00 | −2.88 |
| Nuveen LA Muni A | 9/3/2003 | 3/15/2012 | 13.000 | 145.73 | 144.04 | 0.00 | 1.69 |
| Nuveen LA Muni A | 10/2/2003 | 3/15/2012 | 12.000 | 134.52 | 136.92 | 0.00 | −2.40 |
| Nuveen LA Muni A | 10/6/2003 | 3/15/2012 | 8.000 | 89.68 | 94.40 | 0.00 | −4.72 |
| Nuveen LA Muni A | 11/3/2003 | 3/15/2012 | 8.000 | 89.68 | 94.48 | 0.00 | −4.80 |
| Nuveen LA Muni A | 11/4/2003 | 3/15/2012 | 13.000 | 145.73 | 147.03 | 0.00 | −1.30 |
| Nuveen LA Muni A | 12/1/2003 | 3/15/2012 | 8.000 | 89.68 | 94.96 | 0.00 | −5.28 |
| Nuveen LA Muni A | 12/2/2003 | 3/15/2012 | 12.000 | 134.52 | 136.44 | 0.00 | −1.92 |
| Nuveen LA Muni A | 12/30/2003 | 3/15/2012 | 13.000 | 145.73 | 149.24 | 0.00 | −3.51 |
| Nuveen LA Muni A | 1/5/2004 | 3/15/2012 | 8.000 | 89.68 | 95.52 | 0.00 | −5.84 |
| Nuveen LA Muni A | 2/2/2004 | 3/15/2012 | 8.000 | 89.68 | 96.00 | 0.00 | −6.32 |
| Nuveen LA Muni A | 2/3/2004 | 3/15/2012 | 12.000 | 134.52 | 138.00 | 0.00 | −3.48 |
| Nuveen LA Muni A | 3/1/2004 | 3/15/2012 | 8.000 | 89.68 | 97.28 | 0.00 | −7.60 |
| Nuveen LA Muni A | 3/2/2004 | 3/15/2012 | 13.000 | 145.73 | 151.45 | 0.00 | −5.72 |
| Nuveen LA Muni A | 4/2/2004 | 3/15/2012 | 12.000 | 134.52 | 138.36 | 0.00 | −3.84 |
| Nuveen LA Muni A | 4/5/2004 | 3/15/2012 | 8.000 | 89.68 | 94.88 | 0.00 | −5.20 |
| Nuveen LA Muni A | 5/3/2004 | 3/15/2012 | 8.000 | 89.68 | 93.52 | 0.00 | −3.84 |
| Nuveen LA Muni A | 5/4/2004 | 3/15/2012 | 14.000 | 156.94 | 156.80 | 0.00 | 0.14 |
| Nuveen LA Muni A | 6/1/2004 | 3/15/2012 | 8.000 | 89.68 | 92.56 | 0.00 | −2.88 |
| Nuveen LA Muni A | 6/2/2004 | 3/15/2012 | 13.000 | 145.73 | 144.04 | 0.00 | 1.69 |
| Nuveen LA Muni A | 7/2/2004 | 3/15/2012 | 13.000 | 145.73 | 144.69 | 0.00 | 1.04 |
| Nuveen LA Muni A | 7/6/2004 | 3/15/2012 | 8.000 | 89.68 | 93.68 | 0.00 | −4.00 |
| Nuveen LA Muni A | 8/2/2004 | 3/15/2012 | 8.000 | 89.68 | 93.92 | 0.00 | −4.24 |
| Nuveen LA Muni A | 8/3/2004 | 3/15/2012 | 14.000 | 156.94 | 157.50 | 0.00 | −0.56 |
| Nuveen LA Muni A | 9/2/2004 | 3/15/2012 | 13.000 | 145.73 | 148.33 | 0.00 | −2.60 |
| Nuveen LA Muni A | 9/7/2004 | 3/15/2012 | 8.000 | 89.68 | 94.96 | 0.00 | −5.28 |
| Nuveen LA Muni A | 10/4/2004 | 3/15/2012 | 8.000 | 89.68 | 94.88 | 0.00 | −5.20 |

| [*39]<br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 10/4/2004 | 3/15/2012 | 13.000 | 145.73 | 147.81 | 0.00 | −2.08 |
| Nuveen LA Muni A | 11/1/2004 | 3/15/2012 | 8.000 | 89.68 | 95.52 | 0.00 | −5.84 |
| Nuveen LA Muni A | 11/2/2004 | 3/15/2012 | 13.000 | 145.73 | 148.72 | 0.00 | −2.99 |
| Nuveen LA Muni A | 12/2/2004 | 3/15/2012 | 14.000 | 156.94 | 158.34 | 0.00 | −1.40 |
| Nuveen LA Muni A | 12/6/2004 | 3/15/2012 | 8.000 | 89.68 | 95.04 | 0.00 | −5.36 |
| Nuveen LA Muni A | 12/28/2004 | 3/15/2012 | 14.000 | 156.94 | 159.32 | 0.00 | −2.38 |
| Nuveen LA Muni A | 1/3/2005 | 3/15/2012 | 8.000 | 89.68 | 95.44 | 0.00 | −5.76 |
| Nuveen LA Muni A | 2/2/2005 | 3/15/2012 | 13.000 | 145.73 | 149.76 | 0.00 | −4.03 |
| Nuveen LA Muni A | 2/7/2005 | 3/15/2012 | 8.000 | 89.68 | 96.88 | 0.00 | −7.20 |
| Nuveen LA Muni A | 3/2/2005 | 3/15/2012 | 13.000 | 145.73 | 148.46 | 0.00 | −2.73 |
| Nuveen LA Muni A | 3/7/2005 | 3/15/2012 | 8.000 | 89.68 | 95.68 | 0.00 | −6.00 |
| Nuveen LA Muni A | 4/4/2005 | 3/15/2012 | 8.000 | 89.68 | 94.56 | 0.00 | −4.88 |
| Nuveen LA Muni A | 4/4/2005 | 3/15/2012 | 13.000 | 145.73 | 147.03 | 0.00 | −1.30 |
| Nuveen LA Muni A | 5/2/2005 | 3/15/2012 | 8.000 | 89.68 | 95.68 | 0.00 | −6.00 |
| Nuveen LA Muni A | 5/3/2005 | 3/15/2012 | 13.000 | 145.73 | 148.98 | 0.00 | −3.25 |
| Nuveen LA Muni A | 6/2/2005 | 3/15/2012 | 12.000 | 134.52 | 138.60 | 0.00 | −4.08 |
| Nuveen LA Muni A | 6/6/2005 | 3/15/2012 | 8.000 | 89.68 | 96.56 | 0.00 | −6.88 |
| Nuveen LA Muni A | 7/5/2005 | 3/15/2012 | 8.000 | 89.68 | 96.00 | 0.00 | −6.32 |
| Nuveen LA Muni A | 7/5/2005 | 3/15/2012 | 13.000 | 145.73 | 149.89 | 0.00 | −4.16 |
| Nuveen LA Muni A | 8/1/2005 | 3/15/2012 | 8.000 | 89.68 | 95.44 | 0.00 | −5.76 |
| Nuveen LA Muni A | 8/2/2005 | 3/15/2012 | 13.000 | 145.73 | 148.59 | 0.00 | −2.86 |
| Nuveen LA Muni A | 9/2/2005 | 3/15/2012 | 13.000 | 145.73 | 149.63 | 0.00 | −3.90 |
| Nuveen LA Muni A | 9/6/2005 | 3/15/2012 | 9.000 | 100.89 | 107.64 | 0.00 | −6.75 |
| Nuveen LA Muni A | 10/3/2005 | 3/15/2012 | 8.000 | 89.68 | 93.84 | 0.00 | −4.16 |
| Nuveen LA Muni A | 10/4/2005 | 3/15/2012 | 13.000 | 145.73 | 146.12 | 0.00 | −0.39 |
| Nuveen LA Muni A | 11/1/2005 | 3/15/2012 | 13.000 | 145.73 | 144.95 | 0.00 | 0.78 |
| Nuveen LA Muni A | 11/1/2005 | 3/15/2012 | 8.000 | 89.68 | 92.88 | 0.00 | −3.20 |
| Nuveen LA Muni A | 12/1/2005 | 3/15/2012 | 13.000 | 145.73 | 144.95 | 0.00 | 0.78 |
| Nuveen LA Muni A | 12/2/2005 | 3/15/2012 | 1.000 | 11.21 | 11.08 | 0.00 | 0.13 |
| Nuveen LA Muni A | 12/5/2005 | 3/15/2012 | 8.000 | 89.68 | 92.48 | 0.00 | −2.80 |
| Nuveen LA Muni A | 12/5/2005 | 3/15/2012 | 19.000 | 212.99 | 210.33 | 0.00 | 2.66 |
| Nuveen LA Muni A | 12/6/2005 | 3/15/2012 | 1.000 | 11.21 | 11.09 | 0.00 | 0.12 |
| Nuveen LA Muni A | 12/27/2005 | 3/15/2012 | 13.000 | 145.73 | 144.95 | 0.00 | 0.78 |
| Nuveen LA Muni A | 12/28/2005 | 3/15/2012 | 1.000 | 11.21 | 11.15 | 0.00 | 0.06 |
| Nuveen LA Muni A | 1/3/2006 | 3/15/2012 | 8.000 | 89.68 | 93.28 | 0.00 | −3.60 |
| Nuveen LA Muni A | 2/1/2006 | 3/15/2012 | 13.000 | 145.73 | 144.82 | 0.00 | 0.91 |
| Nuveen LA Muni A | 2/2/2006 | 3/15/2012 | 1.000 | 11.21 | 11.15 | 0.00 | 0.06 |
| Nuveen LA Muni A | 2/6/2006 | 3/15/2012 | 8.000 | 89.68 | 93.28 | 0.00 | −3.60 |
| Nuveen LA Muni A | 3/1/2006 | 3/15/2012 | 13.000 | 145.73 | 145.60 | 0.00 | 0.13 |
| Nuveen LA Muni A | 3/6/2006 | 3/15/2012 | 8.000 | 89.68 | 93.04 | 0.00 | −3.36 |
| Nuveen LA Muni A | 4/3/2006 | 3/15/2012 | 8.000 | 89.68 | 92.64 | 0.00 | −2.96 |
| Nuveen LA Muni A | 4/3/2006 | 3/15/2012 | 14.000 | 156.94 | 155.26 | 0.00 | 1.68 |
| Nuveen LA Muni A | 4/4/2006 | 3/15/2012 | 1.000 | 11.21 | 11.10 | 0.00 | 0.11 |
| Nuveen LA Muni A | 5/1/2006 | 3/15/2012 | 8.000 | 89.68 | 92.00 | 0.00 | −2.32 |
| Nuveen LA Muni A | 5/1/2006 | 3/15/2012 | 14.000 | 156.94 | 154.28 | 0.00 | 2.66 |
| Nuveen LA Muni A | 6/1/2006 | 3/15/2012 | 14.000 | 156.94 | 154.70 | 0.00 | 2.24 |
| Nuveen LA Muni A | 6/5/2006 | 3/15/2012 | 8.000 | 89.68 | 92.64 | 0.00 | −2.96 |

| [*40]<br><br>*Security* | *Date of acquisition* | *Date of sale or exchange* | *Quantity* | *Amount* | *Cost basis* | *Wash sale loss disallowed* | *Gain or loss* |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 7/3/2006 | 3/15/2012 | 8.000 | 89.68 | 91.76 | 0.00 | −2.08 |
| Nuveen LA Muni A | 7/3/2006 | 3/15/2012 | 14.000 | 156.94 | 153.86 | 0.00 | 3.08 |
| Nuveen LA Muni A | 7/5/2006 | 3/15/2012 | 1.000 | 11.21 | 10.97 | 0.00 | 0.24 |
| Nuveen LA Muni A | 8/1/2006 | 3/15/2012 | 14.000 | 156.94 | 155.12 | 0.00 | 1.82 |
| Nuveen LA Muni A | 8/7/2006 | 3/15/2012 | 8.000 | 89.68 | 92.88 | 0.00 | −3.20 |
| Nuveen LA Muni A | 9/1/2006 | 3/15/2012 | 14.000 | 156.94 | 156.94 | 0.00 | 0.00 |
| Nuveen LA Muni A | 9/5/2006 | 3/15/2012 | 8.000 | 89.68 | 93.52 | 0.00 | −3.84 |
| Nuveen LA Muni A | 10/2/2006 | 3/15/2012 | 8.000 | 89.68 | 94.08 | 0.00 | −4.40 |
| Nuveen LA Muni A | 10/2/2006 | 3/15/2012 | 14.000 | 156.94 | 157.78 | 0.00 | −0.84 |
| Nuveen LA Muni A | 10/3/2006 | 3/15/2012 | 1.000 | 11.21 | 11.27 | 0.00 | −0.06 |
| Nuveen LA Muni A | 11/1/2006 | 3/15/2012 | 14.000 | 156.94 | 158.76 | 0.00 | −1.82 |
| Nuveen LA Muni A | 11/6/2006 | 3/15/2012 | 8.000 | 89.68 | 94.24 | 0.00 | −4.56 |
| Nuveen LA Muni A | 12/1/2006 | 3/15/2012 | 14.000 | 156.94 | 160.16 | 0.00 | −3.22 |
| Nuveen LA Muni A | 12/4/2006 | 3/15/2012 | 8.000 | 89.68 | 95.28 | 0.00 | −5.60 |
| Nuveen LA Muni A | 12/5/2006 | 3/15/2012 | 8.000 | 89.68 | 91.20 | 0.00 | −1.52 |
| Nuveen LA Muni A | 12/6/2006 | 3/15/2012 | 1.000 | 11.21 | 11.40 | 0.00 | −0.19 |
| Nuveen LA Muni A | 12/27/2006 | 3/15/2012 | 14.000 | 156.94 | 158.20 | 0.00 | −1.26 |
| Nuveen LA Muni A | 1/3/2007 | 3/15/2012 | 8.000 | 89.68 | 94.40 | 0.00 | −4.72 |
| Nuveen LA Muni A | 2/1/2007 | 3/15/2012 | 14.000 | 156.94 | 157.22 | 0.00 | −0.28 |
| Nuveen LA Muni A | 2/2/2007 | 3/15/2012 | 1.000 | 11.21 | 11.24 | 0.00 | −0.03 |
| Nuveen LA Muni A | 2/5/2007 | 3/15/2012 | 8.000 | 89.68 | 93.92 | 0.00 | −4.24 |
| Nuveen LA Muni A | 3/1/2007 | 3/15/2012 | 14.000 | 156.94 | 158.76 | 0.00 | −1.82 |
| Nuveen LA Muni A | 3/5/2007 | 3/15/2012 | 8.000 | 89.68 | 94.88 | 0.00 | −5.20 |
| Nuveen LA Muni A | 4/2/2007 | 3/15/2012 | 8.000 | 89.68 | 94.00 | 0.00 | −4.32 |
| Nuveen LA Muni A | 4/2/2007 | 3/15/2012 | 10.000 | 112.10 | 112.60 | 0.00 | −0.50 |
| Nuveen LA Muni A | 4/3/2007 | 3/15/2012 | 1.000 | 11.21 | 11.25 | 0.00 | −0.04 |
| Nuveen LA Muni A | 5/1/2007 | 3/15/2012 | 10.000 | 112.10 | 112.80 | 0.00 | −0.70 |
| Nuveen LA Muni A | 5/7/2007 | 3/15/2012 | 8.000 | 89.68 | 94.24 | 0.00 | −4.56 |
| Nuveen LA Muni A | 6/1/2007 | 3/15/2012 | 10.000 | 112.10 | 111.80 | 0.00 | 0.30 |
| Nuveen LA Muni A | 6/4/2007 | 3/15/2012 | 8.000 | 89.68 | 93.36 | 0.00 | −3.68 |
| Nuveen LA Muni A | 6/4/2007 | 3/15/2012 | 1.000 | 11.21 | 11.18 | 0.00 | 0.03 |
| Nuveen LA Muni A | 7/2/2007 | 3/15/2012 | 8.000 | 89.68 | 92.80 | 0.00 | −3.12 |
| Nuveen LA Muni A | 7/2/2007 | 3/15/2012 | 10.000 | 112.10 | 111.10 | 0.00 | 1.00 |
| Nuveen LA Muni A | 8/1/2007 | 3/15/2012 | 10.000 | 112.10 | 111.20 | 0.00 | 0.90 |
| Nuveen LA Muni A | 8/2/2007 | 3/15/2012 | 1.000 | 11.21 | 11.11 | 0.00 | 0.10 |
| Nuveen LA Muni A | 8/6/2007 | 3/15/2012 | 8.000 | 89.68 | 92.64 | 0.00 | −2.96 |
| Nuveen LA Muni A | 9/4/2007 | 3/15/2012 | 8.000 | 89.68 | 92.24 | 0.00 | −2.56 |
| Nuveen LA Muni A | 9/4/2007 | 3/15/2012 | 10.000 | 112.10 | 110.50 | 0.00 | 1.60 |
| Nuveen LA Muni A | 9/5/2007 | 3/15/2012 | 1.000 | 11.21 | 11.11 | 0.00 | 0.10 |
| Nuveen LA Muni A | 10/1/2007 | 3/15/2012 | 8.000 | 89.68 | 93.44 | 0.00 | −3.76 |
| Nuveen LA Muni A | 10/1/2007 | 3/15/2012 | 10.000 | 112.10 | 111.90 | 0.00 | 0.20 |
| Nuveen LA Muni A | 10/2/2007 | 3/15/2012 | 1.000 | 11.21 | 11.20 | 0.00 | 0.01 |
| Nuveen LA Muni A | 11/1/2007 | 3/15/2012 | 10.000 | 112.10 | 112.00 | 0.00 | 0.10 |
| Nuveen LA Muni A | 11/2/2007 | 3/15/2012 | 1.000 | 11.21 | 11.21 | 0.00 | 0.00 |
| Nuveen LA Muni A | 11/5/2007 | 3/15/2012 | 8.000 | 89.68 | 93.44 | 0.00 | −3.76 |
| Nuveen LA Muni A | 12/3/2007 | 3/15/2012 | 8.000 | 89.68 | 93.60 | 0.00 | −3.92 |
| Nuveen LA Muni A | 12/3/2007 | 3/15/2012 | 10.000 | 112.10 | 112.10 | 0.00 | 0.00 |

| [*41] Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 12/6/2007 | 3/15/2012 | 13.000 | 145.73 | 145.34 | 0.00 | 0.39 |
| Nuveen LA Muni A | 12/7/2007 | 3/15/2012 | 1.000 | 11.21 | 11.12 | 0.00 | 0.09 |
| Nuveen LA Muni A | 12/7/2007 | 3/15/2012 | 1.000 | 11.21 | 11.12 | 0.00 | 0.09 |
| Nuveen LA Muni A | 12/28/2007 | 3/15/2012 | 11.000 | 123.31 | 121.77 | 0.00 | 1.54 |
| Nuveen LA Muni A | 1/7/2008 | 3/15/2012 | 8.000 | 89.68 | 93.68 | 0.00 | −4.00 |
| Nuveen LA Muni A | 2/1/2008 | 3/15/2012 | 15.000 | 168.15 | 166.95 | 0.00 | 1.20 |
| Nuveen LA Muni A | 2/4/2008 | 3/15/2012 | 8.000 | 89.68 | 92.80 | 0.00 | −3.12 |
| Nuveen LA Muni A | 3/3/2008 | 3/15/2012 | 9.000 | 100.89 | 98.73 | 0.00 | 2.16 |
| Nuveen LA Muni A | 3/3/2008 | 3/15/2012 | 16.000 | 179.36 | 167.20 | 0.00 | 12.16 |
| Nuveen LA Muni A | 3/4/2008 | 3/15/2012 | 1.000 | 11.21 | 10.63 | 0.00 | 0.58 |
| Nuveen LA Muni A | 4/1/2008 | 3/15/2012 | 16.000 | 179.36 | 171.36 | 0.00 | 8.00 |
| Nuveen LA Muni A | 4/7/2008 | 3/15/2012 | 8.000 | 89.68 | 89.76 | 0.00 | −0.08 |
| Nuveen LA Muni A | 5/1/2008 | 3/15/2012 | 16.000 | 179.36 | 172.80 | 0.00 | 6.56 |
| Nuveen LA Muni A | 5/5/2008 | 3/15/2012 | 8.000 | 89.68 | 90.16 | 0.00 | −0.48 |
| Nuveen LA Muni A | 6/2/2008 | 3/15/2012 | 8.000 | 89.68 | 90.56 | 0.00 | −0.88 |
| Nuveen LA Muni A | 6/2/2008 | 3/15/2012 | 16.000 | 179.36 | 173.28 | 0.00 | 6.08 |
| Nuveen LA Muni A | 7/1/2008 | 3/15/2012 | 16.000 | 179.36 | 170.72 | 0.00 | 8.64 |
| Nuveen LA Muni A | 7/7/2008 | 3/15/2012 | 8.000 | 89.68 | 89.68 | 0.00 | 0.00 |
| Nuveen LA Muni A | 8/1/2008 | 3/15/2012 | 16.000 | 179.36 | 169.60 | 0.00 | 9.76 |
| Nuveen LA Muni A | 8/4/2008 | 3/15/2012 | 9.000 | 100.89 | 99.72 | 0.00 | 1.17 |
| Nuveen LA Muni A | 8/4/2008 | 3/15/2012 | 1.000 | 11.21 | 10.61 | 0.00 | 0.60 |
| Nuveen LA Muni A | 9/2/2008 | 3/15/2012 | 8.000 | 89.68 | 89.20 | 0.00 | 0.48 |
| Nuveen LA Muni A | 9/2/2008 | 3/15/2012 | 17.000 | 190.57 | 181.56 | 0.00 | 9.01 |
| Nuveen LA Muni A | 10/1/2008 | 3/15/2012 | 18.000 | 201.78 | 182.16 | 0.00 | 19.62 |
| Nuveen LA Muni A | 10/6/2008 | 3/15/2012 | 9.000 | 100.89 | 95.13 | 0.00 | 5.76 |
| Nuveen LA Muni A | 11/3/2008 | 3/15/2012 | 9.000 | 100.89 | 90.90 | 0.00 | 9.99 |
| Nuveen LA Muni A | 11/3/2008 | 3/15/2012 | 19.000 | 212.99 | 183.73 | 0.00 | 29.26 |
| Nuveen LA Muni A | 12/1/2008 | 3/15/2012 | 10.000 | 112.10 | 99.40 | 0.00 | 12.70 |
| Nuveen LA Muni A | 12/1/2008 | 3/15/2012 | 19.000 | 212.99 | 181.07 | 0.00 | 31.92 |
| Nuveen LA Muni A | 12/2/2008 | 3/15/2012 | 1.000 | 11.21 | 9.48 | 0.00 | 1.73 |
| Nuveen LA Muni A | 12/5/2008 | 3/15/2012 | 14.000 | 156.94 | 131.46 | 0.00 | 25.48 |
| Nuveen LA Muni A | 12/26/2008 | 3/15/2012 | 20.000 | 224.20 | 182.80 | 0.00 | 41.40 |
| Nuveen LA Muni A | 12/29/2008 | 3/15/2012 | 1.000 | 11.21 | 9.16 | 0.00 | 2.05 |
| Nuveen LA Muni A | 1/5/2009 | 3/15/2012 | 10.000 | 112.10 | 96.30 | 0.00 | 15.80 |
| Nuveen LA Muni A | 2/2/2009 | 3/15/2012 | 9.000 | 100.89 | 90.90 | 0.00 | 9.99 |
| Nuveen LA Muni A | 2/2/2009 | 3/15/2012 | 19.000 | 212.99 | 183.54 | 0.00 | 29.45 |
| Nuveen LA Muni A | 3/2/2009 | 3/15/2012 | 10.000 | 112.10 | 99.60 | 0.00 | 12.50 |
| Nuveen LA Muni A | 3/2/2009 | 3/15/2012 | 19.000 | 212.99 | 181.26 | 0.00 | 31.73 |
| Nuveen LA Muni A | 3/3/2009 | 3/15/2012 | 1.000 | 11.21 | 9.52 | 0.00 | 1.69 |
| Nuveen LA Muni A | 4/1/2009 | 3/15/2012 | 19.000 | 212.99 | 180.88 | 0.00 | 32.11 |
| Nuveen LA Muni A | 4/2/2009 | 3/15/2012 | 1.000 | 11.21 | 9.53 | 0.00 | 1.68 |
| Nuveen LA Muni A | 4/6/2009 | 3/15/2012 | 10.000 | 112.10 | 99.30 | 0.00 | 12.80 |
| Nuveen LA Muni A | 5/1/2009 | 3/15/2012 | 14.000 | 156.94 | 136.08 | 0.00 | 20.86 |
| Nuveen LA Muni A | 5/4/2009 | 3/15/2012 | 9.000 | 100.89 | 91.80 | 0.00 | 9.09 |
| Nuveen LA Muni A | 6/1/2009 | 3/15/2012 | 9.000 | 100.89 | 93.33 | 0.00 | 7.56 |
| Nuveen LA Muni A | 6/1/2009 | 3/15/2012 | 13.000 | 145.73 | 129.48 | 0.00 | 16.25 |
| Nuveen LA Muni A | 6/2/2009 | 3/15/2012 | 1.000 | 11.21 | 9.93 | 0.00 | 1.28 |

| [*42]<br>Security | Date of<br>acquisition | Date of sale<br>or exchange | Quantity | Amount | Cost basis | Wash sale<br>loss<br>disallowed | Gain or<br>loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 7/1/2009 | 3/15/2012 | 14.000 | 156.94 | 138.46 | 0.00 | 18.48 |
| Nuveen LA Muni A | 7/6/2009 | 3/15/2012 | 9.000 | 100.89 | 92.97 | 0.00 | 7.92 |
| Nuveen LA Muni A | 8/3/2009 | 3/15/2012 | 9.000 | 100.89 | 93.78 | 0.00 | 7.11 |
| Nuveen LA Muni A | 8/3/2009 | 3/15/2012 | 13.000 | 145.73 | 129.74 | 0.00 | 15.99 |
| Nuveen LA Muni A | 8/4/2009 | 3/15/2012 | 1.000 | 11.21 | 9.98 | 0.00 | 1.23 |
| Nuveen LA Muni A | 9/1/2009 | 3/15/2012 | 13.000 | 145.73 | 131.95 | 0.00 | 13.78 |
| Nuveen LA Muni A | 9/2/2009 | 3/15/2012 | 1.000 | 11.21 | 10.20 | 0.00 | 1.01 |
| Nuveen LA Muni A | 9/8/2009 | 3/15/2012 | 9.000 | 100.89 | 96.03 | 0.00 | 4.86 |
| Nuveen LA Muni A | 10/1/2009 | 3/15/2012 | 13.000 | 145.73 | 137.02 | 0.00 | 8.71 |
| Nuveen LA Muni A | 10/5/2009 | 3/15/2012 | 9.000 | 100.89 | 99.00 | 0.00 | 1.89 |
| Nuveen LA Muni A | 11/2/2009 | 3/15/2012 | 9.000 | 100.89 | 97.11 | 0.00 | 3.78 |
| Nuveen LA Muni A | 11/2/2009 | 3/15/2012 | 13.000 | 145.73 | 134.68 | 0.00 | 11.05 |
| Nuveen LA Muni A | 11/3/2009 | 3/15/2012 | 1.000 | 11.21 | 10.36 | 0.00 | 0.85 |
| Nuveen LA Muni A | 12/1/2009 | 3/15/2012 | 13.000 | 145.73 | 134.68 | 0.00 | 11.05 |
| Nuveen LA Muni A | 12/2/2009 | 3/15/2012 | 1.000 | 11.21 | 10.40 | 0.00 | 0.81 |
| Nuveen LA Muni A | 12/7/2009 | 3/15/2012 | 9.000 | 100.89 | 97.56 | 0.00 | 3.33 |
| Nuveen LA Muni A | 12/28/2009 | 3/15/2012 | 13.000 | 145.73 | 135.07 | 0.00 | 10.66 |
| Nuveen LA Muni A | 1/4/2010 | 3/15/2012 | 9.000 | 100.89 | 97.38 | 0.00 | 3.51 |
| Nuveen LA Muni A | 2/1/2010 | 3/15/2012 | 9.000 | 100.89 | 97.65 | 0.00 | 3.24 |
| Nuveen LA Muni A | 2/1/2010 | 3/15/2012 | 13.000 | 145.73 | 135.33 | 0.00 | 10.40 |
| Nuveen LA Muni A | 2/2/2010 | 3/15/2012 | 1.000 | 11.21 | 10.43 | 0.00 | 0.78 |
| Nuveen LA Muni A | 3/1/2010 | 3/15/2012 | 9.000 | 100.89 | 97.92 | 0.00 | 2.97 |
| Nuveen LA Muni A | 3/1/2010 | 3/15/2012 | 13.000 | 145.73 | 135.72 | 0.00 | 10.01 |
| Nuveen LA Muni A | 3/2/2010 | 3/15/2012 | 1.000 | 11.21 | 10.44 | 0.00 | 0.77 |
| Nuveen LA Muni A | 4/1/2010 | 3/15/2012 | 13.000 | 145.73 | 135.72 | 0.00 | 10.01 |
| Nuveen LA Muni A | 4/5/2010 | 3/15/2012 | 9.000 | 100.89 | 97.92 | 0.00 | 2.97 |
| Nuveen LA Muni A | 4/5/2010 | 3/15/2012 | 1.000 | 11.21 | 10.44 | 0.00 | 0.77 |
| Nuveen LA Muni A | 4/30/2010 | 3/15/2012 | 13.000 | 145.73 | 136.89 | 0.00 | 8.84 |
| Nuveen LA Muni A | 5/3/2010 | 3/15/2012 | 9.000 | 100.89 | 98.73 | 0.00 | 2.16 |
| Nuveen LA Muni A | 5/3/2010 | 3/15/2012 | 1.000 | 11.21 | 10.53 | 0.00 | 0.68 |
| Nuveen LA Muni A | 5/28/2010 | 3/15/2012 | 13.000 | 145.73 | 137.54 | 0.00 | 8.19 |
| Nuveen LA Muni A | 6/1/2010 | 3/15/2012 | 1.000 | 11.21 | 10.58 | 0.00 | 0.63 |
| Nuveen LA Muni A | 6/7/2010 | 3/15/2012 | 9.000 | 100.89 | 99.09 | 0.00 | 1.80 |
| Nuveen LA Muni A | 6/30/2010 | 3/15/2012 | 13.000 | 145.73 | 137.01 | 0.00 | 8.72 |
| Nuveen LA Muni A | 7/6/2010 | 3/15/2012 | 9.000 | 100.89 | 98.91 | 0.00 | 1.98 |
| Nuveen LA Muni A | 7/30/2010 | 3/15/2012 | 13.000 | 145.73 | 138.32 | 0.00 | 7.41 |
| Nuveen LA Muni A | 7/30/2010 | 3/15/2012 | 1.000 | 11.21 | 10.54 | 0.00 | 0.67 |
| Nuveen LA Muni A | 8/2/2010 | 3/15/2012 | 9.000 | 100.89 | 99.72 | 0.00 | 1.17 |
| Nuveen LA Muni A | 8/31/2010 | 3/15/2012 | 13.000 | 145.73 | 140.79 | 0.00 | 4.94 |
| Nuveen LA Muni A | 8/31/2010 | 3/15/2012 | 1.000 | 11.21 | 10.68 | 0.00 | 0.53 |
| Nuveen LA Muni A | 9/7/2010 | 3/15/2012 | 8.000 | 89.68 | 90.08 | 0.00 | −0.40 |
| Nuveen LA Muni A | 9/30/2010 | 3/15/2012 | 13.000 | 145.73 | 140.66 | 0.00 | 5.07 |
| Nuveen LA Muni A | 9/30/2010 | 3/15/2012 | 1.000 | 11.21 | 10.82 | 0.00 | 0.39 |
| Nuveen LA Muni A | 10/4/2010 | 3/15/2012 | 8.000 | 89.68 | 90.08 | 0.00 | −0.40 |
| Nuveen LA Muni A | 10/29/2010 | 3/15/2012 | 13.000 | 145.73 | 139.87 | 0.00 | 5.86 |
| Nuveen LA Muni A | 11/1/2010 | 3/15/2012 | 8.000 | 89.68 | 89.68 | 0.00 | 0.00 |
| Nuveen LA Muni A | 11/30/2010 | 3/15/2012 | 14.000 | 156.94 | 147.13 | 0.00 | 9.81 |

| [*43]<br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Nuveen LA Muni A | 11/30/2010 | 3/15/2012 | 1.000 | 11.21 | 10.77 | 0.00 | 0.44 |
| Nuveen LA Muni A | 12/6/2010 | 3/15/2012 | 9.000 | 100.89 | 98.37 | 0.00 | 2.52 |
| Nuveen LA Muni A | 12/31/2010 | 3/15/2012 | 14.000 | 156.94 | 143.36 | 0.00 | 13.58 |
| Nuveen LA Muni A | 1/3/2011 | 3/15/2012 | 9.000 | 100.89 | 96.03 | 0.00 | 4.86 |
| Nuveen LA Muni A | 1/31/2011 | 3/15/2012 | 14.000 | 156.94 | 141.40 | 0.00 | 15.54 |
| Nuveen LA Muni A | 1/31/2011 | 3/15/2012 | 1.000 | 11.21 | 10.30 | 0.00 | 0.91 |
| Nuveen LA Muni A | 2/28/2011 | 3/15/2012 | 14.000 | 156.95 | 143.21 | 0.00 | 13.74 |
| Nuveen LA Muni A | 2/28/2011 | 3/15/2012 | 1.000 | 11.21 | 10.11 | 0.00 | 1.10 |
| Blackrock Nat I | 7/26/1999 | 3/15/2012 | 5.000 | 53.70 | 54.35 | 0.65 | 0.00 |
| Blackrock Nat I | 7/26/1999 | 3/15/2012 | 16.000 | 171.83 | 173.93 | 0.00 | −2.10 |
| Blackrock Nat I | 8/25/1999 | 3/15/2012 | 11.000 | 118.13 | 119.21 | 0.00 | −1.08 |
| Blackrock Nat I | 9/27/1999 | 3/15/2012 | 20.000 | 214.80 | 202.67 | 0.00 | 12.13 |
| Blackrock Nat I | 10/15/1999 | 3/15/2012 | 3.000 | 32.21 | 32.94 | 0.00 | −0.73 |
| Blackrock Nat I | 10/25/1999 | 3/15/2012 | 8.000 | 85.92 | 81.60 | 0.00 | 4.32 |
| Blackrock Nat I | 11/26/1999 | 3/15/2012 | 5.000 | 53.70 | 49.96 | 0.00 | 3.74 |
| Blackrock Nat I | 12/27/1999 | 3/15/2012 | 5.000 | 53.70 | 48.95 | 0.00 | 4.75 |
| Blackrock Nat I | 1/25/2000 | 3/15/2012 | 5.000 | 53.70 | 48.36 | 0.00 | 5.34 |
| Blackrock Nat I | 2/25/2000 | 3/15/2012 | 20.000 | 214.80 | 195.95 | 0.00 | 18.85 |
| Blackrock Nat I | 3/27/2000 | 3/15/2012 | 3.000 | 32.22 | 33.24 | 0.00 | −1.02 |
| Blackrock Nat I | 4/17/2000 | 3/15/2012 | 2.000 | 21.48 | 16.59 | 0.00 | 4.89 |
| Blackrock Nat I | 4/25/2000 | 3/15/2012 | 3.000 | 32.22 | 33.07 | 0.00 | −0.85 |
| Blackrock Nat I | 5/25/2000 | 3/15/2012 | 3.000 | 32.21 | 32.39 | 0.00 | −0.18 |
| Blackrock Nat I | 6/15/2000 | 3/15/2012 | 2.000 | 21.47 | 16.51 | 0.00 | 4.96 |
| Blackrock Nat I | 6/26/2000 | 3/15/2012 | 3.000 | 32.22 | 33.17 | 0.00 | −0.95 |
| Blackrock Nat I | 7/25/2000 | 3/15/2012 | 3.000 | 32.22 | 33.53 | 0.00 | −1.31 |
| Blackrock Nat I | 8/15/2000 | 3/15/2012 | 2.000 | 21.48 | 16.88 | 0.00 | 4.60 |
| Blackrock Nat I | 8/25/2000 | 3/15/2012 | 75.000 | 805.50 | 782.45 | 0.00 | 23.05 |
| Blackrock Nat I | 9/15/2000 | 3/15/2012 | 2.000 | 21.48 | 16.92 | 0.00 | 4.56 |
| Blackrock Nat I | 9/25/2000 | 3/15/2012 | 15.000 | 161.10 | 151.81 | 0.00 | 9.29 |
| Blackrock Nat I | 10/25/2000 | 3/15/2012 | 11.000 | 118.14 | 118.30 | 0.00 | −0.16 |
| Blackrock Nat I | 11/15/2000 | 3/15/2012 | 2.000 | 21.48 | 16.80 | 0.00 | 4.68 |
| Blackrock Nat I | 11/27/2000 | 3/15/2012 | 3.000 | 32.22 | 33.68 | 0.00 | −1.46 |
| Blackrock Nat I | 12/15/2000 | 3/15/2012 | 2.000 | 21.47 | 17.20 | 0.00 | 4.27 |
| Blackrock Nat I | 12/26/2000 | 3/15/2012 | 5.000 | 53.70 | 51.89 | 0.00 | 1.81 |
| Blackrock Nat I | 1/25/2001 | 3/15/2012 | 3.000 | 32.21 | 34.49 | 0.00 | −2.28 |
| Blackrock Nat I | 2/15/2001 | 3/15/2012 | 2.000 | 21.48 | 17.26 | 0.00 | 4.22 |
| Blackrock Nat I | 2/26/2001 | 3/15/2012 | 3.000 | 32.21 | 34.51 | 0.00 | −2.30 |
| Blackrock Nat I | 3/15/2001 | 3/15/2012 | 2.000 | 21.48 | 17.32 | 0.00 | 4.16 |
| Blackrock Nat I | 3/26/2001 | 3/15/2012 | 3.000 | 32.22 | 34.71 | 0.00 | −2.49 |
| Blackrock Nat I | 4/25/2001 | 3/15/2012 | 3.000 | 32.22 | 33.79 | 0.00 | −1.57 |
| Blackrock Nat I | 5/15/2001 | 3/15/2012 | 2.000 | 21.47 | 16.93 | 0.00 | 4.54 |
| Blackrock Nat I | 5/25/2001 | 3/15/2012 | 3.000 | 32.22 | 34.02 | 0.00 | −1.80 |
| Blackrock Nat I | 6/15/2001 | 3/15/2012 | 2.000 | 21.48 | 17.11 | 0.00 | 4.37 |
| Blackrock Nat I | 6/25/2001 | 3/15/2012 | 5.000 | 53.70 | 51.42 | 0.00 | 2.28 |
| Blackrock Nat I | 7/25/2001 | 3/15/2012 | 5.000 | 53.70 | 51.78 | 0.00 | 1.92 |
| Blackrock Nat I | 8/27/2001 | 3/15/2012 | 44.000 | 472.56 | 472.77 | 0.00 | −0.21 |
| Blackrock Nat I | 9/17/2001 | 3/15/2012 | 3.000 | 32.22 | 35.04 | 0.00 | −2.82 |

| [*44] Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Blackrock Nat I | 9/25/2001 | 3/15/2012 | 3.000 | 32.22 | 34.64 | 0.00 | −2.42 |
| Blackrock Nat I | 10/25/2001 | 3/15/2012 | 2.000 | 21.48 | 17.39 | 0.00 | 4.09 |
| Blackrock Nat I | 11/15/2001 | 3/15/2012 | 3.000 | 32.22 | 34.78 | 0.00 | −2.56 |
| Blackrock Nat I | 11/26/2001 | 3/15/2012 | 2.000 | 21.48 | 17.22 | 0.00 | 4.26 |
| Blackrock Nat I | 12/17/2001 | 3/15/2012 | 3.000 | 32.22 | 33.58 | 0.00 | −1.36 |
| Blackrock Nat I | 12/26/2001 | 3/15/2012 | 7.000 | 75.18 | 67.68 | 0.00 | 7.50 |
| Blackrock Nat I | 1/25/2002 | 3/15/2012 | 2.000 | 21.48 | 17.12 | 0.00 | 4.36 |
| Blackrock Nat I | 2/15/2002 | 3/15/2012 | 3.000 | 32.22 | 34.22 | 0.00 | −2.00 |
| Blackrock Nat I | 2/25/2002 | 3/15/2012 | 2.000 | 21.48 | 17.19 | 0.00 | 4.29 |
| Blackrock Nat I | 3/15/2002 | 3/15/2012 | 3.000 | 32.22 | 33.86 | 0.00 | −1.64 |
| Blackrock Nat I | 3/25/2002 | 3/15/2012 | 2.000 | 21.48 | 16.85 | 0.00 | 4.63 |
| Blackrock Nat I | 4/15/2002 | 3/15/2012 | 3.000 | 32.22 | 33.94 | 0.00 | −1.72 |
| Blackrock Nat I | 4/25/2002 | 3/15/2012 | 2.000 | 21.48 | 17.03 | 0.00 | 4.45 |
| Blackrock Nat I | 5/15/2002 | 3/15/2012 | 3.000 | 32.22 | 33.86 | 0.00 | −1.64 |
| Blackrock Nat I | 5/28/2002 | 3/15/2012 | 2.000 | 21.47 | 17.01 | 0.00 | 4.46 |
| Blackrock Nat I | 6/17/2002 | 3/15/2012 | 3.000 | 32.22 | 34.18 | 0.00 | −1.96 |
| Blackrock Nat I | 6/25/2002 | 3/15/2012 | 2.000 | 21.48 | 17.09 | 0.00 | 4.39 |
| Blackrock Nat I | 7/15/2002 | 3/15/2012 | 3.000 | 32.22 | 34.40 | 0.00 | −2.18 |
| Blackrock Nat I | 7/25/2002 | 3/15/2012 | 34.000 | 365.16 | 362.25 | 0.00 | 2.91 |
| Blackrock Nat I | 8/15/2002 | 3/15/2012 | 2.000 | 21.48 | 17.23 | 0.00 | 4.25 |
| Blackrock Nat I | 8/26/2002 | 3/15/2012 | 3.000 | 32.22 | 34.40 | 0.00 | −2.18 |
| Blackrock Nat I | 9/16/2002 | 3/15/2012 | 3.000 | 32.22 | 34.68 | 0.00 | −2.46 |
| Blackrock Nat I | 9/25/2002 | 3/15/2012 | 2.000 | 21.48 | 17.47 | 0.00 | 4.01 |
| Blackrock Nat I | 10/15/2002 | 3/15/2012 | 2.000 | 21.47 | 17.28 | 0.00 | 4.19 |
| Blackrock Nat I | 10/25/2002 | 3/15/2012 | 5.000 | 53.70 | 50.66 | 0.00 | 3.04 |
| Blackrock Nat I | 11/15/2002 | 3/15/2012 | 3.000 | 32.22 | 34.12 | 0.00 | −1.90 |
| Blackrock Nat I | 11/25/2002 | 3/15/2012 | 2.000 | 21.48 | 17.01 | 0.00 | 4.47 |
| Blackrock Nat I | 12/16/2002 | 3/15/2012 | 3.000 | 32.22 | 34.14 | 0.00 | −1.92 |
| Blackrock Nat I | 12/26/2002 | 3/15/2012 | 3.000 | 32.22 | 34.30 | 0.00 | −2.08 |
| Blackrock Nat I | 1/15/2003 | 3/15/2012 | 2.000 | 21.48 | 17.05 | 0.00 | 4.43 |
| Blackrock Nat I | 1/27/2003 | 3/15/2012 | 67.000 | 719.58 | 701.51 | 0.00 | 18.07 |
| Blackrock Nat I | 2/18/2003 | 3/15/2012 | 3.000 | 32.22 | 34.18 | 0.00 | −1.96 |
| Blackrock Nat I | 2/25/2003 | 3/15/2012 | 2.000 | 21.48 | 17.20 | 0.00 | 4.28 |
| Blackrock Nat I | 3/17/2003 | 3/15/2012 | 3.000 | 32.22 | 34.50 | 0.00 | −2.28 |
| Blackrock Nat I | 3/25/2003 | 3/15/2012 | 2.000 | 21.48 | 17.06 | 0.00 | 4.42 |
| Blackrock Nat I | 4/15/2003 | 3/15/2012 | 3.000 | 32.22 | 34.18 | 0.00 | −1.96 |
| Blackrock Nat I | 4/25/2003 | 3/15/2012 | 2.000 | 21.48 | 17.27 | 0.00 | 4.21 |
| Blackrock Nat I | 5/15/2003 | 3/15/2012 | 3.000 | 32.22 | 35.08 | 0.00 | −2.86 |
| Blackrock Nat I | 5/27/2003 | 3/15/2012 | 11.000 | 118.14 | 123.54 | 0.00 | −5.40 |
| Blackrock Nat I | 6/16/2003 | 3/15/2012 | 5.000 | 53.70 | 53.28 | 0.00 | 0.42 |
| Blackrock Nat I | 6/25/2003 | 3/15/2012 | 15.000 | 161.10 | 157.76 | 0.00 | 3.34 |
| Blackrock Nat I | 7/15/2003 | 3/15/2012 | 2.000 | 21.48 | 17.23 | 0.00 | 4.25 |
| Blackrock Nat I | 7/25/2003 | 3/15/2012 | 25.000 | 268.50 | 256.20 | 0.00 | 12.30 |
| Blackrock Nat I | 8/15/2003 | 3/15/2012 | 3.000 | 32.22 | 33.56 | 0.00 | −1.34 |
| Blackrock Nat I | 8/25/2003 | 3/15/2012 | 2.000 | 21.47 | 16.81 | 0.00 | 4.66 |
| Blackrock Nat I | 9/15/2003 | 3/15/2012 | 3.000 | 32.22 | 34.02 | 0.00 | −1.80 |
| Blackrock Nat I | 9/25/2003 | 3/15/2012 | 2.000 | 21.48 | 17.12 | 0.00 | 4.36 |

| [*45]<br><br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Blackrock Nat I | 10/15/2003 | 3/15/2012 | 2.000 | 21.48 | 16.95 | 0.00 | 4.53 |
| Blackrock Nat I | 10/27/2003 | 3/15/2012 | 2.000 | 21.48 | 17.12 | 0.00 | 4.36 |
| Blackrock Nat I | 11/17/2003 | 3/15/2012 | 3.000 | 32.22 | 34.50 | 0.00 | −2.28 |
| Blackrock Nat I | 11/25/2003 | 3/15/2012 | 2.000 | 21.48 | 17.28 | 0.00 | 4.20 |
| Blackrock Nat I | 12/15/2003 | 3/15/2012 | 3.000 | 32.22 | 34.52 | 0.00 | −2.30 |
| Blackrock Nat I | 12/26/2003 | 3/15/2012 | 2.000 | 21.48 | 17.37 | 0.00 | 4.11 |
| Blackrock Nat I | 1/15/2004 | 3/15/2012 | 3.000 | 32.22 | 34.94 | 0.00 | −2.72 |
| Blackrock Nat I | 1/26/2004 | 3/15/2012 | 11.000 | 118.14 | 121.66 | 0.00 | −3.52 |
| Blackrock Nat I | 2/17/2004 | 3/15/2012 | 2.000 | 21.48 | 17.47 | 0.00 | 4.01 |
| Blackrock Nat I | 2/25/2004 | 3/15/2012 | 2.000 | 21.48 | 17.50 | 0.00 | 3.98 |
| Blackrock Nat I | 3/15/2004 | 3/15/2012 | 3.000 | 32.22 | 35.10 | 0.00 | −2.88 |
| Blackrock Nat I | 3/24/2004 | 3/15/2012 | 2.000 | 21.48 | 17.45 | 0.00 | 4.03 |
| Blackrock Nat I | 3/25/2004 | 3/15/2012 | 2.000 | 21.48 | 17.41 | 0.00 | 4.07 |
| Blackrock Nat I | 4/26/2004 | 3/15/2012 | 40.000 | 429.60 | 415.60 | 0.00 | 14.00 |
| Blackrock Nat I | 5/21/2004 | 3/15/2012 | 23.000 | 247.02 | 235.29 | 0.00 | 11.73 |
| Blackrock Nat I | 5/25/2004 | 3/15/2012 | 13.000 | 139.62 | 133.10 | 0.00 | 6.52 |
| Blackrock Nat I | 5/28/2004 | 3/15/2012 | 1.000 | 10.73 | 10.26 | 0.00 | 0.47 |
| Blackrock Nat I | 6/22/2004 | 3/15/2012 | 23.000 | 247.02 | 235.75 | 0.00 | 11.27 |
| Blackrock Nat I | 6/25/2004 | 3/15/2012 | 17.000 | 182.58 | 174.59 | 0.00 | 7.99 |
| Blackrock Nat I | 7/22/2004 | 3/15/2012 | 22.000 | 236.28 | 228.14 | 0.00 | 8.14 |
| Blackrock Nat I | 7/26/2004 | 3/15/2012 | 19.000 | 204.06 | 197.02 | 0.00 | 7.04 |
| Blackrock Nat I | 8/20/2004 | 3/15/2012 | 23.000 | 247.02 | 240.81 | 0.00 | 6.21 |
| Blackrock Nat I | 8/25/2004 | 3/15/2012 | 2.000 | 21.48 | 20.91 | 0.00 | 0.57 |
| Blackrock Nat I | 9/21/2004 | 3/15/2012 | 22.000 | 236.28 | 231.66 | 0.00 | 4.62 |
| Blackrock Nat I | 9/27/2004 | 3/15/2012 | 1.000 | 10.74 | 10.56 | 0.00 | 0.18 |
| Blackrock Nat I | 10/21/2004 | 3/15/2012 | 23.000 | 247.02 | 242.88 | 0.00 | 4.14 |
| Blackrock Nat I | 10/25/2004 | 3/15/2012 | 97.000 | 1,041.78 | 1,025.29 | 0.00 | 16.49 |
| Blackrock Nat I | 11/19/2004 | 3/15/2012 | 23.000 | 247.02 | 241.50 | 0.00 | 5.52 |
| Blackrock Nat I | 12/21/2004 | 3/15/2012 | 22.000 | 236.28 | 231.88 | 0.00 | 4.40 |
| Blackrock Nat I | 12/27/2004 | 3/15/2012 | 1.000 | 10.74 | 10.52 | 0.00 | 0.22 |
| Blackrock Nat I | 1/21/2005 | 3/15/2012 | 25.000 | 268.50 | 264.75 | 0.00 | 3.75 |
| Blackrock Nat I | 1/25/2005 | 3/15/2012 | 10.000 | 107.40 | 105.80 | 0.00 | 1.60 |
| Blackrock Nat I | 2/18/2005 | 3/15/2012 | 22.000 | 236.28 | 232.98 | 0.00 | 3.30 |
| Blackrock Nat I | 3/22/2005 | 3/15/2012 | 21.000 | 225.54 | 220.29 | 0.00 | 5.25 |
| Blackrock Nat I | 4/21/2005 | 3/15/2012 | 22.000 | 236.28 | 231.88 | 0.00 | 4.40 |
| Blackrock Nat I | 5/20/2005 | 3/15/2012 | 23.000 | 247.02 | 244.03 | 0.00 | 2.99 |
| Blackrock Nat I | 6/22/2005 | 3/15/2012 | 21.000 | 225.54 | 223.65 | 0.00 | 1.89 |
| Blackrock Nat I | 7/22/2005 | 3/15/2012 | 24.000 | 257.76 | 254.64 | 0.00 | 3.12 |
| Blackrock Nat I | 8/24/2005 | 3/15/2012 | 23.000 | 247.02 | 244.26 | 0.00 | 2.76 |
| Blackrock Nat I | 9/23/2005 | 3/15/2012 | 23.000 | 247.02 | 243.34 | 0.00 | 3.68 |
| Blackrock Nat I | 10/25/2005 | 3/15/2012 | 23.000 | 247.02 | 241.04 | 0.00 | 5.98 |
| Blackrock Nat I | 11/23/2005 | 3/15/2012 | 22.000 | 236.28 | 229.90 | 0.00 | 6.38 |
| Blackrock Nat I | 12/23/2005 | 3/15/2012 | 24.000 | 257.76 | 252.00 | 0.00 | 5.76 |
| Blackrock Nat I | 1/20/2006 | 3/15/2012 | 20.000 | 214.80 | 210.80 | 0.00 | 4.00 |
| Blackrock Nat I | 2/17/2006 | 3/15/2012 | 22.000 | 236.28 | 231.66 | 0.00 | 4.62 |
| Blackrock Nat I | 3/23/2006 | 3/15/2012 | 24.000 | 257.76 | 252.24 | 0.00 | 5.52 |
| Blackrock Nat I | 4/21/2006 | 3/15/2012 | 23.000 | 247.02 | 239.89 | 0.00 | 7.13 |

| [*46]<br><br>Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Blackrock Nat I | 5/23/2006 | 3/15/2012 | 23.000 | 247.02 | 239.66 | 0.00 | 7.36 |
| Blackrock Nat I | 6/22/2006 | 3/15/2012 | 22.000 | 236.28 | 227.92 | 0.00 | 8.36 |
| Blackrock Nat I | 7/21/2006 | 3/15/2012 | 24.000 | 257.76 | 249.84 | 0.00 | 7.92 |
| Blackrock Nat I | 8/22/2006 | 3/15/2012 | 23.000 | 247.02 | 241.96 | 0.00 | 5.06 |
| Blackrock Nat I | 9/21/2006 | 3/15/2012 | 22.000 | 236.28 | 232.54 | 0.00 | 3.74 |
| Blackrock Nat I | 10/31/2006 | 3/15/2012 | 30.000 | 322.20 | 317.70 | 0.00 | 4.50 |
| Blackrock Nat I | 11/30/2006 | 3/15/2012 | 22.000 | 236.28 | 234.08 | 0.00 | 2.20 |
| Blackrock Nat I | 12/29/2006 | 3/15/2012 | 23.000 | 247.02 | 243.11 | 0.00 | 3.91 |
| Blackrock Nat I | 1/3/2007 | 3/15/2012 | 1.000 | 10.74 | 10.58 | 0.00 | 0.16 |
| Blackrock Nat I | 1/31/2007 | 3/15/2012 | 23.000 | 247.02 | 242.19 | 0.00 | 4.83 |
| Blackrock Nat I | 2/1/2007 | 3/15/2012 | 1.000 | 10.74 | 10.53 | 0.00 | 0.21 |
| Blackrock Nat I | 2/28/2007 | 3/15/2012 | 21.000 | 225.54 | 222.60 | 0.00 | 2.94 |
| Blackrock Nat I | 3/30/2007 | 3/15/2012 | 16.000 | 171.84 | 168.80 | 0.00 | 3.04 |
| Blackrock Nat I | 4/30/2007 | 3/15/2012 | 16.000 | 171.84 | 168.64 | 0.00 | 3.20 |
| Blackrock Nat I | 5/1/2007 | 3/15/2012 | 1.000 | 10.74 | 10.54 | 0.00 | 0.20 |
| Blackrock Nat I | 5/31/2007 | 3/15/2012 | 16.000 | 171.84 | 167.52 | 0.00 | 4.32 |
| Blackrock Nat I | 6/29/2007 | 3/15/2012 | 16.000 | 171.84 | 166.24 | 0.00 | 5.60 |
| Blackrock Nat I | 7/2/2007 | 3/15/2012 | 1.000 | 10.74 | 10.39 | 0.00 | 0.35 |
| Blackrock Nat I | 7/31/2007 | 3/15/2012 | 16.000 | 171.84 | 166.24 | 0.00 | 5.60 |
| Blackrock Nat I | 8/1/2007 | 3/15/2012 | 1.000 | 10.74 | 10.38 | 0.00 | 0.36 |
| Blackrock Nat I | 8/31/2007 | 3/15/2012 | 17.000 | 182.58 | 174.59 | 0.00 | 7.99 |
| Blackrock Nat I | 9/28/2007 | 3/15/2012 | 16.000 | 171.84 | 165.60 | 0.00 | 6.24 |
| Blackrock Nat I | 10/1/2007 | 3/15/2012 | 1.000 | 10.74 | 10.35 | 0.00 | 0.39 |
| Blackrock Nat I | 10/31/2007 | 3/15/2012 | 17.000 | 182.58 | 175.78 | 0.00 | 6.80 |
| Blackrock Nat I | 11/30/2007 | 3/15/2012 | 16.000 | 171.84 | 164.96 | 0.00 | 6.88 |
| Blackrock Nat I | 12/31/2007 | 3/15/2012 | 17.000 | 182.58 | 174.25 | 0.00 | 8.33 |
| Blackrock Nat I | 1/2/2008 | 3/15/2012 | 1.000 | 10.74 | 10.27 | 0.00 | 0.47 |
| Blackrock Nat I | 1/31/2008 | 3/15/2012 | 24.000 | 257.76 | 246.72 | 0.00 | 11.04 |
| Blackrock Nat I | 2/29/2008 | 3/15/2012 | 23.000 | 247.02 | 226.09 | 0.00 | 20.93 |
| Blackrock Nat I | 3/3/2008 | 3/15/2012 | 1.000 | 10.74 | 9.89 | 0.00 | 0.85 |
| Blackrock Nat I | 3/31/2008 | 3/15/2012 | 25.000 | 268.50 | 250.00 | 0.00 | 18.50 |
| Blackrock Nat I | 4/1/2008 | 3/15/2012 | 1.000 | 10.74 | 9.98 | 0.00 | 0.76 |
| Blackrock Nat I | 4/30/2008 | 3/15/2012 | 23.000 | 247.02 | 231.38 | 0.00 | 15.64 |
| Blackrock Nat I | 5/1/2008 | 3/15/2012 | 1.000 | 10.74 | 10.06 | 0.00 | 0.68 |
| Blackrock Nat I | 5/30/2008 | 3/15/2012 | 24.000 | 257.76 | 241.92 | 0.00 | 15.84 |
| Blackrock Nat I | 6/30/2008 | 3/15/2012 | 23.000 | 247.02 | 228.85 | 0.00 | 18.17 |
| Blackrock Nat I | 7/31/2008 | 3/15/2012 | 23.000 | 247.02 | 227.93 | 0.00 | 19.09 |
| Blackrock Nat I | 8/1/2008 | 3/15/2012 | 1.000 | 10.74 | 9.91 | 0.00 | 0.83 |
| Blackrock Nat I | 8/29/2008 | 3/15/2012 | 25.000 | 268.50 | 248.75 | 0.00 | 19.75 |
| Blackrock Nat I | 9/30/2008 | 3/15/2012 | 27.000 | 289.98 | 255.96 | 0.00 | 34.02 |
| Blackrock Nat I | 10/1/2008 | 3/15/2012 | 1.000 | 10.74 | 9.47 | 0.00 | 1.27 |
| Blackrock Nat I | 10/31/2008 | 3/15/2012 | 30.000 | 322.20 | 273.90 | 0.00 | 48.30 |
| Blackrock Nat I | 11/28/2008 | 3/15/2012 | 28.000 | 300.72 | 252.84 | 0.00 | 47.88 |
| Blackrock Nat I | 12/31/2008 | 3/15/2012 | 29.000 | 311.46 | 258.68 | 0.00 | 52.78 |
| Blackrock Nat I | 1/30/2009 | 3/15/2012 | 27.000 | 289.98 | 250.29 | 0.00 | 39.69 |
| Blackrock Nat I | 2/2/2009 | 3/15/2012 | 1.000 | 10.74 | 9.30 | 0.00 | 1.44 |
| Blackrock Nat I | 2/27/2009 | 3/15/2012 | 24.000 | 257.76 | 225.36 | 0.00 | 32.40 |

| [*47] Security | Date of acquisition | Date of sale or exchange | Quantity | Amount | Cost basis | Wash sale loss disallowed | Gain or loss |
|---|---|---|---|---|---|---|---|
| Blackrock Nat I | 3/31/2009 | 3/15/2012 | 26.000 | 279.24 | 242.84 | 0.00 | 36.40 |
| Blackrock Nat I | 4/1/2009 | 3/15/2012 | 1.000 | 10.74 | 9.35 | 0.00 | 1.39 |
| Blackrock Nat I | 4/30/2009 | 3/15/2012 | 19.000 | 204.06 | 181.07 | 0.00 | 22.99 |
| Blackrock Nat I | 5/29/2009 | 3/15/2012 | 19.000 | 204.06 | 183.92 | 0.00 | 20.14 |
| Blackrock Nat I | 6/1/2009 | 3/15/2012 | 1.000 | 10.74 | 9.64 | 0.00 | 1.10 |
| Blackrock Nat I | 6/30/2009 | 3/15/2012 | 18.000 | 193.32 | 172.98 | 0.00 | 20.34 |
| Blackrock Nat I | 7/1/2009 | 3/15/2012 | 1.000 | 10.74 | 9.61 | 0.00 | 1.13 |
| Blackrock Nat I | 7/31/2009 | 3/15/2012 | 19.000 | 204.06 | 183.73 | 0.00 | 20.33 |
| Blackrock Nat I | 8/31/2009 | 3/15/2012 | 18.000 | 193.32 | 176.94 | 0.00 | 16.38 |
| Blackrock Nat I | 9/1/2009 | 3/15/2012 | 1.000 | 10.74 | 9.85 | 0.00 | 0.89 |
| Blackrock Nat I | 9/30/2009 | 3/15/2012 | 17.000 | 182.58 | 173.74 | 0.00 | 8.84 |
| Blackrock Nat I | 10/30/2009 | 3/15/2012 | 18.000 | 193.32 | 180.00 | 0.00 | 13.32 |
| Blackrock Nat I | 11/2/2009 | 3/15/2012 | 1.000 | 10.74 | 10.00 | 0.00 | 0.74 |
| Blackrock Nat I | 11/30/2009 | 3/15/2012 | 18.000 | 193.32 | 179.28 | 0.00 | 14.04 |
| Blackrock Nat I | 12/1/2009 | 3/15/2012 | 1.000 | 10.74 | 9.98 | 0.00 | 0.76 |
| Blackrock Nat I | 12/31/2009 | 3/15/2012 | 19.000 | 204.06 | 190.38 | 0.00 | 13.68 |
| Blackrock Nat I | 1/29/2010 | 3/15/2012 | 19.000 | 204.06 | 190.76 | 0.00 | 13.30 |
| Blackrock Nat I | 2/26/2010 | 3/15/2012 | 17.000 | 182.58 | 171.36 | 0.00 | 11.22 |
| Blackrock Nat I | 3/1/2010 | 3/15/2012 | 1.000 | 10.74 | 10.08 | 0.00 | 0.66 |
| Blackrock Nat I | 3/31/2010 | 3/15/2012 | 19.000 | 204.06 | 191.90 | 0.00 | 12.16 |
| Blackrock Nat I | 4/30/2010 | 3/15/2012 | 19.000 | 204.06 | 193.80 | 0.00 | 10.26 |
| Blackrock Nat I | 5/3/2010 | 3/15/2012 | 1.000 | 10.74 | 10.20 | 0.00 | 0.54 |
| Blackrock Nat I | 5/28/2010 | 3/15/2012 | 19.000 | 204.06 | 194.37 | 0.00 | 9.69 |
| Blackrock Nat I | 6/30/2010 | 3/15/2012 | 19.000 | 204.06 | 193.60 | 0.00 | 10.46 |
| Blackrock Nat I | 6/30/2010 | 3/15/2012 | 1.000 | 10.74 | 10.17 | 0.00 | 0.57 |
| Blackrock Nat I | 7/30/2010 | 3/15/2012 | 19.000 | 204.06 | 194.75 | 0.00 | 9.31 |
| Blackrock Nat I | 8/31/2010 | 3/15/2012 | 18.000 | 193.32 | 188.46 | 0.00 | 4.86 |
| Blackrock Nat I | 9/30/2010 | 3/15/2012 | 17.000 | 182.58 | 177.81 | 0.00 | 4.77 |
| Blackrock Nat I | 9/30/2010 | 3/15/2012 | 1.000 | 10.74 | 10.37 | 0.00 | 0.37 |
| Blackrock Nat I | 10/29/2010 | 3/15/2012 | 17.000 | 182.58 | 176.63 | 0.00 | 5.95 |
| Blackrock Nat I | 10/29/2010 | 3/15/2012 | 1.000 | 10.74 | 10.44 | 0.00 | 0.30 |
| Blackrock Nat I | 11/30/2010 | 3/15/2012 | 18.000 | 193.32 | 181.44 | 0.00 | 11.88 |
| Blackrock Nat I | 11/30/2010 | 3/15/2012 | 1.000 | 10.74 | 10.27 | 0.00 | 0.47 |
| Blackrock Nat I | 12/31/2010 | 3/15/2012 | 20.000 | 214.80 | 197.19 | 0.00 | 17.61 |
| Blackrock Nat I | 12/31/2010 | 3/15/2012 | 1.000 | 10.74 | 9.93 | 0.00 | 0.81 |
| Blackrock Nat I | 1/31/2011 | 3/15/2012 | 21.000 | 225.55 | 203.27 | 0.00 | 22.28 |
| Blackrock Nat I | 2/28/2011 | 3/15/2012 | 21.000 | 225.55 | 205.79 | 0.00 | 19.76 |
| Blackrock Nat I | 2/28/2011 | 3/15/2012 | 1.000 | 10.74 | 9.75 | 0.00 | 0.99 |
| Col. Tax Ex. Fd. A | 6/8/2011 | 3/15/2012 | 2332.000 | 32,298.46 | N/A | 0.00 | N/A |
| Col. Tax Ex. Fd. A | 1/26/2012 | 3/15/2012 | 1.000 | 13.85 | N/A | 0.00 | N/A |
| Col. Tax Ex. Fd. A | 1/26/2012 | 3/27/2012 | 0.309 | 4.26 | N/A | 0.00 | N/A |
| Blackrock | 6/8/1994 | 3/15/2012 | 1829.000 | 19,643.46 | N/A | 0.00 | N/A |
| Blackrock | 6/8/1994 | 3/15/2012 | 2523.000 | 27,097.01 | N/A | 0.00 | N/A |

**[*48]** There are five sales for which the abbreviation "N/A" appears in the column for cost basis. The parties disagree as to the true cost basis for these five sales.

XIII.  *In 2012, the Fraziers sold securities from the Franklin Growth Fund, receiving $40,867 of proceeds.*

During 2012, the Fraziers had proceeds from the sale of securities from the Franklin Growth Fund in the amount of $40,867.

XIV.  *In 2012, the Fraziers' received $1,417 from "Columbia Seligman Comm. And Info."*

During 2012, the Fraziers received an amount of $1,417 from "Columbia Seligman Comm. And Info." The parties stipulated that "the Fraziers had no basis in this asset."

XV.  *In 2012, the Fraziers received taxable wages, interest, dividends, IRA distributions, pension distributions, social security benefits, and Schedule E income and had federal income tax withholding.*

The parties stipulated that during 2012, the Fraziers received taxable wages of $1,175,640; taxable interest of $10,308; taxable ordinary dividends of $1,545; qualified dividends of $4,636; taxable income related to rental real estate, royalties, partnerships, S corporations, trusts, etc., of $957,397; taxable IRA distributions of $4,990; pension distributions of $13,079 (of which $11,741 is taxable); and taxable social security benefits of $43,150. The parties also stipulated that the Fraziers had federal income tax withholding of $370,278.

XVI.  *In 2012, the Fraziers paid state and local income taxes and real estate taxes.*

In 2012, the Fraziers paid state and local income taxes of $91,453 and real estate taxes of $11,571.

XVII. *Tax reporting: Louisiana Assisted's Forms 1065, the Fraziers' Forms 1040 and 2012 Form 1099-B, and LHDC's Forms 1120*

The Fraziers filed joined Forms 1040, U.S. Individual Income Tax Return[s], for 2009, 2010, and 2011. LHDC filed Forms 1120, U.S. Corporation Income Tax Return[s], for 2009, 2010, 2011, and 2012.

**[\*49]** Louisiana Assisted filed Forms 1065, U.S. Return[s] of Partnership Income, for 2009, 2010, 2011 and 2012. The notices of deficiency do not make any adjustments that are corrections to the Forms 1065 filed by Louisiana Assisted. However, we discuss Louisiana Assisted's Forms 1065 for these years because Louisiana Assisted's tax reporting affects the tax reporting of its members: Bobbie and LHDC.

To avoid confusion, we define two terms at the outset.

"*Distributive share*": A partnership itself is not subject to income tax. § 701. The income or loss of a partnership is computed as an initial step in calculating the partners' tax liabilities. § 703(a). Each partner's income takes into account the partner's distributive share of the partnership's income or loss. § 702(a). All partners take into account their distributive shares of income regardless of whether income is actually distributed. Treas. Reg. § 1.702-1(a). Thus, "distributive share does not mean *distributed* share. A partner has income irrespective of whether or not any amount is distributed to the partner. The Code could have (and perhaps should have) said allocable share." Richard M. Lipton, Paul Carman, Charles Fassler, & Walter D. Schwidetzsky, *Partnership Taxation* 94 (LexisNexis ed. 2012). In this Opinion, we will use the term "distributive share" to refer to a partner's taxable share of partnership income or loss pursuant to section 702(a).

"*Distribution*" or "*cash distribution*": A partnership may distribute property to a partner. A partner generally does not recognize income on the distribution of property from the partnership except that the partner recognizes a gain to "the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution." § 731(a)(1). In this Opinion, we will use the term "distribution" or "cash distribution" to refer to property or money actually distributed to a partner by a partnership.

A. *Louisiana Assisted*

    1. *Overview of Louisiana Assisted's tax reporting: Forms 1065*

Each of Louisiana Assisted's Forms 1065 contained the following attachments that the IRS argues are relevant to the identity of the member of the LLC other than Bobbie:

- a Schedule B, Other Information;

**[*50]** - a Schedule B-1, Information on Partners Owning 50% or More of the Partnership;

- a Schedule K, Partners' Distributive Share Items;

- a Schedule K–1 issued to Bobbie and a Schedule K–1 issued to William; and

- a document titled "Federal Statements."

Certain lines in the Schedule B ask for information about the partners. Line 2 of the Schedule B asks: "At any time during the tax year, was any partner in the partnership a . . . *nominee or similar person*?" (Emphasis added). Line 3a asks: "At the end of the tax year: Did any foreign or domestic corporation . . . own directly or indirectly an interest of 50% or more in the profit, loss, or capital of the partnership?" On all of the Forms 1065, both questions were answered in the negative.

The Schedule B also asks, in line 3b, whether "any individual . . . own[s] directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership?" Line 3b instructs: "If yes, attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership." The line 3b question was answered in the affirmative, and there were Schedules B-1 attached to each of the four years' Forms 1065. Each of the Schedules B-1 reported William and Bobbie as the partners who each owned 50% or more of the interest in Louisiana Assisted.

The Louisiana Assisted Schedules K–1 for 2009, 2010, 2011, and 2012 were issued to Bobbie and William. On each of the Schedules K–1, Bobbie is reported to be a general partner, and William is reported to be a limited partner. Both Bobbie and William are reported to be "individual" partners, as opposed to, for example, corporate partners. For all four years, Bobbie and William were reported to be partners to shared profits and losses 50-50, and to be partners whose capital accounts were on the tax basis method.[13]

---

[13] For the relevant tax years, and until 2020, a partnership (or entity treated as a partnership for tax purposes) was permitted to calculate a partner's capital account using a variety of methods: "tax basis," "Section 704(b)," "GAAP" (Generally Accepted Accounting Principles), or "any other method." IRS Notice 2019-66, 2019-52 I.R.B. 1509; *see* 2009 IRS Instructions for Form 1065 at 25; 2010 IRS Instructions for Form 1065 at 25; 2011 IRS Instructions for Form 1065 at 24; 2012 IRS Instructions for Form 1065 at 26; *see also* Thomas J. Dickerson & Christopher J. Koyle, *The Elusive*

**[\*51]** The "Federal Statements" document contains a number of subsidiary statements that provide additional detail on certain items reported in the Form 1065, including line 7, "Other income" and line 20, "Other deductions."

We now discuss Louisiana Assisted's tax reporting on a year-by-year basis for each of the tax years at issue.

        2.      *Louisiana Assisted's tax reporting by year*

              a.     *2009*

The following table shows the relevant amounts reported on Louisiana Assisted's 2009 Form 1065.[14]

---

*Treatment of Partnership Syndication Costs*, 97 J. Tax'n 277, 2002 WL 31692866 2. Under the tax basis method, a partner's capital account is credited with the net tax basis (gross tax basis less related liabilities) of assets he contributes to the partnership, while under the GAAP and Section 704(b) methods capital accounts are credited with the net fair market value of contributed property (gross value less any related liabilities). Dickerson, *supra*, at 2.

    [14] Line items without any reported amounts have been omitted.

| [*52] | *Item and line* | *Amount* |
|---|---|---|
| | *Income* | |
| Gross profit (line 3) | | $7,345,149 |
| Other income (line 7) | | 199 |
| **Total income (line 8, sum of lines 3 through 7)** | | **7,345,348** |
| | *Deductions* | |
| Salaries and wages (line 9) | | −116,957 |
| Repairs and maintenance (line 11) | | −1,000 |
| Rent (line 13) | | −62,050 |
| Taxes and licenses paid (line 14) | | −9,957 |
| Employee benefit programs (line 19) | | −4,446 |
| Other deductions (line 20) | | −1,175,450 |
| **Total deductions (line 21, sum of lines 9 through 20)** | | **−1,369,860** |
| **Ordinary business income (loss) (line 22, line 8 minus line 21)** | | **5,975,488** |

Line 22 of the 2009 Form 1065, labeled "Ordinary business income (loss)," shows the total of nonseparately stated income (loss). *See* § 702(a)(8); *see also* 2009 IRS Instructions for Form 1065 at 14.

"SEE STATEMENT 1" is typed next to the $199 of "Other income" on line 7. However, Statement 1 attached to the 2009 Form 1065 does not provide further detail of what the $199 of "Other income" in line 7 is.

"SEE STATEMENT 2" is typed next to the $1,175,450 of "Other deductions" on line 20. Statement 2 attached to the 2009 Form 1065 provides detail of the "Other deductions" amount. Some of these detailed categories are "legal and professional" expenses of $81,171, "outside services" expenses of $993,753, and "payroll processing" expenses of $1,211.

**[*53]** The following table shows the amounts reported on the 2009 Schedule K, Form 1065: (1) total nonseparately stated income ("Ordinary business income (loss)" on the Schedule K), § 702(a)(8), and (2) relevant separately stated items pursuant to sections 702(a) and 703(a).

| *Item and line* | *Amount* |
|---|---|
| "Ordinary business income (loss)" (line 1) (nonseparately stated income, *see* § 702(a)(8)) | $5,975,488 |
| Interest income (line 5) | 6,311 |
| Contributions (line 13a) | 5,000 |
| Net earnings (loss) from self-employment (line 14a) | 2,240,744 |
| Nondeductible expenses (line 18c) | 75 |
| Distributions of cash and marketable securities (line 19a) | 4,300,000 |
| Investment income (line 20a) | 6,311 |

For 2009, Louisiana Assisted issued both Bobbie and William Schedules K–1, both of which are in the record. The following table shows amounts as they were reported on the 2009 Schedule K–1, Form 1065 that Louisiana Assisted issued to William: the beginning balance of William's capital account along with changes to his capital account, his distributive share of partnership items, and his cash distribution.

| [*54]                        Item and line | Amount |
|---|---|
| Beginning capital account balance | $582,194 |
| Current-year increase (decrease) in capital account balance | 2,988,362 |
| Withdrawals and distributions | −2,165,000 |
| **Ending capital account balance** | **1,405,556** |
| "Ordinary business income (loss)" (line 1) (nonseparately stated income, *see* § 702(a)(8)) | 2,987,744 |
| Interest income (line 5) | 3,156 |
| Deduction for cash contribution (line 13) | −2,500 |
| Non-deductible expenses (line 18) | −38 |
| Investment income (line 20) | 3,156 |
| Cash distribution (line 19) | 2,165,000 |

b.    *2010*

The following table shows the relevant amounts reported on Louisiana Assisted's 2010 Form 1065.

| [*55] | *Item and line* | *Amount* |
|---|---|---|
| | *Income* | |
| Gross profit (line 3) | | $1,892,848 |
| **Total gross income (line 8, sum of lines 3 through 7)** | | **1,892,848** |
| | *Deductions* | |
| Salaries and wages (line 9) | | −78,817 |
| Rent (line 13) | | −30,650 |
| Taxes and licenses paid (line 14) | | −7,697 |
| Employee benefit programs (line 19) | | −1,913 |
| Other deductions (line 20) | | −487,441 |
| **Total deductions (line 21, sum of lines 8 through 20)** | | **−606,518** |
| **"Ordinary business stated income (loss)" (line 22, line 8 minus line 21)** | | **1,286,330** |

Line 22 of the 2010 Form 1065, labeled "Ordinary business income (loss)," shows the total of nonseparately stated income (loss). *See* § 702(a)(8); *see also* 2010 IRS Instructions for Form 1065 at 14.

"SEE STATEMENT 1" is typed next to the $487,441 of "Other deductions" on line 20. Statement 1 attached to the 2010 Form 1065 provides detail of the "Other deductions" amount reported in line 20. Some of these detailed categories are "legal and professional" expenses of $15,735, "outside services" expenses of $402,940, and "payroll processing" expenses of $1,656.

The following table shows the amounts reported on the 2010 Schedule K, Form 1065: (1) total nonseparately stated income ("Ordinary business income (loss)" on the Schedule K), section 702(a)(8), and (2) relevant separately stated items pursuant to sections 702(a) and 703(a).

| **[*56]** *Item and line* | *Amount* |
|---|---|
| "Ordinary business income (loss)" (line 1) (nonseparately stated income, *see* § 702(a)(8)) | $1,286,330 |
| Interest income (line 5) | 6,783 |
| Contributions (line 13a) | 8,000 |
| Net earnings (loss) from self-employment (line 14a) | 643,165 |
| Nondeductible expenses (line 18c) | 326 |
| Distributions of cash and marketable securities (line 19a) | 1,789,686 |
| Investment income (line 20a) | 6,783 |

For 2010, Louisiana Assisted issued both Bobbie and William Schedules K–1, both of which are in the record. The following table shows amounts as they were reported on the 2010 Schedule K–1, Form 1065 that Louisiana Assisted issued to William: the beginning balance of William's capital account along with changes to his capital account, his distributive share of partnership items, and his cash distribution.

| *Item and line* | *Amount* |
|---|---|
| Beginning capital account balance | $1,405,556 |
| Current-year increase (decrease) in capital account balance | 642,394 |
| Withdrawals and distributions | −765,000 |
| **Ending capital account balance** | **1,282,950** |
| "Ordinary business income (loss)" (line 1) (nonseparately stated income, *see* § 702(a)(8)) | 643,165 |
| Interest income (line 5) | 3,392 |
| Deduction for cash contribution (line 13) | 4,000 |
| Non-deductible expenses (line 18) | 163 |
| Investment income (line 20) | 3,392 |
| Cash distribution (line 19) | 765,000 |

[*57]        c.      *2011*

The following table shows the relevant amounts reported on Louisiana Assisted's 2011 Form 1065.

| Item and line | Amount |
|---|---|
| *Income* | |
| Gross profit (line 3) | $392,681 |
| **Total gross income (line 8, sum of lines 3 through 7)** | **392,681** |
| *Deductions* | |
| Salaries and wages (line 9) | −66,000 |
| Rent (line 13) | −19,800 |
| Taxes and licenses paid (line 14) | −6,052 |
| Depreciation (line 16) | -1,319 |
| Retirement plans, etc. (line 18) | -1,920 |
| Other deductions (line 20) | −312,762 |
| **Total deductions (line 21, sum of lines 8 through 20)** | **−407,853** |
| **"Ordinary business income (loss)" (line 22, line 8 minus line 21)** | **−15,172** |

Line 22 of the 2011 Form 1065, labeled "Ordinary business income (loss)," shows the total of nonseparately stated income (loss). *See* § 702(a)(8); *see also* 2011 IRS Instructions for Form 1065 at 14.

"SEE STATEMENT 1" is typed next to the $312,762 of "Other deductions" on line 20. Statement 1 attached to the 2011 Form 1065 provides detail of the "Other deductions" amount reported in line 20. Two of these deductions are $7,780 for "legal and professional" expenses and $254,450 for "outside services" expenses.

The following table shows the amounts reported on the 2011 Schedule K, Form 1065: (1) total nonseparately stated income ("Ordinary business income (loss)" on the Schedule K) section 702(a)(8),

**[\*58]** and (2) relevant separately stated items pursuant to sections 702(a) and 703(a).

| Item and line | Amount |
|---|---:|
| "Ordinary business income (loss)" (line 1) (nonseparately stated income, *see* § 702(a)(8)) | −$15,172 |
| Interest income (line 5) | 3,677 |
| Contributions (line 13a) | 7,040 |
| Net earnings (loss) from self-employment (line 14a) | −7,586 |
| Post-1986 depreciation adjustment (line 17a) | 331 |
| Nondeductible expenses (line 18c) | 933 |
| Distributions of cash and marketable securities (line 19a) | 904,489 |
| Investment income (line 20a) | 3,677 |

For 2011, Louisiana Assisted issued both Bobbie and William Schedules K–1, both of which are in the record. The following table shows amounts as they were reported on the 2011 Schedule K–1, Form 1065 that Louisiana Assisted issued to William: the beginning balance of William's capital account along with changes to his capital account, his distributive share of partnership items, and his cash distribution.

| [*59]                                                                                      | Amount      |
|--------------------------------------------------------------------------------------------|-------------|
| *Item and line*                                                                            |             |
| Beginning capital account balance                                                          | $1,282,950  |
| Current-year increase (decrease) in capital account balance                                | −9,734      |
| Withdrawals and distributions                                                              | −450,000    |
| **Ending capital account balance**                                                         | **823,216** |
| "Ordinary business income (loss)" (line 1) (nonseparately stated income, *see* § 702(a)(8)) | −7,586      |
| Interest income (line 5)                                                                    | 1,839       |
| Deduction for cash contribution (line 13)                                                   | −3,520      |
| Alternative minimum tax (AMT) items (line 17)                                               | −165        |
| Non-deductible expenses (line 18)                                                           | −467        |
| Investment income (line 20)                                                                 | 1,839       |
| Cash distribution (line 19)                                                                 | −450,000    |

d.     *2012*

The following table shows the relevant amounts reported on Louisiana Assisted's 2012 Form 1065.

| [*60] | *Item and line* | *Amount* |
|---|---|---|
| *Income* | | |
| Gross profit (line 3) | | $1,978,044 |
| **Total gross income (line 8, sum of lines 3 through 7)** | | **1,978,044** |
| *Deductions* | | |
| Salaries and wages (line 9) | | −20,569 |
| Rent (line 13) | | −4,200 |
| Taxes and licenses paid (line 14) | | −6,297 |
| Depreciation (line 16c) | | −942 |
| Other deductions (line 20) | | −80,093 |
| **Total deductions (line 21, sum of lines 8 through 20)** | | **−112,101** |
| **"Ordinary business income (loss)" (line 22, line 8 minus line 21)** | | **1,865,943** |

Line 22 of the 2012 Form 1065, labeled "Ordinary business income (loss)," shows the total of nonseparately stated income (loss). *See* § 702(a)(8); *see also* 2012 IRS Instructions for Form 1065 at 15.

"SEE STATEMENT 1" is typed next to the $80,093 of "Other deductions" on line 20. Statement 1 attached to the 2012 Form 1065 provides detail of the "Other deductions" amount reported in line 20. Two of these deductions are $5,422 for "legal and professional" expenses and $64,060 for "outside services" expenses.

The following table shows the amounts reported on the 2012 Schedule K, Form 1065: (1) total nonseparately stated income ("Ordinary business income (loss)" on the Schedule K), section 702(a)(8), and (2) relevant separately stated items pursuant to sections 702(a) and 703(a).

| [*61]      *Item and line* | *Amount* |
|---|---:|
| "Ordinary business income (loss)" (line 1) (nonseparately stated income, *see* § 702(a)(8)) | $1,865,943 |
| Net earnings (loss) from self-employment (line 14a) | 932,971 |
| Post-1986 depreciation adjustment (line 17a) | 207 |
| Nondeductible expenses (line 18c) | 109 |
| Distributions of cash and marketable securities (line 19a) | 3,213,666 |

For 2012, Louisiana Assisted issued both Bobbie and William Schedules K–1, both of which are in the record. The following table shows amounts as they were reported on the 2012 Schedule K–1, Form 1065 that Louisiana Assisted issued to William: the beginning balance of William's capital account along with any changes to his capital account, his distributive share of partnership items, and his cash distribution.

| *Item and line* | *Amount* |
|---|---:|
| Beginning capital account balance | $9,354 |
| Current-year increase (decrease) in capital account balance | 932,917 |
| Withdrawals and distributions | −942,271 |
| **Ending capital account balance** | **0** |
| "Ordinary business income (loss)" (line 1) (nonseparately stated income, *see* § 702(a)(8)) | 932,972 |
| Interest income (line 5) | — |
| Deduction for cash contribution (line 13) | — |
| Post-1986 depreciation adjustments (line 17) | −104 |
| Non-deductible expenses (line 18) | −55 |
| Investment income (line 20) | — |
| Cash distribution (line 19) | −942,271 |

[*62] On the Schedule K–1 that Louisiana Assisted issued to William for 2012, his beginning capital account balance was $9,354. On the Schedule K–1 that Louisiana Assisted issued to William for the year before, for 2011, his ending capital account balance was $823,216. For every other year (2009, 2010, and 2011), the prior year's ending capital account balance was the following year's beginning capital account balance.

B.     *The Fraziers*

1.     *The Fraziers' tax reporting for 2009*

Before trial, the parties entered into a stipulation of facts. The stipulation of facts made only the following statement about the Fraziers' tax return for 2009: "The Fraziers' 2009 federal tax return was due October 15, 2010; it was filed March 18, 2013." The stipulation of facts did not attach a copy of the Fraziers' return for 2009.

At trial, no party offered into evidence a copy of that filed return. However, petitioners' counsel offered Exhibit 4-P, a copy of an unsigned Form 1040 for 2009. The IRS did not object to the admission of Exhibit 4-P, and it was admitted. The briefs of petitioners and the IRS rely on Exhibit 4-P to prove what the Fraziers reported on their 2009 tax return.

Although Exhibit 4-P is not signed by either of the Fraziers, no party disputes that the filed return was signed by the Fraziers.

Exhibit 4-P contains no date next to where the Fraziers were to sign the Form 1040. No party takes a position as to whether the Fraziers placed a date next to their signature on the filed return.

Although Exhibit 4-P is not signed by Trombetta as the preparer,[15] no party disputes that the filed return was signed by Trombetta as the preparer.

Exhibit 4-P has a date of August 8, 2013, for the preparer's signature. This date is peculiar because the parties stipulated that the date on which the Fraziers filed their 2009 return was March 18, 2013. We would expect this date to be earlier than the date on which the Fraziers filed their returns because normally a preparer would sign and date the return and next send it to the taxpayer who would then sign

---

[15] The line asking for the preparer's firm name is filled out with Trombetta's firm's name, "Trombetta & Trombetta, C.P.A."

**[*63]** and date it before sending it to the IRS. No party takes a position as to what date appeared on the filed return next to the preparer's signature.

However, the "total tax" amount reported in Exhibit 4-P is $411,762 and the 2009 notice of deficiency states that the "Total Tax Shown on Return or as Previously Adjusted" is $411,762. The "total tax" on a Form 1040 is a figure computed from numerous inputs including a taxpayer's income, deductions, and exemptions. That the total tax amount on Exhibit 4-P is the same as the tax shown amount from the notice of deficiency suggests that Exhibit 4-P uses the same amounts as the Fraziers' filed tax return that the IRS used as a basis for its 2009 notice of deficiency. No party disputes that the amounts on Exhibit 4-P are the same as the filed return.

Thus, we conclude that the Exhibit 4-P is identical to the return that was filed except that (1) the Fraziers signed the filed return (Exhibit 4-P was unsigned), (2) Trombetta signed the filed return (Exhibit 4-P was unsigned), (3) we make no finding as to the date, if any, the Fraziers wrote on the filed return next to their signature (Exhibit 4-P contains no date), (4) we make no finding as to the date, if any, that appears on the filed return next to Trombetta's signature as preparer (Exhibit 4-P has a date of August 8, 2013).

These conclusions are consistent with the proposition that Trombetta prepared the Form 1040, kept a copy of the Form 1040 (which is Exhibit 4-P), signed the original Form 1040 as preparer, and sent the original Form 1040 to the Fraziers. No party gives a different explanation of Exhibit 4-P.

Thus, our description of the filed 2009 Form 1040 is based on the information in Exhibit 4-P, Trombetta's unsigned file copy of the return he sent to the Fraziers.

The Fraziers' 2009 return contains a number of attached schedules. Three schedules are important for our purposes:

- Schedule B, Interest and Ordinary Dividends, which includes an attachment showing interest income (Statement 1-Schedule B, Line 1-Interest Income);

- Schedule C, Profit or Loss from Business (Sole Proprietorship); and

[*64] • Schedule E, Supplemental Income and Loss (From Rental Real Estate, Royalties, Partnerships, S Corporations, Estates, Trusts, REMICs, etc.).

The table below shows relevant excerpts from the Fraziers' 2009 Form 1040 and its schedules.

| Item, schedule, and line | Amount |
|---|---|
| Taxable interest, Sched. B, ln. 1 | $22,778 |
| Distributive share of Louisiana Assisted's separately stated interest income, Sched. B, Stmt. 1 | 3,156 |
| Car and truck expenses, Sched. C, ln. 9 | −7,992 |
| Depreciation and § 179 expense deduction, Sched. C, ln. 13 | −4,545 |
| Payment to LHDC, Sched. C, lns. 27, 48 | −2,987,744 |
| Net Schedule C profit or (loss), Sched. C, ln. 31 | −3,000,281 |
| Total rental real estate and royalty income or (loss), Sched. E, ln. 26 | 22,078 |
| Distributive share of Louisiana Assisted's nonseparately stated income, Sched. E, ln. 28(j) | 2,987,744 |
| Total Schedule E income or (loss), Sched. E, ln. 41 | 3,009,822 |

The "total tax" in line 60 of the Form 1040 was $411,762.

We now address some aspects of the record that relate to the Fraziers' 2009 Form 1040.

First, the $2,987,744 of distributive share of Louisiana Assisted's nonseparately stated income that the Fraziers reported on their Schedule E matches the amount of the distributive share of nonseparately stated income reported on the 2009 Schedule K–1 that Louisiana Assisted issued to William. *See supra* FINDINGS OF FACT Part XVII.A.2.a. As discussed *supra* FINDINGS OF FACT Part X.B, sometime before the years at issue, William asked Bobbie to make checks from Louisiana Assisted for distributions owed to LHDC in William's name in order to conceal these payments from Lala. As part of this subterfuge, William reported LHDC's distributive share of

[*65] Louisiana Assisted's income for 2009 on the Fraziers' joint 2009 tax return.

Second, to offset the inclusion of LHDC's distributive share of Louisiana Assisted's nonseparately stated income, the Fraziers claimed a $2,987,744 deduction on William's Schedule C. In other words, this deduction is essentially a dummy entry to offset the erroneous inclusion of LHDC's distributive share of Louisiana Assisted's income on the Fraziers' joint tax return. The $2,987,744 deduction for the putative payment to LHDC that the Fraziers reported on William's Schedule C is the same amount as the distributive share of Louisiana Assisted's nonseparately stated income reported on the Fraziers' Schedule E and is also the same amount as the distributive share of nonseparately stated income reported on the 2009 Schedule K–1 that Louisiana Assisted issued to William. The Fraziers did not report any income on the 2009 Schedule C.

Third, the Fraziers attached to their 2009 Form 1040 a statement called "Statement 1 - Schedule B, Line 1 - Interest Income," which itemizes the $22,778 of interest income that they reported on their Schedule B. Statement 1 states that the $22,778 is composed in part of $3,156 for the line item "Louisiana Assisted housing Co., LLC." This amount matches the $3,156 of distributive share of separately stated interest income reported on the 2009 Schedule K–1 that Louisiana Assisted issued to William.

The Fraziers' 2009 federal income tax return was due October 15, 2010, but was not filed until March 18, 2013.

2.    *The Fraziers' tax reporting for 2010*

The stipulation of facts made only the following statement about the Fraziers' tax return for 2010: "The Fraziers' 2010 federal income tax return was due October 15, 2011; it was filed May 19, 2014." The stipulation of facts did not attach a copy of the Fraziers' return for 2010.

At trial, no party offered into evidence a copy of the filed return. However, petitioners' counsel offered Exhibit 8-P, a copy of an unsigned Form 1040 for 2010. The IRS did not object to the admission of Exhibit 8-P, and it was admitted. The briefs of petitioners and the IRS rely on Exhibit 8-P to prove what the Fraziers reported on their 2010 tax return.

Exhibit 8-P has the stamp "Preparor Copy," on the first page in large, bold letters.

**[\*66]** Although Exhibit 8-P is not signed by either of the Fraziers, no party disputes that the filed return was signed by the Fraziers.

Exhibit 8-P contains no date next to where the Fraziers were to sign the Form 1040. No party takes the position as to whether the Fraziers placed a date next to their signature on the filed return.

Although Exhibit 8-P is not signed by Trombetta as the preparer,[16] no party disputes that the filed return was signed by Trombetta as the preparer.

The date of the preparer's signature is May 15, 2014. No party disputes that the filed return also contained this date for the preparer's signature.

We conclude that Exhibit 8-P is identical to the return that was filed except that (1) the filed return was not stamped "Preparor Copy," (2) the Fraziers signed the filed return (Exhibit 8-P was unsigned), (3) Trombetta signed the filed return (Exhibit 8-P was unsigned), and (4) we make no finding as to the date, if any, the Fraziers wrote on the filed return next to their signature (Exhibit 8-P contains no date).

The conclusions are consistent with the explanation that Trombetta prepared the original Form 1040, kept a copy of the Form 1040 that was stamped "Preparor Copy" (which is Exhibit 8-P), signed the original Form 1040, and sent the original Form 1040 to the Fraziers. No party gives a different explanation of Exhibit 8-P.

Thus, our description of the filed 2010 Form 1040 is based on the information in Exhibit 8-P, Trombetta's unsigned file copy of the return he sent to the Fraziers.

The Fraziers' 2010 Form 1040 contains a number of attached schedules. Three schedules are important for our purposes:

- Schedule B, Interest and Ordinary Dividends;

---

[16] Unlike the Form 1040 for 2009, the Form 1040 for 2010 has a space for both the preparer's name and the preparer's firm name. The line asking for preparer's name is filled out with "Mark M. Trombetta." The line asking for the preparer's firm's name is filled out with Trombetta's firm's name, "Trombetta & Trombetta, C.P.A."

[*67]
- Schedule C, Profit or Loss from Business (Sole Proprietorship); and

- Schedule E, Supplemental Income and Loss (From Rental Real Estate, Royalties, Partnerships, S Corporations, Estates, Trusts, REMICs, etc.).

The table below shows relevant excerpts from the Fraziers' 2010 Form 1040 and its schedules.

| Item, schedule, and line | Amount |
|---|---|
| Taxable interest, Sched. B, ln. 1 | $30,799 |
| Gross profit, Sched. C, ln. 7 | 17,200 |
| Car and truck expenses, Sched. C, ln. 9 | −16,650 |
| Depreciation and § 179 expense deduction, Sched. C, ln. 13 | −11,060 |
| Office expense, Sched. C, ln. 18 | −6,177 |
| Travel, Sched. C, ln. 24a | −3,045 |
| Payment to LHDC, Sched. C, lns. 27, 48 | −643,165 |
| Net Schedule C profit or (loss), Sched. C., ln. 31 | −662,897 |
| Total rental real estate and royalty income or (loss), Sched. E, ln. 26 | 1,007 |
| Distributive share of Louisiana Assisted's nonseparately stated income, Sched. E, ln. 28(j) | 643,165 |
| Nonpassive loss from Lagniappe Film Fund LLC, Sched. E, ln. 28(h) | −343 |
| Total Schedule E income or (loss), Sched. E., ln. 41 | 643,829 |

The "total tax" in line 60 of Form 1040 was $274,745.

We now address some aspects of the record that relate to the Fraziers' 2010 Form 1040.

First, the $643,185 of distributive share of Louisiana Assisted's nonseparately stated income that the Fraziers reported on their Schedule E matches the amount of the distributive share of

**[\*68]** nonseparately stated income reported on the 2010 Schedule K–1 that Louisiana Assisted issued to William. *See supra* FINDINGS OF FACT Part XVII.A.2.b. As with 2009, William reported LHDC's distributive share of Louisiana Assisted's income for 2010 on the Fraziers' joint 2010 tax return to conceal revenue from Lala.

Second, the $643,165 deduction for the putative payment to LHDC that the Fraziers reported on William's Schedule C is the same amount as the distributive share of Louisiana Assisted's nonseparately stated income reported on the Fraziers' Schedule E and is also the same amount as the distributive share of nonseparately stated income reported on the 2010 Schedule K–1 that Louisiana Assisted issued to William. As with 2009, this deduction is essentially a dummy entry to offset the erroneous inclusion of LHDC's distributive share of Louisiana Assisted's income on the Fraziers' joint tax return.

The Fraziers' 2010 federal income tax return was due October 15, 2011, but was not filed until May 19, 2014.

### 3. *The Fraziers' tax reporting for 2011*

The stipulation of facts made only the following statement about the Fraziers' tax return for 2011: "The Fraziers' 2011 federal income tax return was due October 15, 2012; it was filed October 28, 2014." The stipulation of facts did not attach a copy of the Fraziers' return for 2011.

At trial, no party offered into evidence a copy of the filed return. However, petitioners' counsel offered Exhibit 12-P. The IRS did not object to the admission of Exhibit 12-P, and it was admitted. The briefs of petitioners and the IRS rely on Exhibit 12-P to prove what the Fraziers reported on their 2011 tax return.

Exhibit 12-P has the stamp "Preparor Copy," on the first page in large, bold letters.

Although Exhibit 12-P is not signed by either of the Fraziers, no party disputes that the filed return was signed by the Fraziers.

Exhibit 12-P contains no date next to where the Fraziers were to sign the Form 1040. No party takes a position as to whether the Fraziers placed a date next to their signature on the filed return.

**[*69]** Although Exhibit 12-P is not signed by Trombetta as the preparer,[17] no party disputes that the filed return was signed by Trombetta as the preparer.

The date of the preparer's signature is October 20, 2014. No party disputes that the filed return also contained this date for the preparer's signature.

We conclude that Exhibit 12-P is identical to the return that was filed except that (1) the filed return was not stamped "Preparor Copy," (2) the Fraziers signed the filed return (Exhibit 12-P was unsigned), (3) Trombetta signed the filed return (Exhibit 12-P was unsigned), and (4) we make no finding as to the date, if any, the Fraziers wrote on the filed return next to their signature (Exhibit 12-P contains no date).

The conclusions are consistent with the explanation that Trombetta prepared the original Form 1040, kept a copy of the Form 1040 that was stamped "Preparor Copy" (which is Exhibit 12-P), signed the original Form 1040, and sent the original Form 1040 to the Fraziers. No party gives a different explanation of Exhibit 12-P.

Thus, our description of the filed 2011 Form 1040 is based on the information in Exhibit 12-P, Trombetta's unsigned file copy of the return he sent to the Fraziers.

The Fraziers' 2011 Form 1040 contains a number of attached schedules. Three schedules are important for our purposes:

- Schedule B, Interest and Ordinary Dividends, which includes an attachment showing interest income (Statement 1-Schedule B, Line 1-Interest Income);

- Schedule C, Profit or Loss from Business (Sole Proprietorship); and

- Schedule E, Supplemental Income and Loss (From Rental Real Estate, Royalties, Partnerships, S Corporations, Estates, Trusts, REMICs, etc.).

---

[17] The line asking for preparer's name is filled out with "Mark M. Trombetta." The line asking for the preparer's firm's name is filled out with "Mark M. Trombetta, C.P.A."

**[*70]** The table below shows certain amounts reported on the Fraziers' 2011 Form 1040 and its schedules.

| Item, schedule, and line | Amount |
|---|---|
| Taxable interest, Sched. B, ln. 1 | $12,641 |
| Distributive share of Louisiana Assisted's separately stated interest income, Sched. B, Stmt. 1 | 1,839 |
| Gross income, Sched. C, ln. 7 | 450,000 |
| Depreciation and § 179 expense deduction, Sched. C, ln. 13 | −4,900 |
| Legal and professional expenses, Sched. C, ln. 17 | −7,650 |
| Supplies, Sched. C, ln. 22 | −1,920 |
| Travel, Sched. C, ln. 24a | −3,297 |
| Payment to LHDC, Sched. C, lns. 27a, 48 | −450,000 |
| Net Schedule C profit or (loss), ln. 31 | −17,749 |
| Total rental real estate and royalty income or (loss), Sched. E, ln. 26 | 25,498 |
| Distributive share of Louisiana Assisted's nonseparately stated loss, Sched. E, ln. 28(h) | −7,586 |
| Total Schedule E income or (loss), Sched. E., ln. 41 | 17,912 |

The "total tax" in line 60 of the Form 1040 was $167,481.

We now address some aspects of the record that relate to the Fraziers' 2011 Form 1040.

First, the $7,586 distributive share of Louisiana Assisted's nonseparately stated loss that the Fraziers reported on their Schedule E matches the amount of the distributive share of nonseparately stated loss reported on the 2011 Schedule K–1 that Louisiana Assisted issued to William. *See supra* FINDINGS OF FACT Part XVII.A.2.c. William reported LHDC's distributive share of Louisiana Assisted's loss for 2011 on the Fraziers' joint 2011 tax return, to conceal LHDC's connection with Louisiana Assisted from Lala.

**[\*71]** Second, unlike in previous years for which the Fraziers did not report any income on William's Schedules C related to Louisiana Assisted, they improperly reported $450,000 of gross income on William's 2011 Schedule C for a cash distribution from Louisiana Assisted. This reporting was improper for two reasons. First because, as we hold *infra* OPINION Part I.B, William was not the other member of Louisiana Assisted alongside Bobbie. Second, cash distributions would not have been includible in William's income even if he were the other member of Louisiana Assisted, unless the amount would have exceeded his basis in the LLC. *See* § 731(a)(1). Nothing in the record allows us to determine the outside basis of the other member of Louisiana Assisted alongside Bobbie, but none of the parties asserts that this $450,000 cash distribution exceeded the other member's outside basis. *See infra* OPINION Part II.B.3.b. This $450,000 of income matches the distribution reported on the 2011 Schedule K–1 that Louisiana Assisted issued to William.

William's reporting of $450,000 of income along with an offsetting $450,000 deduction were also part of William's attempt to conceal from Lala the fact that Louisiana Assisted paid cash distributions to LHDC.[18]

Third, the $450,000 deduction for the payment to LHDC that the Fraziers reported on William's Schedule C is equal to the amount of gross income reported on William's Schedule C and withdrawals and distributions reported on the 2011 Schedule K–1 that Louisiana Assisted issued to William. As with prior years, this deduction is essentially a dummy entry to offset the erroneous inclusion of a cash distribution from Louisiana Assisted on the Fraziers' joint 2011 tax return.

Fourth, the Fraziers attached to their 2011 Form 1040 a statement called "Statement 1 – Schedule B, Line 1 – Interest Income," which itemizes the $12,641 taxable interest that they reported on their Schedule B. Statement 1 contains an amount of $1,839 for the line item "Louisiana Assisted Housing Co., LLC." This amount matches the $1,839 of the distributive share of separately stated interest income

---

[18] It is unclear why a distribution payment from Louisiana Assisted to LHDC was included on the Fraziers' return. As we discuss *infra* OPINION Part II.A.2, distribution payments from LLCs are not includable in their members' income unless the amount exceeds the members' basis in the LLC, which the parties do not argue was the case in 2011.

[*72] reported on the 2011 Schedule K–1 that Louisiana Assisted issued to William.

The Fraziers' 2011 federal income tax return was due October 15, 2012, but was not filed until October 28, 2014.

### 4. *The Fraziers' 2012 tax year*

The Fraziers did not file a 2012 tax return.

### C. *LHDC*

### 1. *LHDC's tax reporting for 2009*

The stipulation of facts made only the following statement about LHDC's tax return for 2009: "LHDC's 2009 federal income tax return was due September 15, 2010; it was filed February 28, 2011." The stipulation of facts did not attach a copy of LHDC's return for 2009.

At trial, no party offered into evidence a copy of the filed return. However, petitioners' counsel offered Exhibit 2-P. The IRS did not object to the admission of Exhibit 2-P, and it was admitted. The IRS's brief relies on Exhibit 2-P to prove what LHDC reported on its 2009 tax return. Petitioners relied on Exhibit 2-P during trial to prove what LHDC reported on its 2009 tax return.

Exhibit 2-P has the stamp "Preparor Copy," on the first page in large, bold letters.

Although Exhibit 2-P is not signed by an officer of LHDC, no party disputes that the filed return was signed by an officer of LHDC.

Exhibit 2-P contains no date next to where an officer of LHDC was to sign the Form 1120. No party takes a position as to whether an officer of LHDC placed a date next to the officer's signature on the filed return.

Although Exhibit 2-P is not signed by Trombetta as the preparer,[19] no party disputes that the filed return was signed by Trombetta as the preparer.

---

[19] The line asking for the preparer's firm's name is filled out with Trombetta's firm's name, "Trombetta & Trombetta, C.P.A."

**[*73]** The date of the preparer's signature is February 22, 2011. No party disputes that the filed return also contained this date for the preparer's signature.

We conclude that Exhibit 2-P is identical to the return that was filed except that (1) the filed return was not stamped "Preparor Copy," (2) an officer of LHDC signed the filed return (Exhibit 2-P was unsigned), (3) Trombetta signed the filed return (Exhibit 2-P was unsigned), and (4) we make no finding as to the date, if any, an officer of LHDC wrote on the filed return next to the officer's signature (Exhibit 2-P contains no date).

The conclusions are consistent with the explanation that Trombetta prepared the original Form 1120, kept a copy of the Form 1120 that was stamped "Preparor Copy" (which is Exhibit 2-P), signed the original Form 1120, and sent the original Form 1120 to LHDC. No party gives a different explanation of Exhibit 2-P.

Thus, our description of the filed 2009 Form 1120 is based on the information in Exhibit 2-P, Trombetta's unsigned file copy of the return he sent to LHDC.

LHDC's 2009 Form 1120 contains a number of attached schedules, only one of which, the Schedule K, Other Information, is important for our purposes.[20] Line 5b of the Schedule K attached to LHDC's 2009 return asks, "At the end of the tax year, did the corporation . . . [o]wn directly an interest of 20% or more, or own directly or indirectly, an interest of 50% or more in any foreign or domestic partnership (including an entity treated as a partnership . . .)?" LHDC answered the question in the negative—that it did not own an interest

---

[20] Line 4a of the Schedule K, Other Information, attached to LHDC's 2009 return, asks, "[a]t the end of the tax year . . . [d]id any individual or estate own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote?" The answer was "no." This reporting implies that Mary's ownership of LHDC was less than 20% and that William's ownership of LHDC was less than 20%. This is at odds with Tracy's testimony that Mary owned 75% of LHDC while William owned the remaining 25%. Further, petitioners proposed a finding of fact that "LHDC was owned 75% by Mrs. Frazier and 25% by Mr. Frazier" to which the IRS did not object. Based on Tracy's testimony and petitioners' proposed finding of fact to which the IRS did not object, we find that Mary owned 75% of LHDC and William owned 25%, which is contrary to the response to Line 4a of LHDC's 2009 Schedule K.

[*74] of at least 20% in a domestic partnership or an entity treated as a partnership.

The table below shows relevant excerpts from LHDC's 2009 return.

| Item, schedule, and line | Amount |
| --- | --- |
| Gross profit (line 3) | $9,237,153 |
| Interest income (line 5) | 985 |
| "Other income" (line 10) | 2,425 |
| **Total income (line 11, add lines 3 through 10)** | **9,240,563** |
| Salaries and wages paid (less employment credits) (line 13) | −3,424,424 |
| Repairs and maintenance (line 14) | −4,023 |
| Rents (line 16) | −148,331 |
| Taxes and licenses paid (line 17) | −58,863 |
| Interest payments (line 18) | −5,167 |
| Charitable contributions (line 19) | −7,007 |
| Depreciation from Form 4562 not reported on Schedule A or elsewhere (line 20) | −2,113 |
| Advertising expenses (line 22) | −4,401 |
| "Other deductions" (line 26) | −5,232,086 |
| **Total deductions (line 27, add lines 12 through 26)** | **−8,886,415** |
| Net operating loss deduction (line 29a) | −181,248 |
| Taxable income (line 30) | 172,900 |
| Total tax (line 31) | 50,681 |
| 2008 overpayment credit applied to 2009 tax liability (line 32a) | −47,761 |
| Estimated tax penalty (line 33) | 29 |
| Amount owed (line 34) | 2,949 |

**[\*75]** The "total tax" in line 31 of the Form 1120 was $50,681.

We now address some aspects of the record that relate to LHDC's 2009 Form 1120. We connect the discussion of LHDC's 2009 Form 1120 to LHDC's 2009 income statement because Trombetta used the income statement to prepare LHDC's tax returns and relied on the income statement in his testimony.

First, as Trombetta credibly testified, the total income amount of $9,240,563 on LHDC's 2009 Form 1120, (line 11) included the $2,165,000 cash distribution that LHDC received from Louisiana Assisted. This $2,165,000 amount matches the amount of distribution recorded on LHDC's 2009 income statement under "Fees – LA Assisted Housing LLC."

Second, as Trombetta credibly testified, he used the "Total Sales"[21] amount of $9,239,547, recorded on LHDC's income statement as total income for LHDC's 2009 Form 1120. The discrepancy of $1,016 between the $9,239,547 "Total Sales" in LHDC's income statement and the $9,240,563 total income in LHDC's 2009 Form 1120 is largely attributable to the fact that the $985 of interest earned is included in the computation of the $9,240,563 of total income on the Form 1120 but not in the computation of the $9,239,547 of "Total Sales" amount on the income statement. The record does not reveal any additional information about the source of the $985 of interest income reported in line 5.

Third, LHDC's 2009 Form 1120 has a notation to "See stmt 1" in line 10, "Other income." Similar notations to "See stmt 2" and "See stmt 3" are made for line 19, charitable contributions and in line 26, "Other deductions." These are presumably statements that provide further detail as to the underlying items comprising "Other income," charitable contributions, and "Other deductions." None of these three statements are included with LHDC's 2009 Form 1120.

---

[21] The term "Total Sales" is a misnomer because it implies that the $9,239,547 recorded on LHDC's income statement does not contain a cash distribution from Louisiana Assisted. A cash distribution is not a "sale." However, the income statement shows that the $2,165,000 cash distribution from Louisiana Assisted is included in this "Total Sales" amount of $9,239,547, (included under "Fees – LA Assisted Housing, LLC" which was one of the amounts added into "Total Sales") making the "Total Sales" label counter-intuitive.

[*76] LHDC's 2009 federal income tax return was due September 15, 2010, but was not filed until February 28, 2011.

### 2.    *LHDC's tax reporting for 2010*

The stipulation of facts made only the following statement about LHDC's tax return for 2010: "LHDC's 2010 federal income tax return was due September 15, 2011; it was filed November 16, 2011." The stipulation of facts did not attach a copy of LHDC's return for 2010.

At trial, no party offered into evidence a copy of the filed return. However, petitioners' counsel offered Exhibit 6-P. The IRS did not object to the admission of Exhibit 6-P, and it was admitted. The briefs of petitioners and the IRS rely on Exhibit 6-P to prove what LHDC reported on its 2010 tax return.

Exhibit 6-P has the stamp "Preparor Copy," on the first page in large, bold letters.

Although Exhibit 6-P is not signed by an officer of LHDC, no party disputes that the filed return was signed by an officer of LHDC.

Exhibit 6-P contains no date next to where an officer of LHDC was to sign the Form 1120. No party takes a position as to whether an officer of LHDC placed a date next to the officer's signature on the filed return.

Although Exhibit 6-P is not signed by Trombetta as the preparer,[22] no party disputes that the filed return was signed by Trombetta as the preparer.

The date of the preparer's signature is November 16, 2011. No party disputes that the filed return also contained this date for the preparer's signature.

We conclude that Exhibit 6-P is identical to the return that was filed except that (1) the filed return was not stamped "Preparor Copy," (2) an officer of LHDC signed the filed return (Exhibit 6-P was unsigned), (3) Trombetta signed the filed return (Exhibit 6-P was

---

[22] Unlike the Form 1120 for 2009, the Form 1120 for 2010 has a space for both the preparer's name and the preparer's firm name. The line asking for preparer's name is filled out with "Mark M. Trombetta." The line asking for the preparer's firm's name is filled out with Trombetta's firm's name, "Trombetta & Trombetta, C.P.A."

[*77] unsigned), and (4) we make no finding as to the date, if any, an officer of LHDC wrote on the filed return next to the officer's signature (Exhibit 6-P contains no date).

The conclusions are consistent with the explanation that Trombetta prepared the original Form 1120, kept a copy of the Form 1120 that was stamped "Preparor Copy" (which is Exhibit 6-P), signed the original Form 1120, and sent the original Form 1120 to LHDC. No party gives a different explanation of Exhibit 6-P.

Thus, our description of the filed 2010 Form 1120 is based on the information in Exhibit 6-P, Trombetta's unsigned file copy of the return he sent to LHDC.

LHDC's 2010 Form 1120 contains a number of attached schedules only one of which, the Schedule K, Other Information, is important for our purposes. [23] The 2010 Schedule K reported in line 5b that LHDC did not own an interest of at least 20% in a domestic partnership or an entity treated as a partnership at the end of tax year 2010.

The table below shows relevant excerpts from LHDC's 2010 Form 1120.

---

[23] As for 2009, the Schedule K, Other Information, attached to LHDC's 2010 Form 1120 reported that at the end of the tax year no individual or estate owned directly 20% or more, or directly or indirectly, 50% or more of the total voting power of all classes of LHDC's stock entitled to vote in 2010 (LHDC's response to the question in Line 4a).

| [*78]        *Item, schedule, and line* | *Amount* |
|---|---:|
| Gross profit (line 3) | $5,534,810 |
| Interest income (line 5) | 1,860 |
| **Total income (line 11, add lines 3 through 10)** | **5,536,670** |
| Salaries and wages paid (less employment credits) (line 13) | −2,770,775 |
| Repairs and maintenance (line 14) | −5,411 |
| Rents (line 16) | −150,605 |
| Taxes and licenses (line 17) | −8,078 |
| Interest payments (line 18) | −3,066 |
| Depreciation from Form 4562 not claimed on Schedule A or elsewhere (line 20) | −1,269 |
| Advertising expenses (line 22) | −1,837 |
| Employee benefit programs (line 24) | −6,300 |
| "Other deductions" (line 26) | −2,711,901 |
| **Total deductions (line 27, add lines 12 through 26)** | **−5,659,242** |
| Taxable income (line 30) | −122,572 |
| Total tax (line 31) | 0 |

The "total tax" in line 31 of the Form 1120 was $0.

We now address some aspects of the record that relate to LHDC's 2010 Form 1120. We connect the discussion of LHDC's 2010 Form 1120 to LHDC's 2010 income statement because Trombetta used the income statement to prepare LHDC's tax returns and relied on the income statement in his testimony.

First, as Trombetta credibly testified, the $765,000 cash distribution that LHDC received from Louisiana Assisted was included in the total income amount of $5,536,670 on LHDC's 2010 Form 1120 (line 11). This $765,000 amount matched the amount of distribution recorded on LHDC's 2010 income statement under "Fees – LA Assisted Housing, LLC."

**[*79]** Second, as Trombetta credibly testified, he used the "Total Sales"[24] amount of $5,528,510, recorded on LHDC's income statement as total income for LHDC's 2009 Form 1120. The discrepancy of $8,160 between the $5,528,510 "Total Sales" in LHDC's income statement and the $5,536,670 total income in LHDC's 2010 Form 1120 is partially attributable to the fact that the $1,860 of interest earned is included in the computation of the $5,536,670 of total income on the Form 1120 but not in the computation of the $5,528,510 of "Total Sales" amount on the income statement. Nothing in the record explains why there is a remaining discrepancy of $6,300. The record does not reveal any additional information about the source of the $1,860 of interest income reported in line 5.

Lastly, LHDC's 2010 Form 1120 has a notation to "See stmt 1" in line 26, "Other deductions." This is presumably a statement that provides further detail as to the underlying items comprising "Other deductions." There is no statement 1 included with LHDC's 2010 Form 1120.

LHDC's 2010 Form 1120 was due September 15, 2011, but was not filed until November 16, 2011.

### 3. *LHDC's tax reporting for 2011*

The stipulation of facts made no mention of LHDC's tax return for 2011, nor did it attach a copy of LHDC's return for 2011.

At trial, no party offered into evidence a copy of the filed return. However, petitioners' counsel offered Exhibit 10-P. The IRS did not object to the admission of Exhibit 10-P, and it was admitted. The briefs of petitioners and the IRS rely on Exhibit 10-P to prove what LHDC reported on its 2011 tax return.

Exhibit 10-P has the stamp "Preparor Copy," on the first page in large, bold letters.

Although Exhibit 10-P is not signed by an officer of LHDC, no party disputes that the filed return was signed by an officer of LHDC.

---

[24] The term "Total Sales" is a misnomer. *See supra* FINDINGS OF FACT Part XVII.C.1 note 21. The "Total Sales" amount of $5,528,510 includes $765,000 of distribution from Louisiana Assisted. The $765,000 was included under "Fees – LA Assisted Housing, LLC" which was one of the amounts added into "Total Sales."

**[*80]** Exhibit 10-P contains no date next to where an officer of LHDC was to sign the Form 1120. No party takes a position as to whether an officer of LHDC placed a date next to the officer's signature on the filed return.

Although Exhibit 10-P is not signed by Trombetta as the preparer,[25] no party disputes that the filed return was signed by Trombetta as the preparer.

The date of the preparer's signature is September 16, 2012. No party disputes that the filed return also contained this date for the preparer's signature.

We conclude that Exhibit 10-P is identical to the return that was filed except that (1) the filed return was not stamped "Preparor Copy," (2) an officer of LHDC signed the filed return (Exhibit 10-P was unsigned), (3) Trombetta signed the filed return (Exhibit 10-P was unsigned), and (4) we make no finding as to the date, if any, an officer of LHDC wrote on the filed return next to the officer's signature (Exhibit 10-P contains no date).

The conclusions are consistent with the explanation that Trombetta prepared the original Form 1120, kept a copy of the Form 1120 that was stamped "Preparor Copy" (which is Exhibit 10-P), signed the original Form 1120, and sent the original Form 1120 to LHDC. No party gives a different explanation of Exhibit 10-P.

Thus, our description of the filed 2011 Form 1120 is based on the information in Exhibit 10-P, Trombetta's unsigned file copy of the return he sent to LHDC.

LHDC's 2011 Form 1120 contains a number of attached schedules, only one of which, the Schedule K, Other information, is important for our purposes. [26] The 2011 Schedule K reported in line 5b that LHDC did not own an interest of at least 20% in a domestic

---

[25] The line asking for preparer's name is filled out with "Mark M. Trombetta." The line asking for the preparer's firm's name is filled out with Trombetta's firm's name, "Trombetta & Trombetta, C.P.A."

[26] Just as for 2009 and 2010, the Schedule K, Other Information, attached to LHDC's 2011 Form 1120 reported that at the end of the tax year no individual or estate owned directly 20% or more, or, directly or indirectly, 50% or more of the total voting power of all classes of LHDC's stock entitled to vote in 2011 (LHDC's response to the question in Line 4a).

**[*81]** partnership or an entity treated as a partnership at the end of tax year 2011.

The table below shows relevant amounts reported on LHDC's 2011 Form 1120.

| Item, schedule, and line | Amount |
|---|---:|
| Gross profit (line 3) | $4,830,469 |
| Interest income (line 5) | 296 |
| **Total income (line 11, add lines 3 through 10)** | **4,830,765** |
| Salaries and wages paid (less employment credits) (line 13) | −2,326,407 |
| Repairs and maintenance (line 14) | −40,796 |
| Rents (line 16) | −156,432 |
| Taxes and licenses (line 17) | −42,772 |
| Interest payments (line 18) | −2,750 |
| Depreciation from Form 4562 not claimed on Schedule A or elsewhere (line 20) | −761 |
| Advertising expenses (line 22) | −3,531 |
| "Other deductions" (line 26) | −2,239,036 |
| **Total deductions (line 27, add lines 12 through 26)** | **−4,812,485** |
| Taxable income (line 30) | −18,280 |
| Total tax (line 31) | 2,742 |
| Estimated tax penalty (line 33) | 54 |
| Amount owed (line 34) | 2,796 |

The "total tax" in line 31 of the Form 1120 was $2,742.

We now address some aspects of the record that relate to LHDC's 2011 Form 1120. We connect the discussion of LHDC's 2011 Form 1120 to LHDC's 2011 income statement because Trombetta used the income

**[\*82]** statement to prepare LHDC's tax returns and relied on the income statement in his testimony.

First, as Trombetta credibly testified, the total income amount of $4,830,765 on LHDC's 2011 Form 1120, (line 11) included $477,114 received from Louisiana Assisted. As he testified, the $477,114 was comprised of a $450,000 cash distribution that LHDC received from Louisiana Assisted plus additional amounts that LHDC received from Louisiana Assisted for specific reimbursement items. This $477,114 amount matches the amount of recorded on LHDC's 2011 income statement under "Fees Reimbursed LA Assisted Housing."

Second, the $4,830,469 of gross profit (line 3) reported on LHDC's 2011 Form 1120 matches the $4,830,469 of "Total Sales"[27] from LHDC's 2011 income statement. In the 2011 Form 1120, Trombetta added interest of $296 (line 5) to the $4,830,469 of gross profit (line 3) for the total income of $4,830,765 (line 11). The record does not reveal any additional information about the source of the $296 of interest income reported in line 5.

Lastly, LHDC's 2011 Form 1120 has a notation to "See stmt 1" in line 26, "Other deductions." This is presumably a statement that provides further detail as to the individual items comprising "Other deductions" of $2,239,036. There is no statement 1 included with LHDC's 2011 Form 1120. The parties stipulated that LHDC claimed a $1,818,542 deduction for professional fees, of which the deductibility of $158,993 is at dispute in this case. The "Other deductions" line item of $2,239,036 is the only deduction amount on LHDC's 2011 Form 1120 that is large enough to contain the $1,818,542 of professional fees. All other expense items other than salaries and wages are well below $1,000,000. Therefore, the $1,818,542 deduction for professional fees that the parties stipulated was claimed on LHDC's 2011 Form 1120 is contained in the $2,239,036 of "Other deductions."

LHDC's 2011 Form 1120 is dated September 16, 2012. The parties have not made any stipulations as to when LHDC filed its 2011 tax return, nor does LHDC's 2011 notice of deficiency state when LHDC

---

[27] The term "Total Sales" is a misnomer. *See supra* FINDINGS OF FACT Part XVII.C.1 note 21. The "Total Sales" amount of $4,830,469 includes the $450,000 distribution from Louisiana Assisted which is not a sale, as well as $27,114 for specific reimbursement items, which the record does not indicate are sales. The $477,114 amount ($450,000 + $27,114) was included under "Fees Reimbursed LA Assisted Housing" which was one of the amounts added into "Total Sales."

[*83] filed the tax return upon which the 2011 notice of deficiency was based.

### 4. *LHDC's tax reporting for 2012*

Although the IRS did not issue a notice of deficiency for LHDC's 2012 tax year, and we therefore have no jurisdiction over LHDC's tax year, we discuss LHDC's 2012 tax return because the IRS argues that the tax return helps prove that William was the other member of Louisiana Assisted.

The stipulation of facts made no mention of LHDC's tax return for 2012, nor did it attach a copy of LHDC's return for 2012.

At trial, no party offered into evidence a copy of the filed return. However, petitioners' counsel offered Exhibit 14-P. The IRS did not object to the admission of Exhibit 14-P, and it was admitted. The briefs of petitioners and the IRS rely on Exhibit 14-P to prove what LHDC reported on its 2012 tax return.

Exhibit 14-P has the stamp "Preparor Copy," on the first page in large, bold letters.

Although Exhibit 14-P is not signed by an officer of LHDC, no party disputes that the filed return was signed by an officer of LHDC.

Exhibit 14-P contains no date next to where an officer of LHDC was to sign the Form 1120. No party takes a position as to whether an officer of LHDC placed a date next to the officer's signature on the filed return.

Although Exhibit 14-P is not signed by Trombetta as the preparer,[28] no party disputes that the filed return was signed by Trombetta as the preparer.

The date of the preparer's signature is September 12, 2013. No party disputes that the filed return also contained this date for the preparer's signature.

---

[28] The line asking for preparer's name is filled out with "Mark M. Trombetta." The line asking for the preparer's firm's name is filled out with "Mark M. Trombetta, C.P.A."

**[*84]** We conclude that Exhibit 14-P is identical to the return that was filed except that (1) the filed return was not stamped "Preparor Copy," (2) an officer of LHDC signed the filed return (Exhibit 14-P was unsigned), (3) Trombetta signed the filed return (Exhibit 14-P was unsigned), and (4) we make no finding as to the date, if any, an officer of LHDC wrote on the filed return next to the officer's signature (Exhibit 14-P contains no date).

The conclusions are consistent with the explanation that Trombetta prepared the original Form 1120, kept a copy of the Form 1120 that was stamped "Preparor Copy" (which is Exhibit 14-P), signed the original Form 1120, and sent the original Form 1120 to LHDC. No party gives a different explanation of Exhibit 14-P.

Thus, our description of the filed 2012 Form 1120 is based on the information in Exhibit 14-P, Trombetta's file copy of the return he sent to LHDC.

Thus, our description of the return LHDC filed is based on the information in LHDC's 2012 Form 1120, marked as Exhibit 14-P, Trombetta's file copy of the unsigned return.

LHDC's 2012 tax return contains a number of attached schedules, only one of which, the Schedule K, Other Information, is important for our purposes.[29] The 2012 Schedule K reported in line 5b that LHDC did not own an interest of at least 20% in a domestic partnership or an entity treated as a partnership at the end of tax year 2012.

The 2012 tax return reported $1,155,000 in deductions for "compensation of officers" in line 12 of the tax return.

The table below shows relevant amounts reported on LHDC's 2012 tax return.

---

[29] Just as for 2009, 2010, and 2011, the Schedule K, Other Information, attached to LHDC's 2012 Form 1120 reported that at the end of the tax year no individual or estate owned directly 20% or more, or, directly or indirectly, 50% or more of the total voting power of all classes of LHDC's stock entitled to vote in 2012 (LHDC's response to the question in Line 4a.

| [*85]   Item, schedule, and line | Amount |
|---|---|
| Gross profit (line 3) | $4,566,274 |
| Gross rents (line 6) | 2,855 |
| Capital gain (line 8) | 165,000 |
| **Total income (line 11, add lines 3 through 10)** | **4,734,129** |
| Compensation of officers (line 12) | −1,155,000 |
| Salaries and wages paid (less employment credits) (line 13) | −1,872,306 |
| Repairs and maintenance (line 14) | −1,162 |
| Rents (line 16) | −143,760 |
| Taxes and licenses (line 17) | 30,394 |
| Interest payments (line 18) | −2,365 |
| Depreciation from Form 4562 not claimed on Schedule A or elsewhere (line 20) | −1,142 |
| Advertising expenses (line 22) | −1,857 |
| Other deductions (line 26) | −1,835,795 |
| **Total deductions (line 27, add lines 12 through 26)** | **−4,982,993** |
| Taxable income (line 30) | −248,864 |
| Total tax (line 310 | 0 |

The "total tax" in line 31 of the Form 1120 was $0.

We now address some aspects of the record that relate to LHDC's 2012 tax return. We connect the discussion of LHDC's 2012 Form 1120 to LHDC's 2012 income statement because Trombetta used the income statement to prepare LHDC's tax returns and relied on the income statement in his testimony.

First, as Trombetta credibly testified, the $4,734,129 of total income in line 11 included a cash distribution from Louisiana Assisted. Nothing in the record allows us to accurately determine the amount of

**[*86]** this distribution. As discussed *supra* FINDINGS OF FACT Part X.A, we make no finding as to the amount of this distribution.

Second the $4,734,129 from LHDC's 2012 Form 1120 (line 11) is $2,855 more than the $4,731,274 "Total Sales" in LHDC's income statement. The $2,855 difference is due to the fact that the $2,855 of interest earned is included in the computation of the $4,734,129 of total income on the tax return but not in the computation of the $4,731,274 of "Total Sales" amount on the income statement. The record does not reveal any additional information about the source of the $2,855 of interest income reported in line 5.

Third, the parties stipulated that "On its 2012, [sic] LHDC reported $165,000.00 in capital gain with respect to the sale or disposition of [Louisiana Assisted]. Respondent contends this capital gain should have been reported by the Fraziers." The $165,000 amount is recorded as "Capital gain net income" on Line 8 of LHDC's 2012 tax return. Line 8 contains a parenthetical stating "attach Schedule D (Form 1120)." Since a Form 1120 Schedule D, Capital Gains and Losses, provides additional information about a corporate taxpayer's capital gain, we would reasonably expect LHDC's 2012 Schedule D to provide additional detail on the $165,000 capital gain. However, the record does not contain a Schedule D for LHDC's 2012 tax year. We do not know whether the Schedule D (1) was filed with LHDC's 2012 tax return but was not included with Exhibit 14-P, (2) was never filed with LHDC's 2012 return in the first place, or (3) ever existed at all.

Fourth, line 12, for compensation to officers, directs the taxpayer to "attach Form 1125-E." Although the 2012 tax return reported $1,155,000 in deductions for "compensation of officers" on line 12 of the tax return, there is no Form 1125-E in the record. We do not know whether the Form 1125-E was filed with LHDC's 2012 tax return but was not included with Exhibit 14-P; was never filed with LHDC's 2012 return in the first place; or ever existed at all.

Lastly, LHDC's 2012 return has a notation to "See stmt 1" in line 26, "Other deductions." This is presumably a reference to a statement that provides further detail of the underlying items comprising "Other deductions," but there is no statement 1 included with LHDC's 2012 tax return. We do not know whether statement 1 (1) was filed with LHDC's 2012 tax return but was not included with Exhibit 14-P, (2) was never filed with LHDC's 2012 return in the first place, or (3) ever existed at all.

[*87] XVIII. *Notices of deficiency*

The IRS issued a notice of deficiency to the Fraziers for tax years 2009, 2010, and 2011. The IRS issued separate notices of deficiency to William and Mary for tax year 2012. The IRS issued a notice of deficiency to LHDC for each of three tax years: 2009, 2010, and 2011.

For each of these years, the parties made concessions regarding some of the adjustments made by the notices of deficiency. We now describe the adjustments made by the notices of deficiency and any related concessions.

A. *The Fraziers*

1. *2009 tax year*

William and Mary were issued a notice of deficiency for 2009. The notice was dated January 15, 2014. The following table details each non-computational adjustment in the notice of deficiency, the amount of the adjustment, and any concessions made by the parties with respect to each adjustment after the issuance of the notice of deficiency.

| *Adjustment* | *Amount of adjustment* | *Concessions by the parties* |
|---|---|---|
| Disallowance of dummy Schedule C deduction that offsets the reported inclusion of LHDC's distributive share of Louisiana Assisted's nonseparately stated income | $2,987,744 | None |
| Unreported income from state income tax refund | 991 | The Fraziers conceded that the amount is includible in income and had not been reported. |

The 2009 notice of deficiency determined that there was an underpayment of $1,051,988 as follows:

| | |
|---|---|
| Total corrected tax liability (Form 4549-A, Income Tax Examination Changes, line 11) | $1,463,750 |
| "Total Tax Shown on Return or as Previously Adjusted" (Form 4549-A, line 12) | −411,762 |
| **Underpayment** | **1,051,988** |

[*88] The $411,762 "Total Tax Shown on Return or as Previously Adjusted" in the 2009 notice of deficiency matches the $411,762 in line 60 of the Fraziers' 2009 Form 1040, total tax.

Recall *supra* FINDINGS OF FACT Part XVII.B.1 that the Fraziers reported LHDC's $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income on their 2009 Form 1040, which they offset with a dummy deduction of $2,987,744 on William's Schedule C. The notice of deficiency disallowed the offsetting $2,987,744 dummy deduction but did not reduce the Fraziers' (or LHDC's) income by $2,987,744. The parties subsequently agreed that "if the Fraziers may deduct the full $2,987,744.00 in 2009 related to the payments[30] to LHDC, then LHDC has additional gross income in the amount of $822,744.00,[31] but if the Fraziers may not deduct the $2,987,744.00, LHDC will have a reduction in gross income in the amount of $2,165,000.00.[32]" We hold *infra* OPINION Part II.B.1.a that the Fraziers' $2,987,744 dummy deduction is disallowed, that LHDC must include the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and the $3,156 distributive share of Louisiana Assisted's separately stated interest income, and that

---

[30] The word "payments" is a misnomer to the extent that it implies that funds were actually transferred. Nothing in the record indicates that the $2,987,744 amount was actually transferred from Louisiana Assisted. The $2,987,744 amount represents the distributive share of Louisiana Assisted's 2009 nonseparately stated income for the member other than Bobbie. A distributive share is a tax law concept that determines the amount of partnership income taxable to the individual partner; it does not represent a transfer of funds. *See* § 702(a); Treas. Reg. § 1.702-1(a).

[31] For 2009, LHDC included an amount of $2,165,000 in its income representing a distribution from Louisiana Assisted. However, a partner generally does not recognize income on the distribution of property from the partnership—except that the partner recognizes a gain to "the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution." § 731(a)(1). The stipulation anticipates that if the Court holds that LHDC was the other member of Louisiana Assisted then LHDC's income would be increased by $2,987,744 (to include the amount representing the distributive share of Louisiana Assisted's nonseparately stated income) but reduced by $2,165,000 (representing a distribution from Louisiana Assisted). Hence, LHDC would have "additional gross income in the amount of $822,744.00" ($2,987,744 − $2,165,000).

[32] The stipulation also anticipates the potential inverse holding: that William was the other member of LHDC. In that case, according to the stipulation, the Fraziers would not be permitted to deduct the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income, and LHDC's income would still be reduced by $2,165,000 (representing a distribution from Louisiana Assisted).

**[\*89]** LHDC's income does not include the $2,165,000 of cash distributions.[33]

The notice of deficiency determined that the Fraziers are liable for a section 6662 accuracy-related penalty of $210,398 for "one or more of the following: (1) Negligence or disregard of rules or regulations; (2) Substantial understatement of income tax; (3) Substantial valuation misstatement (overstatement)." The IRS has since conceded that the underpayment was not due to negligence or disregard of rules or regulations, nor substantial valuation misstatement, leaving only the issue of whether the underpayment was due to substantial understatement.

The notice of deficiency determined a section 6651(a)(1) addition to tax of $261,807 for the Fraziers' failure to timely file their 2009 return. According to the notice of deficiency, the Fraziers' 2009 tax return was due on October 15, 2010, suggesting that the Fraziers filed a six-month extension. The notice of deficiency stated that the Fraziers

---

[33] The parties do not appear to urge that the Court take the stipulation literally. First, the stipulation does not account for the $3,156 distributive share of Louisiana Assisted's separately stated interest income, which the parties were aware was at issue. (The Fraziers reported the $3,156 on their 2009 return, and the IRS argues that the Fraziers' reporting of this $3,156 interest income shows that William was the other member of Louisiana Assisted.) Second, the IRS argues on brief for a different means of adjusting the Fraziers' income in 2009 and other years:

> [R]espondent's disallowance of the Fraziers' claimed Schedule C expenses should be upheld. However, if the Court holds that LHDC, rather than Mr. Frazier, was the true owner of the 50-percent interest in LAHC [Louisiana Assisted] during the years at issue, then adjustments to the Fraziers' returns for the years at issue will need to be made. First, the income and deductions reported by the Fraziers on Schedule E from LAHC [Louisiana Assisted] will need to be reversed, as well as the Schedule C income and deductions claimed by Mr. Frazier, and the income must be added to LHDC's gross income as appropriate.

Thus, if LHDC is held to be the other member of Louisiana Assisted, the IRS argues not that the Fraziers may deduct the distributive share of Louisiana Assisted's nonseparately stated—as stated in the stipulation—but that the income on the Fraziers' Schedule E and deductions on William's Schedule C should be reversed.

Instead, we understand the stipulation to be a recognition by the parties that either William or LHDC was the other member of Louisiana Assisted and that either William or LHDC (but not both) will have the tax consequences of being the other member of Louisiana Assisted.

**[*90]** filed their return on March 18, 2013, which is the same date that the parties have stipulated the return was filed.

We find that March 18, 2013, is the filing date although this date is before the date next to the preparer's signature in the 2009 Form 1040 (Exhibit 4-P), which shows a date of August 8, 2013. We found *supra* FINDINGS OF FACT Part XVII.B.1 that Exhibit 4-P was the copy of the form that Trombetta kept when he signed the original copy of the return and sent it the to the Fraziers for them to sign and file with the IRS. We also found that Exhibit 4-P is identical to the return that was filed (with the exception of the taxpayers' signatures and date and Trombetta's signature). None of the parties argue that August 18, 2013, was the filing date or that that Exhibit 4-P is not the same in amounts as the return that was filed.

## 2.    *2010 tax year*

The Fraziers were issued a notice of deficiency for 2010. The notice was dated April 21, 2015. The following table details each non-computational adjustment in the notice of deficiency, the amount of the adjustment, and any concessions made by the parties with respect to each adjustment:

| Adjustment | Amount of adjustment | Concessions by the parties |
|---|---|---|
| Disallowance of dummy Schedule C deduction that offsets the reported inclusion of LHDC's distributive share of Louisiana Assisted's nonseparately stated income | $643,165 | None |
| Disallowance of partnership loss from Lagniappe Film Fund LLC | 343 | The Fraziers conceded that the IRS correctly disallowed this partnership loss. |

The 2010 notice of deficiency determined that there was an underpayment of $211,420 as follows:

| | |
|---|---|
| Total corrected tax liability (Form 4549-A, line 11) | $486,165 |
| "Total Tax Shown on Return or as Previously Adjusted" (Form 4549-A, line 12) | − 274,745 |
| **Underpayment** | **211,420** |

**[\*91]** The $274,745 "Total Tax Shown on Return or as Previously Adjusted" in the 2010 notice of deficiency matches the $274,745 in line 60 of the Fraziers' 2010 Form 1040, total tax.

Recall *supra* FINDINGS OF FACT Part XVII.B.2 that the Fraziers reported LHDC's $643,165 distributive share of Louisiana Assisted's nonseparately stated income on their 2010 Form 1040, which they offset with a dummy deduction of $643,165 on William's Schedule C. The notice of deficiency disallowed the offsetting $643,165 dummy deduction but did not reduce the Fraziers' (or LHDC's) income by $643,165. The parties subsequently agreed that "if the Fraziers may not deduct the $643,165.00 payment[34] to LHDC, LHDC will have a reduction in gross income in that amount."[35] We hold *infra* OPINION Part II.B.2.a that the Fraziers' $643,165 dummy deduction is disallowed, that LHDC must include the $643,165 distributive share of Louisiana Assisted's nonseparately stated income and $3,392 distributive share of Louisiana Assisted's separately stated interest income, and that LHDC's income does not include the $765,000 of cash distribution that it received from Louisiana Assisted.[36]

---

[34] The word "payment" is a misnomer to the extent that it implies that funds were actually transferred. Nothing in the record indicates that the $643,165 amount was actually transferred from Louisiana Assisted. The $643,165 amount represents the distributive share of Louisiana Assisted's 2010 nonseparately stated income for the member other than Bobbie. A distributive share is a tax law concept that determines the amount of partnership income taxable to the individual partner; it does not represent a transfer of funds. *See* § 702(a); Treas. Reg. § 1.702-1(a).

[35] Unlike for 2009, *see supra* notes 31 and 32, and for a reason unknown to Court, the parties only considered the result if the Court held that William was the other member. In that case, according to the stipulation, the Fraziers would not be permitted to deduct the $643,165 distributive share of Louisiana Assisted's nonseparately stated income, and LHDC's income would be reduced by $643,165. For 2010, as for 2009, LHDC included an amount in its income representing a distribution from Louisiana Assisted ($765,000 for 2010). It seems that the parties' stipulation is intended to say that if William were held to be the other member, the Fraziers' income should include the $643,165 distributive share of Louisiana Assisted's nonseparately stated income, and LHDC's income should be reduced by that amount because it would not be the other member.

[36] The parties do not appear to urge that the Court take the stipulation literally. *See supra* FINDINGS OF FACT Part XVIII.A.1 note 32. Instead, we understand the stipulation to be a recognition by the parties that either William or LHDC was the other member of Louisiana Assisted and that either William or LHDC (but not both) will have the tax consequences of being the other member of Louisiana Assisted.

**[\*92]** The notice of deficiency determined that the Fraziers are liable for a section 6662 accuracy-related penalty of $42,284 for "one or more of the following: (1) Negligence or disregard of rules or regulations; (2) Substantial understatement of income tax; (3) Substantial valuation misstatement (overstatement); (4) Transaction lacking economic substance." The IRS has since conceded that the underpayment was not due to negligence or disregard of rules or regulations, substantial valuation misstatement, or transaction lacking economic substance, leaving only the issue of whether the underpayment was due to substantial understatement.

The notice of deficiency determined a section 6651(a)(1) addition to tax of $52,855 for the Fraziers' failure to timely file their 2010 return. According to the notice of deficiency, the Fraziers' 2010 tax return was due on October 15, 2011, suggesting that the Fraziers filed a six-month extension. The notice of deficiency determined that the Fraziers filed their return on May 19, 2014, which is the same date that the parties have stipulated the return was filed. We find that May 19, 2014, is the filing date.

3.    *2011 tax year*

The Fraziers were issued a notice of deficiency for 2011. The notice was dated April 22, 2015. The following table details the single non-computational adjustment in the notice of deficiency and the amount of the adjustment.

| Adjustment | Amount of adjustment | Concessions by the parties |
|---|---|---|
| Disallowance of dummy Schedule C deduction that offsets the inclusion of LHDC's cash distribution from Louisiana Assisted | $450,000 | None |

The 2011 notice of deficiency determined that there was an underpayment of $167,051 as follows:

| | |
|---|---|
| Total corrected tax liability (Form 4549-A, line 11) | $334,532 |
| "Total Tax Shown on Return or as Previously Adjusted" (Form 4549-A, line 12) | − 167,481 |
| **Underpayment** | **167,051** |

**[\*93]** The $167,481 "Total Tax Shown on Return or as Previously Adjusted" in the 2011 notice of deficiency matches the $167,481 in line 60 of the Fraziers' 2011 Form 1040, total tax.

Unlike in 2009 and 2010, the parties did not make a stipulation regarding the result of the allowance or disallowance of the dummy deduction.

The notice of deficiency determined that the Fraziers are liable for a section 6662 accuracy-related penalty of $33,410 for "one or more of the following: (1) Negligence or disregard of rules or regulations; (2) Substantial understatement of income tax; (3) Substantial valuation misstatement (overstatement); (4) Transaction lacking economic substance." The IRS has since conceded that the underpayment was not due to negligence or disregard of rules or regulations, substantial valuation misstatement, or transaction lacking economic substance, leaving only the issue of whether the underpayment was due to substantial understatement.

The notice of deficiency determined a section 6651(a)(1) addition to tax of $41,763 for the Fraziers' failure to timely file their 2011 return. According to the notice of deficiency, the Fraziers' 2011 tax return was due on October 15, 2012, suggesting that the Fraziers filed a six-month extension. The notice of deficiency states that the Fraziers filed their return on October 28, 2014, which is the same date that the parties have stipulated the return was filed. We find that October 28, 2014, is the filing date.

4.    *2012 tax year*

As explained before, the Fraziers did not file federal income tax returns for the tax year 2012. William and Mary were issued separate notices of deficiency for 2012. Both notices were dated April 21, 2015.

Mary's notice of deficiency determined that she received $442 in ordinary dividends, $4,862 in IRA distributions, $980 in taxable interest, $20,640 in salaries and wages, $19,547 in Social Security income, $2,315 in qualified dividends, and $1,417 short-term capital gain income from "Columbia Seligman Comm. and Info." Mary's notice of deficiency determined that she had federal income tax withholding of $183,727 and that she was entitled to the standard deduction of $5,950 for a married person filing a separate return, and a personal exemption of $3,800. Finally, Mary's notice of deficiency determined she was liable for $29,420 in section 6651(a)(2) addition to tax, and $60,178 in section

**[*94]** 6651(a)(1) addition to tax. In calculating the additions to tax under section 6651(a)(1) and (a)(2) the notice of deficiency took the position that the IRS created a substitute for return with a tax shown amount of $451,185 and a filing date of February 12, 2015 (the same date the notice of deficiency was prepared). This means that the additions to tax under section 6651(a)(1) and (a)(2) were both calculated with a multiplier of $267,458 ($451,185 total corrected tax liability minus $183,727 allowable payments on or prior to due date of return).

William's notice of deficiency determined that he received $932,972 in Schedule E partnership flow-through income from Louisiana Assisted, $908 in Schedule E royalties, $922 in ordinary dividends, $11,869 in IRA distributions, $9,327 in taxable interest, $1,155,000 in salaries and wages, $23,604 in Social Security income, $2,315 in qualified dividends, $40,867 in short-term capital gain income from the Franklin Growth Fund,[37] $306,596 in short-term capital gain income from the Merrill Lynch brokerage account,[38] and $165,000 in short-term capital gain income from Bobbie Robinson. William's notice of deficiency determined that he had federal income tax withholding of $186,551 and that he was entitled to the standard deduction of $5,950 for a married person filing a separate return, and a personal exemption of $3,800. Finally, William's notice of deficiency determined he was liable for $29,536 in section 6651(a)(2) addition to tax, and $60,414 in section 6651(a)(1) addition to tax. In calculating the additions to tax under section 6651(a)(1) and (a)(2) the notice of deficiency took the position that the IRS created a substitute for return with a tax shown amount of $455,057 and a filing date of February 12, 2015 (the same date the notice of deficiency was prepared). This means that the additions to tax under section 6651(a)(1) and (a)(2) were both calculated with a multiplier of $268,506 ($455,057 total corrected tax liability minus $186,551 allowable payments on or prior to due date of return).

The parties executed stipulations regarding William and Mary's filing status for 2012. The parties stipulated that "[t]he Fraziers may claim married filing jointly with respect to the 2012 taxable year; the parties recognize, and agree, that the resulting joint and several tax

---

[37] Although the notice of deficiency referred to the "Franklin Growth Fund Class A," it is apparent in context that the notice of deficiency was referring to the Franklin Growth Fund referred to in our findings of fact.

[38] Although the notice of deficiency referred to "Merrill Lynch Pierce Fenner & Smith," it is apparent in context that the notice of deficiency was referring to the Merrill Lynch brokerage account referred to in our findings of fact.

**[*95]** liability may exceed the individual deficiencies proposed in the individual notices of deficiency." We interpret this stipulation to mean that the William and Mary's tax liability for 2012 is computed on a married-filing-jointly status.

The parties stipulated that during 2012, the Fraziers received taxable wages of $1,175,640. This amount is the sum of the amounts of wages and salaries determined by the notice of deficiency to have been earned by Mary ($20,640) and William ($1,155,000). Thus, the stipulation represents the agreement by the parties that these two adjustments are correct in total.

The parties stipulated that during 2012, the Fraziers received taxable interest of $10,308. This amount is the sum of the amounts of taxable interest determined by the notice of deficiency to have been earned by Mary ($980) and William ($9,327). (There is a $1 difference probably due to rounding.) Thus, the stipulation represents the agreement by the parties that these two adjustments are correct in total.

The parties stipulated that during 2012, the Fraziers received $4,990.00 of "taxable IRA distributions" and $11,741.00 of "taxable . . . pension distributions." The sum of these two numbers is $16,731. This is also the sum of the amounts determined by the notice of deficiency to be the IRA distributions earned by Mary ($4,862) and the IRA distributions earned by William ($11,869). Because of the similarity of the descriptions in the stipulation and in the notice of deficiency, and because of the identity of the two sums, we conclude that the stipulation represents the agreement by the parties that these two adjustments are correct in total.

The parties stipulated that during 2012, the Fraziers received taxable social security benefits of $43,150. This amount is the sum of the amounts of taxable social security income determined by the notice of deficiency to have been earned by Mary ($19,547) and William ($23,604). (There is a $1 difference probably due to rounding.) Thus, the stipulation represents the agreement by the parties that these two adjustments are correct in total.

The parties stipulated that during 2012, the Fraziers received taxable ordinary dividends of $1,545. This amount is greater than the $1,364 total amount of ordinary dividends determined by the notices of deficiency to have been earned by Mary ($442) and William ($922).

**[*96]** The parties stipulated that during 2012, the Fraziers received qualified dividends of $4,636. This amount is $6 greater than the $4,630 total amount of qualified dividends determined by the notice of deficiency to have been earned by William ($2,315) and Mary ($2,315).

The parties stipulated that during 2012, the Fraziers received $957,397.00 of taxable income related to rental real estate, royalties, partnerships, S corporations, trusts, etc. The comparable amount determined to have been earned by the Fraziers in the notice of deficiency was $933,880, which is the sum of (1) $932,972 determined to have been earned by William in partnership flow-through income from Louisiana Assisted and (2) $908 determined to have been earned by William in royalties.

*See infra* OPINION Part VII for our holdings on these types of income.

The parties stipulated that during 2012, the Fraziers had "proceeds from the sale or disposition" of securities in the Franklin Growth Fund in the amount of $40,867, and that the amount of the basis of these securities remains at issue. By contrast, the notice of deficiency had determined that the $40,867 was the short-term "gain" from the sale of these same securities. This determination would have been consistent with a determination that the proceeds from the sale or disposition of the securities was $40,867 and the basis in these securities was $0. *See infra* OPINION Part V for our holdings related to the securities sold from the Franklin Growth Fund.

The parties stipulated that "the Fraziers had proceeds from the sale or disposition of Columbia Seligman Comm. And Info capital assets in the amount of $1,417.00" and that "the Fraziers had no basis in this asset." *See infra* OPINION Part VI for our holdings related to the $1,417 amount from "Columbia Seligman Comm. And Info."

The parties stipulated that the Fraziers had proceeds from the sale or disposition of securities in the Merrill Lynch brokerage account in the amount of $306,596 and the amount of the basis remains at issue. William's notice of deficiency determined that the sales of securities from the Merrill Lynch brokerage account resulted in $306,596 of short-term capital "gain," which would be consistent with the determination that there was $306,596 of proceeds from the sale or disposition of these securities and that the basis of these securities was $0. However, the $306,596 amount in the notice of deficiency and stipulation does not

[*97] match the $307,261 of proceeds stated in the Form 1099-B, which the Frazier's actually received. In the notice of deficiency, the IRS did not show how it arrived at the $306,596 number, nor did it attempt to reconcile the $306,596 with the $307,261 amount stated in the Form 1099-B or even reference the Form 1099-B at all. *See infra* OPINION Part IV for our holdings related to the securities sold from the Merrill Lynch brokerage account.

The parties also stipulated that Fraziers had federal income tax withholding of $370,278. This is the sum of the amounts determined by the notices of deficiency to have been withheld from the income of Mary ($183,727) and William ($186,551).

The stipulations did not address how many exemptions should be computed in determining the Fraziers' income tax liability. *See infra* OPINION Part IX for our holdings on the Fraziers' exemptions for 2012.

B.    *LHDC*

1.    *2009 tax year*

LHDC was issued a notice of deficiency for 2009. The notice was dated January 14, 2014. The following table details each non-computational adjustment in the notice of deficiency, the amount of the adjustment, and any concessions made by the parties with respect to each adjustment after the issuance of the notice of deficiency.

| *Adjustment* | *Amount of adjustment* | *Concessions by the parties* |
|---|---|---|
| Disallowance of deduction for professional fees | $886,148 | The IRS conceded that the amount is deductible. |
| Unreported interest income from BanCorp South | 3,316 | LHDC conceded that the amount is includible in income and had not been reported. |
| Unreported dividend income from Intel Corporation | 144 | LHDC conceded that the amount is includible in income and had not been reported. |
| Unreported rental income from Jefferson Parish | 3,588 | The IRS conceded that the amount is not includible in income. |

**[\*98]** The 2009 notice of deficiency determined that there was an underpayment of $313,155 as follows:

| | |
|---|---:|
| Total corrected tax liability (Form 4549-A, line 11) | $320,737 |
| "Total Tax Shown on Return or as Previously Adjusted" (Form 4549-A, line 12) | – 7,582 |
| **Underpayment** | **313,155** |

The $7,582 "Total Tax Shown on Return or as Previously Adjusted" in the 2009 notice of deficiency is computed by subtracting the $43,099 of refund per Form 1139, "Corporation Application for Tentative Refund" from the $50,681 tax per original return.[39] The $50,681 tax per original return matches the $50,681 in line 31, total tax, of LHDC's 2009 Form 1120.

The notice of deficiency determined that LHDC is liable for a section 6662 accuracy-related penalty of $62,631 for "one or more of the following: (1) Negligence or disregard of rules or regulations; (2) Substantial understatement of income tax; (3) Substantial valuation misstatement (overstatement)." The IRS has since conceded that the underpayment was not due to negligence or disregard of rules or regulations, or substantial valuation misstatement, leaving only the issue of whether the underpayment was due to substantial understatement.

The notice of deficiency also determined a section 6651(a)(1) addition to tax of $77,933 for LHDC's failure to timely file its 2009 return. According to the notice of deficiency, LHDC's 2009 tax return

---

[39] In calculating a deficiency under section 6211, an underpayment under section 6664, and an understatement under 6662, refunds received are treated as rebates to the extent that they were made on the ground that the tax imposed was less than the excess of the sum of the amount shown as the tax by the taxpayer on his return, plus amounts not so shown previously assessed (or collected without assessment) over rebates previously made. *See* § 6664(a)(2); *Pesch v. Commissioner*, 78 T.C. 100, 110–13 (1982); *see also Galloway v. Commissioner*, 149 T.C. 407, 414, 418–19 (2017); *Baldwin v. Commissioner*, 97 T.C. 704, 709–10 (1991). Treasury Regulation § 1.6664-2 provides a formula for calculating an underpayment: underpayment = W − (X + Y − Z) in which W = the amount of income tax imposed; X = the amount shown as the tax by the taxpayer on his return; Y = amounts not so shown previously assessed (or collected without assessment); and Z = the amount of rebates made. Thus, the IRS calculated the underpayment as $320,737 − ($50,681 + 0 − $43,099) = $313,155. While the record does not reveal whether LHDC received the $43,099 refund, petitioners do not argue that LHDC did not receive it, nor do they contest that the IRS subtracted the refund from the tax per original return.

**[\*99]** was due on September 15, 2010. The notice of deficiency states that LHDC filed its return on February 28, 2011, which is the same date the parties have stipulated the return was filed. We find that February 28, 2011, is the filing date.

2.      *2010 tax year*

LHDC was issued a notice of deficiency for 2010. The notice was dated April 22, 2015. The following table details each non-computational adjustment in the notice of deficiency, the amount of the adjustment, and any concessions by the parties with respect to each adjustment after the issuance of the notice of deficiency.

| *Adjustment* | *Amount of adjustment* | *Concessions by the parties* |
|---|---|---|
| Disallowance of deduction for salaries and wages | $424,935 | None |
| Unreported interest income from BanCorp South | 935 | LHDC conceded that the amount is includible in income and had not been reported. |
| Unreported dividend income from Intel Corporation | 167 | LHDC conceded that the amount is includible in income and had not been reported. |
| Unreported "[o]ther income" from Louisiana Workers Compensation Corporation | 2,156 | The IRS conceded that the amount is not includible in income. |

The 2010 notice of deficiency determined that there was an underpayment of $9,270 as follows:

| | |
|---|---|
| Total corrected tax liability (Form 4549-A, line 11) | $9,270 |
| "Total Tax Shown on Return or as Previously Adjusted" (Form 4549-A, line 12) | − 0 |
| **Underpayment** | **9,270** |

The $0 "Total Tax Shown on Return or as Previously Adjusted" in the 2010 notice of deficiency matches the $0 in line 31, total tax, of LHDC's 2010 Form 1120.

**[\*100]** The $424,935 of deductions for salaries and wages that the IRS disallowed was out of a total deduction for salaries and wages taken of $2,770,775.

The notice of deficiency determined that LHDC is liable for a section 6662 accuracy-related penalty of $20,299 for "one or more of the following: (1) Negligence or disregard of rules or regulations; (2) Substantial understatement of income tax; (3) Substantial valuation misstatement (overstatement); (4) Transaction lacking economic substance." The IRS has since conceded that the underpayment was not due to negligence or disregard of rules or regulations, substantial valuation misstatement, or transaction lacking economic substance, leaving only the issue of whether the underpayment was due to substantial understatement.

The notice of deficiency also determined a section 6651(a)(1) addition to tax of $15,224 for LHDC's failure to timely file its 2010 return. According to the notice of deficiency, LHDC's 2010 tax return was due on September 15, 2011. The notice of deficiency determined that LHDC filed its return on November 16, 2011, which is the same date the parties have stipulated the return was filed. We find that November 16, 2011, is the filing date.

3.     *2011 tax year*

LHDC was issued a notice of deficiency for 2011. The notice was dated April 22, 2015. The following table details each non-computational adjustment in the notice of deficiency, the amount of the adjustment, and any concessions made by the parties with respect to each adjustment after the issuance of the notice of deficiency.

| [*101] Adjustment | Amount of adjustment | Concessions by the parties |
|---|---|---|
| Disallowance of deduction for salaries and wages | $358,922 | None |
| Disallowance of deduction for professional fees | 158,993 | None |
| Unreported interest income from BanCorp South | 1,195 | LHDC conceded this amount was includible in income but had not been reported. |
| Unreported dividend income from Intel Corporation | 214 | LHDC conceded this amount was includible in income but had not been reported. |
| Unreported "[o]ther income" from Louisiana Workers Compensation Corporation | 2,262 | The IRS conceded that the amount is not includible in income. |

The 2011 notice of deficiency determined that there was an underpayment of $177,759 as follows.

| | |
|---|---|
| Total corrected tax liability (Form 4549-A, line 11) | $177,759 |
| "Total Tax Shown on Return or as Previously Adjusted" (Form 4549-A, line 12) | − 0 |
| **Underpayment** | **177,759** |

The $0 "Total Tax Shown on Return or as Previously Adjusted" in the 2011 notice of deficiency is computed by subtracting the $2,742 of refund per Form 1139 from the $2,742 tax per original return.[40] The $2,742 tax per original return matches the $2,742 in line 31, total tax, of LHDC's 2011 Form 1120.

The $358,922 of deductions for salaries and wages that the IRS disallowed was out of a total deduction for salaries and wages taken of

---

[40] In years in which a corporation applies for a refund per Form 1139, Tax per Original Return, appears in the "Other Information" section of the Form 4549-A and matches "Total tax"—line 31 of the Form 1120. The "refund per Form 1139" is subtracted from "Tax per Original Return" to arrive at "Total Tax Shown on Return or as Previously Adjusted"—line 12 of the Form 4549-A. We discuss the reason for this subtraction as it relates to the calculation of deficiencies, underpayments, and understatements *supra* FINDINGS OF FACT Part XVIII.B.1 note 39.

[*102] $2,326,407. The $158,993 of professional fees that the IRS disallowed was out of a total deduction for professional fees taken of $1,818,542.

The notice of deficiency determined that LHDC is liable for a section 6662 accuracy-related penalty of $36,152 for "one or more of the following: (1) Negligence or disregard of rules or regulations; (2) Substantial understatement of income tax; (3) Substantial valuation misstatement (overstatement); (4) Transaction lacking economic substance." The IRS has since conceded that the underpayment was not due to negligence or disregard of rules or regulations, substantial valuation misstatement, or transaction lacking economic substance, leaving only the issue of whether the underpayment was due to substantial understatement.

OPINION

As a general rule, the taxpayer has the burden of proof, which includes both the burden of production and persuasion. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Cozzi v. Commissioner*, 88 T.C. 435, 443 n.8 (1987). The burden of persuasion is satisfied by the preponderance of the evidence. *Estate of Gilford v. Commissioner*, 88 T.C. 38, 51 (1987). In an exception to the general rule that the taxpayer bears the burden of proof, section 7491(a) provides that the burden of proof shifts to the IRS with respect to an issue related to income tax liability if the following conditions are met: (1) the taxpayer introduced credible evidence with respect to that factual issue relevant to ascertaining the taxpayer's tax liability, (2) the taxpayer complied with all applicable substantiation requirements for that factual issue, (3) the taxpayer maintained all required records for that factual issue, and (4) the taxpayer cooperated with reasonable requests for information from the IRS regarding that factual issue. § 7491(a)(1), (a)(2)(A), (B), and (C). If the taxpayer is a corporation, then section 7491(a)(2)(C) imposes a fifth requirement: the corporation's net worth may "not exceed $7,000,000 at the time the . . . [petition] was filed." 28 U.S.C. § 2412(d)(2)(B) (cross-referenced by § 7430(c)(4)(A)(ii)). The taxpayer bears the burden of proving that these requirements for shifting the burden of proof have been met. *See Rolfs v. Commissioner*, 135 T.C. 471, 483 (2010), *aff'd*, 668 F.3d 888 (7th Cir. 2012). Petitioners argue that the burden of proof should be shifted to the IRS on only one issue, the 2010 and 2011 salary-and-wage and professional-fees deductions. However, petitioners have failed to demonstrate that they cooperated with reasonable requests for information from IRS with respect to that issue.

[*103] Therefore, we conclude that petitioners have not met the requirements of section 7491(a) for shifting the burden of proof on this issue. Petitioners have the burden of proof on all issues related to their income tax liability.

In our findings of fact, we set forth a chart replicating the information found on the Form 1099-B sent by Merrill Lynch to the Fraziers. Some aspects of the chart above merit additional explanation. The "Amount" column in the chart refers to the proceeds from the sale. The Form 1099-B has a column labeled "Transaction Description." Each transaction reported by the Form 1099-B is described as a "Sale." The "Transaction Description" column in the Form 1099-B is omitted from the chart. The Form 1099-B reports mathematical totals that are omitted from the chart. The parties agree that the information on the Form 1099-B in the record is correct. The only exception to this agreement is that the parties stipulated that the proceeds received by the Fraziers from the 1,030 sales was $306,596, whereas the proceeds from the same sales reported on the Form 1099-B sum to $307,261. We adjust for this $665 discrepancy *infra* OPINION Part IV.B.6.

The Form 1099-B that Merrill Lynch sent the Fraziers reported 1,030 sales of securities made by the Fraziers during 2012. The Form 1099-B reported the cost basis for each of the 1,030 sales except for 5 sales. For these five sales, Form 1099-B reported that the cost basis was "N/A." The cost basis for the shares from these sales were reported as "N/A" because the shares were transferred into the Fraziers' Merrill Lynch brokerage account at an unknown time prior to the end of 2012.

Shortly before trial Trombetta prepared a spreadsheet estimating the cost basis for the five sales for which the Form 1099-B reported that the relevant cost basis were "N/A." We admitted the spreadsheet. Although his estimates are memorialized in the spreadsheet, they are also explained in his testimony. We do not rely on the spreadsheet separate from his testimony.

The five sales for which the Form 1099-B does not show basis are: (1) the 2,332 shares of Columbia Tax Exempt Fund A that were acquired on June 8, 2011, and sold on March 15, 2012, for which Trombetta estimated the basis to be $30,642; (2) the one share of Columbia Tax Exempt Fund A that was acquired on January 26, 2012, and sold on March 15, 2012, for which Trombetta estimated the basis to be $13.14; (3) the 0.309 of a share of Columbia Tax Exempt Fund A that was acquired on January 26, 2012, and sold on March 27, 2012, for which

[*104] Trombetta estimated the basis to be $4.06; (4) the 1,829 shares of Blackrock Municipal I that were acquired on June 8, 1994, and sold on March 15, 2012, for which Trombetta estimated the basis to be $19,003; and (5) the 2,523 shares of Blackrock Municipal I that were acquired on June 8, 1994, and sold on March 15, 2012, for which Trombetta estimated the basis to be $19,003. Trombetta's method of calculating the cost basis of these shares as well as our holdings on these basis are discussed *infra* OPINION Part IV.B.1.

Besides preparing the spreadsheet, Trombetta prepared a Form 1040 for the Fraziers' 2012 tax year. The Fraziers submitted the Form 1040 to the IRS three days before trial. The Form 1040 is not signed or dated by either of the Fraziers. The Form 1040 included Schedules C, D, and E. Although we admitted the Form 1040 as evidence, no party contends that the Form 1040 should be considered a filed return. However, the Fraziers' brief relies on the Form 1040 to explain its litigating position for certain issues.

The Schedule C included with the unfiled Form 1040 states an amount of $932,972 on line 48, "Total other expenses." This amount is further described by the Schedule C as the amount "paid to Louisiana Housing Development Corp." The stipulation states that this $932,972 on the Schedule C is a "claim" by the Fraziers of a "deduction related to" an "alleged payment[] to LHDC" that the IRS "disallowed for lack of substantiation and for lack of business purpose." We understand the stipulation to mean that petitioners' litigating position is that the Fraziers are entitled to the $932,972 deduction and that the IRS disagrees.

For same unfiled Form 1040, the Schedule D, line 7, "Net short-term capital gain or (loss)" states an amount of $3,857, which is attributable to the sales of securities in the Merrill Lynch account for securities sold one year or less from their acquisition date. The amount itself is computed from the information (i.e., amount realized and cost basis) in the Merrill Lynch Form 1099-B for securities sold one year or less from their acquisition date. For three such sales, the Form 1099-B did not show a cost basis; the cost basis for these three sales was computed from Trombetta's basis estimates memorialized in his spreadsheet.

For the same unfiled Form 1040, the Schedule D, line 13, "Capital gain distributions," states an amount of $1,417, which is the amount that the Fraziers received from "Columbia Seligman Comm. And Info,"

[*105] and for which the Fraziers concede they have no basis. Placing the $1,417 amount on line 13 signifies the Fraziers' claim that the $1,417 amount received from the "Columbia Seligman Comm. And Info" should be considered a capital gain dividend and should therefore be treated as long-term capital gain. *See infra* OPINION Part VI for our holdings on this amount.

For the same unfiled Form 1040, the Schedule D, line 15, "Net long-term capital gain or (loss)" states an amount of $4,364. This $4,364 amount is the sum of (a) $1,417 (the amount received from "Columbia Seligman Comm. And Info") and (b) $2,947. The $2,947 amount is attributable to the sales of securities in the Merrill Lynch account for securities sold more than one year after their acquisition date. The $2,947 amount itself is computed from the information (i.e., amount realized, cost basis, and amount of loss disallowed under the wash-sale rule) in the Merrill Lynch Form 1099-B for securities sold more than one year after their acquisition date. For two such sales, the Form 1099-B did not show a cost basis; the cost basis for these two sales was computed from Trombetta's basis estimates memorialized in his spreadsheet. The $2,947 amount reflected the disallowance of $6 of loss because of the wash-sale rule. This was consistent with the Form 1099-B's treatment of the $6 loss (rounded to the nearest dollar). *See infra* OPINION Part IV.B.4 for our holdings on the wash sale loss disallowance.

Consistent with the Form 1099-B, the Schedule D for the unfiled Form 1040 for 2012 assumed that the total sales proceeds of securities sold from the Merrill Lynch account in 2012 was $307,262, [41] which is $666 more than the $306,596 that the parties stipulated that the Fraziers received from the sales of securities from the Merrill Lynch brokerage account in 2012. As explained later, we interpret petitioners' brief to take the position that, contrary to the Schedule D, total sales proceeds of securities sold from the Merrill Lynch account in 2012 was $306,596. *See infra* OPINION Part IV.B.6.

Although the parties stipulated that the Fraziers had proceeds of $40,867 from the sale or disposition of capital assets from the Franklin Growth Fund, the Schedule D included with the unfiled Form 1040 for

---

[41] The Fraziers received total proceeds of $307,261, as is stated on the Form 1099-B, whereas adding the proceeds in the Schedule D results in a sum of $307,262. The Schedule D uses rounded numbers, but the Form 1099-B uses dollars and cents. Thus, the one-dollar difference is the result of rounding to the nearest dollar.

**[\*106]** 2012 does not account for the Franklin Growth Fund securities at all. *See infra* OPINION Part V for our holdings on these securities.

The Fraziers attached a Schedule E to the unfiled Form 1040 for 2012. In the Schedule E, the Fraziers state an amount of $932,972 in line 28(j), "Nonpassive income from Schedule K–1," with a description "Louisiana Assisted Housing Co., LLC." This amount corresponds to the $932,972 of nonseparately stated income reported on the 2012 Schedule K–1 issued to William from Louisiana Assisted.

In the unfiled Form 1040 for 2012, the Fraziers compute their taxable income with itemized deductions in the amount of $103,024 for (1) state and local income taxes of $91,453 plus (2) real estate taxes of $11,571. *See infra* OPINION Part VIII for our holdings on these deductions.

I.      *LHDC was the other member of Louisiana Assisted.*

During tax years 2009 through 2012, Louisiana Assisted was a multi-member LLC owned by Bobbie and a second member, the identity of whom is a central point of dispute in this case. Petitioners contend that the other member of Louisiana Assisted was LHDC. The IRS contends that the other member of Louisiana Assisted was William. Identifying the other member of Louisiana Assisted determines which taxpayer (LHDC or William) has the tax consequences of owning a membership interest in Louisiana Assisted from 2009 through 2012.

A.      *Under Louisiana law, the other membership interest in Louisiana Assisted was owned by LHDC.*

Louisiana Assisted was a Louisiana LLC for the years at issue. We consider here whether it was William or LHDC who, under the law of Louisiana, owned the membership interest of Louisiana Assisted that was not owned by Bobbie. We conclude that it was William.

A "member" of an LLC "means a person[42] with a membership interest in an LLC with the rights and obligations specified under this Chapter." La. Stat. Ann. § 12:1301(13) (2007). The term "this Chapter" means Chapter 22 of the Louisiana Statutes, which is known as the "Limited Liability Company Law." *See* La. Stat. Ann. §§ 12:1301,

---

[42] Person "means a natural person, corporation, partnership, limited partnership, domestic or foreign limited liability company, joint venture, trust, estate, or association." La. Stat. Ann. § 12:1301(18) (2007).

**[\*107]** 12:1369 (2007). Chapter 22 defines a "membership interest" in an LLC as "a member's rights in a limited liability company, collectively, including" (1) the "share of the profits and losses of the limited liability company,"[43] (2) the "right to receive distributions of the limited liability company's assets,"[44] (3) any "right to vote,"[45] or (4) any right to "participate in management." [46] La. Stat. Ann. § 12:1301(14) (2007).

Under Louisiana law, a membership interest in an LLC is an "incorporeal movable." La. Stat. Ann. § 12:1329 (2007). "The ownership of a movable, 'including an incorporeal movable,' is voluntarily transferred by a contract between the owner and the transferee that purports to transfer the ownership of the movable." La. Civ. Code Ann. art. 518 (2007). Thus, to determine if the owner of an LLC membership interest transferred the membership interest to a transferee, the contract between the owner and the transferee is controlling. To establish, under Louisiana law, the existence of an oral contract involving goods or services with price or value in excess of $500, the oral contract must be proved by (1) at least one witness and (2) "other corroborating circumstances." La. Civ. Code Ann. art. 1846 (2007). A witness for these purposes may be a party to the oral contract. *See Foshee v. Hand-Enis Realty Co.,* 237 So. 2d 437, 439 (La. App. 3 Cir. 1970).

---

[43] Section 1323 of the Limited Liability Company Law provides:

The profits and losses of a limited liability company shall be allocated among the members and among classes of members in the manner provided in a written operating agreement. To the extent the operating agreement does not so provide in writing, profits and losses shall be allocated equally among the members.

La. Stat. Ann. § 12:1323 (2007).

[44] Section 1324 of the Limited Liability Company Law addresses a member's right to receive interim distributions, and section 1325 addresses a member's right to receive distributions upon a member's withdrawal. *See* La. Stat. Ann. §§ 12:1324, 1325 (2007).

[45] Section 1318 of the Limited Liability Company Law provides default rules for member voting. *See* La. Stat. Ann. § 12:1318 (2007). These default rules have no bearing on the facts of this case.

[46] Section 1311 of the Limited Liability Company Law provides a default rule for member management, *see* La. Stat. Ann. § 12:1311 (2007), while section 1312 provides that the articles of organization can require that the LLC be managed by "one or more managers who may, but need not, be members." La. Stat. Ann. § 12:1312 (2007). These rules on management have no bearing on the facts of this case.

**[*108]** That a person contributes capital to an LLC may be evidence that the person is a member of the LLC. *Egle v. Egle*, 2006-1550, p. 10 (La. App. 3 Cir. 6/27/07), 963 So. 2d 454, 460, *writ denied*, 2007-1596 (La. 10/26/07), 966 So. 2d 579; *Moise v. Moise*, 06-876, p. 4 (La. App. 5 Cir. 3/13/07), 956 So. 2d 9, 11. Under the Limited Liability Company Law, a member's contribution to capital may take a variety of forms: "The contribution of a member to a limited liability company may take the form of cash, property, services rendered, or a promissory note or other binding obligation to contribute cash or property or to perform services." La. Rev. Stat. Ann. § 12:1321 (2007). In *Egle*, a Louisiana court determined that two individuals were members of an LLC because—although they did not pay cash for their capital contribution per the original agreement—they provided valid consideration through a credit transaction. 2006-1550 at 10, 963 So. 2d at 460-463. In *Moise*, a Louisiana court found that an individual was the sole member of an LLC by virtue of his capital contribution of land in partial consideration of the 100% interest in the LLC. 06-876 at 4, 956 So. 2d at 11.

Louisiana courts have considered tax reporting, among other factors, in determining who is a member of an LLC. *Destiny Servs., L.L.C.*, 2010-1895 at 5 (finding that plaintiffs were members of the LLC and considering, among other factors, that tax returns characterized plaintiffs as members and that plaintiffs were issued Forms K–1). However, tax reporting is not dispositive. *See Labby v. Labby Mem'l Enterprises, LLC*, No. 2:18-CV-01388, 2020 WL 5742539, at *1–*2 (W.D. La. Sept. 24, 2020) (finding an individual was not a member of an LLC although the LLC issued him a Form K–1); *Moise*, 06-876 at 3–4, 956 So. 2d at 10–11 (determining that wife was not a member of the LLC although the LLC's tax return stated husband and wife were 50% members).

In 2007, pursuant to an oral contract, Bobbie sold 50% of Louisiana Assisted to either LHDC (according to petitioners) or William (according to the IRS) in exchange for the use of LHDC's resources. In 2012, also pursuant to an oral contract, Bobbie repurchased the 50% of Louisiana Assisted sold in 2007 for $165,000. The record does not contain any documentation related to this payment (such as a copy of the check that Bobbie wrote or any bank statements showing receipt of the $165,000).

Bobbie was a "witness" to the 2007 oral contract. *See* La. Civ. Code Ann. art. 1846 (2007). She testified that the 2007 oral contract called for her to transfer a 50% membership interest in Louisiana Assisted to

**[*109]** LHDC. We find Bobbie's testimony credible because she was in the best position to know the terms of the 2007 oral contract (and the 2012 oral contract).[47] Additionally, her testimony was corroborated by Tracy.

Tracy's testimony serves as "other corroborating circumstances" to the 2007 oral contract. *See* La. Civ. Code Ann. art. 1846 (2007). In 2005, after Hurricane Katrina, Tracy quit her job in Austin, moved to Louisiana, and began working for LHDC. Tracy testified that she had extensive involvement in LHDC at the time when the 2007 oral contract was made, and that she knew about of the oral contract. Tracy testified that LHDC became the other member of Louisiana Assisted through the contract. We find Tracy's testimony credible because, by virtue of her extensive involvement in LHDC, she was in a position to know of the 2007 oral contract.

Another "corroborating circumstance[]" that indicates that LHDC acquired the second membership interest in Louisiana Assisted under the 2007 oral contract is that LHDC, not William, shared in the profits and losses of Louisiana Assisted and had a right to receive distributions of Louisiana Assisted's assets. *See* La. Stat. Ann. § 12:1301(13) and (14) (2007). The parties agree that Louisiana Assisted initially wrote checks for distributions to LHDC. The fact that the checks for distributions were initially written to LHDC suggests that LHDC had the right to receive distributions from Louisiana Assisted, at least immediately after acquiring the interest in 2007. From 2009 through 2012 checks for the distributions were written to William, which, the IRS argues, shows that William had the right to such distributions. However, Bobbie began writing checks to William only because William "was concerned about his problem he was having with Mr. Lala." Although Bobbie wrote the checks to William, she sent the checks to Trombetta and expected that Trombetta would ensure that LHDC received the funds. Trombetta credibly[48] testified that William never received these checks and that these checks were deposited directly in LHDC's account instead:

---

[47] Although William, acting as LHDC's agent in the 2007 oral contract (and the 2012 oral contract), was a witness to the contracts, William could not testify at trial because he had Alzheimer's disease.

[48] We believe Trombetta's testimony is credible because, as LHDC's accountant, he would have personally received the checks and deposited them in LHDC's account. Further, Bobbie's testimony corroborated Trombetta's testimony when she testified that she sent the checks directly to Trombetta.

**[\*110]** *Question*: Now, when Bobbie made out the check, did she send that check directly to you?

*Trombetta Answer*: Directly to me.

*Question*: And then what would you do with the check?

*Trombetta Answer*: One of my staff would deposit that into the Louisiana Housing's [LHDC's] operating account.[49]

*Question*: You did not deposit to Elmo's[50] [William's] account?

*Trombetta Answer*: No.

*Question*: Only to the LHDC account?

*Trombetta Answer*: It only went into LHDC's account.

The placement of William's name on these checks was a formality of title that did not impart actual ownership over the distributions. *See Corliss v. Bowers*, 281 U.S. 376, 378 (1930).

Another "corroborating circumstance[]" indicating that LHDC received the other membership interest was that LHDC made a capital contribution to Louisiana Assisted by giving Louisiana Assisted the use of LHDC's work force, office space, and information systems. *See* La. Stat. Ann. § 12:1321 (2007); *see also Egle*, 2006-1550 at 10, 963 So. 2d at 460; *Moise*, 06-876 at 4, 956 So. 2d at 11. Bobbie agreed to exchange a 50% membership interest in Louisiana Assisted for Louisiana Assisted's right to use LHDC's workers, office space, and information systems to administer the DHAP payments to residents of the Mississippi Gulf Coast—LHDC's capital contribution. *See* La. Stat. Ann. § 12:1321 (2007); *see also Egle*, 2006-1550 at 10, 963 So. 2d at 460; *Moise*, 06-876 at 4, 956 So. 2d at 11. LHDC paid the salaries and wages of its workers through Creative Payroll Services. Robert, who worked for LHDC, developed the information technology infrastructure that was adapted for Louisiana Assisted's use. LHDC's office space, which was leased by

---

[49] Trombetta had "a facsimile of Mr. Frazier's signature" which he used to endorse checks from LHDC to various professionals. Trombetta must have used this facsimile of William's signature to endorse these checks from Louisiana Assisted as well.

[50] Elmo is William's middle name.

[*111] LHDC, was set aside for use by Louisiana Assisted. The infrastructure and work force belonged to LHDC, not William. Although William is a shareholder in LHDC, LHDC is a separate entity. *See Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 438-439 (1943).

The tax reporting of Louisiana Assisted, LHDC, and the Fraziers is not determinative of who acquired the membership interest in Louisiana Assisted. Below is a summary of the tax reporting[51] of Louisiana Assisted, the Fraziers, and LHDC for tax years 2009–2012.

| | *2009* | *2010* | *2011* | *2012* |
|---|---|---|---|---|
| *(1) Distribution from Louisiana Assisted to LHDC* | $2,165,000 | $765,000 | $450,000 | $942,271 |
| *(2) NonBobbie distributive share of Louisiana Assisted's nonseparately stated income* | 2,987,744 | 643,165 | −7,586 | 932,972 |
| *(3) NonBobbie distributive share of Louisiana Assisted's separately stated interest income* | 3,156 | 3,392 | 1,839 | — |
| *(4) William's reported income inclusion of Louisiana Assisted's nonseparately stated income* | 2,987,744 | 643,165 | −7,586 | 932,972 |
| *(5) William's reported income inclusion of Louisiana Assisted's separately stated interest income* | 3,156 | — | 1,839 | — |
| *(6) William's Schedule C income inclusion from distribution from Louisiana Assisted* | — | — | 450,000 | — |
| *(7) William's dummy deduction* | 2,987,744 | 643,165 | 450,000 | 932,972 |
| *(8) LHDC's reported income inclusion from distribution from Louisiana Assisted* | 2,165,000 | 765,000 | 477,114[52] | unknown[53] |

---

[51] For 2012, the Fraziers did not file a tax return. Rows four through seven, for 2012, are based on the Fraziers unfiled, unsigned 2012 Form 1040 and attachments, which are relevant only because they contain the Fraziers' litigating position for issues also argued on brief.

[52] This amount includes the $450,000 distribution from Louisiana Assisted to LHDC plus specific reimbursement items.

[53] Total income (line 11) includes a distribution from Louisiana Assisted to LHDC, but does not indicate the amount.

**[*112]** The first, second, and third rows reflect what was reported on the Forms K–1 that Louisiana Assisted issued to William. We use the term "NonBobbie" to refer to the amounts reported ostensibly for William as the member of Louisiana Assisted other than Bobbie. The fourth row reflects what was reported on the Fraziers' Schedule E (filed in 2009–2011, but unfiled in 2012). The fifth row reflects what was reported on the Fraziers' Schedule B and attachments. The sixth and seventh rows reflect what was reported on the Fraziers' Schedule C (filed in 2009–2011, but unfiled in 2012). The eighth row reflects what was reported on LHDC's Forms 1120.

Louisiana Assisted's, the Fraziers', and LHDC's tax reporting suggests to the IRS that William was the other 50% member of Louisiana Assisted opposite Bobbie.

First, Louisiana Assisted issued Schedules K–1 to Bobbie and William (not to LHDC) for tax years 2009 through 2012.

Second, for tax years 2009 to 2012, LHDC did not report a distributive share of Louisiana Assisted's nonseparately stated income, but the Fraziers reported a distributive share of Louisiana Assisted's nonseparately stated income on their Schedules E for tax years 2009 through 2011. (Recall the Fraziers did not file a tax return for 2012.)

Third, for tax years 2009 to 2012, LHDC did not report a distributive share of Louisiana Assisted's separately stated interest income, but the Fraziers reported a distributive share of Louisiana Assisted's separately stated interest income for 2009 and 2011.

Fourth, Louisiana Assisted's Schedules B and B-1 stated that there was no corporation that owned Louisiana Assisted and that its only members were Bobbie and William.

Lastly, LHDC reported in line 5b of its Schedule K, Form 1120, that it did not own an interest of at least 20% in a domestic entity treated as a partnership for tax years 2009 through 2012, suggesting it did not own 50% of Louisiana Assisted from 2009 through 2012.

On the other hand, one portion of LHDC's 2012 return implies that LHDC was the other member. LHDC recorded $165,000 in capital gain on its 2012 tax return. The parties stipulated: "On its 2012, [sic] LHDC reported $165,000.00 in capital gain with respect to the sale or disposition of [Louisiana Assisted]. Respondent contends this capital gain should have been reported by the Fraziers." This reporting suggests

**[*113]** that LHDC, not William, sold its membership interest in Louisiana Assisted back to Bobbie in 2012.

More importantly, facts and circumstances indicate that the tax reporting was part of a paper trail designed to deceive Lala. Trombetta passed income from Louisiana Assisted through the Fraziers' tax return by reporting the distributive share of nonseparately stated income from Louisiana Assisted on the Fraziers' Schedule E and claiming a corresponding deduction on William's Schedule C.[54] We found *supra* FINDINGS OF FACT Part VIII that this was part of a subterfuge to conceal payments from Lala.

Furthermore, although the tax returns of Louisiana Assisted, the Fraziers, and LHDC stated that William and not LHDC was the other member of Louisiana Assisted, tax reporting is not determinative of whether a person owns a membership interest in an LLC under Louisiana law. *See Labby*, 2020 WL 5742539, at *1–2; *Moise*, 06-876 at 3–4, 956 So. 2d at 10–11.

We hold that under Louisiana law LHDC acquired the other 50% membership interest in Louisiana Assisted through the 2007 oral contract with Bobbie.

B. *Under federal tax law, the other membership interest in Louisiana Assisted was owned by LHDC.*

Determining that LHDC became the other member of Louisiana Assisted in 2007 under Louisiana law does not, without further analysis, resolve the question of whether LHDC became the other member of Louisiana Assisted in 2007 under federal tax law. True, the principle expressed in *Keith v. Commissioner*, 115 T.C. 605, 611 (2000) (citing *United States v. National Bank of Commerce,* 472 U.S. 713, 722 (1985)), suggests that the result under Louisiana law controls the result under federal tax law. In *Keith*, *id.*, we stated: "In determining whether passage either of title or of benefits and burdens has occurred, we look to State law. It is State law that creates, and governs the nature of, interests in property, with Federal law then controlling the manner in which such

---

[54] For 2011, unlike for 2009 and 2010, the Fraziers improperly reported $450,000 of gross income on William's Schedule C for a cash distribution from Louisiana Assisted. They reported a corresponding $450,000 deduction on William's Schedule C. This was also part of William's attempt to conceal from Lala cash payments from Louisiana Assisted to LHDC. *See supra* FINDINGS OF FACT Part VIII.

[*114] interests are taxed." But the principle expressed in *Estate of Skaggs v. Commissioner*, 75 T.C. 191, 198 (1980), suggests that state law is not relevant. In *Estate of Skaggs, id.*, we stated: "[T]he Internal Revenue Code, not State law, determines who is a partner and what is a partnership for Federal tax purposes." In this case, we need not reconcile these two principles. Respondent does not rely on the principle in *Estate of Skaggs* in support of his theory that William was the other member of Louisiana Assisted opposite Bobbie. Nor does respondent point to any particular provision of the Internal Revenue Code that suggests that conclusion. By contrast, in *Estate of Skaggs*, the Court relied on section 708, dealing with termination of a partnership, for its holding that the partnership in that case did not terminate by the death of one of its two partners. Our reading of respondent's brief is that respondent is of the view that the identity of the non-Bobbie partner is revealed by tax reporting. That is, in respondent's view, William is the other member of Louisiana Assisted because his returns reported income from Louisiana Assisted and because he was named by Louisiana Assisted's Forms K–1 as the other member. But tax reporting is not dispositive of tax treatment. It is only a piece of evidence to weigh. Here we do not find the tax reporting to be persuasive evidence that William was the other member of Louisiana Assisted for three reasons: (1) the tax reporting was mixed on that point (LHDC reported the gain from the 2012 sale of the membership interest, William did not), (2) the tax reporting of William as the other member was intended only to deceive Lala, and (3) William did not exercise rights of ownership over the membership interest in that he did not receive distributions from Louisiana Assisted except as a conduit for LHDC. In conclusion, the way the membership interest was reported on the tax returns does not convince us that William was the other member of LHDC. We conclude that LHDC was the other member under federal tax law for the purpose of this case.

C. *The IRS's* Danielson *argument is inapposite because petitioners are not attempting to disavow the terms of the 2007 oral agreement.*

The IRS also argues that *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), compels the conclusion that William was the other member of Louisiana Assisted. In *Danielson*, the Third Circuit held:

[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to

[*115] the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

*Danielson*, 378 F.2d at 775. Although *Danielson* was an opinion of the Third Circuit, the Fifth Circuit has applied the *Danielson* rule in several cases. *Smith v. Commissioner*, 65 F.3d 37, 40 n.13 (5th Cir. 1995), *aff'g* T.C. Memo. 1994-149; *Insilco Corp. v. United States*, 53 F.3d 95, 99 (5th Cir. 1995); *Spector v. Commissioner*, 641 F.2d 376, 386 (5th Cir. 1981), *rev'g* 71 T.C. 1017 (1979).

The IRS argues that LHDC and the Fraziers are bound under the *Danielson* rule to the tax consequences of William being the other member of Louisiana Assisted because (according to the IRS) the 2007 oral agreement was for William to acquire 50% of Louisiana Assisted from Bobbie. We reject the argument. As we held *supra* OPINION Part I.A, the 2007 oral agreement was for Bobbie to transfer a 50% membership interest in Louisiana Assisted to LHDC (not William). Thus, by arguing that LHDC (not William) was the other member of Louisiana Assisted from 2007 to 2012, petitioners are not disavowing their contract.

The *Danielson* rule does not disturb our conclusion that LHDC acquired the other 50% membership interest in Louisiana Assisted through the 2007 oral agreement with Bobbie.

II. *The tax consequences to LHDC and the Fraziers of LHDC being the other member of Louisiana Assisted*

Having determined that LHDC was the other member of Louisiana Assisted, we now discuss the tax consequences to petitioners resulting from LHDC's ownership of 50% of Louisiana Assisted.

A. *Legal Concepts*

1. *Tax Court jurisdiction*

The Tax Court is a court of limited jurisdiction, and the Court may exercise jurisdiction only to the extent authorized by Congress. § 7442; *Naftel v. Commissioner*, 85 T.C. 527, 529 (1985). The Tax Court has jurisdiction to redetermine a taxpayer's deficiency for a particular year only if the notice of deficiency issued to the taxpayer determined a deficiency for the year and the petition seeks a redetermination for that year. Rule 13(a), (c); §§ 6212, 6213. Under section 6214(a), the Tax Court

**[\*116]** has jurisdiction to determine a deficiency greater than that determined by the notice of deficiency provided that the IRS has made a claim for the increased deficiency. Further:

> Rule 41(b)(1) . . . provides that when an issue not raised in the pleadings is tried with the express or implied consent of the parties, that issue is treated in all respects as if it had been raised in the pleadings. Thus, where respondent raises an issue that could result in an increased deficiency without formally amending his pleading and that issue is tried with petitioner's express or implied consent, the requirement in section 6214(a) that respondent make a claim for the increased deficiency is satisfied. *See Woods v. Commissioner,* 91 T.C. 88, 93 (1988).

*Smaldino v. Commissioner*, T.C. Memo. 2021-127, at *16.

### 2.     *Taxation of entities treated as partnerships*

Federal tax law treats an LLC with multiple members as a partnership unless the LLC elects to be treated as a corporation for federal tax purposes. *See* Treas. Reg. § 301.7701-3(a) and (b)(1)(i).

A partnership itself is not subject to income tax. § 701. The income or loss of a partnership is computed as an initial step in calculating the partners' tax liabilities. § 703(a). Each partner's income takes into account the partner's distributive share of the partnership's income or loss. § 702(a). "Section 702(a)(1) through (a)(7) requires that specific items of partnership gain, loss, deduction, and credit be segregated by the partnership and separately stated on the returns of the individual partners." *Garcia*, 96 T.C. at 794. Items of partnership gain, loss, deduction, and credit not specified in section 702(a)(1) through (7) are referred to as nonseparately stated items. *Id.*

All partners take into account their distributive shares of income regardless of whether income is actually distributed. Treas. Reg. § 1.702-1(a). A partner generally does not recognize income on the distribution of property from the partnership except that the partner recognizes a gain to "the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution." § 731(a)(1). For convenience, we refer to the partner's adjusted basis in its partnership interest as the partner's outside basis. *See Kligfield Holdings v. Commissioner*, 128 T.C. 192, 196 (2007).

**[\*117]** A partner's outside basis is determined in the following manner: there is an initial outside basis when the partnership interest is acquired, and then there are annual adjustments to outside basis. The initial outside basis depends on how the partnership interest was acquired. If the partnership interest was acquired by a contribution to the partnership, the partner's initial outside basis equals the amount of cash contributed plus the partner's basis in any other contributed property. § 722. If the partnership interest was acquired "other than by contribution," for example, through a purchase transaction, the partner's initial outside basis is determined by the basis rules in sections 1011 through 1016. § 742. For example, if a taxpayer bought a partnership interest for $10,000, the taxpayer's initial basis in the partnership would be $10,000. That is because section 1012 provides that the basis of property is equal to the cost of the property. The annual adjustments to a partner's outside basis consist of increases and decreases for various amounts. A partner's outside basis is increased by the partner's distributive share of partnership taxable income, as well as by other amounts. § 705(a)(1). A partner's outside basis is decreased (but not below zero) by distributions received from the partnership, by the partner's distributive share of partnership losses and expenditures, and by other amounts. §§ 705(a)(2), 733; s*ee also* Treas. Reg. § 1.705-1(a)(3).

    B.    *Analysis*

        1.    *2009 tax year*

For 2009, Louisiana Assisted reported on Schedule K–1 that William was one of its members, William's distributive share of its nonseparately stated income was $2,987,744, and his distributive share of its separately stated interest income was $3,156. Louisiana Assisted also reported on Schedule K–1 that it made a cash distribution of $2,165,000 to William (even though the cash distribution was in fact made directly to LHDC). The Fraziers included the distributive share of nonseparately stated income of $2,987,744 on the Schedule E of their joint 2009 tax return. They reported a dummy deduction for the same amount on William's individual Schedule C on their 2009 joint tax return to offset the $2,987,744 income reported on their Schedule E. The Fraziers also reported the $3,156 of separately stated interest income on the Schedule B of their 2009 joint tax return. LHDC reported the $2,165,000 cash distribution it received from Louisiana Assisted as income on its 2009 corporate tax return. LHDC did not report the

[*118] $2,987,744 of nonseparately stated income on its return. Nor did it report the $3,156 of separately stated interest income.

The IRS disallowed the $2,987,744 dummy deduction claimed on William's individual Schedule C in the notice of deficiency issued to the Fraziers. The IRS did not make adjustments to either the Fraziers' or LHDC's income for any of the other items described in the previous paragraph (the $2,987,744 distributive share of nonseparately stated income, the $3,156 distributive share of separately stated interest income reported in the Fraziers' 2009 income, and the $2,165,000 cash distribution from Louisiana Assisted to LHDC reported in LHDC's 2009 income).

### a.     *The Fraziers*

We held that during the years at issue, including 2009, LHDC (not William) was the true 50% member of Louisiana Assisted opposite Bobbie. Therefore, the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and $3,156 distributive share of Louisiana Assisted's separately stated interest income are not includible in the Fraziers' income. The Fraziers are not permitted to take the $2,987,744 dummy deduction that they took to offset the inclusion of the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income.

### b.     *LHDC*

Also, as result of our holding that LHDC (not William) was the true 50% member of Louisiana Assisted opposite Bobbie, the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and the $3,156 distributive share of Louisiana Assisted's separately stated interest income are includible in LHDC's income. *See* § 702(a); Treas. Reg. § 1.702-1(a). The $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and $3,156 distributive share of Louisiana Assisted's separately stated interest income increase LHDC's outside basis in Louisiana Assisted by $2,990,900 ($2,987,744 plus $3,156). *See* § 705(a)(1).

We hold that LHDC's income does not include the $2,165,000 of cash distributions that it received from Louisiana Assisted because neither petitioners nor the IRS asserts that this cash distribution exceeded LHDC's outside basis in Louisiana Assisted immediately before the distribution. *See* § 731(a)(1). This cash distribution decreases

[*119] LHDC's outside basis in Louisiana Assisted by $2,165,000. §§ 705(a)(2), 733.

Recall that for 2009, LHDC improperly reported the $2,165,000 cash distribution as income but did not report its $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and $3,156 distributive share of Louisiana Assisted's separately stated interest income. The IRS did not adjust LHDC's income in the 2009 notice of deficiency to include the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income or to include the $3,156 distributive share of Louisiana Assisted's separately stated interest income. By holding that LHDC's income is increased by $825,900 (i.e., increased by $2,987,744 plus $3,156 and decreased by $2,165,000), we are redetermining LHDC's deficiency to be greater than what the IRS determined in LHDC's 2009 notice of deficiency. Therefore, we address whether we may properly do so under section 6214(a).

The parties have argued extensively over the issue of whether the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income is includible in the Fraziers' or LHDC's income for 2009. Accordingly, this issue was tried by consent under Rule 41(b)(1) and is considered raised by the pleadings. *See Smaldino*, T.C. Memo. 2021-127, at *16. As a result, the IRS is considered to have asserted a claim for an increase in LHDC's deficiency due to the inclusion in LHDC's income of the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income. *See id.* Therefore, we can redetermine LHDC's deficiency to be greater than what the IRS determined in the notice of deficiency due to LHDC's inclusion of the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income in LHDC's taxable income. *See* § 6214(a).

The parties have also tried by consent the issue of whether the $3,156 distributive share of Louisiana Assisted's separately stated interest income is includible in the Fraziers' or LHDC's income. In its Answering Brief, the IRS argues that the fact that the Fraziers reported the $3,156 of interest income shows that William was the other member of Louisiana Assisted. This argument suggests that the $3,156 amount is properly includable in the Fraziers' income. Petitioners' response to this argument, found in their Reply Brief, is that Trombetta erred in reporting the $3,156 amount on the Fraziers' return. They invite judicial "resolution" of this error. This response is tantamount to the position that the $3,156 amount is includable in the Fraziers' income. Accordingly, the issue of whether the $3,156 interest income is

**[*120]** includible in the Fraziers' or LHDC's income was tried by consent under Rule 41(b)(1). *See Smaldino*, T.C. Memo. 2021-127, at *16. Therefore, we can redetermine LHDC's deficiency to be greater than what the IRS determined in the notice of deficiency due to LHDC's inclusion of the $3,156 distributive share of Louisiana Assisted's separately stated interest income in LHDC's taxable income. *See* § 6214(a).

Therefore, our redetermination of LHDC's deficiency to be greater than that determined by the IRS in the notice of deficiency due to the inclusion of the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and the $3,156 distributive share of Louisiana Assisted's separately stated interest income is permissible under section 6214(a).

### 2. *2010 tax year*

For 2010, Louisiana Assisted reported that William was one of its members, that William's distributive share of its nonseparately stated income was $643,165, and that his distributive share of its separately stated interest income was $3,392. Louisiana Assisted also reported that it made a cash distribution of $765,000 to William (even though the cash distribution was in fact made directly to LHDC). For 2010, the Fraziers' joint return included the distributive share of nonseparately stated income of $643,165 on the Schedule E. They reported a dummy deduction for the same amount on William's individual Schedule C of their 2010 joint tax return to offset the $643,165 income reported on their Schedule E. The Fraziers did not report the $3,392 of separately stated interest income on the Schedule B of their 2010 joint tax return.[55]

---

[55] The Schedule B attached to the Fraziers' 2010 Form 1040 has a notation to "See Statement 1" in reference to a $30,799 amount of interest income. Statement 1 is presumably a statement that provides detail for this $30,799 of interest income just like Statement 1 attached to the Fraziers' 2009 Form 1040 did for the $22,778 of interest income reported on the 2009 Form 1040. There was no Statement 1 included with the Fraziers' 2010 Form 1040. We do not know whether the 2010 Statement 1 (1) was originally attached to the Fraziers' 2010 Form 1040 but omitted from the trial record, (2) was never filed with the Fraziers' 2010 Form 1040 in the first place, or (3) ever existed at all. The 2010 Schedule K–1 issued to William reports separately stated interest income of $3,392. Without Statement 1, we do not know if the $30,799 of interest income reported on the Fraziers' 2010 Schedule B includes the $3,392 reported on the 2010 Schedule K–1 issued to William. The IRS asserts that the Fraziers' Schedule B included the $3,392 of separately stated interest income. A finding that the Fraziers' Schedule B includes the $3,392 separately stated interest

[*121] LHDC reported the $765,000 cash distribution it received from Louisiana Assisted as income on its 2010 corporate tax return. LHDC did not report the $643,165 of nonseparately stated income on its return. Nor did it report the $3,392 of separately stated interest income.

The IRS disallowed the $643,165 dummy deduction claimed on William's individual Schedule C in the notice of deficiency issued to the Fraziers. The IRS did not make adjustments to either the Fraziers' or LHDC's income for any of the other items described in the previous paragraph (the $643,165 distributive share of nonseparately stated income reported in the Fraziers' 2010 income, the $765,000 cash distribution from Louisiana Assisted to LHDC reported in LHDC's 2010 income, and the $3,392 distributive share of separately stated interest income).

### a.    *The Fraziers*

We held that during the years at issue, including 2010, LHDC (not William) was the true 50% member of Louisiana Assisted opposite Bobbie. Therefore, the $643,165 distributive share of Louisiana Assisted's nonseparately stated income is not includible in the Fraziers' income. The Fraziers are not permitted to take the $643,165 dummy deduction that they took to offset the inclusion of the $643,165 distributive share of Louisiana Assisted's nonseparately stated income.

### b.    *LHDC*

Also as a result of our holding that LHDC (not William) was the true 50% member of Louisiana Assisted opposite Bobbie, the $643,165 distributive share of Louisiana Assisted's nonseparately stated income and the $3,392 distributive share of Louisiana Assisted's separately stated interest income are includible in LHDC's income. *See* § 702(a); Treas. Reg. § 1.702-1(a). The $643,165 distributive share of Louisiana Assisted's nonseparately stated income and the $3,392 distributive share of Louisiana Assisted's separately stated interest income increase

income would be a determination in favor of the taxpayer because our holding *infra* OPINION Part II.B.2.a, would then result in a reduction of the Fraziers' taxable income by $3,392. Hence this assertion is a concession by the IRS. Yet the Fraziers deny that the Schedule B included the $3,392 of separately stated interest income. A finding that the Fraziers' Schedule B does not include $3,392 separately stated interest income would be a determination in favor of the IRS because there would be no such reduction. Hence this denial is a concession by the Fraziers. Faced with these competing concessions, we think that the Fraziers are in a better position to say whether their Schedule B included a report of the $3,392. We conclude it did not.

**[\*122]** LHDC's outside basis in Louisiana Assisted by $646,557 ($643,165 plus $3,392). *See* § 705(a)(1).

We hold that LHDC's income does not include the $765,000 of cash distribution that it received from Louisiana Assisted because neither LHDC nor the IRS asserts that this cash distribution exceeded LHDC's outside basis in Louisiana Assisted immediately before the distribution. *See* § 731(a)(1). This cash distribution decreases LHDC's outside basis in Louisiana Assisted by $765,000. §§ 705(a)(2), 733.

Recall that for 2010, LHDC improperly reported the $765,000 cash distribution as income but did not report its $643,165 distributive share of Louisiana Assisted's nonseparately stated income and $3,392 distributive share of Louisiana Assisted's separately stated interest income. LHDC also had $935 of unreported interest income from BanCorp South and $167 of unreported dividend income from Intel. As a result, LHDC overreported income by $117,341 ($765,000 minus ($643,165 + $3,392 + $935 + $167)). Unlike with 2009, the net effect of our holdings regarding LHDC's taxable income for 2010 is a decrease in taxable income. Therefore, these holdings do not contribute to the redetermination of a deficiency greater than that determined by the IRS in the notice of deficiency for 2010 under section 6214(a).

### 3.  *2011 tax year*

For 2011, Louisiana Assisted reported that William was one of its members, his distributive share of its nonseparately stated loss was $7,586, and his distributive share of its separately stated interest income was $1,839. Louisiana Assisted also reported that it made a cash distribution of $450,000 to William even though the cash distribution was in fact made directly to LHDC. The Fraziers included the distributive share of nonseparately stated loss of $7,586 on the Schedule E of their joint 2011 tax return. The Fraziers reported the $450,000 cash distribution as income on William's individual Schedule C of their 2011 joint tax return along with a dummy deduction for the same amount on the same Schedule C to offset the $450,000 of reported income. The Fraziers reported the $1,839 of separately stated interest income on the Schedule B of their 2011 joint tax return. LHDC reported the $450,000 cash distribution it received from Louisiana Assisted as income on its 2011 corporate tax return. LHDC did not report the $7,586 nonseparately stated loss on its return. Nor did it report the $1,839 of separately stated interest income.

[*123] The IRS disallowed the $450,000 dummy deduction claimed on William's individual Schedule C in the notice of deficiency issued to the Fraziers. The IRS did not make adjustments to either the Fraziers' or LHDC's income for any of the other items described in the previous paragraph (the $450,000 cash distribution from Louisiana Assisted to LHDC and the $1,839 distributive share of separately stated interest income reported in the Fraziers' 2011 income and the $450,000 cash distribution from Louisiana Assisted to LHDC reported in LHDC's 2011 income).

a.      *The Fraziers*

We held that during the years at issue, including 2011, LHDC (not William) was the true 50% member of Louisiana Assisted opposite Bobbie. Therefore, the $7,586 distributive share of Louisiana Assisted's nonseparately stated loss and the $1,839 distributive share of Louisiana Assisted's separately stated interest income are not includible in the Fraziers' income. Furthermore, the $450,000 cash distribution that Louisiana Assisted made to LHDC is not includible in the Fraziers' income because the cash distribution was in fact made directly to LHDC. The Fraziers are not permitted to take the $450,000 dummy deduction that they took to offset the inclusion of the $450,000 cash distribution that Louisiana Assisted made to LHDC.

The IRS did not adjust the Fraziers' income in the 2011 notice of deficiency to disallow the $7,586 distributive share of Louisiana Assisted's nonseparately stated loss. By holding that the Fraziers' income is increased by $5,747 (the disallowance of the $7,586 loss netted against the non-inclusion of $1,839 of interest income), we are redetermining the Fraziers' deficiency to be greater than what the IRS determined in the 2011 notice of deficiency. Therefore, we must address whether we may properly do so under section 6214(a).

The parties have argued extensively over the issue of whether the $7,586 distributive share of Louisiana Assisted's nonseparately stated loss is includible in the Fraziers' or LHDC's income for 2011. Accordingly, this issue was tried by consent under Rule 41(b)(1). *See Smaldino*, T.C. Memo. 2021-127, at *16. As a result, the IRS is considered to have asserted a claim for an increase in the Fraziers' deficiency due to the disallowance of the $7,586 distributive share of Louisiana Assisted's nonseparately stated loss. *See id.* Therefore, we can redetermine the Fraziers' deficiency to be greater than what the IRS determined in the notice of deficiency due to the disallowance of the

**[\*124]** $7,586 distributive share of Louisiana Assisted's nonseparately stated loss. *See* § 6214(a). Our holding that the Fraziers' income does not include the $1,839 separately stated interest income has the effect of reducing the Fraziers' deficiency and, therefore, is not an exercise of the Court's jurisdiction to determine a deficiency greater than the amount of the deficiency in the notice of deficiency under § 6214(a).

b.  *LHDC*

Also as a result of our holding that LHDC (not William) was the true 50% member of Louisiana Assisted opposite Bobbie, the $7,586 distributive share of Louisiana Assisted's nonseparately stated loss and the $1,839 distributive share of Louisiana Assisted's separately stated interest income are includible in LHDC's income. *See* § 702(a); Treas. Reg. § 1.702-1(a). The $7,586 distributive share of Louisiana Assisted's nonseparately stated loss and the $1,839 distributive share of Louisiana Assisted's separately stated interest income decrease LHDC's outside basis in Louisiana Assisted by $5,747 (−$7,856 + $1,839). *See* § 705(a)(1).

We hold that LHDC's income does not include the $450,000 cash distribution that it received from Louisiana Assisted because neither LHDC nor the IRS asserts that this cash distribution exceeded LHDC's outside basis in Louisiana Assisted immediately before the distribution. *See* § 731(a)(1). This cash distribution decreases LHDC's outside basis in Louisiana Assisted by $450,000. §§ 705(a)(2), 733.

Recall that for 2011, LHDC improperly reported the $450,000 cash distribution as income but did not report its $7,586 distributive share of Louisiana Assisted's nonseparately stated loss and $1,839 distributive share of Louisiana Assisted's separately stated interest income. LHDC also had $1,195 of unreported interest income from BanCorp South and $214 of unreported dividend income from Intel. As a result, LHDC overreported income by $454,338 ($450,000 plus $7,586 minus ($1,839 + $1,195 + $214)). The net effect of our holdings regarding LHDC's taxable income for 2011 is a decrease in taxable income. Therefore, there is no jurisdictional issue related to a redetermination of a deficiency greater than that determined by the IRS in the notice of deficiency for 2011 under section 6214(a).

4.  *2012 tax year*

For 2012, Louisiana Assisted reported that William's distributive share of its nonseparately stated income was $932,972. Louisiana Assisted reported that there was no separately stated interest income

**[\*125]** for 2012. (Line 5 "interest income" in the Schedule K is blank, as is line 5 "interest income" in the Schedules K–1 issued to Bobbie and William.) Louisiana Assisted also reported that it made a cash distribution of $942,271 to William, although the record is unclear whether the actual amount of the distribution was $942,271, $926,434, or another amount. *See supra* FINDINGS OF FACT Part X.A.

The Fraziers did not file an income tax return for 2012. The IRS prepared notices of deficiency for William and Mary. The IRS included the $932,972 distributive share of Louisiana Assisted's nonseparately stated income and $165,000 capital gain from the sale of the 50% membership interest in Louisiana Assisted in William's income because the IRS asserts that William was the 50% member of Louisiana Assisted.

Petitioners argue that the Fraziers' income does not include the $932,972 distributive share of Louisiana Assisted's nonseparately stated income and $165,000 capital gain from the sale of the 50% membership interest in Louisiana Assisted because LHDC and not William was the 50% member of Louisiana Assisted.

The Fraziers sent the joint unfiled 2012 Form 1040 to the IRS the Monday (April 24, 2017) prior to trial, which was admitted into evidence as Exhibit 16-P. The Fraziers' 2012 Form 1040 is significant only as the Fraziers have seemingly adopted it as their litigating position. The unfiled 2012 Form 1040 reports no net income attributable to an ownership interest in Louisiana Assisted, although (perhaps to be consistent with the filed returns) it does so through a dummy deduction trick. First, Schedule E reports pass-through income of $932,972 from the Schedule K–1 issued by Louisiana Assisted. Second, the Schedule C reports a deduction of $932,972 with a description "[l]ess paid to Louisiana Housing Development Corp." Although petitioners seemingly urge us to adopt the tax treatment shown on the unfiled 2012 Form 1040, the Form 1040's position that a distributive share of Louisiana Assisted's income is includable in William's income is inconsistent with petitioners' argument (and our holding) that William was not a member of Louisiana Assisted.

LHDC reported a $165,000 capital gain on its 2012 corporate tax return for gain from the sale of 50% of its membership interest in Louisiana Assisted.

[*126]                    a.    *The Fraziers*

We held that during the years at issue, including 2012, LHDC (not William) was the true 50% member of Louisiana Assisted opposite Bobbie. Therefore, the $932,972 distributive share of Louisiana Assisted's nonseparately stated income and the $165,000 gain from the sale of the 50% membership interest in Louisiana Assisted are not includible in the Fraziers' income. And the Fraziers are not permitted to take the $932,972 dummy deduction to offset the inclusion of the $932,972 distributive share of Louisiana Assisted's nonseparately stated income.

                    b.    *LHDC*

Although LHDC reported on its 2012 return that it had $165,000 capital gain from its sale of its membership interest in Louisiana Assisted, LHDC (and the other petitioners) argue on brief that LHDC had a capital *loss* on the sale. However, the IRS did not issue a notice of deficiency to LHDC for 2012.

We have jurisdiction over deficiencies for LHDC for 2009, 2010, and 2011 (because the IRS issued notices of deficiency to LHDC for those years and LHDC filed the petitions with respect to those years). Rule 13(a). We also have jurisdiction over deficiencies for William and Mary for 2009–12 (because the IRS issued notices of deficiency to them for those years and because they filed petitions for those years). *Id.* However, we do not have jurisdiction over any deficiency for LHDC for 2012 and therefore do not determine the amount of gain or loss realized from the 2012 sale. *Id.*

Recall that the Schedule K–1 that Louisiana Assisted issued to William for 2012 states that his beginning capital account balance was $9,354. Recall furthermore that the Schedule K–1 that Louisiana Assisted issued to William for the year before, for 2011, stated that his ending capital account balance was $823,216. For every other year (2009, 2010, and 2011), the prior year's ending capital account balance was the following year's beginning capital account balance. Nothing in the record explains why the 2011 ending capital account balance did not match the 2012 beginning capital account balance—petitioners' brief suggests that this was a computational error. Petitioners contend that the Court should find that $823,216 was the balance of the 2012 beginning capital account (i.e., LHDC's capital account, because petitioners contend that LHDC, not William, was the owner of the

[*127] membership interest). Petitioners further contend that because $823,216 was its capital account balance, LHDC had a capital loss on its sale of its 50% interest in Louisiana Assisted instead of a capital gain of $165,000 (although petitioners do not put forward an amount they believe should be the capital loss). Petitioners' argument appears to conflate LHDC's capital account with its outside basis. Ultimately, we cannot consider petitioners' capital-loss argument because we have no jurisdiction over LHDC's 2012 taxable year. Furthermore, there is no dispute regarding substantial economic effect.[56] Therefore LHDC's capital account in Louisiana Assisted is not relevant for resolution of this case.

III.    *We do not sustain the IRS's adjustments to LHDC's 2010 and 2011 salary-and-wage deductions and to LHDC's 2011 professional-fee deductions.*

Section 162(a) allows a deduction for "the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Deductible ordinary and necessary expenses can include "a reasonable allowance for salaries or other compensation for personal services actually rendered." § 162(a)(1). A taxpayer on the accrual method of accounting deducts expenses as they are accrued. Treas. Reg. § 1.461-1(a)(2). A taxpayer on the cash method of accounting—such as LHDC—deducts expenses as they are paid.[57] Treas. Reg. § 1.461-1(a)(1).

For a taxpayer to be entitled to deductions under section 162(a), the business for which the expenses are incurred or paid must be the taxpayer's business. *See du Pont*, 308 U.S. at 493–94; *United States v.*

---

[56] We need not determine the capital accounts of the members of Louisiana Assisted during the years at issue. A partner's distributive share of income, gain, loss, or credit is determined by the partnership agreement, unless the allocation under the partnership agreement has no substantial economic effect, in which case the distributive share is determined in accordance with the partner's interest in the partnership. § 704(a), (b)(2). The allocation under the partnership agreement has substantial economic effect if the capital accounts are maintained in accordance with the regulations. Treas. Reg. § 1.704-1(b)(2)(iv)(a). If the partnership agreement makes no provision as to the distributive share, then the distributive share is determined in accordance with the partner's interest in the partnership. § 704(b)(2). Here Louisiana Assisted and its members reported that the distributive shares of the members were equal. The IRS does not challenge this proportion. Rather it challenges the identity of the member opposite Bobbie.

[57] LHDC used the cash basis for accounting during all years at issue. *See supra* FINDINGS OF FACT Part I.

**[\*128]** *Cocke*, 399 F.2d 433, 447 (5th Cir. 1968); *H.W. Nelson Co. v. United States*, 308 F.2d 950, 954 (Ct. Cl. 1962). In other words, a taxpayer may not deduct expenses it incurs or pays on behalf of another taxpayer. *See du Pont*, 308 U.S. at 493–94; *Cocke*, 399 F.2d at 447; *H.W. Nelson Co*, 308 F.2d at 954. Thus, a shareholder of a corporation cannot deduct expenses the shareholder paid or incurred for the business of the corporation. *du Pont*, 308 U.S. at 493–94. Similarly, "a partner may not deduct partnership expenses on his individual return." *Klein v. Commissioner*, 25 T.C. 1045, 1051 (1956); *see also McLaughlan v. Commissioner*, 558 Fed. Appx. 374, 377 (5th Cir. 2014) ("[A] partner may not deduct the expenses of the partnership on his individual return, even if the expenses were incurred by the partner in furtherance of partnership business."). However, there is an exception to the rule that a partner may not deduct partnership expenses on his return: When, under a partnership agreement, a partner is required to pay partnership expenses out of the partner's own funds, the partner is entitled to deduct the amount thereof from the partner's gross income. *Klein*, 25 T.C. at 1051–52. To fit into the exception, the expenses paid on behalf of the partnership cannot be reimbursable by the partnership to the partner who pays these expenses. *Id.* at 1052; *see also McLauchlan*, 558 Fed. Appx. at 379.

A taxpayer must substantiate a deduction claimed under section 162(a) by establishing entitlement to such deduction, including that the amount of the expense to which the deduction relates has been paid or incurred. §§ 6001, 162(a); Treas. Reg. § 1.6001-1(a); *see also Boyd v. Commissioner*, 122 T.C. 305, 319–20 (2004). The taxpayer's returns alone do not substantiate its deductions because returns are merely statements of a taxpayer's claims. *Wilkinson v. Commissioner*, 71 T.C. 633, 639 (1979). In general, a taxpayer is required to maintain records that are sufficient to enable the IRS to determine its correct tax liability.[58] *See* § 6001; Treas. Reg. § 1.6001-1(a).

On its 2010 tax return, LHDC reported a deduction for salaries and wages of $2,770,775. In the notice of deficiency for 2010, the IRS disallowed $424,935 of that deduction, thus allowing $2,345,840 of the deduction claimed. The notice of deficiency made no adjustment to

---

[58] When a taxpayer is able to demonstrate payment or incurrence of a deductible expense but cannot substantiate the precise amount, the Court may estimate the amount of the expense if the taxpayer produces credible evidence providing a basis for the Court to make such an estimate. *Cohan v. Commissioner*, 39 F.2d 540, 544 (2d Cir. 1930).

**[*129]** LHDC's deductions relating to its payment of professional fees for that year.

On its 2011 return, LHDC reported a deduction for salaries and wages of $2,326,407. On its 2011 tax return, LHDC reported "[o]ther deductions" of $2,239,036, which includes a deduction for professional fees of $1,818,542. *See supra* FINDINGS OF FACT Part XVII.C.3. In the notice of deficiency for 2011, the IRS disallowed $358,922 of the $2,326,407 deduction for salaries and wages claimed for 2011 (thus allowing $1,967,485 of the deduction claimed). The IRS also disallowed $158,993 of the $1,818,542 deduction for professional fees for 2011 (thus allowing $1,659,549 of the deduction claimed).

Explaining these adjustments for 2010 and 2011, the notices of deficiency stated that "it had not been established" that the disallowed amounts (1) constituted "ordinary and necessary business expenses" or (2) were "expended for the purpose designated." The notices of deficiency did not explain that the amounts were disallowed because they related to the expenses of Louisiana Assisted. The notices of deficiency did not explain why the IRS disallowed portions of the salary-and-wage and professional-fee deductions while allowing the remaining portions of the deductions claimed.

In its Answer to LHDC's petitions, the IRS did not give any further justification for the disallowances. Nor did it explain why the claimed deductions were disallowed in part and allowed in part.

The IRS's Pretrial Memorandum included the following discussion of the IRS's position regarding the disallowed salary-and-wage and professional-fee deductions:

> Professional fees/compensation deduction: LHDC claimed deductions for professional fees for . . . 2011 in the amount[] of . . . $158,993.00 . . . and salary expenses for 2010 and 2011 in the amounts of $424,935.00 and $358,922.00, respectively. LHDC has not substantiated these claimed deductions.

The $158,933 amount referred to in the excerpt above is the portion of LHDC's professional-fee deduction for 2011 that was disallowed in the notice of deficiency. The $424,935 amount referred to in the excerpt above is the portion of LHDC's salary-and-wage deduction for 2010 that was disallowed in the notice of deficiency. The $358,922 amount referred to in the excerpt above is the portion of LHDC's salary-and-wage

**[\*130]** deduction for 2011 that was disallowed in the notice of deficiency. Therefore, the excerpt is an explanation that the disallowed amounts had not been "substantiated." The excerpt does not explain specifically that the amounts were disallowed because they related to the expenses of Louisiana Assisted.

Another portion of the IRS's Pretrial Memorandum gave the following description of the legal principles justifying the disallowance of portions of LHDC's salary-and-wage deductions and professional-fee deductions:

> Taxpayers generally must maintain sufficient records to establish their tax liability. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87 (1975), *aff'd.* 540 F.2d 821 (5th Cir. 1976). A taxpayer's self-serving declaration is generally not a sufficient substitute for records. *Weiss v. Commissioner*, T.C. Memo. 1999-17.
>
> . . . .
>
> I.R.C. § 162(a) permits a taxpayer to deduct the ordinary and necessary expenses paid or incurred in carrying on a trade or business.

This excerpt stresses the lack of "records" and it paraphrases section 162(a). It does not specifically suggest that the amounts were disallowed because they related to the expenses of Louisiana Assisted.

At trial, as will be discussed *infra* OPINION Part III.A, petitioners presented evidence that LHDC paid the same amounts that it deducted.

After trial, we ordered the parties to file briefs in the following sequence: (1) petitioners' Opening Brief, (2) respondent's Answering Brief, and (3) petitioners' Reply Brief.

In petitioners' Opening Brief, they addressed the disallowed amounts of salary-and-wage deductions—$424,935 and $358,922 for 2010 and 2011 respectively—by claiming that the disallowed amounts were ordinary and necessary business expenses and that Trombetta's testimony shows that these amounts were actually paid by LHDC. Specifically, petitioners explained that Trombetta's testimony shows LHDC paid total payroll expenses of $2,770,775 and $2,326,407 in 2010 and 2011 respectively. Petitioners also argued that the $158,993

**[\*131]** disallowed amount of professional fees for 2011 (out of a total claimed professional-fee deduction of $1,818,542) were ordinary and necessary business expenses and that Trombetta's testimony shows that the $158,993 amount was actually paid. Specifically, petitioners argued that they substantiated the entire $1,818,542 LHDC deducted because (1) Trombetta testified that he personally wrote all of the checks totaling $1,818,542 and (2) the professional-fee ledger admitted into evidence corroborates Trombetta's testimony by showing the total amount of professional fees paid in 2011 was $1,818,542. Thus, in petitioners' view, having proved the $1,818,542 total claimed deduction, they proved the $158,993 subset of the total claimed deduction.

In its Answering Brief, the IRS responded with two arguments. First, the IRS argued that petitioners did not establish that the disallowed amounts ($424,935 of salary-and-wage expenses for 2010, $358,922 of salary-and-wage expenses for 2011, and $158,993 of professional-fee expenses for 2011) were "in fact paid." Second, the IRS argued that even if paid, the disallowed amounts were not ordinary and necessary to LHDC's business because LHDC paid the disallowed portions for work performed on behalf of Louisiana Assisted. The IRS relies on *Deputy v. du Pont*, 308 U.S. 488, 493–95 (1940), and *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233 (Ct. Cl. 1969), for authority that LHDC cannot deduct expenses paid on behalf of Louisiana Assisted.

In their Reply Brief, petitioners contend that the IRS's second argument described above (i.e., that LHDC cannot deduct expenses paid on behalf of Louisiana Assisted) was a new argument inappropriately raised during the briefing stage of proceedings. Petitioners nevertheless respond to the IRS's position by arguing that because work performed on behalf of Louisiana Assisted benefitted LHDC, LHDC is entitled to deductions reported for compensation paid to Louisiana Assisted's workers.

A. *The entire amounts of disallowed salaries and wages and professional fees were paid.*

We address the IRS's first argument, that LHDC has failed to show that the amounts deducted for salaries and wages, and for professional fees, "were in fact paid."

For the salary-and-wage deductions, LHDC introduced into evidence two salary-and-wage ledgers created by Trombetta's firm,

[*132] Creative Payroll Solutions, for 2010 and 2011 respectively. The salary-and-wage ledgers show the biweekly amounts that LHDC paid Creative Payroll Solutions for (1) wages for all workers treated as employees by LHDC, (2) payroll expenses with respect to such workers other than wages, and (3) a fee for Creative Payroll Solutions. The salary-and-wage ledgers also show the total annual amounts of these biweekly payments. The total amount paid in 2010 is shown as $2,770,775.28. The total amount paid in 2011 is shown as $2,326,406.19. Trombetta credibly testified that the salary-and-wage ledgers accurately recorded the amounts paid by LHDC to Creative Payroll Solutions. We find that the salary-and-wage ledgers in conjunction with Trombetta's testimony establish that LHDC actually paid $2,770,775 for total salary-and-wage expenses in 2010 and $2,326,407 for total salary-and-wage expenses in 2011. *See Higbee v. Commissioner,* 116 T.C. 438, 447 (2001).

For professional-fee deductions, LHDC introduced into evidence a professional-fee ledger for 2011. As explained *supra* FINDINGS OF FACT Part IX, Creative Payroll Solutions wrote checks from LHDC's bank account to pay professional fees on behalf of LHDC. The professional-fee ledger contains a column for the date each payment was made, the payee to whom the payment was made, and the amount the payee was paid. The sum of all payments is shown in the ledger as $1,818,542. Trombetta credibly testified that $1,818,542 was the actual amount of professional fees that LHDC paid in 2011 and that his office wrote and mailed all the checks for payments shown in the ledger (which according to the ledger, totaled $1,818,542).[59] We find that the professional-fee ledger in conjunction with Trombetta's testimony establishes that LHDC actually paid the amount of $1,818,542 for professional-fee expenditures in 2011. *See Higbee*, 116 T.C. at 440.

B.    *The IRS is not permitted to rely on the new theory raised on brief.*

We now address the IRS's second argument, i.e., that the disallowed portions of the salary-and-wage deductions ($424,935 for 2010 and $358,922 for 2011) and professional-fee deductions ($158,993

---

[59] At trial, LHDC's counsel asked Trombetta if the total was "$1,818,524" instead of the $1,818,542 stated by the professional-fee ledger, to which Trombetta replied "correct." We believe petitioners' counsel meant to say "$1,818,542" and that Trombetta meant to agree to that amount.

[*133] for 2011) were not expenses of LHDC's business because these were Louisiana Assisted's expenses.

A party can rely on a legal theory only if it has provided the opposing party with fair warning of the theory so that the opposing party is not surprised and prejudiced in its ability to prepare its case. *Smalley v. Commissioner*, 116 T.C. 450, 456 (2001). The opposing party is considered to be surprised or prejudiced when the lack of notice causes it not to present evidence at trial to defend against the new theory. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 349–50 (2013) (taxpayer was prejudiced because taxpayer had no reason to introduce evidence directed towards disproving the IRS's new argument first raised on brief); *Sundstrand v. Commissioner*, 96 T.C. 226, 348 (1991) (taxpayer was prejudiced because taxpayer would have introduced additional evidence had it known of the new theory); *Seligman v. Commissioner*, 84 T.C. 191, 199 (1985) (taxpayers were prejudiced because taxpayers did not have the opportunity to present evidence on the new theory); *Ware v. Commissioner*, 92 T.C. 1267, 1269 (1989) (taxpayers were not prejudiced because it is unclear what additional evidence the taxpayers would have presented on account of the new theory); *Pagel, Inc. v. Commissioner*, 91 T.C. 200, 212 (1988) (taxpayers were not prejudiced because the evidence necessary for a legal determination under the new theory proposed by IRS was already in the record). A theory can be considered a new theory even if it involves the same Code section as the theory upon which the case was tried. *Sundstrand Corp.*, 96 T.C. at 347.

The first time the IRS made the argument that the disputed deductions related to Louisiana Assisted was in its Answering Brief filed after trial. The argument was not made in the notices of deficiency, the Answer, or the Pretrial Memorandum.

LHDC did not have fair warning that the IRS intended to rely on the argument that the disallowed portions of the expenses were paid in carrying on another taxpayer's business. *See du Pont*, 308 U.S. at 493–94. The principal limitations to section 162(a) usually involve three issues: (1) whether the expense was "ordinary and necessary," (2) whether the expense was paid or incurred for business and not personal reasons, (3) and whether the expense was a current expense and not a capital investment. Marvin A. Chirelstein, *Federal Income Taxation* 97 (1999). Thus, a taxpayer might expect, from the IRS's invocation of section 162(a), arguments related to these three issues, but

**[\*134]** not the expense-of-another-taxpayer argument. *See Sundstrand Corp.*, 96 T.C. at 347–48.

The lack of fair warning prejudiced LHDC because the IRS's failure to identify its expense-of-another-taxpayer argument denied LHDC the opportunity to present evidence against the argument. *See Seligman*, 84 T.C. at 199; *see also Chapman Glen Ltd.*, 140 T.C. at 349–50. Had LHDC had appropriate notice of the expense-of-another-taxpayer argument, it could have directly challenged its factual premises. For example, LHDC could have presented evidence showing that LHDC's workers did not perform $424,935 and $358,922 worth of services on behalf of Louisiana Assisted in 2010 and 2011 respectively (and instead performed the services for LHDC or performed services of a value less than these amounts for Louisiana Assisted). For example, LHDC could have presented evidence showing that it did not pay professional fees worth $158,993 on behalf of Louisiana Assisted in 2011 (and instead paid the fees for LHDC or paid a lesser amount for Louisiana Assisted). Furthermore, LHDC may have argued that the expenses paid on behalf of Louisiana Assisted fell under an exception to the expense-of-another-taxpayer rule, specifically that a partner is entitled to deduct partnership expenses to the extent that (1) the partner is required to pay partnership expenses out of the partner's own funds and (2) those expenses are not reimbursable. *See Klein*, 25 T.C. at 1051–52. In furtherance of this argument, LHDC could have presented evidence showing that its workers were required under its arrangement with Louisiana Assisted to provide services to Louisiana Assisted and that it did not expect reimbursement for these services.[60]

Because LHDC was not given fair warning, and because the lack of fair warning prejudiced LHDC, we decline to consider the IRS's theory that LHDC's salary-and-wage expenses and professional-fee expenses are not deductible under the theory that the expenses were actually expenses of Louisiana Assisted.

---

[60] As we have found, Louisiana Assisted made reimbursement payments to LHDC of $17,560 in 2009, $17,460 in 2010, $27,114 in 2011, and an indeterminate amount in 2012. We cannot discern from the record what these reimbursement payments were for. Tracy testified that LHDC charged Louisiana Assisted only for expenses that were discrete and identifiable, such as an unusually large copy job, and that LHDC was reimbursed for only a fraction of the expenses it actually paid on behalf of Louisiana Assisted. There is no information in the record that indicates whether there was any formal reimbursement policy.

**[\*135]** We hold that LHDC is permitted to deduct the entire $2,770,775 of salary-and-wage deductions reported on its 2010 return, the entire $2,326,407 of salary-and-wage deductions reported on its 2011 tax return, and the entire $1,818,542 of professional-fee deductions reported on its 2011 tax return.

IV. *The Fraziers had $3,856 short-term capital gain and $2,283 in long-term capital gain for 2012 from the sales of capital assets from the Merrill Lynch brokerage account.*

A. *The law*

Section 1221 defines a "capital asset" as property held by a taxpayer, except for eight categories of property specifically excluded from the definition. *See Tempel v. Commissioner*, 136 T.C. 341, 345 (2011), *aff'd sub nom. Esgar Corp. v. Commissioner*, 744 F.3d 648 (10th Cir. 2014).

The amounts of gains and losses on the sale or disposition of property, including capital assets, are generally determined by section 1001(a). Under section 1001(a), the amount of gain from the sale or disposition of a property is equal to the amount realized on the sale or disposition of the property minus the adjusted basis (as defined in section 1011). And the amount of loss from the sale or disposition of property is equal to the adjusted basis (as defined in section 1011) minus the amount realized on the sale or disposition of the property. § 1001(a). The amount realized from the sale or disposition of property is the amount of money received plus the fair market value of any non-money property received. § 1001(b).

Section 1011(a) provides that the adjusted basis for determining the gain or loss from the sale or disposition of property is the basis as adjusted under section 1012 or other applicable sections of the Code. Section 1012(a) provides the general rule that the basis of property is the cost of the property.

Taxpayers must substantiate their basis for the purpose of determining the amount of gain or loss that they must recognize on the disposition of a capital asset. *Cullins v. Commissioner*, 24 T.C. 322, 328 (1955). In general, taxpayers must keep adequate records to substantiate their basis. § 6001; Treas. Reg. § 1.6001-1(a). However, where a taxpayer lacks adequate records of its basis in an asset, we have applied the *Cohan* rule to estimate basis of the asset if the taxpayer has provided some reasonable evidentiary ground upon which to make such

[*136] an estimate. *Cohan*, 39 F.2d at 544; s*ee also Prosperity Co., Inc. v. Commissioner*, 17 T.C. 171, 186 (1951) (applying the *Cohan* rule to estimating cost basis). The Court's estimate under *Cohan* will bear heavily against "the taxpayer whose inexactitude is of his own making." *Cohan*, 39 F.2d at 543–44.

The sale of a capital asset results in either short-term capital gain or loss or long-term capital gain or loss, depending on how long the asset is held—the holding period. § 1222. Capital gain or loss is *short-term* if the asset is held for one year or less, § 1222(1) and (2), and *long-term* if the asset is held for more than one year, § 1222(3) and (4). The distinction between short-term and long-term matters because net long-term capital gains are subject to tax at the preferential rates set forth in section 1(h).

Short-term capital gains and losses are netted for either "net short-term capital gain," or "net short-term capital loss." Section 1222(5) defines "net short-term capital gain" as "the excess of short-term capital gains for the taxable year over the short-term capital losses for such year." Section 1222(6) defines "net short-term capital loss" as "the excess of short-term capital losses for the taxable year over the short-term capital gains for such year."

Long-term capital gains and losses are netted for either "net long-term capital gain," or "net long-term capital loss." Section 1222(7) defines "net long-term capital gain" as "the excess of long-term capital gains for the taxable year over the long-term capital losses for such year." Section 1222(7) defines "net long-term capital loss" as "the excess of long-term capital losses for the taxable year over the long-term capital gains for such year."

B.   *Analysis of the Fraziers' sales of securities from the Merrill Lynch brokerage account*

As discussed before, the Fraziers made 1,030 sales of securities from their Merrill Lynch brokerage account in 2012.

1.   *Cost basis*

The parties agree that the Form 1099-B prepared by Merrill Lynch accurately shows the cost basis for all 1,030 sales of securities except for 5 sales for which the Form 1099-B states that the cost basis is "N/A." In this section we set forth our findings as to the cost basis for these 5 sales.

**[\*137]**        a.        *The Fraziers had basis of $30,642 in the 2,332 shares of Columbia Tax Exempt Fund A that they acquired on June 8, 2011, and sold on March 15, 2012.*

On March 15, 2012, the Fraziers sold 2,332 shares of Columbia Tax Exempt Fund A, which they had acquired on June 8, 2011. The Fraziers' basis was estimated by Trombetta to be $30,642.48, which Trombetta computed by multiplying (a) $13.14, the closing price per share on June 8, 2011, by (b) 2,332, the number of shares acquired. Trombetta's testimony explaining his calculations is persuasive of the Fraziers' cost basis in the 2,332 shares of Columbia Tax Exempt Fund A. Therefore, we hold that the Fraziers' cost basis in the 2,332 shares of Columbia Tax Exempt Fund A is $30,642.

b.        *The Fraziers had basis of (a) $13.14 in the 1 share of Columbia Tax Exempt Fund A that they acquired on January 26, 2012, and sold on March 15, 2012; and (b) $4.06 in the 0.309 of a share of Columbia Tax Exempt Fund A that they acquired on January 26, 2012, and sold on March 27, 2012.*

On March 15, 2012, the Fraziers sold 1 share of Columbia Tax Exempt Fund A, which they had acquired on January 26, 2012. On March 27, 2012, the Fraziers sold 0.309 of a share of Columbia Tax Exempt Fund A, which they had also acquired on January 26, 2012. Trombetta's basis estimate for these 1.309 shares assumed the Fraziers paid the same price per share for these 1.309 shares as they did for the other 2,332 shares of Columbia Tax Exempt Fund A even though the 2,332 shares were bought on June 8, 2011, at a closing price of $13.14 per share, whereas the 1.309 shares were bought on January 26, 2012.

Trombetta's estimate of the cost basis of the 1.309 shares relied on a closing price of June 8, 2011, and the record lacks direct evidence of the closing price on January 26, 2012. *Cohan* allows us to estimate a taxpayer's basis in an asset if the record provides some reasonable ground upon which we may make the estimate. *See* 39 F.2d at 544. Here, petitioners argue that the Fraziers' acquisition cost was $13.14 per share, the market price on June 8, 2011. This market price is an imperfect indicator of the cost of the 1.309 shares, which were acquired six months later, on January 26, 2012. Nonetheless, it still provides us with a reasonable ground for estimating the cost of the 1.309 share.

[*138] Therefore, we hold that the Fraziers' basis in the one share of Columbia Tax Exempt Fund A acquired on January 26, 2012, and sold on March 15, 2012, is $13.14 ($13.14 × 1) and the basis in the 0.309 of a share of Columbia Tax Exempt Fund A acquired on January 26, 2012, and sold on March 27, 2012, is $4.06 ($13.14 × 0.309).

> c. *The Fraziers had basis of (a) $19,003 in the 1,829 shares of Blackrock Municipal I that they acquired on June 8, 1994, and sold on March 15, 2012; and (b) $26,214 in the (separately listed on the Form 1099-B) 2,523 shares of Blackrock Municipal I that they acquired on June 8, 1994, and sold on March 15, 2012.*

On March 15, 2012, the Fraziers sold 4,352 shares of Blackrock Municipal I. The Form 1099-B reported this as two different sales (of 1,829 shares and 2,523 shares). All 4,352 shares had been acquired on the same date, June 8, 1994. Trombetta estimated the Fraziers' basis in the total 4,352 shares to be $45,217.28, which he computed by multiplying (a) $10.39, the closing price per share on June 8, 1994, by (b) 4,352, the number of shares purchased. Trombetta's testimony explaining his estimates is persuasive of the Fraziers' cost basis of these shares. Therefore, we hold that the Fraziers' cost basis in the 1,829 shares was $19,003 (1,829 × $10.39, rounded to nearest dollar), and the cost basis in the 2,523 shares was $26,214 (2,523 × $10.39, rounded to nearest dollar).

> 2. *The securities sold from the Merrill Lynch brokerage account in 2012 were capital assets.*

In the stipulation, the parties agreed that the securities sold were capital assets: "During 2012, the Fraziers had proceeds from the sale or disposition of Merrill Lynch *capital assets*." (emphasis added). *See* § 1221 (defining "capital asset" as property held by a taxpayer, except for eight categories of property specifically excluded from the definition). This means that the character of the gains and losses from the 1,030 sales is capital rather than ordinary.

**[\*139]**    3.    *Holding periods for the five sales of securities for which the Form 1099-B states the cost basis are "N/A"*

For the 1,030 sales of securities, the Form 1099-B expressly classifies the gain or loss from the sale as long-term or short-term, except that the Form 1099-B does not do so for the 5 securities sales for which the Form 1099-B states that the cost basis are "N/A." For these five sales, the gain or loss can be classified as long-term or short-term by comparing the acquisition dates and sales dates stated by the Form 1099-B.

For the 2,332 shares of Columbia Tax Exempt Fund A acquired on June 8, 2011, and sold on March 15, 2012, the holding period was less than a year, and the resulting gain is short-term gain. *See* § 1222(1) and (2).

For the one share of Columbia Tax Exempt Fund A acquired on January 26, 2012, and sold on March 15, 2012, the holding period was less than one year, and the resulting gain is short-term gain. *See* § 1222(1) and (2).

For the 0.309 of a share of Columbia Tax Exempt Fund A acquired on January 26, 2012, and sold on March 27, 2012, the holding period was less than one year, and the resulting gain is short-term gain. *See* § 1222(1) and (2).

For the 1,829 shares and the 2,523 shares of Blackrock Municipal I acquired on June 8, 1994, and sold on March 15, 2012, the holding period was more than one year, and the resulting gain is long-term gain. *See* § 1222(3) and (4).

    4.    *The Fraziers' long-term capital gain is computed without the $5.62 loss disallowed by the wash-sale.*

Under section 1091, no deduction is allowed for a loss sustained from the sale of securities if, within a period beginning 30 days before the sale and ending 30 days after the sale the taxpayer has acquired substantially identical securities. *See also* Treas. Reg. 1.1091-1(a). This is known as the "wash-sale" rule.

The Form 1099-B states $5.62 for "Wash Sale Loss Disallowed." The Fraziers' unfiled 2012 Form 1040, Schedule D, computes the gain on the sale of the Merrill Lynch securities by excluding the $5.62

**[\*140]** (rounded to the nearest dollar) loss reported on the Merrill Lynch Form 1099-B as a wash-sale-loss disallowance. Thus, the Fraziers do not take the position that they are entitled to the $5.62 loss. We hold that the Fraziers' long-term capital gain does not include the $5.62 loss disallowed.

> 5. *The Fraziers' short-term and long-term capital gains from the sales of securities from the Merrill Lynch brokerage account assuming that the total proceeds from the sales were $307,261 (the total of the amounts stated in the Form 1099-B)*

Our holdings mean that the Fraziers had basis of $72,857[61] in the securities sold from the Merrill Lynch brokerage account held for one year or less. According to the Form 1099-B, the Fraziers received $307,261 in total proceeds from the 1,030 sales and $76,713 of these proceeds were from assets that were held for one year or less. Thus, the Fraziers had $3,856 in short-term capital gain from the sales of these securities. *See* §§ 1001, 1222(1). ($3,856 = $76,713 − $72,857). This computation is made before accounting for the $665 discrepancy between the $307,261 in total proceeds reported on the Form 1099-B and the $306,569 amount in the parties' stipulation.

Our holdings mean that the Fraziers had basis of $227,606[62] in securities sold from the Merrill Lynch brokerage account held for more than one year. According to the Form 1099-B, the Fraziers received $307,261 in total proceeds from the 1,030 sales and $230,548 of these proceeds were from assets that were held for more than one year. Thus, the Fraziers had (accounting for the $5.62 of wash sale loss disallowed) $2,948 of long-term capital gain from the sales of these securities. ($2,948 = $230,548 − $227,606 + $5.62 (rounded to the nearest dollar).) *See* §§ 1001, 1222(3). This computation is made before accounting for the $665 discrepancy between the $307,261 in total proceeds reported on the Form 1099-B and the $306,569 amount in the parties' stipulation.

---

[61] The Form 1099-B shows that the basis of securities sold in 2012 and held for one year or less totaled $42,197.56. We added this amount to the basis of the shares of Columbia Tax Exempt Fund A (for which the Form 1099-B states the cost basis are "N/A") estimated by Trombetta ($30,642.48 + $13.14 + $4.06).

[62] The Form 1099-B shows that the basis of securities sold in 2012 and held for more than one year totaled $182,388.71. We added this amount to the basis of the shares of Blackrock Municipal I (for which the Form 1099-B states the cost basis are "N/A") estimated by Trombetta ($19,003.31 + $26,213.97).

**[*141]**    6.    *The Fraziers' short-term and long-term capital gains from the sales of securities from the Merrill Lynch brokerage account after accounting for the $665 discrepancy between the total proceeds in the Form 1099-B and the total proceeds in the stipulation*

There is a $665 discrepancy between the $306,596 amount of proceeds that the parties stipulate that the Fraziers received from the sales of securities from the Merrill Lynch brokerage account and the $307,261[63] amount of proceeds that the Fraziers actually received from these securities.

Here we trace the history of this discrepancy.

The Form 1099-B issued by Merrill Lynch stated that the total proceeds from the 2012 sales of securities from the Merrill Lynch brokerage account were $307,261. Not only is the $307,261 stated as the total of these proceeds, but it is arithmetically the total of all the proceeds reported on the Form 1099-B for all 1,030 sales of securities reported for 2012.

The 2012 notice of deficiency issued to William determined that the gain from the sales of securities in the Merrill Lynch brokerage account was $306,596. The notice of deficiency did not state how this amount was computed, i.e., it did not state the amount realized or the cost basis.

The Fraziers prepared a Form 1040 shortly before trial that takes the position that the total proceeds were $307,262.

The parties stipulated that, "[d]uring 2012, the Fraziers had proceeds from the sale or disposition of Merrill Lynch capital assets in the amount of $306,596."

Petitioners' brief, in its proposed findings of fact, states that the total proceeds were $306,596: "During 2012, Mr. and Mrs. Frazier had proceeds from the sale or disposition of Merrill Lynch capital assets in the amount of $306,596." Although the brief also asserts that the Schedule D from the unfiled 2012 Form 1040, which reflects total proceeds of $307,262, "represents the true short-term and long-term capital gain recognized by the Petitioners," the brief acknowledges that "[t]here are minor mathematical errors reflected in the calculation of the

---

[63] The one-dollar difference is likely the result of rounding to the nearest dollar.

**[\*142]** proceeds, basis, and gain/loss calculations" in the unfiled 2012 Form 1040.

On brief, the IRS agrees that the total proceeds received were $306,569: "[A]s indicated in the Stipulation of Facts, in 2012 the Fraziers received proceeds from the sale or disposition of Merrill Lynch capital assets in the amount of $306,596."

The IRS brief acknowledges that the Form 1099-B from Merrill Lynch "reflects that $307,261.08 was paid." In a footnote to this sentence the IRS states, "Respondent cannot account for the difference in amounts reported to respondent and the amounts reported to Mr. Frazier."

Neither petitioners nor the IRS take a position on how to treat the $665 discrepancy between the stipulated $306,596 proceeds and the actual $307,261 of proceeds that the Fraziers received, as reported on the Form 1099-B. Although we found *supra* FINDINGS OF FACT Part XII that the information in the Form 1099-B was accurate and that the Fraziers in fact received $307,261, we hold parties to their stipulations under Rule 91(e). Thus, we must determine the effect of the $306,596 stipulation.

According to the Form 1099-B, the Fraziers received proceeds of $76,713 from assets sold from the Merrill Lynch brokerage account held for one year or less and proceeds of $230,548 from assets sold from the Merrill Lynch brokerage account held for more than one year. The total of the two amounts—$307,261—is inconsistent with the stipulation. Reducing proceeds from capital assets held for one year or less, rather than proceeds from capital assets held for more than one year, would be favorable to the Fraziers because this would reduce short-term capital gain, rather than long-term capital gain. *See* §§ 1001, 1222(1), (3). Long-term capital gain is taxed less than short-term capital gain. *See Verito v. Commissioner*, 43 T.C. 429, 441 (1965).

Under Rule 142(a), the petitioner bears the burden of proof. As petitioners, it was incumbent on the Fraziers to show that the proceeds from assets held for one year or less should be reduced by $665. The Fraziers failed to explain or account for the $665 in their arguments. Therefore, we hold that the $230,548 proceeds from assets held for more than one year—resulting in long-term capital gain—should be reduced by $665 to $229,883 to account for the fact that the parties stipulated

**[\*143]** that the Fraziers received $306,596 of proceeds from the sales of the Merrill Lynch capital assets.

As a result, the Fraziers had $3,856 short-term capital gain and $2,283 in long-term capital gain for 2012 from the sales of capital assets from the Merrill Lynch brokerage account. *See* §§ 1001, 1222(1) and (3).

V.  *For 2012, the Fraziers had $40,867 in short-term capital gain from the sale of securities from the Franklin Growth Fund.*

In 2012, the Fraziers sold securities from the Franklin Growth Fund for $40,867. The notice of deficiency mailed to William determined that he had $40,867 of short-term capital gain from the sale of the securities from the Franklin Growth Fund.

Under the stipulation, the parties agree that the securities sold were capital assets: "During 2012, the Fraziers had proceeds from the sale or disposition of Franklin Growth Fund *capital assets* in the amount of $40,867.00." (Emphasis added.) In their briefs, the Fraziers do not dispute the determination in the notice of deficiency that the gain from the Franklin Growth Fund securities was short-term capital gain as opposed to long-term capital gain. In their briefs, they also concede that William had no basis in the Franklin Growth Fund securities that were sold in 2012. That means the amount of the gain from the sales is equal to $40,867. *See* § 1001(a).

We conclude that the notice of deficiency issued to William correctly determined that he had $40,867 in short-term capital gain from the sale of securities from the Franklin Growth Fund.

VI.  *The Fraziers had $1,417 in short-term capital gain from "Columbia Seligman Comm. And Info."*

A "capital gain dividend" (also called a "capital gain distribution") is defined in section 852(b)(3)(C)(i) as "any dividend, or part thereof, which is reported by [a regulated investment company] as a capital gain dividend in written statements furnished to its shareholders." *See* Treas. Reg. § 1.852-4(c) ("A capital gain dividend, as defined in section 852(b)(3)(C), is any dividend or part thereof which is designated by a *regulated investment company . . .*" (emphasis added)); *see also* IRS Publication 550, Investment Income and Expenses (For use in preparing 2012 Returns) at 21. Under section 852(b)(3), a shareholder who earns a "capital gain dividend" must treat it as a long-term capital gain: "A capital gain dividend shall be treated by the shareholders as a gain from

**[*144]** the sale or exchange of a capital asset held for more than 1 year." We discuss the law on the tax treatment of capital assets *supra* OPINION Part IV.A.

Three days before trial, the Fraziers provided the IRS an unsigned, unfiled Form 1040 for 2012 which no party contends is a filed return. In the Schedule D attached to this unfiled Form 1040, the Fraziers state the $1,417 amount on line 13, "Capital gain distributions." This appears to be an assertion by the Fraziers that the $1,417 amount from "Columbia Seligman Comm. And Info" was a capital gain dividend which should be treated as long-term capital gain under section 852(b)(3)(B). *See also* IRS Publication 550, Investment Income and Expenses (For use in preparing 2012 Returns) at 21, 25.

In their Opening Brief, the Fraziers generally put forward the view that the Schedule D attached to the unfiled Form 1040 was correct. However, the Fraziers did not specifically argue that the $1,417 amount from "Columbia Seligman Comm. And Info" was a capital gain dividend. Not surprisingly, the IRS did not address this in their Answering Brief. Finally, the Fraziers did not argue for capital gain dividend treatment of the $1,417 amount in their Reply Brief. Nowhere in the record is there evidence—such as the written notice required to be sent to shareholders under Treasury Regulation § 1.852-4(c)(4) designating a dividend as a capital gain dividend—that the $1,417 amount from "Columbia Seligman Comm. And Info" was a capital gain dividend.

We hold that the Fraziers are not entitled to capital gain dividend treatment under section 852(b)(3)(B) for the $1,417 amount from "Columbia Seligman Comm. And Info" for two reasons. First, the Fraziers failed to provide evidence for treating the $1,417 amount from "Columbia Seligman Comm. And Info" as a capital gain dividend under section 852(b)(3)(B). For example, the Fraziers could have provided the written notice required to be sent to shareholders under Treasury Regulation § 1.852-4(c)(4), which they did not. Second, they waived the argument that they are entitled to capital gain dividend treatment for the $1,417 amount by failing to clearly raise the argument on brief. *See Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned.").

We hold that the Fraziers had zero basis in the "Columbia Seligman Comm. And Info" assets and that they had proceeds from the sale or exchange of these assets of $1,417, resulting in $1,417 in short-term capital gain. *See* § 1222(1). Under the stipulation, the parties agree

**[\*145]** that the securities sold were capital assets: "During 2012, the Fraziers had proceeds from the sale or disposition of Columbia Seligman Comm. And Info *capital assets* in the amount of $1,417." (Emphasis added.) *See* § 1221 (defining "capital asset" as property held by a taxpayer, except for eight categories of property specifically excluded from the definition). Under the stipulation, the parties agree that the Fraziers had no basis in these assets: "the Fraziers had no basis in this asset." We hold parties to their stipulations under Rule 91(e). The IRS in the notice of deficiency determined that the Fraziers realized short-term capital gain income from "Columbia Seligman Comm. and Info" in the amount of $1,417. Under Rule 142(a), the IRS's determination of a taxpayer's liability in a notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect. Because the Fraziers did not introduce any evidence for a different treatment of the $1,417 amount, we uphold the IRS's determination in the notice of deficiency regarding this amount.

VII.   *The Fraziers received $957,397 in Schedule E income, $1,545 in ordinary dividends, and $4,636 in qualified dividends for 2012.*

For 2012, for several types of income, the amounts to which the parties stipulated are greater than the amounts in the notices of deficiency:

- For Schedule E income "related to rental real estate, royalties, partnerships, S corporations, trusts, etc.," the $957,397 amount that the parties stipulated is greater than the total amount of Schedule E income determined in the notices of deficiency, $933,880.

- For ordinary dividends, the $1,545 amount that the parties stipulated is greater than the total amount of ordinary dividends determined in the notices of deficiency, $1,364.

- For qualified dividends, the $4,636 amount that the parties stipulated is $6 greater than the total amount of qualified dividends determined in the notices of deficiency, $4,630.

For these types of income, we hold that the amounts in the stipulations are the correct amounts that the Fraziers received. We hold parties to their stipulations under Rule 91(e).

Although this could result in determining a deficiency greater than that determined in the notices of deficiency, we believe that by

**[\*146]** stipulating to amounts greater than the amounts determined in the notices of deficiency, the parties have tried these issues by consent. Section 6214(a) provides that the Tax Court has jurisdiction to redetermine the correct amount of deficiency even if the redetermined amount is greater than the amount originally determined in the notice of deficiency, as long as the greater amount was asserted by the IRS before or during trial. The IRS is considered to have asserted a claim for a greater deficiency if the parties try the issue by consent under Rule 41(b)(1), even if the IRS does not raise the issue in the notice of deficiency or in pleadings. *Smaldino*, T.C. Memo. 2021-127, at \*16.

VIII. *For 2012, the Fraziers are entitled to the standard deduction of $14,200.*

Mary's 2012 notice of deficiency determined that she was entitled to the standard deduction of $5,950 for a married person filing a separate return. And William's 2012 notice of deficiency determined that he was entitled to the standard deduction of $5,950 for a married person filing a separate return.

The stipulation addresses William and Mary's filing status for 2012. It says they can file jointly. But the stipulation does not say whether their joint tax liability should be computed with a standard deduction versus itemized deductions. The standard deduction is the sum of the basic standard deduction and the additional standard deduction. § 63(c)(1). The basic standard deduction for a couple filing jointly is $11,900 for 2012. *See* §§ 63(c), 1(f)(3); Rev. Proc. 2011-52 § 3.11(1), 2011-45 I.R.B. 701. The additional standard deduction is the additional amount to which the taxpayer is entitled under section 63(f). § 63(c)(3). Section 63(f)(1) provides for an additional standard deduction for taxpayers who are at least 65 years of age at the end of the taxable year. Both William and Mary are entitled to the additional standard deduction under section 63(f)(1) because each was over 65 years of age at the close of 2012. The additional standard deduction for 2012 was $1,150. Rev. Proc. 2011-52 § 3.11(3), 2011-45 I.R.B. 701. Thus, an additional standard deduction amount of $1,150 is added for each of the Fraziers. § 63(f)(1); Rev. Proc. 2011-52 § 3.11(3), 2011-45 I.R.B. 701. As a result, the Fraziers are entitled to the standard deduction of $14,200 ($11,900 + $1,150 +$1,150).

Unless a taxpayer makes an election to itemize deductions for the taxable year, no itemized deductions are allowed for the taxable year. § 63(e)(1). An election to itemize deductions "shall be made on the

[*147] taxpayer's return." § 63(e)(2). Thus, a taxpayer must file a return in order to elect to itemize deductions. § 63(e)(1)–(2); *see also Salter v. Commissioner,* T.C. Memo. 2022-29, at *4–5; *Jenkins v. Commissioner*, T.C. Memo. 2021-54, at * 53.

During 2012, the Fraziers paid state and local income taxes of $91,453 and real estate taxes of $11,571. *See supra* FINDINGS OF FACT Part XVI. The parties stipulated that the Fraziers paid these amounts in 2012. These amounts are potentially deductible as itemized deductions, at least for a taxpayer who properly elects to itemized deductions.

But the Fraziers did not file a return for 2012. Three days before trial, they provided the IRS an unsigned, unfiled Form 1040 for 2012 which no party contends is a filed return. In their unsigned, unfiled Form 1040, the Fraziers compute their taxable income with itemized deductions in the amount of $103,024 for (1) state and local income taxes of $91,453 plus (2) real estate taxes of $11,571. After trial, the parties filed briefs in the following sequence: (1) petitioners' Opening Brief, (2) respondent's Answering Brief, and (3) petitioners' Reply Brief. In their Opening Brief, petitioners did not argue that the Fraziers are entitled to these deductions (or that they are entitled to itemize their deductions). Thus, the IRS did not address these deductions in its Answering Brief. Finally, petitioners did not argue that they are entitled to these deductions in their Reply Brief.

We hold that the Fraziers are not entitled to itemized deductions (including deductions for state and local income taxes and real estate taxes) for two reasons. First, the Fraziers did not file a return for 2012. Thus, they did not elect to itemize deductions, and they are not permitted itemized deductions for 2012. *See* § 63(e)(1) and (2). Second, they waived the argument that they are entitled to itemized deductions by failing to raise the issue on brief.

IX.     *The Fraziers' income for 2012 is computed with two personal exemptions for a total of $7,600.*

The IRS in Mary's notice of deficiency determined that she was entitled to a personal exemption of $3,800. And the IRS in William's notice of deficiency determined that he was entitled to a personal exemption of $3,800. As a couple with married-filing-jointly status, William and Mary's taxable income is computed with two personal

**[\*148]** exemptions for a total personal-exemption deduction of $7,600. *See* §§ 151(d), 1(f)(3); Rev. Proc. 2011-52 § 3.19, 2011-45 I.R.B. 701.

X.    *The Fraziers' liability for section 6662 accuracy-related penalties*

Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax to which section 6662 applies. Section 6662(b)(2) provides that section 6662 applies to the portion of an underpayment of tax attributable to a substantial understatement of income tax. For 2009, the notice of deficiency determined that the Fraziers were liable for section 6662 penalties for "one or more of the following: (1) Negligence or disregard of rules or regulations; (2) Substantial understatement of income tax; (3) Substantial valuation misstatement (overstatement)." For 2010 and 2011, the notices of deficiency determined that the Fraziers were liable for section 6662 penalties for "one or more of the following: (1) Negligence or disregard of rules or regulations; (2) Substantial understatement of income tax; (3) Substantial valuation misstatement (overstatement); (4) Transaction lacking economic substance." For 2009, 2010 and 2011, the IRS has since conceded that the underpayments were not due to negligence or disregard of rules or regulations, substantial valuation misstatement, or transaction lacking economic substance, leaving only the issue of whether the underpayments were due to substantial understatement.

An understatement of income tax is the excess of (1) the amount of the tax required to be shown on the return (i.e., the correct tax) minus (2) the tax reported minus any rebate. § 6662(d)(2)(A). For individuals, an understatement of income tax is substantial if it exceeds the greater of (1) 10% of the correct tax or (2) $5,000. § 6662(d)(1)(A). An underpayment is the amount by which the tax imposed (i.e., the correct tax) exceeds the excess of (1) the sum of (a) the tax reported plus (b) amounts not so reported that were previously assessed (or collected without assessment) minus (2) any rebates made. § 6664(a); Treas. Reg. § 1.6664-2(a) and (b).

Section 6751(b) provides that the initial determination to impose certain types of penalties (including accuracy-related penalties under section 6662(a)) must generally be personally approved in writing by the immediate supervisor of the person making the determination. *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).

**[\*149]** The IRS bears the initial burden of production regarding the applicability of the section 6662(a) penalty to an individual. § 7491(c). If the IRS meets its burden of production that the section 6662(a) penalty is applicable, then the individual taxpayer bears the burden to persuade the Court that the section 6662(a) penalty is inapplicable. *Webber v. Commissioner*, 144 T.C. 324, 377 (2015).

Section 6664(c)(1) provides that the penalty under section 6662(a) does not apply to any portion of the underpayment to the extent that the taxpayer had reasonable cause for that portion of the underpayment and acted in good faith with respect to that portion of the underpayment. Whether the taxpayer acted with reasonable cause and good faith depends on all the pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). Generally, the most important factor is the extent of the taxpayer's efforts to assess the proper tax liability. *Id.* If the IRS meets its burden of production that the 6662(a) penalty applies, then the taxpayer has the burden to prove that it acted with reasonable cause and in good faith under section 6664(c)(1). *See Stough v. Commissioner*, 144 T.C. 306, 321 (2015).

The parties stipulate that for all petitioners (including the Fraziers),

> [t]he requirements of I.R.C. § 6751(b)(1) have been satisfied with respect to the application of the I.R.C. § 6662(a) penalties for all taxable years at issue to the extent, and only to the extent, such penalties are exclusively related to the portion of any underpayment which is attributable to any substantial understatement of income tax pursuant to I.R.C. § 6662(b)(2) and I.R.C. § 6662(d).

Thus, the supervisory-approval requirement of section 6751(b)(1) has been met for all taxable years at issue with respect to the application of the section 6662(a) accuracy-related penalty attributable to substantial understatements of income tax.

**[\*150]** A.  *For 2009, the Fraziers are not liable for the accuracy-related penalty under section 6662(a).*

There is no underpayment for 2009. An underpayment exists only if the correct tax exceeds the tax reported.[64] § 6664(a). The tax reported is $411,762, the amount the Fraziers reported on their 2009 return.

As explained below, the 2009 return overreported the Fraziers' income by a total amount of $2,165. The Fraziers overreported income by incorrectly including the $2,987,744 distributive share of nonseparately stated income of Louisiana Assisted because LHDC (not William) was the other member of Louisiana Assisted in 2009. *See supra* OPINION Part I.B. The Fraziers also overreported income by incorrectly including the $3,156 of separately stated interest income of Louisiana Assisted because LHDC (not William) was the other member of Louisiana Assisted in 2009.

The Fraziers underreported income by claiming the $2,987,744 Schedule C dummy deduction, the disallowance of which we sustained. Additionally, the Fraziers underreported income by failing to report $991 from a state income tax refund.

As a result, the Fraziers overreported income by $2,165 ($2,987,744 + $3,156 − ($2,987,744 + $991)). Because the return overreported income, the tax reported on the return exceeded the correct tax. Thus, there is no underpayment. Because there is no underpayment of tax for 2009, the Fraziers are not liable for the accuracy-related penalty under section 6662(a) for 2009.

Although petitioners put forth a reasonable cause argument for the section 6662(a) penalties for the Fraziers for all tax years, we need not address this argument for the Fraziers for the 2009 tax year because the underpayment for 2009 is zero.

---

[64] For 2009, there were no "amounts not so reported that were previously assessed (or collected without assessment)," § 6664(a)(1)(B), or "rebates made," § 6664(a)(2).

**[\*151]** B. *For 2010, the Fraziers are not liable for the accuracy-related penalty under section 6662(a) because the understatement is not substantial, a point that will be confirmed by Rule 155 computations.*

There is an underpayment for 2010 only if the correct tax exceeds the tax reported.[65] § 6664(a). The tax reported is $274,745, the amount the Fraziers reported on their 2010 return. The correct tax is a result of our holdings and the parties' concessions and stipulations. It will be computationally determined by the Court after the parties submit their Rule 155 computations.

As explained below, the 2010 return underreported the Fraziers' income by a total amount of $343. The Fraziers overreported income by including the $643,165 distributive share of nonseparately stated income of Louisiana Assisted. This amount was not includable in the Fraziers' income because William was not a member of LHDC. *See supra* OPINION Part II.B.2.a.

The Fraziers underreported income by taking a $643,165 Schedule C dummy deduction, the disallowance of which we sustained. The Fraziers also underreported income by claiming a $343 disallowed partnership loss from Lagniappe Film Fund LLC.

As a result, the Fraziers underreported income by $343 ($643,165 + $343 − $643,165). Thus, there is an underpayment.

The Fraziers are liable for a section 6662(a) penalty only if there is a substantial understatement for that year. An understatement is the correct tax minus the tax reported (because there are no rebates for 2010). *See* § 6662(d)(2)(A). An understatement is substantial if the understatement exceeds the greater of (1) 10% of the correct tax or (2) $5,000. § 6662(d)(1)(A). The tax reported on the return was $274,745. It does not appear that the understatement is substantial, a point that will be confirmed by computations under Rule 155.

---

[65] For 2010, there were no "amounts not so reported that were previously assessed (or collected without assessment)," § 6664(a)(1)(B), or "rebates made," § 6664(a)(2).

**[\*152]** C.    *For 2011, the Fraziers are not liable for the accuracy-related penalty under section 6662(a) because the understatement is not substantial, a point that will be confirmed by Rule 155 computations.*

There is an underpayment for 2011 only if the correct tax exceeds the tax reported.[66] § 6664(a). The tax reported is $167,481. The correct tax depends on our holdings and the parties' concessions and stipulations and will be computationally determined by the Court after the parties submit their Rule 155 computations.

As explained below, the 2011 return underreported the Fraziers' income by a total amount of $5,747. The Fraziers overreported income by including the $450,000 cash distribution from Louisiana Assisted. This amount was not includable in the Fraziers' income. *See supra* OPINION Part II.B.3.a. The Fraziers also overreported income by including the $1,839 distributive share of separately stated interest income of Louisiana Assisted, which was not includable because William was not a member of Louisiana Assisted. *See supra* OPINION Part II.B.3.a.

The Fraziers underreported income by taking a $450,000 Schedule C dummy deduction, the disallowance of which we sustained. The Fraziers also underreported income by claiming a $7,586 distributive share of Louisiana Assisted's nonseparately stated loss. We disallow this loss because William was not a member of Louisiana Assisted. *See supra* OPINION Part II.B.3.a.

As a result, the Fraziers underreported income by $5,747 ($450,000 + $7,586 − ($450,000 + $1,839)). Thus, there is an underpayment.

The Fraziers are liable for a section 6662(a) penalty only if there is a substantial understatement for that year. An understatement is the correct tax minus the tax reported (because there are no rebates for 2011). *See* § 6662(d)(2)(A). An understatement is substantial if the understatement exceeds the greater of (1) 10% of the correct tax or (2) $5,000. § 6662(d)(1)(A). The tax reported on the return was $167,481.

---

[66] For 2011 there were no "amounts not so reported that were previously assessed (or collected without assessment)," § 6664(a)(1)(B), or "rebates made," § 6664(a)(2).

[*153] It does not appear that the understatement is substantial, a point that will be confirmed by computations under Rule 155.

XI.     *The Fraziers' liability for section 6651(a)(1) additions to tax*

   A.     *The law*

Under section 6012(a)(1)(A)(iv), individuals who are "entitled to make a joint return" are required to file an income tax return if both spouses' gross income combined is greater than the sum of (1) twice the exemption amount, (2) the basic standard deduction applicable to a joint return, and (3) "the amount of the additional standard deduction for each additional standard deduction to which the individual or his spouse is entitled by reason of section 63(f)(1)." § 6012(a)(1)(B). Section 63(f)(1) provides for an additional standard deduction for individuals who have attained the age of 65 by the close of the taxable year.

For 2009, the exemption amount was $3,650, the basic standard deduction applicable to a joint return was $11,400, and the additional standard deduction was $1,100. §§ 1(f)(3), 63(c), (f)(1), 151(d); Rev. Proc. 2008-66 § 3.10(1), 3.10(3), 3.19(1), 2008-45 I.R.B. 1107. Thus, for 2009, couples entitled to make a joint return who were both over the age of 65 were required to file a return if their combined gross income exceeded $20,900. *See* § 6012(a)(1)(A)(iv). [67] For 2009, the Fraziers' gross income was $1,362,703,[68] which exceeds the threshold of $20,900. Thus, the Fraziers were required to file a return for 2009.

For 2010, the exemption amount was $3,650, the basic standard deduction applicable to a joint return was $11,400, and the additional standard deduction was $1,100. §§ 1(f)(3), 63(c), (f)(1), 151(d); Rev. Proc. 2009-50 § 3.11(1), 3.11(3), 3.19, 2009-45 I.R.B. 617. Thus, for 2010, couples entitled to make a joint return who were both over the age of 65 were required to file a return if their combined gross income exceeded $20,900. *See* § 6012(a)(1)(A)(iv). For 2010, the Fraziers' gross income

---

[67] Both William and Mary were over age 65 by the close of the taxable year 2009.

[68] For 2009, the Fraziers reported gross income of $1,364,868, which is decreased by $3,156, *see* OPINION Part II.B.1.a, and increased by $991.

[*154] was $1,001,890,[69] which exceeds the filing threshold of $20,900. Thus, the Fraziers were required to file a return for 2010.

For 2011, the exemption amount was $3,700, the basic standard deduction applicable to a joint return was $11,600, and the additional standard deduction was $1,150. §§ 1(f)(3), 63(c), (f)(1), 151(d); Rev. Proc. 2011-12 § 2.05(1), 2.05(3), 2.07(1), 2011-2 I.R.B. 297. Thus, for 2011, couples entitled to make a joint return who were both over the age of 65 were required to file a return if their combined gross income exceeded $21,300. *See* § 6012(a)(1)(A)(iv). For 2011, the Fraziers' gross income was $645,080,[70] which exceeds the filing threshold of $21,300. Thus, the Fraziers were required to file a return for 2011.

For 2012, the exemption amount was $3,800, the basic standard deduction applicable to a joint return was $11,900, and the additional standard deduction was $1,150. §§ 1(f)(3), 63(c), (f)(1), 151(d); Rev. Proc. 2011-52 § 3.11(1), 3.11(3), 3.19, 2011-45 I.R.B. 701. Thus, for 2012, couples entitled to make a joint return who were both over the age of 65 were required to file a return if their combined gross income exceeded $21,800. *See* § 6012(a)(1)(A)(iv). For 2012, the Fraziers' gross income was $2,257,830,[71] which exceeds the filing threshold of $21,800. Thus, the Fraziers were required to file a return for 2012.

Section 6651(a)(1) imposes an addition to tax for the failure to file a required tax return by its filing deadline (determined by taking into account any extensions of that deadline). The section 6651(a)(1) addition to tax is 5% of the correct tax for each month or fraction of a month the

---

[69] For 2010, the Fraziers reported gross income of $1,001,547, which is increased by $343.

[70] For 2011, the Fraziers reported gross income of $639,333, which is increased by $7,586 and decreased by $1,839, *see* OPINION Part II.B.3.a.

[71] The Fraziers' gross income for 2012 is calculated by adding the following: taxable wages of $1,175,640, taxable interest of $10,308, taxable IRA distributions of $4,990, taxable pension distributions of $11,741, *supra* FINDINGS OF FACT Part XVIII.A.4; Schedule E income of $957,397, ordinary dividends of $1,545, qualified dividends of $4,636, *supra* OPINION Part VII; short-term capital gain of $3,856 and long-term capital gain of $2,283 from the sales of capital assets from the Merrill Lynch brokerage account, *supra* OPINION Part IV; $40,867 in short-term capital gain from the sale of securities from the Franklin Growth Fund, *supra* OPINION Part V; and $1,417 in short-term capital gain from Columbia Seligman Comm And Info., *supra* OPINION Part VI.

**[\*155]** failure to file continues, not to exceed 25% in the aggregate. § 6651(a)(1), (b)(1); *see also* Treas. Reg. § 301.6651-1(b).

The section 6651(a)(1) addition to tax is reduced by the amount of the section 6651(a)(2) addition to tax, for any month (or fraction of a month) to which both additions to tax apply. § 6651(c)(1). (The section 6651(a)(2) addition to tax is discussed more fully *infra* OPINION Part XII.)

Section 6651(b)(1) provides that the correct tax is "reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return," including amounts withheld for federal income tax. *See* § 31(a).

A substitute for return prepared by the IRS under section 6020(b) does not count as a return filed by the taxpayer for purposes of section 6651(a)(1). § 6651(g)(1); *Spurlock v. Commissioner*, 118 T.C. 155, 159 (2002).

Section 7491(c) imposes on the IRS the burden of production with respect to an individual's liability for the section 6651(a)(1) addition to tax. The IRS can satisfy its burden of production by producing evidence that the taxpayer failed to timely file a required federal income tax return. *See Wheeler v. Commissioner*, 127 T.C. 200, 207–08 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008); *Higbee*, 116 T.C. at 447. Once the IRS has satisfied its burden of production, the burden of proof is on the taxpayer to show that the addition to tax is improper. *Higbee*, 116 T.C. at 446.

The burden of proof includes the burden of establishing that the failure to timely file is due to reasonable cause and not due to willful neglect. *See* § 7491(c); *Higbee*, 116 T.C. at 446. The delay is due to a "reasonable cause" if "the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time." Treas. Reg. § 301.6651-1(c). "Willful neglect" is "conscious, intentional failure or reckless indifference." *United States v. Boyle*, 469 U.S. 241, 245 (1985). Whether there was reasonable cause (and no willful neglect) is a question of fact "answered on the basis of the circumstances of the individual case." *Grecian Magnesite Mining, Indus. & Shipping Co. v. Commissioner*, 149 T.C. 63, 94 (2017), *aff'd*, 926 F.3d 819 (D.C. Cir. 2019); *accord Boyle*, 469 U.S. at 249 n.8.

**[\*156]** The failure of an accountant or lawyer to prepare a taxpayer's return is not in and of itself reasonable cause for a failure to timely file. *Logan Lumber Co. v. Commissioner*, 365 F.2d 846, 854 (5th Cir. 1966); *see also Boyle*, 469 U.S. at 251.

The unavailability of information does not constitute reasonable cause; a taxpayer is expected to timely file a return based on the best information available and then, if necessary, file an amended return when better information emerges. *Estate of Vriniotis v. Commissioner*, 79 T.C. 298, 311 (1982); *Electric & Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1343-1345 (1971), *aff'd without published opinion*, 496 F.2d 876 (5th Cir. 1974).

A taxpayer's illness or incapacity can be a reasonable cause for failing to file timely returns. *See Williams v. Commissioner*, 16 T.C. 893, 906 (1951). For illness or incapacity to constitute reasonable cause, a taxpayer must show that he was incapacitated to such a degree that he was unable to prepare his returns on the dates they were due. *See id.*

B.     *Analysis*

1.     *For 2009, the Fraziers are liable for the section 6651(a)(1) addition to tax.*

The Fraziers' 2009 tax return was due October 15, 2010, because the Fraziers had filed a six-month extension of the filing deadline. The Fraziers did not file their 2009 tax return until March 18, 2013. Therefore, the Fraziers are liable for the section 6651(a)(1) addition to tax for the 2009 tax year unless they have proven that they had reasonable cause for their failure to timely file their return and their failure to file was not due to willful neglect. *See* § 6651(a)(1); *Higbee*, 116 T.C. at 446–47.

Petitioners make two arguments why the Fraziers' failure to timely file their 2009 return was due to reasonable cause and not due to willful neglect. First, they argue that the Fraziers relied on Trombetta to file their income tax return on time. Because the failure of an accountant to prepare a taxpayer's return is not reasonable cause for a failure to timely file, the Fraziers' alleged reliance on Trombetta is not reasonable cause for their failure to timely file their 2009 return. *See Logan Lumber Co.*, 365 F.2d at 854. Second, they argue that the Fraziers needed LHDC to file its corporate income tax return before they could file their personal income tax return. The unavailability of information is not reasonable cause for the failure to file a return. *See Estate of*

**[\*157]** *Vriniotis*, 79 T.C. at 311. Therefore, LHDC's late filing of its 2009 income tax return was not reasonable cause for the Fraziers' failure to timely file their 2009 income tax return. *See id.*; *Electric & Neon*, 56 T.C. at 1343–45. In conclusion, we hold that the Fraziers did not have reasonable cause for failing to timely file their 2009 income tax return.[72]

Accordingly, the Fraziers are liable for the section 6651(a)(1) addition to tax for failure to timely file their 2009 income tax return. The section 6651(a)(1) addition to tax is 5% of the correct amount of tax, plus another 5% of the correct amount of tax for each month or fraction of a month the failure to file continues, "reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return," and not to exceed 25% in the aggregate. § 6651(a)(1), (b)(1). The Fraziers' correct amount of tax for 2009 resulting from the conclusions in this Opinion will be computed under Rule 155. This correct amount of tax must be reduced by $416,523, the amount of tax that the Fraziers paid before the due date of their 2009 return. *See* § 6651(b)(1).

2. *For 2010, the Fraziers are liable for the section 6651(a)(1) addition to tax.*

The Fraziers' 2010 tax return was due October 15, 2011, because the Fraziers had filed a six-month extension of the filing deadline. The Fraziers did not file their 2010 tax return until May 19, 2014. Therefore, the Fraziers are liable for the section 6651(a)(1) addition to tax for the 2010 tax year unless they have proven that they had reasonable cause for their failure to timely file their return and their failure to file was not due to willful neglect. *See* § 6651(a)(1); *Higbee*, 116 T.C. at 446–47.

Petitioners make two arguments that the failure to timely file the 2010 return was due to reasonable cause and not willful neglect. First, they argue that the Fraziers relied on Trombetta to file their income tax

---

[72] Petitioners also argue that the Court ought to grant the Fraziers relief from their 2009 section 6651(a)(1) addition to tax under the policy allowing an abatement of penalties for the first time a taxpayer fails to file a return set forth in the Internal Revenue Manual 20.1.1.3.6.1 (Nov. 25, 2011). The Internal Revenue Manual provides the IRS's intra-agency operating procedures. The provisions of the Internal Revenue Manual do not confer judicially enforceable rights on taxpayers. *Valen Mfg. Co. v. United States*, 90 F.3d 1190, 1194 (6th Cir. 1996); *United States v. Horne*, 714 F.2d 206, 207 (1st Cir. 1983); *see also United States v. Caceres*, 440 U.S. 741, 750–51 (1979). Therefore, we cannot grant the Fraziers the relief that they seek.

**[\*158]** return. Because the failure of an accountant to prepare a taxpayer's return is not reasonable cause for a failure to timely file, the Fraziers' alleged reliance on Trombetta is not reasonable cause for their failure to timely file their 2010 return. *See Logan Lumber Co.*, 365 F.2d at 854. Second, they argue that the Fraziers needed LHDC to file its corporate income tax return before they could file their personal income tax return. The unavailability of information is not reasonable cause for the failure to file a return. *See Estate of Vriniotis*, 79 T.C. at 311. Therefore, LHDC's late filing of its 2010 income tax return was not reasonable cause for the Fraziers' failure to timely file their 2010 income tax return. *See id.*; *Electric & Neon*, 56 T.C. at 1343–45. In conclusion, we hold that the Fraziers did not have reasonable cause for failing to timely file their 2010 income tax return.

Accordingly, the Fraziers are liable for the section 6651(a)(1) addition to tax for failure to timely file their 2010 income tax return. The section 6651(a)(1) addition to tax is 5% of the correct amount of tax, plus another 5% of the correct amount of tax for each month or fraction of a month the failure to file continues, "reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return," and not to exceed 25% in the aggregate. § 6651(a)(1), (b)(1). The Fraziers' correct amount of tax for 2010 resulting from conclusions in this Opinion will be computed under Rule 155. This correct amount of tax must be reduced by $267,574, the amount of tax that the Fraziers paid before the due date of their 2010 return. *See* § 6651(b)(1).

> 3.  *For 2011, the Fraziers are liable for the section 6651(a)(1) addition to tax.*

The Fraziers' 2011 tax return was due October 15, 2012, because the Fraziers had filed a six-month extension of the filing deadline. The Fraziers did not file their 2011 tax return until October 28, 2014. Therefore, the Fraziers are liable for the section 6651(a)(1) addition to tax for the 2011 tax year unless they have proven that they had reasonable cause for their failure to timely file their return and their failure to file was not due to willful neglect. *See* § 6651(a)(1); *Higbee*, 116 T.C. at 446–47.

Petitioners argue that the Fraziers' failure to timely file their 2011 return was due to reasonable cause and not willful neglect because they relied on Trombetta to file their income tax return. Because the

**[\*159]** failure of an accountant to prepare a taxpayer's return is not reasonable cause for a failure to timely file, the Fraziers' alleged reliance on Trombetta is not reasonable cause for their failure to timely file their 2011 return. *See Logan Lumber Co.*, 365 F.2d at 854.

Therefore, we hold that the Fraziers did not have reasonable cause for their failing to timely file their 2011 income tax return. Accordingly, the Fraziers are liable for the section 6651(a)(1) addition to tax for failure to timely file their 2011 income tax return. The section 6651(a)(1) addition to tax is 5% of the correct amount of tax, plus another 5% of the correct amount of tax for each month or fraction of a month the failure to file continues, "reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return," and not to exceed 25% in the aggregate. § 6651(a)(1), (b)(1). The Fraziers' correct amount of tax for 2011 resulting from conclusions in this Opinion will be computed under Rule 155. This correct amount of tax must be reduced by $162,145, the amount of tax that the Fraziers paid before the due date of their 2010 return. *See* § 6651(b)(1).

4.     *For 2012, the Fraziers are not liable for the section 6651(a)(1) addition to tax.*

The Fraziers did not file an income tax return for 2012. Therefore, the Fraziers are liable for the section 6651(a)(1) addition to tax for the 2012 tax year unless they have proven that they had reasonable cause for their failure to file their return and their failure to file was not due to willful neglect. *See* § 6651(a)(1); *Higbee*, 116 T.C. at 446–47.

In 2012 and 2013, William, who was in his mid-70s, suffered from dementia. The Fraziers contend that William's dementia prevented him and Mary from timely filing their 2012 income tax return. Their claim is supported by credible testimony.

Therefore, we hold that, because of William's incapacity from dementia, the Fraziers had reasonable cause for their failing to file their 2012 income tax returns. Accordingly, the Fraziers are not liable for the section 6651(a)(1) addition to tax for failure to timely file their 2012 income tax returns.

**[\*160]** XII.    *The Fraziers' liability for the section 6651(a)(2) addition to tax for 2012*

Section 6651(a)(2) provides that if a taxpayer fails to pay the amount shown as tax on a return on or before the due date for payment, and unless the failure is due to reasonable cause and not due to willful neglect, there is a late-payment addition to tax of 0.5% of the amount shown as tax on the return, with an additional 0.5% of the amount shown as tax on the return added for each additional month or fraction of a month during which the failure to pay continues, not exceeding 25% in the aggregate. Section 6651(c)(2) provides that if the "amount required to be shown as tax on a return"—the correct tax—is less than the amount shown as tax on a return, the correct tax is used in calculating the addition to tax under section 6651(a)(2) instead of the amount shown as tax on the return.

The due date for payment is generally the same as the unextended due date for filing the return. § 6151(a). For calendar-year individual taxpayers, the return is due on April 15. § 6072(a); Treas. Reg. §§ 1.6072-1(a)(1), 1.6081-1(a); *see also* § 7503 (extending April 15 deadline for holidays and weekends).

When a taxpayer does not file a return for the tax year at issue, the IRS can prepare a substitute for return, pursuant to section 6020(b), which is treated as the return for purposes of section 6651(a)(2). § 6651(g)(2). In instances in which the IRS prepared a substitute for return under section 6020(b), the amount of tax due as shown on the substitute for return is considered the tax shown on the return for purposes of section 6651(a)(2). § 6651(g)(2).

Treasury Regulation § 301.6020-1(b)(2) sets forth the requirements that a document must meet to be a substitute for return under section 6020(b):

> A document (or set of documents) signed by the Commissioner or other authorized Internal Revenue Officer or employee shall be a return . . . if the document (or set of documents) identifies the taxpayer by name and taxpayer identification number, contains sufficient information from which to compute the taxpayer's tax liability, and purports to be a return.

Thus, a document or set of documents is a substitute for return for purposes of section 6020(b) if it (1) is signed by the Commissioner or

**[\*161]** other authorized employee, (2) identifies the taxpayer by name and taxpayer identification number, (3) contains sufficient information to compute the taxpayer's tax liability, and (4) purports to be a return. *See id.*

Regarding the signature requirement of Treasury Regulation § 301.6020-1(b)(2), the regulation provides:

> A return may be signed by the name or title of an Internal Revenue Officer or employee being handwritten, stamped, typed, printed or otherwise mechanically affixed to the return, so long as that name or title was placed on the document to signify that the Internal Revenue Officer or employee adopted the document as a return for the taxpayer. The document and signature may be in written or electronic form.

Section 6651(b)(2) provides that the amount of tax shown on the return is, for purposes of computing the addition for any month, reduced by the amount of any part of the tax paid on or before the beginning of the month and by the amount of any credit against the tax reported on the return.

For individual taxpayers, the IRS has the burden of producing evidence that the addition to tax under section 6651(a)(2) is appropriate. § 7491(c). The IRS can satisfy its burden of production with evidence that it prepared a valid substitute for return under 6020(b) and that the taxpayer failed to pay the tax shown on the substitute for return. *Wheeler*, 127 T.C. at 210.

Once the IRS has satisfied its burden of production, the taxpayer has the burden to prove that the addition to tax is not appropriate. *McLaine v. Commissioner*, 138 T.C. 228, 245 (2012), *as amended* (June 7, 2012) (citing *Higbee,* 116 T.C. at 447). This burden includes the burden of proving that the failure to pay was due to reasonable cause and not due to willful neglect. *See* § 6651(a)(2). Treasury Regulation § 301.6651-1(c) provides the standard as to what constitutes reasonable cause for failing to pay:

> A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax

**[\*162]** or would suffer an undue hardship . . . if he paid on the due date.

The regulation further provides that in evaluating whether this showing is made "consideration will be given to all the facts and circumstances of the taxpayer's financial situation". *Id.*

> A. *Petitioners waived the argument that (1) the IRS did not prepare a valid substitute for return under section 6020(b) and (2) the IRS has not produced evidence that it prepared such a return.*

The notices of deficiency included documents that can qualify as substitutes for returns under 6020(b) if they were signed. The Fraziers did not file returns for 2012 and the IRS prepared separate notices of deficiency for William and Mary for 2012. The Forms 4549-A, Income Tax Examination Changes, and attached Forms 886-A, Explanation of Items, incorporated in each of the Fraziers' 2012 notices of deficiency meet all but one of the requirements of Treasury Regulation § 301.6020-1(b)(2)—they identify the taxpayer by name and taxpayer identification number and contain sufficient information to compute the taxpayer's tax liability. However, they do not meet the signature requirement. Treas. Reg. § 301.6020-1(b)(2). On neither of the Forms 4549-A nor the Forms 886-A is a "name or title . . . placed on the document to signify that the Internal Revenue Officer or employee adopted the document as a return for the taxpayer." *Id.*

The notices of deficiency determined that valid substitutes for returns had been prepared on February 12, 2015, which was the same date the notices of deficiency were prepared, and that the tax shown on the substitutes for returns was $455,057 for William and $451,185 for Mary (before accounting for timely payments and credits against tax).

Petitioners and the IRS stipulated that the IRS filed substitutes for returns pursuant to section 6020(b) for the Fraziers individually for 2012. Although the stipulation does not specify that the substitutes for returns consist of documents in the notices of deficiency (the Forms 4549-A and 886-A) or specify the amount of tax shown on the substitutes for returns, petitioners did not dispute (on brief or otherwise) the determinations in the notices of deficiency that the substitutes for returns were prepared on February 12, 2015, and that the tax shown on the substitutes for returns was $455,057 for William and $451,185 for Mary.

[*163]  The IRS can satisfy its burden of production with evidence that it prepared a valid substitute for return under 6020(b) and that the taxpayer failed to pay the tax shown on the substitute for return. *Wheeler*, 127 T.C. at 210. Because the parties stipulated that the IRS filed substitutes for returns pursuant to section 6020(b) and because petitioners did not argue (on brief or otherwise) that the substitutes for returns referenced in the stipulation did not meet the requirements of Treasury Regulation § 301.6020-1(b)(2), we hold that petitioners waived the argument that the IRS did not prepare valid substitutes for returns under 6020(b) and we treat the Forms 4549-A and 886-A prepared for William and Mary as their substitutes for returns. Petitioners did not pay the tax shown on the substitutes for returns, hence the IRS has satisfied its burden of production. *See* § 7491(c).

B.  *For 2012, should the Rule 155 computations show a positive amount as the correct amount of tax, the Fraziers are liable for the section 6651(a)(2) addition to tax.*

The amount of tax shown on the returns under section 6651(a)(2) (accounting for section 6651(c)(2) and 6651(b)), if any, will be determined under Rule 155. Should the Rule 155 computations show a positive amount, the Fraziers are liable for the section 6651(a)(2) addition to tax for the 2012 tax year unless they have proven that they had reasonable cause for their failure to pay. *See* § 6651(a)(2); *see also McLaine*, 138 T.C. at 245–46 (taxpayer bears the burden of proving reasonable cause for section 6651(a)(2) additions to tax).

As to the Fraziers' liability for the addition to tax under 6651(a)(2), petitioners make the general statement that "Delinquency Penalties Should Not Apply" and that "penalties set forth in IRC Section 6651(a)(1) and IRC Section 6651(a)(2) should not be imposed." However, all their specific arguments in support of this general statement go to late *filing* under 6651(a)(1) not late *payment* under 6651(a)(2). To prove, under 6651(a)(2), that the failure to pay was due to reasonable cause and not due to willful neglect the petitioner must show "that he exercised ordinary business care and prudence in providing for *payment* of his tax liability and was nevertheless either unable to *pay* the tax or would suffer an undue hardship . . . ." Treas. Reg. § 301.6651-1(c) (emphasis added). The Fraziers provide no explanation for their failure to pay, such as an argument based on their financial situation or that they would have faced an undue hardship if they paid on the due date. *See id.* Therefore, the Fraziers have not argued that that they had reasonable cause for their failure to pay. *See* § 6651(a)(2).

**[\*164]** XIII. *LHDC's liability for section 6662 accuracy-related penalties*

Section 6662(a) and (b)(2) imposes a 20% penalty on the portion of an underpayment of tax attributable to a substantial understatement of income tax. An understatement of income tax is the excess of (1) the correct tax minus (2) the tax reported minus any rebate. § 6662(d)(2)(A). For a corporation (other than an S corporation or a personal holding company)

> there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the lesser of—
> > (i) 10 percent of the tax required to be shown on the return for the taxable year (or, if greater, $10,000), or
> > (ii) $10,000,000.

§ 6662(d)(1)(B).

An underpayment is the amount by which the correct tax exceeds the excess of (1) the sum of (a) the tax reported plus (b) amounts not so reported that were previously assessed (or collected without assessment) minus (2) any rebates made. § 6664(a); Treas. Reg. § 1.6664-2(a) and (b).

Section 6751(b) provides that the initial determination to impose certain types of penalties (including accuracy-related penalties under section 6662) must generally be personally approved in writing by the immediate supervisor of the person making the determination. *See Graev*, 149 T.C. at 493.

Unlike for individual taxpayers, the IRS does not have the burden of production with respect to section 6662(a) accuracy-related penalties asserted against corporate taxpayers. § 7941(c) ("[T]he Secretary shall have the burden of production in any court proceeding with respect to the liability of any *individual* for any penalty [or] addition to tax . . . ." (emphasis added)); *see also NT, Inc. v. Commissioner*, 126 T.C. at 194–95; *Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 231–32 (2018). A corporate taxpayer has the burden of production, *NT, Inc.*, 126 T.C. at 194. As with individual taxpayers, a corporate taxpayer has the burden of persuasion. *Cozzi*, 88 T.C. at 443 n.8.

Section 6664(c)(1) provides that the penalty under section 6662(a) does not apply to any portion of the underpayment to the extent that the taxpayer had reasonable cause for that portion of the underpayment and

**[\*165]** acted in good faith with respect to that portion of the underpayment. "Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98 (2000) (citing *Boyle,* 469 U.S. 241), *aff'd,* 299 F.3d 221 (3d Cir. 2002). Good faith reliance on the advice of an independent, competent professional may meet this requirement. Treas. Reg. § 1.6664-4(b)(1); *see also Neonatology*, 115 T.C. at 98. However, the "advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances." Treas. Reg. § 1.6664-4(c)(1)(i). Advice is defined by Treasury Regulation § 1.6664-4(c)(2):

> Advice is any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly, with respect to the imposition of the section 6662 accuracy-related penalty. Advice does not have to be in any particular form.

In *Neonatology*, we held that for a taxpayer to reasonably rely on professional advice so as to possibly negate a section 6662(a) penalty, the taxpayer must prove by a preponderance of the evidence that "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." 115 T.C. at 99. We also held that "[t]he mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein." *Id.* at 100.

> The parties stipulate that for all petitioners (including LHDC),

> [t]he requirements of I.R.C. § 6751(b)(1) have been satisfied with respect to the application of the I.R.C. § 6662(a) penalties for all taxable years at issue to the extent, and only to the extent, such penalties are exclusively related to the portion of any underpayment which is attributable to any substantial understatement of income tax pursuant to I.R.C. § 6662(b)(2) and I.R.C. § 6662(d).

**[\*166]** Thus, we hold that the supervisory-approval requirements of section 6751(b)(1) have been met for all taxable years at issue with respect to the application of the section 6662(a) accuracy-related penalty attributable to substantial understatements of income tax.

A. *For 2009, if Rule 155 computations show a substantial understatement, LHDC is liable for the section 6662(a) penalty for the entire underpayment.*

There is an underpayment only if the correct tax exceeds the tax reported minus any rebates made.[73] The tax reported is $50,681, the amount that LHDC reported on its 2009 return. There was a $43,099 rebate in the form of a refund received.[74] *See supra* FINDINGS OF FACT Part XVIII.B.1 note 39 and accompanying text. The correct tax is the result of our holdings and parties' concessions and stipulations. It will be computationally determined by the Court after the parties submit their Rule 155 computations. LHDC overreported income by including the $2,165,000 cash distribution from Louisiana Assisted. We hold that this amount is not includable in LHDC's income because neither petitioners nor the IRS asserts that this cash distribution exceeded LHDC's outside basis in Louisiana Assisted immediately before the distribution. *See* § 731(a)(1). *See supra* OPINION Part II.B.1.b.

LHDC underreported income by failing to include the $2,987,744 distributive share of Louisiana Assisted's nonseparately stated income and $3,156 distributive share of Louisiana Assisted's separately stated interest income. These amounts were includable because LHDC was the true member of Louisiana Assisted in 2009. *See supra* OPINION Part I.B. LHDC also underreported income by failing to report the $3,316 of interest income from BanCorp South, the $144 of dividend income from Intel Corporation, and the $3,588 of rental income from Jefferson Parish.

---

[73] For 2009, there were no "amounts not so reported that were previously assessed (or collected without assessment)." § 6664(a)(1)(B).

[74] In calculating an underpayment under section 6664 and an understatement under 6662, refunds received are treated as rebates to the extent that they were made on the ground that the tax imposed was less than the excess of the sum of the amount shown as the tax by the taxpayer on its return, plus amounts not so shown previously assessed (or collected without assessment) over rebates previously made. *See* § 6664(a)(2); *Pesch,* 78 T.C. at 110–13; *see also Galloway*, 149 T.C. at 414, 418–19; *Baldwin*, 97 T.C. at 709–10.

**[\*167]** As a result, LHDC underreported income by \$832,948 (\$2,987,744 + \$3,156 + \$3,316 + \$144 + \$3,588 − \$2,165,000). It follows that the correct tax is greater than the tax reported (\$50,681). This means that the correct tax is also greater than the tax reported (\$50,681) minus rebates (\$43,000).[75] Thus, there is an underpayment.

There is an understatement for 2009 if the correct tax exceeds the tax reported minus any rebates made.[76] § 6662(d)(2)(A). The tax reported is \$50,681, and there was a \$43,099 rebate in the form of a refund received.[77] Thus, there is an understatement for 2009. An understatement is "substantial" under section 6662(d)(1)(B) if it "exceeds the lesser of—(i) 10 percent of the tax required to be shown on the return for the taxable year (or, if greater, \$10,000), or (ii) \$10,000,000." This will be computationally determined by the Court after the parties submit their Rule 155 computations.

If there is a substantial understatement for 2009, LHDC is liable for the section 6662(a) penalty for the entire underpayment except to the extent that any portion of the underpayment is due to reasonable cause and for which LHDC acted in good faith.

LHDC failed to set forth any reasonable-cause-and-good-faith-argument regarding its failure to report the \$3,316 of interest income from BanCorp South, the \$144 of dividend income from Intel Corporation, and the \$3,588 of rental income from Jefferson Parish.

LHDC argues that the section 6662(a) penalty should not apply because it had reasonable cause and acted in good faith by allegedly relying on professional advice from Trombetta. It asserts that Trombetta advised it that because it was the true member of Louisiana Assisted it (1) should not include the \$2,987,744 distributive share of nonseparately stated income of Louisiana Assisted and the \$3,156 separately stated interest income of Louisiana Assisted, and (2) should instead include a

---

[75] In calculating an underpayment under section 6664 and an understatement under 6662, refunds received are treated as rebates to the extent that they were made on the ground that the tax imposed was less than the excess of the sum of the amount shown as the tax by the taxpayer on its return, plus amounts not so shown previously assessed (or collected without assessment) over rebates previously made. *See* § 6664(a)(2); *Pesch,* 78 T.C. at 110–13; *see also Galloway*, 149 T.C. at 414, 418–19; *Baldwin*, 97 T.C. at 709–10.

[76] For 2009, there were no "amounts not so reported that were previously assessed (or collected without assessment)." § 6664(a)(1)(B).

[77] *See supra* OPINION Part X.A note 64.

**[\*168]** lesser amount, $2,165,000, representing a cash distribution from Louisiana Assisted. However, the record does not indicate that Trombetta gave this advice. Trombetta prepared LHDC's tax returns. However, "[t]he mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein." *Neonatology*, 115 T.C. at 100. Petitioners have failed to show that Trombetta gave advice, meaning "any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion" to not include this income from Louisiana Assisted. *See* Treas. Reg. 1.6664-4(c)(2).

Petitioners bear the burden of proving reasonable cause, which they have not carried. We hold that LHDC did not have reasonable cause for failing to include the $2,987,744 distributive share of nonseparately stated income of Louisiana Assisted and the $3,156 separately stated interest income of Louisiana Assisted.

If Rule 155 computations show a substantial understatement for 2009, LHDC is liable for the section 6662(a) penalty for the entire underpayment for the year.

B. *For 2010, LHDC is not liable for the accuracy-related penalty under section 6662(a).*

There is no underpayment of tax for 2010. An underpayment is the excess of the correct tax over the tax reported.[78] The tax reported is $0, the amount that LHDC reported on its 2010 return.

Although the notice of deficiency disallowed $424,935 of LHDC's salary-and-wage deductions, we held *supra* OPINION Part III that LHDC is entitled to deduct the $424,935. Thus, LHDC's 2010 return did not underreport income in claiming the $424,935 deduction.

LHDC overreported income by incorrectly including the $765,000 cash distribution from Louisiana Assisted. We hold that this amount is not includable in LHDC's income because neither petitioners nor the IRS asserts that this cash distribution exceeded LHDC's outside basis in Louisiana Assisted immediately before the distribution. *See* § 731(a)(1). *See supra* OPINION Part II.B.2.b.

---

[78] For 2010, there were no "amounts not so reported that were previously assessed (or collected without assessment)," § 6664(a)(1)(B), or "rebates made," § 6664(a)(2).

**[\*169]** LHDC underreported income by failing to include the $643,165 distributive share of Louisiana Assisted's nonseparately stated income and the $3,392 distributive share of Louisiana Assisted's separately stated interest income. These amounts were includable in LHDC's income because LHDC was the true member of Louisiana Assisted in 2010. *See supra* OPINION Part II.B.2.b. LHDC also underreported income by failing to report $935 of interest income from BanCorp South and $167 of dividend income from Intel. As a result, LHDC overreported income by $117,341 ($765,000 − ($643,165 + $3,392 + $935 + $167)). Because the return overreported income, the tax reported on the return exceeded the correct tax. Thus, there is no underpayment. Because there is no underpayment of tax for 2010, LHDC is not liable for the accuracy-related penalty under section 6662(a) for 2010.

Although petitioners put forth a reasonable cause argument for all section 6662(a) penalties for LHDC for all tax years, we need not address this argument for LHDC for 2010 because LHDC is not liable for the accuracy-related penalty under section 6662(a) for 2010.

C.  *For 2011, LHDC is not liable for the accuracy-related penalty under section 6662(a).*

There is no underpayment of tax for 2011. There is an underpayment only if the correct tax exceeds the tax reported minus any rebates made.[79] The tax reported is $2,742—the amount that LHDC reported on its 2011 return. There was a $2,742 rebate in the form of a refund received.[80] *See supra* FINDINGS OF FACT Part XVIII.B.1 note 39 and accompanying text.

Although the notice of deficiency disallowed $358,922 of LHDC's salary-and-wage deductions and $158,993 of LHDC's professional-fee deductions, we held *supra* OPINION Part III that LHDC is entitled to deduct the $358,922 and $158,993. Thus, LHDC's 2011 return did not

---

[79] For 2011, there were no "amounts not so reported that were previously assessed (or collected without assessment)." § 6664(a)(1)(B).

[80] In calculating an underpayment under section 6664 and in calculating an understatement under 6662, refunds received are treated as rebates to the extent that they were made on the ground that the tax imposed was less than the excess of the sum of the amount shown as the tax by the taxpayer on its return, plus amounts not so shown previously assessed (or collected without assessment) over rebates previously made. *See* § 6664(a)(2); *Pesch*, 78 T.C. at 110–13; *see also Galloway*, 149 T.C. at 414, 418–19; *Baldwin*, 97 T.C. at 709–10.

[*170] underreport income in claiming the $358,922 and $158,993 deductions.

LHDC overreported income by incorrectly including the $450,000 cash distribution from Louisiana Assisted. We hold that this amount is not includable in LHDC's income because neither petitioners nor the IRS asserts that this cash distribution exceeded LHDC's outside basis in Louisiana Assisted immediately before the distribution. *See* § 731(a)(1). *See supra* OPINION Part II.B.3.b. LHDC also overreported income because it did not deduct the $7,586 distributive share of Louisiana Assisted's nonseparately stated loss from its 2011 income. LHDC was entitled to deduct this loss because LHDC was the true member of Louisiana Assisted in 2011. *See supra* OPINION Part II.B.3.b.

LHDC underreported income by failing to include the $1,839 distributive share of Louisiana Assisted's separately stated interest income. This amount was includable in LHDC's income because LHDC was the true member of Louisiana Assisted in 2011. *See supra* OPINION Part II.B.3.b. LHDC also failed to report $1,195 of interest income from BanCorp and $214 of dividend income from Intel. As a result, LHDC overreported income by $454,338 ($450,000 + $7,586 − ($1,839 + $1,195 + $214)). Therefore, the correct tax is less than the reported tax. It follows that the correct tax is also less than the reported tax minus the $2,742 rebate. Thus, there is no underpayment. There is no penalty under section 6662(a) if there is no underpayment of tax. Because there is no underpayment of tax for 2011, LHDC is not liable for the accuracy-related penalty under section 6662(a) for 2011.

Although petitioners put forth a reasonable cause argument for all section 6662(a) penalties for LHDC for all tax years, we need not address this argument for LHDC for 2011 because LHDC is not liable for the accuracy-related penalty under section 6662(a) for 2011.

XIV. *LHDC's liability for section 6651(a)(1) additions to tax*

Every corporation subject to taxation under subtitle A[81] must file a federal income tax return. § 6012(a)(2). Section 6651(a)(1) imposes an

---

[81] Subtitle A, "Income Taxes," comprises sections 1–1564 of the Internal Revenue Code. It includes section 11, which imposes a tax on every corporation (with certain exceptions not relevant here). The tax imposed on LHDC is the section 11 corporate tax, and the tax return that was untimely filed is Form 1120, U.S. Corporation Income Tax Return.

**[\*171]** addition to tax for the failure to file a tax return by its filing deadline (determined by taking into account any extensions of that deadline). The section 6651(a)(1) addition to tax is 5% of the correct tax for each month the failure to file continues, not to exceed 25% in the aggregate. § 6651(a)(1), (b)(1); *see also* Treas. Reg. § 301.6651-1(b). Section 6651(b)(1) provides that the correct tax is "reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return," including amounts withheld for federal income tax. *See* § 31(a).

As with the section 6662(a) accuracy-related penalty, the IRS does not have the burden of production with respect to section 6651(a)(1) additions to tax asserted against corporate taxpayers. § 7941(c); *see NT, Inc.*, 126 T.C. at 194–95.

A corporate taxpayer has the burden of proof, *NT, Inc.,* 126 T.C. at 194. The burden of proof includes the burden of establishing that the failure to timely file is due to reasonable cause and not due to willful neglect. *See* § 6651(a)(1). The delay is due to a "reasonable cause" if "the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time." Treas. Reg. § 301.6651-1(c). "Willful neglect" is "conscious, intentional failure or reckless indifference." *Boyle*, 469 U.S. at 245. Whether there was reasonable cause (and no willful neglect) is a question of fact "answered on the basis of the circumstances of the individual case." *Grecian Magnesite Mining, Indus. & Shipping Co.*, 149 T.C. at 94; *accord Boyle* 469 U.S. at 249 n.8.

The failure of an accountant or lawyer to prepare a taxpayer's return is not in and of itself reasonable cause for a failure to timely file. *Logan Lumber Co.*, 365 F.2d at 854; *see also Boyle*, 469 U.S. at 251.

A. *For 2009, LHDC is liable for the section 6651(a)(1) addition to tax.*

LHDC's 2009 income tax return was due on September 15, 2010, but was not filed until February 28, 2011. Because LHDC filed the return more than five months after its due date, it is liable for the maximum 25% section 6651(a)(1) addition to tax for the 2009 tax year unless it has proven that it had reasonable cause for its failure to timely file and its failure was not due to willful neglect. *See* § 6651(a)(1); *Higbee*, 116 T.C. at 446–47.

**[\*172]** Petitioners argue that LHDC's failure to timely file its 2010 return was due to reasonable cause and not willful neglect because it relied on Trombetta to timely file its income tax return. The failure of an accountant to prepare a taxpayer's return is not reasonable cause for a failure to timely file. *See Logan Lumber Co.*, 365 F.2d at 854. LHDC's alleged reliance on Trombetta is not reasonable cause for its failure to timely file its 2009 return.[82]

We find that LHDC did not have reasonable cause for failing to timely file its 2009 income tax return. Accordingly, we hold that LHDC is liable for the section 6651(a)(1) addition to tax for failure to timely file its 2009 income tax return. LHDC's correct amount of tax for 2009 resulting from the conclusions in this Opinion will be computed under Rule 155. This correct amount of tax must be reduced by $47,761, the amount of tax that LHDC paid in 2009 before the due date of its 2009 return. *See* § 6651(b)(1).

B.      *For 2010, LHDC is liable for the section 6651(a)(1) addition to tax.*

LHDC's 2010 income tax return was due on September 15, 2011, but was not filed until November 16, 2011. Two months of addition to tax is calculated because LHDC filed its return two months after its due date. Treas. Reg. § 301.6651-1(b). Therefore, LHDC is liable for a 10% section 6651(a)(1) addition to tax for the 2010 tax year unless it has proven that it had reasonable cause for its failure to timely file and its failure was not due to willful neglect. *See* § 6651(a)(1); *Higbee*, 116 T.C. at 446–47.

LHDC argues that it relied on Trombetta to timely file its income tax return. The failure of an accountant to prepare a taxpayer's return is not reasonable cause for a failure to timely file. *See Logan Lumber*

---

[82] LHDC also argues that the Court ought to grant it relief from its 2009 section 6651(a)(1) addition to tax under the policy allowing an abatement of penalties for the first time a taxpayer fails to file a return set forth in the Internal Revenue Manual 20.1.1.3.6.1. (Nov. 25, 2011). The Internal Revenue Manual provides the IRS's intra-agency operating procedures. The provisions of the Internal Revenue Manual do not confer judicially enforceable rights on taxpayers. *Valen Mfg. Co.*, 90 F.3d at 1194; *Horne*, 714 F.2d at 207; *see also Caceres*, 440 U.S. at 750–51. Therefore, we cannot grant LHDC the relief that it seeks.

**[\*173]** *Co.*, 365 F.2d at 854. LHDCs' alleged reliance on Trombetta is not reasonable cause for its failure to timely file its 2010 return.

We hold that LHDC did not have reasonable cause for failing to timely file its 2010 income tax return. Accordingly, we hold that LHDC is liable for the section 6651(a)(1) addition to tax for failure to timely file its 2010 income tax return. LHDC's correct amount of tax for 2010 resulting from the conclusions in this Opinion will be computed under Rule 155.[83]

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[83] LHDC did not make any payments prior to the date its return was due or have any tax withholdings in 2010 with which to reduce its section 6651(a)(1) addition to tax. *See* § 6651(b)(1).